## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.*, BARBARA BERNIER, §§§§ | |
| Plaintiff/Relator, §§ | Case No.: 0:16-CV-970-DA-370AD |
| vs. §§ | **COMPLAINT** |
| INFILAW CORPORATION, a Florida corporation; and CHARLOTTE SCHOOL OF LAW, LLC, a foreign limited liability company, §§§§§§ | **FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** |
| Defendants. §§§ | **JURY TRIAL DEMANDED** |

Relator, BARBARA BERNIER, files suit on behalf of the UNITED STATES OF

AMERICA against Defendants, INFILAW CORPORATION (Infilaw) and CHARLOTTE

SCHOOL OF LAW (CSOL), and alleges:

### NATURE OF THE ACTION

1. This is a *qui tam* action, pursuant to the False Claims Act, 31 U.S.C. § 3729, *et*

*seq.*, to recover damages from false claims Defendants made to the United States Department of

Education, in violation of Title IV of the Higher Education Act (HEA), 20 U.S.C. §§ 1070, *et*

*seq.*, to receive payment directly or indirectly from the United States Department of the

Treasury. The fraudulent conduct underlying the allegations herein likely exceeds the sum of

$500 million dollars.

### PARTIES

2. Relator, BARBARA BERNIER, is *sui juris* and is an adult citizen of the State of

North Carolina. At all times material, Bernier was and is a Professor of Law at CSOL and is the

S-1

original source of the allegations contained herein. CSOL hired Relator as a Professor of Law, effective January 1, 2013. Relator originally earned tenure in 1996 at a different law school, and such tenure was formalized at CSOL on May 5, 2014. At CSOL, Relator instructs law students in Constitutional Law, First Amendment, Property, International Comparative Law, and Ethics. Bernier brings this action on behalf of the UNITED STATES OF AMERICA, pursuant to 31 U.S.C. § 3730(b)(2). Bernier, in filing this action, has engaged in protected conduct, pursuant to 31 U.S.C. § 3730(h), because the allegations contained herein are sufficient to support a reasonable conclusion that Infilaw and CSOL could fear being reported to the federal government for fraud or sued in a *qui tam* action.

      3.     Defendant, INFILAW CORPORATION, is a domestic corporation organized under the laws of the State of Florida, with its principal place of business located in Florida. At all times material, Infilaw's managerial employees acted within the scopes of their employment and knowingly furthered the conduct described herein, in prohibition of the False Claims Act.

      4.     Defendant, CSOL, is a foreign limited liability company organized under the laws of the State of North Carolina. CSOL has six members: (a) JAY CONISON is *sui juris* and is an adult citizen of North Carolina; (b) SHIRLEY FULTON is *sui juris* and is an adult citizen of North Carolina; (c) JAMES J. HANKS, JR. is *sui juris* and is an adult citizen of the State of Maryland; (d) INFILAW CORPORATION is a Florida corporation with its principal place of business located in Florida; (e) CHIDI OGENE is *sui juris* and is an adult citizen of North Carolina; and, (f) TOM WIPPMAN is *sui juris* and is an adult citizen of the State of Illinois. At all times material, CSOL's managerial employees acted within the scopes of their employment and knowingly furthered the conduct described herein, in prohibition of the False Claims Act.

## JURISDICTION

2

5.     The court has jurisdiction over the subject matter in this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, because this action arises under the laws of the United States, and this action involves a false claim made to the United States.

6.     The court has *in personam* jurisdiction over Infilaw and CSOL, pursuant to 31 U.S.C. § 3732, because they can be found and transact business in the State of Florida.

## VENUE

7.     Venue is proper in this court, pursuant to 28 U.S.C. § 1391 and 31 U.S.C. § 3732, because at least one of the Defendants reside in this judicial district and acts proscribed by 31 U.S.C. § 3729 occurred in this judicial district.

## FACTUAL ALLEGATIONS

### *The Higher Education Act*

8.     Under Title IV of the HEA, the federal government operates a number of programs that disburse financial aid to students to help defray the costs of higher education. These programs include the Federal Pell Grant, the Federal Family Educational Loan Program, William D. Ford Federal Direct Loan Program, the Federal Perkins Loan, and the Graduate PLUS Loan.  Financial aid disbursed under these programs are only available to students who attend qualifying schools.

9.     Qualifying schools must enter into Program Participation Agreements (PPAs) with the United States Department of Education, which such agreements certify that the qualifying school will adhere to requirements of applicable federal statutes and regulations. Qualifying schools are required to enter into the PPA initially, and then re-affirm their duties, obligations, and promises under the PPA on an annual basis.  Executing the PPA and agreeing to comply with applicable federal statutes and regulations are prerequisites and the *sine qua non* of

3

federal funding for one basic reason: if a qualifying school does not agree to comply with the federal statutes and regulations, then the school will not receive federal student aid under Title IV of the HEA.

10.     Qualifying schools must also obtain accreditation from an approved accrediting agency that is recognized by the United States Secretary of Education. The Section of Legal Education and Admissions to the Bar of the American Bar Association (ABA) is the recognized accrediting agency for programs that lead to the degree of juris doctor.

11.     Becoming a qualifying school is significant, as it then allows students attending a qualifying school to obtain 100% financing of their higher education from the federal government.

12.     Under the HEA, an accredited law school must agree that it will not award recruiters any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments.

13.     In addition, accredited law schools, as proprietary institutions of higher education, must agree that it will derive not less than ten percent of its revenues from sources other than funds provided under Title IV of the HEA. This is known as the "90/10 rule."

14.     The HEA requires law schools to review their students' academic progress at the end of each academic period. In order to be eligible for continuing federal financial aid, students must achieve academic standing that is consistent with the institution's requirements for graduation.

15.     The HEA also requires that, in the case of institutions that advertise job placement rates as a means of attracting students to enroll in the institution, the institution will make available to prospective students, at or before the time of application (a) the most recent available

4

data concerning employment statistics, graduation statistics, and any other information necessary to substantiate the truthfulness of the advertisements, and (b) relevant State licensing requirements of the State in which such institution is located for any job for which the course of instruction is designed to prepare such prospective students.

16.    In addition, the HEA requires that, in the case of an institution that participates in federal loan programs under Title 20 of the United States Code, the institution will develop a code of conduct, with which the institution's officers, employees, and agents shall comply, that prohibits a conflict of interest with the responsibilities of an officer, employee, or agent of an institution with respect to such loans; publish such code of conduct prominently on the institution's website; and, administer and enforce such code of conduct by, at a minimum, requiring that all of the institution's officers, employees, and agents with responsibilities with respect to such loans be annually informed of the provisions of the code of conduct.

17.    The United States Department of Education requires that any funded program at a qualified school should enable a graduate to earn a sufficient income to service the debt of the program within specific parameters of disposable income percentages.

18.    Under ABA Rule 205(b), the dean and faculty of a law school shall jointly formulate and administer admissions decisions and academic standards for retention. As stated by Interpretation 205-2 to Rule 205(b), "[a]dmission of a student to a law school without the approval of the dean and faculty of the law school violates the [ABA] Standards."

19.    Under ABA 501(b), a law school should not admit applicants who do not appear capable of satisfactorily completing its program of legal education and being admitted to the bar. As stated by Interpretation 501-1 to Rule 501(b), "in assessing compliance with Standard 501(b) are the academic and admission test credentials of the law school's entering students, the

5

academic attrition rate of the law school's students, the bar passage rate of its graduates, and the effectiveness of the law school's academic support program." Interpretation 501-4 to Rule 501(b) states that "[a] law school may not permit financial considerations detrimentally to affect its admission and retention policies and their administration. A law school may face a conflict of interest whenever the exercise of sound judgment in the application of admission policies or academic standards and retention policies might reduce enrollment below the level necessary to support the program."

### *Infilaw Corporation*

20.     Legal education is like no other institution of higher learning. It is highly profitable for the school itself, parent institution or university—public or private. Law schools have always provided a high return on investment or expense. Most law school graduates know little about the business of the school, how it is governed, accredited, and what regulatory structure might apply.

21.     Infilaw organized under Florida law in 2006. Infilaw was created to acquire the Florida Coastal School of Law.

22.     Infilaw is a for-profit corporation; it is not an academic institution. Infilaw's for-profit framework and culture dominate academic issues, and profitability is determinative.

23.     Early in its history, Infilaw held itself out to prospective faculty that it was an environment that valued ideas, experience and entrepreneurial initiative. Infilaw bought legitimacy for its three private law schools through the credentials of faculty it recruited. Now, Infilaw has little, if any, respect for academically accomplished faculty.

24.     Infilaw recruited several Board members and Officers with significant connections to high-levels of the ABA, including Dennis Archer, the present Chair of the ABA

6

Counsel on Legal Education and former Chair of the ABA Task Force for Student Financial Aid. Within the ABA, Archer has duties concerning accreditation and financial reviews of law schools. Archer currently sits on the Board of Infilaw.

25.     Infilaw is self-described as "a consortium that includes an independent network of ABA-approved law schools and companies that provide management solutions, new educational programs, and pioneering, technology-driven course delivery to law schools and higher education institutions nationally and internationally."

26.     Infilaw describes its mission as "to establish the benchmark of inclusive excellence in professional education for the 21st Century," which is allegedly supported by three key pillars (a) centering on "serving the underserved," (b) providing an education that is "student-outcome centered," and (c) graduating students who are "practice-ready."

27.     As a marketing function and response for creating law programs that do not specifically follow a traditional model, Infilaw asserts that their programs are "disruptive" to legal education and law professors. The company uses this "disruption" model to describe its operating model as challenging that of long standing more highly ranked law schools. Under this umbrella of marketing, Infilaw focuses its alleged academic programs as ones that immediately place its graduates into the stream of commerce. This model is offered comparatively to traditional "theory only" programs, that allegedly do not prepare graduates for immediate practice competencies.

28.     Infilaw has several private investors, one of whom is the Sterling Partners, a Chicago based venture capital firm with a portfolio valued at more than $4 billion. Sterling Partners holds several investments in the education and education management sectors.

29.    Infilaw is interconnected with Sterling Partners through its Chief Executive Officer, Rick Inatome, who currently sits on the Board of Sterling Partners.

30.    Sterling Partners' owns an 88% position in Infilaw, and states that it is "well positioned to benefit from future liquidity opportunities as [Infilaw's] business continues to grow." According to Sterling Partners, Infilaw enjoys 90+% job placement and bar passage rates at each of its law schools. This representation, however, is not accurate for the reasons stated below.

31.    Infilaw owns three private, for-profit law schools: Florida Coastal School of Law, located in Jacksonville, Florida; Arizona Summit School of Law, located in Phoenix, Arizona; and, CSOL, located in Charlotte, North Carolina. Infilaw collectively refers to these three law schools as the "Consortium of Law Schools."

32.    The law student admission profiles at the Consortium of Law Schools is virtually identical.

33.    Within Infilaw, employees informally refer to the corporate headquarters as "Central Services," which provides a variety of services to the Consortium of Law Schools and their employees, including marketing, information technology, management services, educational design, human resources and employee benefit services.

34.    The Consortium of Law Schools are not autonomous; each law school strictly adheres to Infilaw's policies and procedures. Infilaw executives are present at every law school, including CSOL, as a "President," who have superior rank over the Dean of each of the Consortium of Law Schools. Thus, Infilaw directly controls all significant financial and managerial decisions at the Consortium of Law Schools. Within the past year, Infilaw has replaced all employees of the Financial Aid Office staff at CSOL with its own employees. This

8

creates a conflict of interest between Infilaw employees and CSOL as to, among other things, improper trust accounting for Title IV funds, as explained below.

35.     The average grade point averages and LSAT scores of incoming first year law students at the Consortium of Law Schools has declined precipitously, while the number of first year students at each school has increased dramatically—all juxtaposed against a significant decline in the number of law student applicants nationwide.

36.     Infilaw's Consortium of Law Schools accepts applicants who not only represent the lowest LSAT percentiles, but who also have amongst the lowest grade point averages nationwide. Although the LSAT proposes to predict only likelihood of success in the first year of law school, according to statistics from the Law School Admission Council (LSAC), the lowest LSAT score ranges correlate more closely with bar exam failures.

37.     Infilaw operates akin to a consulting firm. Many Infilaw employees, including Adam Cota, the Vice President of Academics for the Consortium of Law Schools, has neither educational nor legal training. Vice President Cota is tasked with designing law school curriculum at the Consortium of Law Schools, and is directed by Infilaw to purposefully differ the curriculum from traditional programs at other law schools by restructuring credits earned and by eliminating major topics from core classes. This results in non-transferable course credit, creating an atmosphere where it becomes virtually impossible for CSOL law students to transfer to other law schools after their first year of studies. Where CSOL students make an attempted transfer, Infilaw deploys a law school retention team, whose sole purpose is to stop the transfer by offering financial incentives to the law students.

38.     Aside from the Consortium of Law Schools, Infilaw's portfolio includes Infilaw Management Solutions and iLawVentures.

39.     Infilaw Management Solutions allegedly seeks to engage in services agreements with law schools to build lasting relationships with law schools and universities whereby it focuses on the administrative responsibilities, to enable the law schools to focus their core academic program. Infilaw Management Solutions claims to provide accreditation support, bar preparation programs, career services planning, emotional intelligence workshop facilitation, faculty and staff engagement, management engagement, student acquisition programs, and student engagement.

40.     iLawVentures is allegedly a leading partner for online juris doctor, post-juris doctor, and non-juris doctor programs. iLawVentures claims to diversify revenue streams and build up surpluses that support a law school's core J.D. mission.

41.     Infilaw's most recent acquisitions are Phillips Graduate University (PGU) (formerly Phillips Graduate Institute), a psychology school, and Inspiras California LLC. PGU houses Inspiras California LLC, a shared services company that provides administrative services for Infilaw and the Consortium of Law Schools.

*Infilaw's Trust Accounting*

42.     Federal student aid monies for law students at the Consortium of Law Schools are disbursed electronically by the United States Department of the Treasury into each law school's bank account. The Consortium of Law Schools are paid to administer the loans, and once student enrollment status is confirmed, the law schools deduct tuition and administrative fees owed, and then disburse the remaining balance to law students.

43.     Infilaw instructs the Financial Aid Office staff at CSOL to hold student financial money and not disburse any such funds to students until the course drop-add period closes. But the monies disbursed by the United States Department of the Treasury do not remain in CSOL's

bank account, and thus, are not immediately available for transfer to the law students. Rather, Infilaw accesses the accounts, transfers substantially all of the funds to its own bank accounts and for its own uses in the interim. On one occasion, the Financial Aid Office staff was so concerned that CSOL's bank account was depleted that staff called Infilaw headquarters and were told that such moving of funds was the usual course of business for Infilaw. Thereafter, the Financial Aid Office staff was forced to constantly check the balance of the bank account to monitor when they could write and disburse checks for the law students. Until Infilaw replaced the money in the CSOL bank account, Infilaw instructed the Financial Aid Office staff to tell students that that the "checks were not in yet."

### Formation and Accreditation of CSOL

44.     CSOL opened in 2007.

45.     CSOL is an authorized educational institution by the State of North Carolina.

46.     Since 2007, CSOL has grown to be the largest law school in the State of North Carolina.

47.     CSOL is ranked in the fourth tier of all American law schools. Despite this ranking, CSOL tuition is on par with many first tier American law schools.

48.     The cost of law student tuition at CSOL has increased from $30,000 in 2010 to more than $41,000 in 2015. The total cost per student at CSOL, considering living expenses, fees, and federal loan origination costs was $106,050 in 2010 and more than $134,000 in 2015.

49.     Approximately 90% of graduates from the Consortium of Law Schools have each, conservatively, amassed more than $238,000 in student loan debt, each, based on a calculated full time of study for three years of legal studies, with accrued interest at prevailing rates.

50.    CSOL offers campus-based full-time and part-time juris doctor and masters of laws programs. CSOL also offers a certificate in paralegal studies program, as well as an online corporate compliance certificate program.

51.    CSOL received provisional accreditation from the ABA in 2008 and full accreditation in June 2011. The ABA performed a site inspection of CSOL in 2014.

52.    CSOL law students, since 2011 when the school attained full accreditation through the ABA, have been eligible to obtain 100% financing from the federal government for their entire legal education.

53.    Within three months of becoming fully accredited and site certified, CSOL Dean Jay Conison instituted buy-outs of faculty and staff, which dramatically altered the nature of the law school as it existed at the time when it achieved full accreditation from the ABA. During the first buy-out, in January 2015, more than thirty employees left the law school. And during the Summer 2015 and Spring 2016, CSOL bought out several more faculty members.

54.    Every semester and intercession, Infilaw instructs faculty and staff at CSOL to openly violate copyright laws for course textbooks. As a result of denying CSOL law students their student loan disbursements in a timely manner, students often start the semester without the funds required to purchase course materials and textbooks. In fact, many students do not have text books for several weeks into a semester, which places them at a severe disadvantage. Infilaw and CSOL instruct the faculty and staff to photocopy and post copies of needed chapters online. This can easily be hundreds of pages of materials in the first week alone. Compounding matters further, CSOL Dean Jay Conison cut the CSOL library budget, disallowing any purchase of course textbooks. Most law school libraries typically retain one or two copies of all course books on hand and make them available for students. Any CSOL faculty or staff who points out

this problem are greeted by a response from Infilaw that they are thinking outside of the "Infilaw culture," which is a real threat to the person's employment future.

### Student Admissions at CSOL

55.     CSOL engages in a pattern and practice of admitting academically unqualified students, for the benefit of Infilaw, who has a financial interest in CSOL admitting as many students as possible and obtaining federal financial aid under Title IV of the HEA. After CSOL admitted its first class, Infilaw began to demonstrate an intense drive to increase law student admissions and set aside known, long-standing data from the Law School Admission Council (LSAC), in favor of tripling and quadrupling the first year entering class, even though the national pool of applicants was in sharp decline. Infilaw's acts were financially motivated, rather than academically motivated and in the best interests of CSOL.

56.     LSAC's statistical database is significant. LSAC has shown through its data the historical growth and recent decline in law school applicants—as well as providing certain predictions for future LSAT takers. Given LSAC's history of collecting data, the statistical analysis of the data for the legal education market is accurate. According to the LSAC National Longitudinal Bar Passage Study published in 1998 by LSAC, law school grade point averages and LSAT scores are the best predictors of bar passage rates.

57.     Although there is a CSOL Faculty Admissions Committee, CSOL insulates the Committee so that it does not review all student applications, as is traditionally done in most law schools and required by ABA Rule 205(b). Admissions decisions and the number of law students to admit to CSOL are entirely controlled by Infilaw, and it is in Infilaw's financial interest to admit students, irrespective of their indicators of likely success in law school.

58.     The CSOL Faculty Admissions Committee has very limited involvement in
admission decisions, and is not involved in admissions decisions for academically underqualified
students.  A single member of the faculty is assigned to review student applications from a single
LSAT score group.

59.     The student population at CSOL peaked in 2013, at approximately 1,600 students.
During a period of decreasing numbers of law school applicants nationwide, the student
populations at the Consortium of Law Schools, overall, has grown by 10–18.3% per year until
2014.

60.     Infilaw has repeatedly identified minority students from Historically Black
Colleges and Universities (HBCUs) as a major source of students and a revenue stream.  Infilaw
actively courts HBCU Presidents to promote the Consortium of Law Schools to HBCU students.
For example, in 2013 and 2014, CSOL held recruitment events at Livingston College in
Salisbury, North Carolina.  CSOL indiscriminately admitted approximately 40 students in 2013
and 50 students from 2014 from Livingston College to CSOL.  Both sets of students failed at an
extremely high rate, and most did not make it through a second semester.

61.     The CSOL Admissions Office has a very high rate of employee dismissals at the
end of each recruiting cycle, generally in September of each year.  Prior to the fall admissions
cycle, Infilaw issues an expected class size mandate to the CSOL Admissions Office staff, who
know their jobs are dependent on meeting the admissions number directives.

62.     Many candidates for admission at CSOL are academically unqualified, and would
be improbable candidates for admission in most other law schools. There are a few law schools
that admit applicants from lower statistical tiers, but not as low as those admitted by Infilaw's

Consortium of Law Schools. The median LSAT score for CSOL law students, for example, is 142.

63.     While admission to law school via the LSAT is the norm, CSOL avoids using the LSAT as an admission metric through implementation of its "Alternative Admission Model Placement Law Exam" (AAMPLE), which is marketed as an LSAT admission alternative. For unqualified applicants, this is a second chance at going to law school, as all they must do for admission to CSOL is pass a two class, online program for one month.

64.     Infilaw originally created AAMPLE as a way to increase admissions of minority students at the Consortium of Law Schools, but Infilaw now routinely deploys AAMPLE for general admissions at its law schools, including CSOL. Traditionally, at CSOL, law student admission via AAMPLE amounted to just 10% of all admissions, which was in compliance with the ABA rule limiting the percentage of students admitted through a conditional admission or alternate admission program to a 10% maximum. In 2015, more than 70% of first year law students entering CSOL gained admission through AAMPLE.

65.     Infilaw relies on AAMPLE as an alternate standard for certifying that a student as qualified to study law, and that the student will, more likely than not, pass a bar exam. During a faculty meeting in Spring 2015, the CSOL Director of Bar Preparation disclosed to Relator, and others present at the meeting, that even if a student who enters CSOL through AAMPLE does exceptionally well academically, such students will still only have a 25% chance of passing a bar exam, even if they have achieved a grade point average of 3.2–3.5 at CSOL. The Director also stated that these statistics apply to all students at CSOL, not just those who enter the law school through AAMPLE.

*False Certifications of Students Lacking Satisfactory Academic Progress*

66.     The CSOL student handbook has changed several times since the school launched, generally to downwardly adjust the minimum grade point average that law students must attain before being subject to academic dismissal. The operative student handbook originally required students to attain a grade point average of 2.00 in order to be in good academic standing. Over time, the 2.00 minimum fell to 1.50. Thereafter, the CSOL faculty voted to change the 1.50 minimum back to 1.90.

67.     Based on the requirements of the CSOL student handbook, 157 students at CSOL from Fall 2015 should have been academically dismissed because they failed to achieve the minimum grade point average of 1.90 to remain in good academic standing. In a meeting with CSOL faculty and staff after grades from the Fall 2015 semester grades had been released and recorded, CSOL President Chidi Ogene announced that it was "unacceptable" to Infilaw to fail so many students whose grade point averages fell below the 1.90 standard required to maintain good academic standing.

68.     CSOL President Ogene is an Infilaw executive, and he is Infilaw's former general counsel.

69.     To retain students who should have been academically dismissed based on their Fall 2015 grades, CSOL President Ogene summarily changed the minimum passing grade point average of 1.90 downward to 1.50. CSOL President Ogene took this action without faculty agreement and without any formality. The result was that instead of academically dismissing the 157 students, CSOL would only have to dismiss 92 students. Ultimately, this decision by CSOL re-certified 65 students to the United States Department of Education as making satisfactory progress under the relevant guidelines, when they should have been academically dismissed from

the law school. The students then received additional federal financial aid, despite that they should have been academically dismissed from CSOL.

70.     During a February 2016 faculty meeting where Relator was present, CSOL Dean Conison, with respect to CSOL President Ogene's actions, specifically stated that President Ogene took such action because "the company [Infilaw] could not tolerate the financial loss or harm to its reputation."

71.     The CSOL student handbook also rarely reflects other *ad hoc* administrative changes made by or at the direction of the CSOL President, an Infilaw executive. For example, according to one version of the CSOL handbook, in order for law students to participate in certain upper level and online summer courses, they must have achieved a certain minimum grade point average. But when Infilaw realized that application of this rule would reduce its projected revenue, it simply directed that the minimum grade point average as stated in the CSOL student handbook must be lowered. The amendment to this rule was never authorized by a vote of the faculty, and the *ad hoc* revision generated an additional half million dollars of profit for Infilaw. CSOL students are generally unaware of what the student handbook requires because it is unilaterally changed at the direction of Infilaw to suit its needs.

72.     CSOL has also implemented work around measures to the federal student aid requirements, through procedures surrounding Spring 2016 and Summer 2016 grades. With respect to Spring 2016 grades, Infilaw directed the CSOL Registrar and Financial Aid Office staff to allow students who have failing grade point averages at the end of the semester to place the Spring 2016 grade point average "on hold," then to apply for federal financial aid for the first session of Summer 2016. Infilaw also instructed the CSOL Registrar's Office staff to combine students' grades from the first session of Summer 2016 with their failing grades from Spring

17

2016, in hopes that averaging the two sets of grades will yield a passing grade point average. Under these new guidelines implemented by CSOL, law students obtain federal student aid despite their failure to meet satisfactory progress under the relevant HEA guidelines.

73.     To capitalize on a recent revision to ABA Rule 505, which formerly required academically dismissed students to endure a two-year period before re-applying for entry to law school, CSOL has also implemented a re-entry program. CSOL piloted the program in Spring 2016, and will continue the program in Fall 2016. Under the program, academically dismissed students simply "start over." After dismissal, CSOL gives law students the option to either appeal their failing grades (and if successful) continue at the school, or they can simply "re-enter" the law school. Under the re-entry option, CSOL simply wipes the dismissed students' academic records clean for a new first year start. Re-entry students surrender all previous credits earned, if any, and CSOL deletes the students' prior academic record.

74.     The CSOL re-entry program has no effect on the debt that law students already previously incurred, which was received from the federal government. After re-entry, law students apply for financial aid, again, to finance their first year of legal studies, again.

75.     A faculty member in the CSOL Academic Support Department disclosed to Relator that CSOL has sent students sent to the Department that have been academically dismissed from the law school three times, and yet, are still given the opportunity to re-enter the law school and borrow federal financial aid under Title IV of the HEA.

76.     In addition to the foregoing, CSOL creates travel classes to destinations such as New Orleans, LA, Washington, D.C., and New York, NY, that lack any lecture or classroom components. They are nothing more than field trips without substance, and students receive federal student aid for the classes without any educational component. The travel classes are

18

administratively delegated, and not listed in a permanent course catalog. They are described in brief and only prior to the offering, and then "disappear." These classes are not reviewed or considered by a curriculum committee, and the credits associated with the courses are arbitrary.

### CSOL's Efforts to Maximize on Veterans to Avoid the 90/10 Rule

77.     A regulatory loophole in Title IV of the HEA permits eligible institutions for federal aid to exclude other forms of federal funding, such as that received by active duty and veterans of the United States Military, from their revenue calculation for purposes of compliance with the 90/10 rule.

78.     Infilaw and CSOL actively exploit veterans and active military to end-run the 90/10 rule, all in the name of profit. CSOL targets veterans and active military members in its admission process, and then treats those students more academically favorable than those who borrow federal student aid. For example, at CSOL, active duty and veteran law students are not failed as readily as those who borrow federal student aid.

### CSOL's Manipulation of Bar Exam and Employment Statistics

79.     CSOL engages in generous incentives to prevent law students from taking the bar exam if they appear statistically unlikely to pass. The CSOL Dean's Office has telephoned graduates the night before the bar exam to actively discourage them from taking the exam the next day. The CSOL Dean's Office offers compensation for the lost bar exam registration fees in the form of a $5,000 stipend, and an opportunity to study more intensively until the next administration of the bar exam. If the graduate accepts the offer and opts not take the bar exam the next day, he or she loses their status as a "first-time taker" because the graduate was already registered for the bar exam. Thereafter, upon sitting for the exam the graduate becomes a "second-time taker," and their scores, passing or failing, are not required to be reported in the

school's statistics under ABA guidelines. This tactic allows CSOL to manipulate its statistic for first time takers, and the ultimate statistic reported to the public is misleading.

80.     In addition to the foregoing, CSOL offers graduates a "residency" to study for the bar exam. This allows CSOL to report its recent graduates as employed. The CSOL graduates that have accepted these offers are placed in a specified area of the law school library to "study," and are characterized as employees of the library. CSOL librarians, however, are instructed not to request these "employees" to perform any work. This tactic allows CSOL to manipulate its employment statistic for its recent graduates, and the ultimate statistic reported to the public is misleading.

81.     There has been a marked decline of bar passage rates at Infilaw's Consortium of Law Schools from more than 75% to below 35% in North Carolina between 2010 and 2016. No other American law school has had a similar decrease in bar passage. The passage rate for the July 2015 North Carolina Bar Exam was 47% for CSOL first time takers, compared to a statewide pass rate of 67.1% for the same group. The CSOL bar passage rate for the February 2016 North Carolina Bar Exam was 34.7%.

82.     The bar passage rate at CSOL has been a declining trend for the last four years, and the bar passage rate at CSOL is out of compliance with ABA Rule 301(a), which requires that "[a] law school shall maintain an educational program that prepares its students for admission to the bar, and effective and responsible participation in the legal profession." Interpretation 301-6 to ABA Rule 301(a) provides as follows:

A.     A law school's bar passage rate shall be sufficient, for purposes of Standard 301(a), if the school demonstrates that it meets any one of the following tests:

1)     That for students who graduated from the law school within the five most recently completed calendar years:

(a) 75 percent or more of these graduates who sat for the bar passed a bar examination, or

(b) in at least three of these calendar years, 75 percent of the students graduating in those years and sitting for the bar have passed a bar examination.

In demonstrating compliance under sections (1)(a) and (b), the school must report bar passage results from as many jurisdictions as necessary to account for at least 70% of its graduates each year, starting with the jurisdiction in which the highest number of graduates took the bar exam and proceeding in descending order of frequency.

2) That in three or more of the five most recently completed calendar years, the school's annual first-time bar passage rate in the jurisdictions reported by the school is no more than 15 points below the average first-time bar passage rates for graduates of ABA-approved law schools taking the bar examination in these same jurisdictions.

In demonstrating compliance under section (2), the school must report first-time bar passage data from as many jurisdictions as necessary to account for at least 70 percent of its graduates each year, starting with the jurisdiction in which the highest number of graduates took the bar exam and proceeding in descending order of frequency. When more than one jurisdiction is reported, the weighted average of the results in each of the reported jurisdictions shall be used to determine compliance.

B.    A school shall be out of compliance with the bar passage portion of 301(a) if it is unable to demonstrate that it meets the requirements of paragraph A (1) or (2).

83.    CSOL, by intentionally manipulating the statistics for first time bar exam takers,

demonstrates an effort to avoid compliance with ABA Rule 301(a).

*Unusual Connections Between Infilaw, CSOL, and a Candidate for the Haitian Presidency*

84.    Several incidents occurring over the past several years suggest the possibility that

Infilaw is likely engaged in inappropriate behaviors with foreign persons and organizations

relating to specific business transactions with Infilaw. The most significant of such incidents

involves the pro bono program between CSOL and Haiti.

85.     CSOL Associate Dean Dan Piar approached Relator in Spring 2014 about an upcoming business trip that he had to visit Haiti. CSOL Associate Dean Piar described the purpose of trip—to explore the possibility of Infilaw establishing a gold mining contract with the Haitian government because the gold mining contracts established under the prior government administration had been recently canceled by Haiti's Parliament. CSOL Associate Dean Piar provided significant detail including the fact that Infilaw would be superior because it would pay the Haitian Government 6% rather than the 4% of the mined material offered by Canadian mining companies. CSOL Associate Dean Piar also suggested a "tie-in" of CSOL students by placing them in-country for Infilaw "presence and visibility."

86.     Approximately two weeks later and after his Haiti trip, CSOL Associate Dean Piar spoke again with Relator. CSOL Associate Dean Piar offered details from his travels—that he made contact with the relevant persons connected to the Haitian government, they discussed the gold mining contracts, and other arrangements.

87.     Former CSOL President Don Lively, an Infilaw executive and investor, and the current President of the Arizona Summit School of Law, contacted Relator in January 2015 to schedule a meeting concerning establishing the Haiti pro bono program. Former CSOL President Lively described the program as law students traveling to Haiti to participate in a program associated with one of Chantal Volcy Ceant's foundations. Volcy Ceant is the wife of Jean Henri Ceant, who at the time of establishing the CSOL Haiti pro bono program was a candidate for the Haitian presidency. According to CSOL Associate Dean Piar, under the pro bono program, CSOL law students would provide legal service to enforce child support payments and receive school credits (and borrow federal student aid to pay tuition for the program to generate more money for CSOL, according to Former CSOL President Lively).

22

Relator pointed out the difficulties that the program would encounter with the language barriers, as French and Creole are the primary languages spoken in Haiti, and also that the law students did not have any training or understanding of the Haitian civil legal system. Former CSOL President Lively summarily dismissed Relator's concerns.

88.     A few months after the meeting with Former CSOL President Lively, CSOL held a major event at CSOL in honor of the Ceants. The event was billed as a "Signing Ceremony." The event culminated with Former CSOL President Lively and the Ceants signing an agreement of understanding concerning the CSOL Haiti pro bono program.

89.     Former CSOL President Lively assigned the formation of the pro bono program to CSOL Associate Dean for Experimental Learning, Kama Pierce.

90.     Approximately ten students went to Haiti in June 2015, all of whom did so with the use of federal student aid that was borrowed for educational purposes but used for travel expenses. The students who went to Haiti attended meetings, court hearings, and met with government officials, yet, they did not perform any legal work.

91.     In preparation for the Summer 2016 Haiti pro bono program, CSOL retained a Haitian attorney, Ludwig LeBlanc to provide a crash course to law students on the Haitian civil legal system. LeBlanc is related to and is the law partner of Camille LeBlanc, who along with Jean Henri Ceant, is the co-founder of a major Haitian political party.

92.     Relator served a confidential written disclosure statement on the Government on June 1, 2016, pursuant to 31 U.S.C. § 3730(b)(2), containing substantially all material evidence and information Relator possesses related to the conduct described herein.

93.     All general and statutory conditions precedent has either occurred or been waived by operation of law.

23

94. Relator retained the law firm of Watson LLP to litigate her interests in this action, and is obligated to pay such firm reasonable attorneys' fees for its services. Watson LLP is entitled to recover its attorneys' fees and costs from Defendants, pursuant to 31 U.S.C. § 3730(d).

## COUNT I
### Violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A)
### (Infilaw and CSOL)

95. Relator re-alleges and incorporates the allegations contained in paragraphs 1 through 94, as though fully set forth herein.

96. Good faith entry into a PPA is a condition of payment necessary for an eligible institution to receive federal student aid under Title IV of the HEA.

97. CSOL entered into an initial PPA with the United States Department of Education, in exchange for distribution of federal financial aid under Title IV of the HEA. Infilaw is a third party service provider under the PPA, and controls financial aid at CSOL.

98. CSOL entered into the initial PPA in bad faith to establish Title IV eligibility, and at or before the time of entering into the PPA, Infilaw and CSOL intended to defraud the federal government.

99. By entering into the PPA, CSOL, as an eligible institution within the meaning of the HEA, agreed that it would comply with all statutory provisions of or applicable to Title IV, all applicable regulatory provisions of Title IV, including the requirements set forth in 34 C.F.R. § Part 600 and 34 C.F.R. § Part 668, and the terms and provisions of the PPA.

100. Infilaw and CSOL knowingly violated Title IV of the HEA, its implementing regulations under 34 C.F.R. § Part 600 and 34 C.F.R. § Part 668, and the PPA by making, among other fraudulent claims, the following fraudulent claims:

a. Infilaw and CSOL admitted academically underqualified students to CSOL without the approval of the dean and faculty of the law school, in violation of ABA Rule 205(b);

b. Infilaw and CSOL admitted academically underqualified students to CSOL, in violation of ABA Rule 501(b) that a law school should not admit applicants who do not appear capable of satisfactorily completing its program of legal education and being admitted to the bar;

c. Infilaw and CSOL altered law students' grades through the CSOL re-entry program, in violation of 34 C.F.R. § 668.34, as such students failed to achieve satisfactory progress to maintain the continued receipt of federal student aid under Title IV of the HEA;

d. CSOL breached its fiduciary duty to use federal student aid monies received from the United States Department of Education when Infilaw used improper trust accounting procedures and depleted CSOL's bank accounts containing federal student aid, and then used such funds for Infilaw's own benefit;

e. CSOL failed to display financial responsibility by allowing Infilaw to use improper trust accounting procedures to deplete CSOL's bank accounts containing federal student aid, and then used such funds for Infilaw's own benefit;

f. CSOL, in advertising job placement rates, failed to make available to prospective law students the most recent data concerning employment statistics by failing to disclose that graduates were "employed" by the law

25

school to study for the bar exam, and as a result, engaged in misleading career

placement performance with materially misleading employment statistics;

g.  CSOL made re-certifications of academically underqualified students at the

end of each academic reporting period as having made satisfactory progress,

as a condition for the continued receipt of federal financial aid;

h.  CSOL failed to maintain the accreditation standards set by the ABA, pursuant

to Part H if Title IV of the HEA;

i.  Infilaw and CSOL failed to implement a written plan to combat the

unauthorized distribution of copyrighted material by users of the law school's

network;

j.  CSOL failed to create or follow any a code of conduct, to prohibit conflicts of

interest with the responsibilities of its officers, employees, or agents with

respect to Title IV financial aid; and

k.  CSOL failed to enable its graduates to earn sufficient incomes to service the

debt of its academic program within specific parameters of disposable income

percentages.

101.    In performing the foregoing acts, Infilaw and CSOL knowingly defrauded the

federal government by causing false claims to be presented to the United States Department of

Education for payment or approval, in violation of 31 U.S.C. § 3729, *et seq.*, when CSOL was

not in compliance with the statutory and regulatory requirements of Title IV of the HEA, and did

not enter into the initial PPA in good faith.

102.    As a result, Infilaw and CSOL caused the United States Department of the

Treasury to pay money to Infilaw and CSOL that it was not obligated to pay.

103.    Infilaw, through CSOL, receives federal student aid monies under Title IV of the HEA from the United States Department of Education.

104.    Infilaw and CSOL made fraudulent claims with knowledge that such claims would be tied to an increase in funds to Infilaw and CSOL under Title IV of the HEA.

105.    By entering into the PPA in bad faith, CSOL is required to return any Title IV funds to the United States Department of Education, along with interest and any special costs incurred by the United States Department of Education.

106.    As a direct and proximate cause of Infilaw and CSOL's false claims to the federal government, the United States Department of the Treasury, with respect to CSOL, has directly or indirectly paid over $285 million, based on approximately 1,355 academically underqualified CSOL law students obtaining federal financial aid from 2010 to present. The estimated amount of fraudulently obtained funds considers assumptions such as the attrition rate, number of law students who were re-admitted after failure, and those admitted off-season, other than a fall admit.

107.    The total amount that Infilaw has wrongfully received from the federal government from the Consortium of Law Schools due to its false claims likely exceeds $500 million, based upon the amount of tuition per underqualified student multiplied by the total number of admitted and underqualified students at the Consortium of Law Schools, decreased by the percentage of scholarships awarded to such students, and from the dates of full accreditation by the ABA for Florida Coastal School of Law (2002), Arizona Summit School of Law (2010), and CSOL (2011).

108.    All fraudulent claims submitted to the federal government by Infilaw and CSOL are subject to a civil fine under 31 U.S.C. § 3729(a).

109. The federal government is entitled to the full value of the fraudulent and false claims submitted Infilaw and CSOL for payment.

**WHEREFORE,** Relator, BARBARA BERNIER, on behalf of the UNITED STATES OF AMERICA, demands judgment against Defendants, INFILAW CORPORATION and CHARLOTTE SCHOOL OF LAW, and respectfully requests that the court enter judgment in favor of the United States in an amount equal to three times the amount of damages the federal government has sustained because of Infilaw and CSOL's actions, pursuant to 31 U.S.C. § 3729(a); civil penalties of not less than $5,000 and not more than $10,000, for each violation, pursuant to 31 U.S.C. § 3729(a); that Relator be awarded reasonable attorneys' fees and costs, pursuant to 31 U.S.C. § 3730(d); that Relator be awarded with the applicable percentage of award, pursuant to 31 U.S.C. § 3730(d); that Relator and the United States be awarded with pre-judgment and post-judgment interest; and any such further relief as the court deems just and proper.

**COUNT II**
**Violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B)**
**(Infilaw and CSOL)**

110. Relator re-alleges and incorporates the allegations contained in paragraphs 1 through 94, and paragraphs 96 through 97, as though fully set forth herein.

111. CSOL knowingly entered into the initial PPA agreement with the United States Department of Education in bad faith to defraud the federal government.

112. Infilaw and CSOL then, thereafter, intended to use the initial PPA and re-certifications of same to submit false claims for payment. All subsequent claims made by Infilaw and CSOL to the United States Department of Education incident to the initial PPA were poisoned by the bad faith underlying the PPA.

28

113.    The initial PPA is a false record, within the meaning of 31 U.S.C. §
3729(a)(1)(B).

114.    Infilaw and CSOL caused the initial PPA to be submitted to the United States
Department of Education, in order to receive financial aid subsidies from the federal
government.

115.    As a result of a false record, Infilaw and CSOL caused the United States
Department of the Treasury to pay money to Infilaw and CSOL that it was not obligated to pay.

116.    Infilaw and CSOL made the false record with knowledge that the initial PPA was
made in bad faith, and would be tied to an increase in funds to Infilaw and CSOL under Title IV
of the HEA.

117.    All fraudulent records submitted to the federal government by Infilaw and CSOL
are subject to a civil fine under 31 U.S.C. § 3729(a).

118.    The federal government is entitled to the full value of the fraudulent and false
records submitted Infilaw and CSOL for payment.

**WHEREFORE,** Relator, BARBARA BERNIER, on behalf of the UNITED STATES
OF AMERICA, demands judgment against Defendants, INFILAW CORPORATION and
CHARLOTTE SCHOOL OF LAW, and respectfully requests that the court enter judgment in
favor of the United States in an amount equal to three times the amount of damages the federal
government has sustained because of Infilaw and CSOL's actions, pursuant to 31 U.S.C. §
3729(a); civil penalties of not less than $5,000 and not more than $10,000, for each violation,
pursuant to 31 U.S.C. § 3729(a); that Relator be awarded reasonable attorneys' fees and costs,
pursuant to 31 U.S.C. § 3730(d); that Relator be awarded with the applicable percentage of
award, pursuant to 31 U.S.C. § 3730(d); that Relator and the United States be awarded with pre-

judgment and post-judgment interest; and any such further relief as the court deems just and proper.

<strong><u>COUNT III</u></strong><br><strong>Violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(C)</strong><br><strong>(Infilaw and CSOL)</strong>

119.    Relator re-alleges and incorporates the allegations contained in paragraphs 1 through 94, paragraphs 96 through 98, and paragraph 100, as though fully set forth herein.

120.    Infilaw and CSOL conspired to violate Sections 3729(a)(1)(A) and 3729(a)(1)(B) of the False Claims Act, in violation of 31 U.S.C. § 3729(a)(1)(C).

121.    More specifically, Infilaw, through its executives, CSOL President Ogene, had an unlawful agreement to conspire with CSOL, through CSOL Dean Jay Conison, to defraud the federal government, and in doing so, the conspiracy made false or fraudulent claims to the United States Department of Education, in violation of 31 U.S.C. § 3729(a)(1)(A).

122.    In addition, Infilaw, through its executives, had an unlawful agreement to conspire with CSOL, through its managerial employees, to defraud the federal government, and in doing so, CSOL entered into the initial PPA with the United States Department of Education, in bad faith and with intent to defraud the federal government, in violation of 31 U.S.C. § 3729(a)(1)(B).

123.    The conspirators knowingly took acts in furtherance of the conspiracy, to get false or fraudulent claims and fraudulent records allowed by the United States Department of Education and paid by the United States Department of the Treasury.

124.    All false claims and false records submitted to the federal government by the conspiracy are subject to a civil fine under 31 U.S.C. § 3729(a).

125.    The federal government is entitled to the full value of the false claims and false records submitted by the conspiracy for payment.

**WHEREFORE,** Relator, BARBARA BERNIER, on behalf of the UNITED STATES OF AMERICA, demands judgment against Defendants, INFILAW CORPORATION and CHARLOTTE SCHOOL OF LAW, and respectfully requests that the court enter judgment in favor of the United States in an amount equal to three times the amount of damages the federal government has sustained because of Infilaw and CSOL's actions, pursuant to 31 U.S.C. § 3729(a); civil penalties of not less than $5,000 and not more than $10,000, for each violation, pursuant to 31 U.S.C. § 3729(a); that Relator be awarded reasonable attorneys' fees and costs, pursuant to 31 U.S.C. § 3730(d); that Relator be awarded with the applicable percentage of award, pursuant to 31 U.S.C. § 3730(d); that Relator and the United States be awarded with pre-judgment and post-judgment interest; and any such further relief as the court deems just and proper.

Dated: June 6, 2016

Respectfully submitted,

**Coleman W. Watson, Esq.**
Florida Bar. No. 0087288
California Bar No. 266015
Georgia Bar No. 317133
New York Bar No. 4850004
Email: coleman@watsonllp.com
          docketing@watsonllp.com

**WATSON LLP**

31

121 S. Orange Avenue, Suite 1500
Orlando, FL 32801
T:    407.377.6634
F:    407.377.6688

*Attorneys for Relator,*
BARBARA BERNIER

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 6, 2016, pursuant to 31 U.S.C. § 3730(b)(2) and Fed. R. Civ. P. 4(i)(1), I served Complaint filed under Seal, as well as a second copy of Relator's written disclosure, via certified mail, upon the following:

**United States Department of Justice**
950 Pennsylvania Avenue, NW
Washington, D.C. 20530

**United States Attorney's Office, Middle District of Florida**
Civil Process Clerk
400 N. Tampa Street, Suite 3200, Tampa, FL 33602

Coleman W. Watson, Esq.

32