**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

| | |
|---|---|
| _____ ) | |
| UNITED STATES OF AMERICA, ) | |
| *ex rel.* BARBARA BERNIER, ) | |
| ) | |
| Plaintiff, ) | Case No. 6:16-cv-00970-RBD-TBS |
| ) | |
| v. ) | **MOTION TO DISMISS &** |
| ) | **MEMORANDUM OF LAW** |
| INFILAW CORPORATION, a Florida ) | |
| Corporation, and CHARLOTTE SCHOOL ) | **ORAL ARGUMENT REQUESTED** |
| OF LAW, LLC, a foreign limited liability ) | |
| company, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

**MOTION TO DISMISS OF DEFENDANTS
INFILAW CORPORATION AND CHARLOTTE SCHOOL OF LAW, LLC
AND SUPPORTING MEMORANDUM OF LEGAL AUTHORITY**

# Table of Contents

**Page**

INTRODUCTION ................................................................................................... 1

FACTUAL & PROCEDURAL BACKGROUND ................................................... 3

STANDARD OF REVIEW ..................................................................................... 7

ARGUMENT .......................................................................................................... 8

    I.     BERNIER HAS NO PLAUSIBLE BASIS TO ALLEGE CSL
          ENTERED INTO THE PPA IN BAD FAITH. ........................................ 8

    II.    ALL THREE COUNTS ARE BARRED BECAUSE THE
          UNDERLYING ALLEGATIONS WERE PUBLICLY DISCLOSED
          AND BERNIER IS NOT AN ORIGINAL SOURCE. ................................ 11

          A.     The Public Disclosure Bar ................................................... 12

          B.     Bernier's Allegations Are Substantially the Same as Prior
                Public Disclosures in Various News Sources. ..................... 12

          C.     Bernier Is Not an Original Source ...................................... 23

    III.   COUNTS I & II FAIL TO STATE A CLAIM FOR VIOLATION OF
          FCA SUBSECTIONS 3729(A)(1)(A) AND (A)(1)(B). ................................ 27

          A.     Bernier Offers Only Bare Conclusory Assertions of Knowledge ...... 27

          B.     The Complaint Fails to Meet the Falsity Requirement ..................... 29

          C.     Bernier Has Not Plead Materiality ...................................... 33

          D.     Bernier Is Unable to Point to Even a Single False Claim
                Presented to the Government Under § 3729(a)(1)(A) ...................... 33

    IV.   BERNIER ALLEGES NO FACTS TO SUPPORT HER
          CONSPIRACY CLAIM ............................................................... 38

CONCLUSION ...................................................................................................... 40

## Table of Authorities

**Page(s)**

### Cases

*Ambrosia Coal & Constr. Co. v. Pages Morales,*
  482 F.3d 1309 (11th Cir. 2007) ...................................................................29, 36

*Ashcroft v. Iqbal,*
  129 S.Ct. 1937, 556 U.S. 662 (2009) ..........................................................3, 7, 9

*U.S. ex rel. Atkins v. McInteer,*
  470 F.3d 1350 (11th Cir. 2006) ................................................................35, 36, 37

*U.S. ex rel. Barber v. Paychex, Inc.,*
  2010 WL 2836333 (S.D. Fla. 2010) ....................................................................12

*Barchiesi v. CSL,*
  Case No. 3:16-cv-00861 (W.D.N.C.) .....................................................................7

*U.S. ex rel. Barrett v. Beauty Basics, Inc.,*
  2015 WL 3650960 (N.D. Ala. 2015) ....................................................................31

*Battle v. Bd. of Regents,*
  468 F.3d 755 (11th Cir. 2006) ..............................................................................23

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007).................................................................................... 7, 9, 27

*Bernier v. Florida A&M Univ.,*
  Case No. 13-CA-3239 (Cir. Ct. Leon County) (filed Nov. 11, 2013) .................4

*Bernier v. Florida A&M Univ.,*
  No. 4:14-cv-108 (N.D. Fla. Feb. 28, 2014)...........................................................4

*Bernier v. Mattox, et al.,*
  Case No. 15-CA-3070 (Cir. Ct. Leon County) (filed Dec. 30, 2015)..................4

*Brooks v. Blue Cross and Blue Shield of Fl., Inc.,*
  116 F.3d 1364 (11th Cir. 1997) ......................................................................29, 36

*U.S. ex rel. Brooks v. Lockheed Martin Corp.,*
  423 F. Supp. 2d 522 (D. Md. 2006).....................................................................39

*U.S. ex rel. Brown v. BankUnited Tr.*
  *2005-1,* 235 F. Supp. 3d 1343 (S.D. Fla. 2017)...............................17, 21, 24, 25

**Table of Authorities**
(continued)

**Page(s)**

*U.S. ex rel. Brown v. Walt Disney World Co.*,
  361 F. App'x 66 (11th Cir. 2010) ......................................................................25

*Bryant v. Avado Brands, Inc.*,
  187 F.3d 1271 (11th Cir. 1999) .......................................................................14

*Cade v. Progressive Cmty. Healthcare, Inc.*,
  2011 WL 2837648 (N.D. Ga. 2011) ................................................................36

*Chandler v. Sec'y of Fla. Dep't of Transp.*,
  695 F.3d 1194 (11th Cir. 2012) ........................................................................3

*U.S. ex rel. Clausen v. Lab. Corp. of Am., Inc.*,
  290 F.3d 1301 (11th Cir. 2002) ............................................................... *passim*

*Cooper v. Blue Cross and Blue Shield of Fla., Inc.*,
  19 F.3d 562 (11th Cir. 1994) ....................................................................13, 15

*Corsello v. Lincare, Inc.*,
  428 F.3d 1008 (11th Cir. 2005) ...............................................10, 33, 35, 38

*U.S. ex rel. Devlin v. State of California*,
  84 F.3d 358 (9th Cir. 1996) ...........................................................................25

*U.S. ex rel. Fine v. MK-Ferguson Co.*,
  99 F.3d 1538 (10th Cir. 1996) ........................................................................24

*U.S. ex rel. Florida Soc'y of Anesthesiologists v. Choudhry*,
  2017 WL 2591399 (M.D. Fla. 2017) ..........................................................36, 37

*U.S. ex rel. Gatsiopoulos v. Kaplan Career Inst., ICM Campus*,
  2011 WL 3489443 (S.D. Fla. 2011) .............................................................9, 33

*U.S. ex rel. Hafter D.O. v. Spectrum Emergency Care, Inc.*,
  190 F.3d 1156 (10th Cir. 1999) ......................................................................26

*U.S. ex rel. Harris v. Lockheed Martin Corp.*,
  905 F. Supp. 2d 1343 (N.D. Ga. 2012) .........................................................39

*Herrera v. CSL*,
  Case No. 17-cv-1965 (N.C. Super. Ct.) ...........................................................7

*Hill v. Morehouse Med. Assocs.*,
  82 F. App'x 213 (11th Cir. 2003) ....................................................................36

**Table of Authorities**
(continued)

**Page(s)**

*Hopper v. Solvay Pharm., Inc.,*
  590 F. Supp. 2d 1352 (M.D Fla. 2008)............................................................12

*Jacobs v. Bank of Am. Corp.,*
  2017 WL 2361943 (S.D. Fla. 2017) ...............................................................25

*Jallali v. Nova Se. Univ., Inc.,*
  486 F. App'x 765 (11th Cir. 2012) ......................................................8, 34, 37

*Jallali v. Sun Healthcare Grp.,*
  667 F. App'x 745 (11th Cir. 2016) ..................................................................37

*U.S. ex rel. John Doe v. Health First, Inc.,*
  2016 WL 3959343 (M.D. Fla. 2016) ....................................................7, 29, 30

*U.S. ex rel. Jones v. Collegiate Funding Servs., Inc.,*
  2011 WL 129842 (E.D. Va. 2011)...................................................................25

*U.S. ex rel. Keeler v. Eisai, Inc.,*
  2013 WL 12049080 (S.D. Fla. 2013), *aff'd,* 568 F. App'x 783 (11th Cir.
  2014) (per curiam) .....................................................................................24, 27

*Krebs v. CSL,*
  Case No. 3:17-cv-00190 (W.D.N.C.) ................................................................7

*U.S. ex rel. Lee v. Corinthian Colls.,*
  655 F.3d 984 (9th Cir. 2011) ...........................................................................29

*Levy v. CSL,*
  Case No. 3:17-CV-00026-GCM (W.D.N.C.) ....................................................7

*U.S. ex rel. Lewis v. Walker,*
  438 F. App'x. 885 (11th Cir. 2011) .................................................................24

*U.S. ex rel. Main v. Oakland City Univ.,*
  426 F.3d 914 (7th Cir. 2005) .............................................................................9

*U.S. ex rel. Mastej v. Health Mgmt. Assocs., Inc.,*
  591 F. App'x 693 (11th Cir. 2014) ................................................................8, 9

*McAndrew v. Lockheed Martin Corp.,*
  206 F.3d 1031 (11th Cir. 2000) .......................................................................39

*U.S. ex rel. Miller v. Weston Educ., Inc.,*
  840 F.3d 494 (8th Cir. 2016) ...........................................................................10

**Table of Authorities**
(continued)

Page(s)

*In re Nat. Gas Royalties,*
    562 F.3d 1032 (10th Cir. 2009) ...............................................................24, 25

*U.S. ex rel. Osheroff v. Humana Inc.,*
    2012 WL 4479072 (S.D. Fla. 2012), *aff'd* 776 F.3d 805 (11th Cir. 2015)................24, 26

*U.S. ex rel. Osheroff v. Humana, Inc.,*
    776 F.3d 805 (11th Cir. 2015) ................................................................. *passim*

*U.S. ex rel. Payton v. Pediatric Servs. of Am., Inc.,*
    2017 WL 3910434 (S.D. Ga. 2017)........................................................... *passim*

*U.S. ex rel. Peretz v. Humana, Inc.,*
    2011 WL 11053884 (D. Ariz. 2011)..................................................................39

*U.S. ex rel. Phalp v. Lincare Holdings, Inc.,*
    857 F.3d 1148 (11th Cir. 2017) .......................................................................27

*U.S. ex rel. Pilecki-Simko v. Chubb Inst.,*
    2010 WL 1076228 (D.N.J. 2010), *aff'd,* 443 F. App'x. 754 (3d Cir. 2011).....................39

*U.S. ex rel. Pilecki-Simko v. Chubb Inst.,*
    443 F. App'x 754 (3d Cir. 2011) ......................................................................28

*U.S. ex rel. Reagan v. E. Texas Med. Ctr. Reg'l Healthcare Sys.,*
    274 F. Supp. 2d 824 (S.D. Tex. 2003), *aff'd,* 384 F.3d 168 (5th Cir. 2004) ....................39

*Rutledge v. Aveda,*
    2015 WL 2238786 (N.D. Ala. 2015) ..............................................................28, 34, 37

*Rutledge v. Aveda,*
    2015 WL 9826462 (N.D. Ala. 2015) ..................................................................28

*U.S. ex rel. Saldivar v. Fresenius Med. Care Holdings, Inc.,*
    841 F.3d 927 (11th Cir. 2016) ......................................................................23, 25

*U.S. ex rel. Scharber v. Golden Gate Nat'l Senior Care LLC,*
    135 F. Supp. 3d 944 (D. Minn. 2015)..................................................................39

*Schindler Elevator Corp. v. U.S. ex rel. Kirk,*
    563 U.S. 401 (2011).......................................................................................12

*U.S. ex rel. Schubert v. All Children's Health Sys., Inc.,*
    2013 WL 1651811 (M.D. Fla. 2013) ..................................................................36

**Table of Authorities**
(continued)

<b>Page(s)</b>

*U.S. ex rel. Schubert v. All Children's Health Sys., Inc.*,
  941 F. Supp. 2d 1332 (M.D. Fla. 2013)......................................................................21, 24

*Sealey v. Stidham*,
  2015 WL 5083992 (M.D. Ala. 2015) ............................................................................31

*U.S. ex rel. Sharpe v. Americare Ambulance*,
  2017 WL 2840574 (M.D. Fla. 2017) ........................................................................27, 29

*U.S. ex rel. Urquilla-Diaz v. Kaplan, Univ.*,
  2017 WL 2992197 (S.D. Fla. 2017) ..............................................................................25

*U.S v Alcan Elec. and Eng'g, Inc.*,
  197 F.3d 1014 (9th Cir. 1999) .......................................................................................25

*U.S. v. Healogics, Inc.*,
  2016 WL 2744949 (M.D. Fla. 2016) .............................................................................39

*U.S. v. LifePath Hospice, Inc.*,
  2016 WL 5239863 (M.D. Fla. 2016) .............................................................................38

*U.S. v. Molina Healthcare of Fla., Inc.*,
  2015 WL 5562313 (S.D. Fla. 2015), *aff'd sub nom.*, *Wilhelm v. Molina
  Healthcare of Fla., Inc*., 674 F. App'x 960 (11th Cir. 2017) (per curiam)......................23

*U.S. v. Sanford-Brown, Ltd.*,
  788 F.3d 696 (7th Cir. 2015), *reinstated in part and superseded in part*,
  *U.S. v. Sanford-Brown, Ltd.*, 840 F.3d 445 (7th Cir. 2016)...................................... *passim*

*U.S. v. Univ. of Phoenix*,
  2014 WL 3689764 (E.D. Cal. 2014)..............................................................................25

*Universal Health Servs., Inc. v. U.S. ex rel. Escobar*,
  136 S. Ct. 1989 (2016).......................................................................................29, 30, 33

*Urquilla-Diaz v. Kaplan Univ.*,
  780 F.3d 1039 (11th Cir. 2015) ...............................................................10, 32, 34, 36

**Statutes**

20 U.S.C. § 1099b.............................................................................................................31

**Table of Authorities**
(continued)

Page(s)

31 U.S.C.
    § 3729(a)(1)(A) ............................................................................. *passim*
    § 3729(a)(1)(B) ............................................................................. *passim*
    § 3729(a)(1)(C) ..............................................................................2, 39
    § 3729(b)(1)(A) ...................................................................................27
    § 3729(b)(4) .......................................................................................34
    § 3730(e)(4)(A) ......................................................................12, 13, 23
    § 3730(e)(4)(B) ......................................................................23, 24, 25

**Rules and Regulations**

34 C.F.R.
    § Part 600 ...........................................................................................30
    § Part 668 ...........................................................................................30

Federal Rules of Civil Procedure

    8(a) .......................................................................................................1
    9(b) ............................................................................................. *passim*
    12(b)(6) ........................................................................................1, 7, 12

Fed. R. Evid. 201(b)-(d) .......................................................................2

**Other Authorities**

ABA Section of Legal Education and Admission to the Bar, *Notice of
    Probation and Specific Remedial Action* (Nov. 14, 2016) ....................6

Chris Kirkham, *Corinthian Colleges Tells Investors It Is Facing a Criminal
    Probe*, Los Angeles Times (Aug. 13, 2014) ......................................11

*Council Action on Charlotte School of Law, August 11, 2017* (Aug. 11, 2017) ......................6

Alia Wong, *The Downfall of For-Profit Colleges*, The Atlantic (Feb. 23,
    2015) ...............................................................................................11

Ashley A. Smith, *The End for ITT Tech*, Inside Higher Ed (Sept. 7, 2016) ............................11

Charlotte School of Law, *Charlotte School of Law Fast Facts* (Jul. 1, 2015) .........................23

U.S. Dep't of Educ., *U.S. Department of Education Heightens Oversight of
    Corinthian Colleges* (June 19, 2014) ................................................11

U.S. Dept't of Educ., *Letter on Denial of Application to Participate in the
    Federal Student Financial Assistance Programs* (Dec. 19, 2016) ......................7

Table of Authorities
(continued)

**Exhibits**

*Exhibit 1*, Paul Campos, *The Law School Scam, The Atlantic* (Sept. 2014) ................... *passim*

*Exhibit 2*, Paul Campos, *The Law School Scam Continues*, The Atlantic
  (Oct. 23, 2015) ...............................................................................15, 17, 19, 22

*Exhibit 3*, David Frakt, *David Frakt on His Shorter Than Expected
  Presentation at Florida Coastal School of Law*, The Faculty Lounge
  (Aug. 8, 2014) ..............................................................................................15, 21

*Exhibit 4*, *Guest Post by a Former Charlotte Law Professor, Part 2*,
  Outside the Law School Scam (Sept. 15, 2014) ..........................................15, 18

*Exhibit 5*, David Frakt, *Don't Say I Didn't Warn You, Florida Coastal*, The
  Faculty Lounge (Nov. 13, 2014)...............................................................15, 17, 20

*Exhibit 6*, David Frakt, *How Low Can You Go, InfiLaw?*, The Faculty Lounge
  (Dec. 18, 2014) ....................................................................................................16

*Exhibit 7*, Debra Cassens Weiss, *This Law School Had a 30% Bar Pass Rate;
  Do Lower Standards Presage Troubled Times for Law Grads?*, ABA
  Journal (Oct. 26, 2015) ..........................................................................16, 17, 20

*Exhibit 8*, Julie Rose, *After 8 Years, Charlotte School Of Law Has Become
  NC's Largest. So What's Value Of Degree*, WFAE (Sept. 12, 2013).................17

*Exhibit 9*, Karen Sloan, *Lawsuit: InfiLaw Paying Law Grads to Put Off Bar
  Exam*, National Law Journal (June 4, 2015)...........................................18, 19, 20

*Exhibit 10*, Staci Zaretsky, *Which Law Schools Allegedly Paid Students Not
  To Take The Bar Exam?*, Above the Law (June 5, 2015).......................18, 19, 22

*Exhibit 11*, *Infilaw Allegedly Paid Graduates Not to Take the Bar; Faces
  Fraud and Discrimination Allegations*, Outside the Law School Scam
  (June 6, 2015)......................................................................................................19

*Exhibit 12*, Karen Sloan, *Arizona Summit Defends Encouraging Grads to
  Delay Bar Exam*, National Law Journal (June 11, 2015) .............................19, 20

*Exhibit 13*, Staci Zaretsky *Law School Dean Allegedly Begged Graduates Not
  to Take the Bar Exam*, Above the Law (Jul. 28, 2015)................................19, 20

**Table of Authorities**
(continued)

Page(s)

*Exhibit 14*, David Frakt, *Three Myths Used to Justify Predatory Admission Practices - The Instructive Example of InfiLaw*, The Faculty Lounge (June 3, 2016) .................................................................................................... 20

*Exhibit 15*, Kathryn Rubino, *Law School Dean Blames Lazy Students for Terrible Bar Passage Statistics*, Above the Law (Sept. 2, 2015) ....................................20

*Exhibit 16*, Editorial Board, *The Law School Debt Crisis*, N.Y. Times (Oct. 24, 2015) ................................................................................................20

*Exhibit 17*, Stephen J. Harper, *Too Many Law Students, Too Few Legal Jobs*, The N.Y. Times (Aug. 25, 2015) .......................................................................21

*Exhibit 18*, Jordan Weissmann, *The Jobs Crisis at Our Best Law Schools Is Much, Much Worse Than You Think*, The Atlantic (Apr. 9, 2013)...................................21

*Exhibit 19*, Paul Bowers, *InfiLaw, Charleston School of Law, and the Rise of For-Profit Colleges*, Charleston City Paper (Aug. 14, 2013) ............................................22

*Exhibit 20*, Paul Campos, *Does Your Conscience Bother You?*, Lawyers Guns & Money (Jul. 6, 2013)..............................................................................22

*Exhibit 21*, Kyle McEntee, *Caveat Venditor: Empty Threats from Notorious For-Profit Law Schools*, Above the Law (May 26, 2016)................................................22

*Exhibit 22*, Charlotte School of Law, *Why Charlotte School of Law* (Mar. 7, 2016) ...................................................................................................3

Defendants InfiLaw Corporation ("InfiLaw") and Charlotte School of Law, LLC ("CSL") (collectively, "Defendants") hereby move to dismiss Plaintiff Barbara Bernier's ("Plaintiff," "Relator," or "Bernier") Complaint with prejudice pursuant to Federal Rules of Civil Procedure 8(a), 9(b), and 12(b)(6).  Defendants request oral argument.

## **INTRODUCTION**

Relator Barbara Bernier, a former professor at CSL, seeks to capitalize on the misfortune of her former employer, which closed earlier this year.  Without any personal knowledge or basis for her claims, Bernier recklessly accuses CSL and its corporate parent – institutions dedicated to helping underserved and minority students gain access to the legal profession – of engaging in a scheme to defraud the government of millions of dollars.  Not only is this accusation wrong and unfounded, but the Complaint should be dismissed because Bernier cannot satisfy the requirements for a claim under the False Claims Act ("FCA").

The FCA is designed to encourage private citizens with personal knowledge of fraudulent claims for federal payments to present that knowledge to the government in exchange for a substantial portion of any recovery.  Congress recognized that this incentive creates the potential for baseless lawsuits, however, so it set high thresholds for such "relators" to proceed in court.  And even before the complaint can be served, it must be filed under seal so the government can investigate and, if it so chooses, intervene and prosecute the case.  Here, the government declined to intervene, so Bernier is proceeding on her own.

The Complaint should be dismissed for several independent reasons.  First, the FCA requires, and Bernier entirely lacks, first-hand knowledge of an allegedly fraudulent claim for payment or a false certification.  Bernier premises her case on CSL's allegedly fraudulent

entry into a Program Participation Agreement ("PPA"), a contract with the Department of Education ("Department"), execution of which makes students eligible to receive federal financial aid.  Bernier alleges that, *from the very beginning*, when CSL executed its PPA in 2011, CSL fraudulently intended not to honor its PPA.  This remarkable (and false) accusation is entirely unfounded.  In fact, Bernier does not and cannot assert any factual basis for such a claim because *she didn't even start at CSL until 2013*, two years *after* CSL executed the PPA.  In addition, according to her Complaint, Bernier worked as a professor her entire time at CSL, never once working with financial aid, admissions, billing or PPA certifications, further proving she lacks knowledge of any supposed fraudulent claim for payment or false certification.  And while Bernier speculates that InfiLaw (CSL's parent) actually made all substantive decisions related to the PPA, Bernier *never worked at InfiLaw at all*, in any capacity.

In short, Bernier lacks knowledge of Defendants' actions at the time of the allegedly fraudulent execution of the PPA and lacks knowledge of the school's requests for payment or other financial activities, and so her conclusory (and erroneous) allegations that Defendants all along intended to defraud the Government or later submitted false claims are unsupported, implausible and legally insufficient.  Simply alleging "bad faith" entry into a PPA and subsequent "noncompliance" with contractual and regulatory requirements resulting in submissions of allegedly false claims in violation of 31 U.S.C. § 3729(a)(1)(A), (B) and (C), is legally insufficient under the FCA.  This fundamental deficiency alone requires dismissal.

Second, the FCA's "public disclosure bar" requires dismissal because Bernier's claims are based on information already available from public sources, and she is not an

original source. The Complaint merely repackages a litany of faulty allegations leveled against Defendants in the media – typically from sources hostile to the for-profit model of higher education – for years prior to the filing of the Complaint. As detailed below, every material allegation in the Complaint is substantially similar to an allegation asserted well before the Complaint was filed. And Bernier does not qualify as an original source because she does not and cannot plead first-hand, independent knowledge of any fraudulent acts or false claims. Bernier is precisely the type of removed former employee with nothing but second-hand speculation and pre-existing criticism from the media that the FCA excludes.

Finally, Bernier fails to state an FCA or conspiracy claim because she cannot plead the necessary statutory elements of knowledge, falsity, materiality, presentment of a claim for payment, or proper parties to a conspiracy. Accordingly, the Complaint should be dismissed in its entirety.

## FACTUAL & PROCEDURAL BACKGROUND[1]

CSL opened in 2007. Compl. ¶ 44. Since inception, CSL envisioned a unique mission with respect to enabling minorities and other underrepresented populations to access the legal profession, striving to advance "inclusive excellence" by "creat[ing] an environment for persons of all backgrounds and life experiences."[2] The *National Jurist* recognized CSL as

---

[1]    Defendants take the facts as alleged in the Complaint only for purposes of this motion, as they must. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949, 556 U.S. 662, 678 (2009); *Chandler v. Sec'y of Fla. Dep't of Transp.*, 695 F.3d 1194, 1198 (11th Cir. 2012).

[2]    Charlotte School of Law, *Why Charlotte School of Law* (Mar. 7, 2016)), http://www.charlottelaw.edu/why-charlotte-school-of-law/    [https://web.archive.org/web/20160307170910/ http://www.charlottelaw.edu:80/why-charlotte-school-of-law/].

"one of the nation's most diverse law schools," a recognition that "attests to the importance" CSL placed on diversity. *Id.*

InfiLaw's consortium "includes an independent network of ABA-approved law schools and companies that provide management solutions, new educational programs, and pioneering, technology-driven course delivery to law schools and higher education institutions nationally and internationally." Compl. ¶ 25. Its mission is "to establish the benchmark of inclusive excellence in professional education for the 21st Century," "supported by three key pillars[:] (a) centering on 'serving the underserved,' (b) providing education that is 'student-outcome centered,' and (c) graduating students who are 'practice-ready.'" *Id.* ¶ 26. One of InfiLaw's three private law schools is CSL. *Id.* ¶ 31.

Any school that wishes to be eligible for federal student aid under Title IV of the Higher Education Act ("HEA") must execute a PPA. CSL executed its PPA in 2011. *See* Compl. ¶¶ 51-52 (alleging CSL's students have been eligible for federal aid since it was fully accredited in 2011, logically inferring that the PPA was entered in 2011).

Bernier joined CSL on January 1, 2013. *Id.* ¶ 2. According to the Complaint, Bernier worked at CSL only as a law professor, not in any other capacity. *See id.* Bernier does not allege she ever worked in the admissions or financial aid office at CSL, ever worked with PPA certifications or claims for payment from the government, or ever worked at InfiLaw.[3]

---

[3]     In 2013, the same year she joined CSL as a professor, Bernier sued her prior employer, Florida A&M, alleging discrimination and retaliation. *See Bernier v. Florida A&M Univ.*, Case No. 13-CA-3239 (Cir. Ct. Leon County, Fla.) (filed Nov. 20, 2013), removed to federal court at *Bernier v. Florida A&M Univ.*, No. 4:14-cv-108-RH-CAS (N.D. Fla. Feb. 28, 2014). In late 2015, Bernier sued the attorney and law firm that represented her against Florida A&M for legal malpractice. *See Bernier v. Mattox, et al.*, Case No. 15-CA-3070 (Cir. Ct. Leon County, Fla.) (filed Dec. 30, 2015).

Bernier filed the Complaint on June 6, 2016.  *See* Dkt. No. 1.  The allegation underpinning Bernier's entire Complaint is that CSL entered into its PPA in bad faith, specifically that, at the time it entered the PPA in 2011, CSL knowingly and fraudulently intended not to honor its obligations under the PPA.  Compl. ¶¶ 98, 111.

Bernier was not employed by CSL when CSL entered into the PPA in 2011.  Compl. ¶¶ 2, 52.  The Complaint does not allege any basis for Bernier to have any knowledge of CSL's actions in 2011 or of its entry into the PPA.  Nevertheless, the Complaint lists allegations related to various activities in which CSL and InfiLaw purportedly engaged related to specific topics, as follows:  their admission practices and accepting academically underqualified students (*id*. ¶¶ 54-58, 69-75, 100(b), (g)), InfiLaw's control over CSL's admission decisions (*id*. ¶¶ 57-58, 100(h)), use of alternative admissions practices to "circumvent" conventional metrics (*id*. ¶¶ 62-67, 100(b), (h)), offering students living stipends so they can prepare for the bar exam on an extended schedule (*id*. ¶¶ 79, 83, 100(h)-(i)), bar passage rates (*id*. ¶¶ 81-82, 100(h)), hiring graduates to work in the library (*id*. ¶¶ 80, 100(f)), application of a grading curve to retain students who might otherwise be dismissed (*id*. ¶¶ 66-70, 100(g)-(h)), and graduates' debt load and earnings (*id*. ¶¶ 17, 48-49, 100(k)).

As detailed in Section II, *infra*, these allegations are substantially the same as allegations previously publicly asserted in news articles, reports and websites.  Bernier also alleges improper trust accounting procedures (*id*. ¶¶ 43, 100(d)-(e), (j)), copyright violations (*id*. ¶¶ 54, 100(i)), and firing admissions staff for failing to meet expected class size mandates (*id*. ¶ 61).

Count I alleges that CSL entered into the PPA in bad faith, and that its alleged subsequent failure (years later) to comply with all applicable contractual, statutory, and regulatory requirements – preconditions of federal funding under Title IV of the HEA – consequently resulted in the submission of "false claims" to the government in violation of 31 U.S.C. § 3729(a)(1)(A).  *Id.* ¶¶ 96, 99-101.  Count II alleges that Defendants entered into the PPA "knowingly" and in "bad faith," making it a "false record" and poisoning all subsequent claims for payment made to the government in violation of 31 U.S.C. § 3729(a)(1)(B).  Compl. ¶¶ 110-118.  Count III alleges that InfiLaw conspired with its subsidiary CSL to violate FCA subsections § 3729(a)(1)(A) and (B).  *Id.* ¶¶ 119-125.

The Complaint asserts that, as a result of these alleged violations, the government improperly paid CSL over $285 million, "based on approximately 1,355 academically underqualified [CSL] students obtaining federal financial aid from 2010 to present."  *Id.* ¶ 106.  The Complaint does not identify a single underqualified student or a single false claim.

On November 14, 2016, the ABA Council of the Section of Legal Education and Admissions to the Bar ("ABA") placed CSL on probation, finding CSL had not demonstrated compliance with ABA Standards 301(a), 501(a) and 501(b).[4]  CSL remained accredited while on probation.[5]  Despite remaining accredited, the Department denied CSL's recertification of

---

[4]      ABA Section of Legal Education and Admission to the Bar, *Notice of Probation and Specific Remedial Action* (Nov. 14, 2016), https://www.americanbar.org/content/dam/aba/administrative/legal_education_and_admissions_to_the_bar/PublicNoticeAnnouncements/2016_november_charlotte_probation_public_notice.authcheckdam.pdf.

[5]      *See* ABA Council of the Section of Legal Education and Admission to the Bar, *Council Action on Charlotte School of Law, August 11, 2017* (Aug. 11, 2017), https://www.americanbar.org/content/dam/aba/administrative/legal_education_and_admissions_to_the_bar/council_reports_and_resolutions/August2017OpenSessionMaterials/2017_august_statement_on_charlotte_school_of_law.authcheckdam.pdf.

eligibility for Title IV student loans on December 19, 2016.[6]  CSL closed in August 2017.[7]

The Government declined to intervene in this case on August 14, 2017.  Dkt. No. 14 at 1.[8]

## STANDARD OF REVIEW

To survive a Rule 12(b)(6) motion, the Complaint must plead facts sufficient to state a claim that is plausible on its face.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  FCA claims are subject to the strict pleading standard of Rule 9(b).  *U.S. ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1308-09 (11th Cir. 2002).  An FCA complaint satisfies Rule 9(b) if it sets forth "facts as to time, place, and substance of the defendant's alleged fraud, specifically the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them."  *Id.* at 1310 (internal quotations and citation omitted).  "When an FCA claim is at issue, district courts must disregard assertions of law and conclusory statements of fact regarding a defendant's alleged fraudulent submissions to the Government."  *U.S. ex rel. John Doe v. Health First, Inc.*, 2016 WL 3959343, at *4 (M.D. Fla. 2016) (Dalton, J.) (citation omitted).

---

[6]     U.S. Dep't of Educ., *Letter on Denial of Application to Participate in the Federal Student Financial Assistance Programs* (Dec. 19, 2016), https://studentaid.ed.gov/sa/sites/default/files/csl-recert-denial.pdf.

[7]     Charlotte School of Law, http://www.charlottelaw.edu/404.html (last visited October 25, 2017).

[8]     The Government was investigating Defendants before Relator disclosed the Complaint's allegations to it.  Dkt. No. 12 at 4.  Additionally, former CSL students have filed several lawsuits relating to the school's closure (*Krebs v. CSL*, Case No. 3:17-cv-00190-GCM (W.D.N.C.); *Barchiesi v. CSL*, Case No. 3:16-cv-00861-GCM (W.D.N.C.); *Levy v. CSL*, Case No. 3:17-CV-00026-GCM (W.D.N.C.) and *Herrera v. CSL*, Case No. 17-cv-1965 (N.C. Super. Ct.) (Master File)).

## ARGUMENT

### I.   BERNIER HAS NO PLAUSIBLE BASIS TO ALLEGE CSL ENTERED INTO THE PPA IN BAD FAITH.

Bernier alleges that *from the very beginning* when CSL executed its foundational contract with the Department it fraudulently intended not to honor its commitment under the PPA.  This fundamental accusation permeates all three causes of action:  that CSL entered into its initial PPA in bad faith, "and at or before the time of entering into the PPA, Infilaw and CSOL intended to defraud" the government.  Compl. ¶¶ 98, 111, 119.  This allegedly tainted all subsequent claims for disbursement of Title IV funds.  *Id.* ¶ 112.

Bernier provides no plausible basis for her allegations about either InfiLaw or CSL's knowledge or intent when the PPA was executed, much less anything close to Rule 9(b) particularity.  The Complaint alleges CSL entered the PPA in 2011, when Bernier claims CSL's students became eligible for federal funding.  *Id.* ¶ 52.[9]  Bernier was not hired at CSL until 2013.  *Id.* ¶ 2.  Thus, Bernier has not alleged (and does not have) personal, first-hand knowledge regarding CSL's entry into its PPA.   It is well established that personal knowledge is prerequisite to maintaining an FCA complaint without other indicia of reliability to support relator's allegations, which are also absent.  *See U.S. ex rel. Mastej v. Health Mgmt. Assocs., Inc.,* 591 F. App'x 693, 709 (11th Cir. 2014) (dismissing FCA claims related to activity of former employer that occurred outside date range of employment); *Jallali v. Nova Se. Univ., Inc.*, 486 F. App'x 765, 767 (11th Cir. 2012) (affirming dismissal of relator's complaint for lack of personal knowledge of practices alleged to be fraudulent);

---

[9]     Bernier later alleges CSL students obtained "federal financial aid" commencing in 2010.  *Id.* ¶ 106.

*U.S. ex rel. Gatsiopoulos v. Kaplan Career Inst., ICM Campus*, 2011 WL 3489443, at *1 n.3 (S.D. Fla. 2011) (limiting allegations of fraudulent conduct to time of employment).

And directly applicable here, the law requires a relator to establish the allegedly fraudulent entry into the PPA for a relator to use such entry as the premise of her claims. *See U.S. v. Sanford-Brown, Ltd.*, 788 F.3d 696, 709 (7th Cir. 2015), *reinstated in part and superseded in part*, *U.S. v. Sanford-Brown, Ltd.*, 840 F.3d 445 (7th Cir. 2016) ("[R]elator must establish the defendants' mindset at the time of entry into the PPA. . . . In other words, [relator needs] to prove that [defendants] *knowingly* entered into the PPA *to defraud the government*."); *U.S. ex rel. Main v. Oakland City Univ.*, 426 F.3d 914, 917 (7th Cir. 2005) ("To prevail in this suit [relator] must establish that the University not only knew, when it signed the [application for eligibility], that [the relevant violations] are forbidden, but also planned to continue [the violations] while keeping the Department of Education in the dark.").

Not surprisingly, given her indisputable lack of personal knowledge, Bernier offers only bare, formulaic legal conclusions that CSL entered into the PPA "in bad faith" and that "at or before" that time, both Defendants "intended to defraud the federal government." Compl. ¶ 98. The Complaint lacks any factual support or plausible basis for these conclusory allegations, and they must be disregarded. *See Mastej*, 591 F. App'x at 709 (relator's general and conclusory allegations of activity outside dates of employment with defendant were insufficient where he "articulated no factual basis for his assertion[s]"); *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 570.

For the same reason, Bernier fails to meet Rule 9(b)'s exacting particularity standard, failing entirely to allege facts regarding who signed the PPA, when, where, what statements were made therein, or any other specifics, all of which are independently fatal to her claims. *See Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1012 (11th Cir. 2005) (relator must allege specific "'facts as to [the] time, place, and substance of the defendant's alleged fraud'" in addition to "'the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them'" (quoting *Clausen*, 290 F.3d at 1310)).

In fact, the absence of any plausible basis to allege that *InfiLaw* entered into the PPA (which it did not) is a sufficient ground, in itself, to require dismissal of InfiLaw.[10]

Lastly, the other fraudulent activity in which Bernier alleges Defendants engaged all purportedly occurred ***after*** CSL's entry into the PPA.  As a matter of law, subsequent noncompliance cannot be used to support a contention that a PPA was entered into in bad faith.  *Sanford-Brown, Ltd.*, 788 F.3d at 709 ("[P]romises of future performance do not become false due to subsequent non-compliance." (citation omitted)); *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1058-63 (11th Cir. 2015) (affirming dismissal because relators failed to present evidence establishing scienter at the time PPA was executed).  "[I]t is not enough to show that [the school] did not comply with the PPA; Relators must show that [the school], when signing the PPA, knew [what was] required, and that [the school] intended not to" comply.  *U.S. ex rel. Miller v. Weston Educ., Inc.*, 840 F.3d 494, 500 (8th Cir. 2016). *U.S. ex rel. Miller* is instructive because, unlike Bernier, the relators not only established pre-

---

[10]     Bernier does not allege that InfiLaw signed the PPA, only that "Infilaw is a third party service provider under the PPA."  Compl. ¶ 97.  She provides no detail or allegation as to the legal implications of this.  While she alleges InfiLaw "controls financial aid at CSOL," *id.*, Bernier earlier alleges that this only began in the past year, *id.* ¶ 34, so it cannot relate to the time at which CSL entered into the PPA.

and post-PPA activity in support of their claims, but also they witnessed firsthand the noncompliant conduct.  *Id*. at 498-499, 500-503.

In short, the Complaint shows that Bernier lacks personal knowledge that CSL entered into the PPA in bad faith, or that InfiLaw entered into the PPA at all.  Because these allegations underlie all three Counts, the Complaint must be dismissed.

## II.   ALL THREE COUNTS ARE BARRED BECAUSE THE UNDERLYING ALLEGATIONS WERE PUBLICLY DISCLOSED AND BERNIER IS NOT AN ORIGINAL SOURCE.

For several years, the for-profit model for institutions of higher education has been the subject of intense media criticism and regulatory scrutiny, notwithstanding statutes and regulations authorizing proprietary schools and acknowledging their benefits.  *E.g.*, Alia Wong, *The Downfall of For-Profit Colleges*, The Atlantic (Feb. 23, 2015), https://www.theatlantic.com/education/archive/2015/02/the-downfall-of-for-profit-colleges/385810/.[11]  Proprietary law schools, including CSL, have not escaped this scrutiny. Like many others, both CSL and InfiLaw have been the focus of numerous stories, articles, and editorials – often egregiously slanted or grossly inaccurate – regarding admissions practices, student quality, tuition costs, financial aid, preparation for bar passage, and other issues.  Regardless of whether these claims have merit (they do not), these public disclosures legally bar the Complaint in this case.  The FCA does not permit a relator to proceed if her allegations were already public.   Here, the Complaint is a compendium of recycled

---

[11]      *See also* U.S. Dep't of Educ., *U.S. Department of Education Heightens Oversight of Corinthian Colleges* (June 19, 2014), https://www.ed.gov/news/press-releases/us-department-education-heightens-oversight-corinthian-colleges; Chris Kirkham, *Corinthian Colleges Tells Investors It Is Facing a Criminal Probe*, Los Angeles Times (Aug. 13, 2014), http://www.latimes.com/business/la-fi-corinthian-colleges-20140814-story.html; Ashley A. Smith, *The End for ITT Tech*, Inside Higher Ed (Sept. 7, 2016), https://www.insidehighered.com/news/2016/09/07/itt-tech-shuts-down-all-campuses.

contentions that repeat or minimally embellish on prior public allegations.[12]   Consequently,

and because Bernier is not an original source, her Complaint must be dismissed.

### A.      The Public Disclosure Bar.

The FCA requires that a relator's complaint be dismissed "if substantially the same

allegations or transactions" "were publicly disclosed" in the news media, unless the relator

"is an original source of the information."   31 U.S.C. § 3730(e)(4)(A).   As the Supreme

Court described it, this public disclosure bar (the "Bar") reflects "an effort to strike *a balance*

between encouraging private persons to root out fraud and stifling parasitic lawsuits."

*Schindler Elevator Corp. v. U.S. ex rel. Kirk*, 563 U.S. 401, 413 (2011) (citation omitted).[13]

This Circuit requires dismissal when:  (1)  the allegations made by the relator already

have been publicly disclosed; (2) disclosed information was substantially the same as that in

the relator's suit; and (3) relator is not an "original source" of that information.   *Osheroff*,

776 F.3d at 812.

### B.      Bernier's Allegations Are Substantially the Same as Prior Public Disclosures in Various News Sources.

The vast majority of Bernier's allegations merely repeat previously waged attacks on

Defendants in news media sources, including newspapers and magazines.   *See Osheroff*, 776

F.3d at 813 ("Newspaper articles clearly qualify as news media."); *U.S. ex rel. Barber v.*

---

[12]      Although her allegations regarding copyright violations, accounting procedures, terminating admissions staff, and a potential pro bono program are not subsumed within the public disclosure bar, as discussed *infra* Section III.B, they do not provide a basis for any violation of the FCA.

[13]      *See also Hopper v. Solvay Pharm., Inc.*, 590 F. Supp. 2d 1352, 1358 (M.D. Fla. 2008) ("The purpose [] is to prevent opportunistic lawsuits by individuals with no personal knowledge of fraud who gathered their information from the public domain.").  As part of amendments to the FCA in 2010, the Bar was changed from a jurisdictional Bar to an affirmative defense.  *See U.S. ex rel. Osheroff v. Humana, Inc.*, 776 F.3d 805, 810 (11th Cir. 2015) (holding that the amended statute "creates grounds for dismissal for failure to state a claim rather than for lack of jurisdiction").

*Paychex, Inc.*, 2010 WL 2836333, at *8-9 (S.D. Fla. 2010) (including magazine articles and websites in list of public disclosures barring relator's claims).  Public websites also fall within the "broad sweep" of news media under the Bar.  *Osheroff*, 776 F.3d at 813.

The publicly disclosed information need not be identical to a relator's allegations for the Bar to apply; they need only be "substantially the same."  § 3730(e)(4)(A).  This prong is simply a "quick trigger to get to the more exacting original source inquiry," and it is satisfied if the claims are based "in any part" on public disclosures, regardless of whether relator actually viewed or relied upon the publicly disclosed information.  *Cooper v. Blue Cross and Blue Shield of Fla., Inc.*, 19 F.3d 562, 567-68 & n.10 (11th Cir. 1994) (citation omitted)).[14]

Similarly, prior public disclosures need not allege fraud but need only be sufficient to "raise an inference of fraud" to trigger the Bar.  *Osheroff*, 776 F.3d at 814.  In *Osheroff*, the Eleventh Circuit applied the Bar even though it acknowledged that the relator "include[d] some details that [were] not present in the public disclosures...."  *Id.* at 814-15.  The court held the public disclosures were "substantially similar" to the relator's allegations because they disclosed the "essential allegations" of the complaint: that the clinics provided free services and that these services were "paid for by taxpayer dollars."  *Id.* at 814 (citation omitted).  Such disclosures were sufficient to raise "an inference of fraud" and invoke the Bar.  *Id.*; *see Payton*, 2017 WL 3910434, at *6-7 (applying Bar because relator's new allegations "merely offer[ed] greater detail," and there was "significant overlap" with public disclosures).

---

[14]     *See also Osheroff*, 776 F.3d at 814 (adopting the same *Cooper* analysis); *U.S. ex rel. Payton v. Pediatric Servs. of Am., Inc.*, 2017 WL 3910434, at * 6 (S.D. Ga. 2017) (determining whether public disclosures are substantially the same "is not particularly exacting").

Bernier's allegations are substantially similar to those made previously in public:[15]

***Admitting academically unqualified students***:   One of Bernier's primary allegations is that CSL admitted students who were academically underqualified, or incapable of passing the bar exam.   Compl. ¶¶ 55-59, 100(b), (h).   Such contentions – often biased and uninformed – have been leveled at CSL and InfiLaw for years prior to this suit.   In fact, two articles published in *The Atlantic* by Paul Campos – well before the Complaint – made these very same contentions.[16]   In fact, the entire thrust of the Complaint largely mimics these two articles.   Campos' September 2014 article purported to investigate the admissions practices at InfiLaw (including CSL), suggesting (incorrectly) that they "tak[e] large numbers of students that almost no other ABA-accredited law school would consider admitting."  *Exhibit 1*.   He cited each InfiLaw school's LSAT.  *Id.*   The author, a law school professor like Relator, asserted that, due to their purportedly meager qualifications, a large proportion of InfiLaw's students would never be capable of passing the bar.  *Id.*   He also argued (incorrectly) that these practices appeared to violate ABA's standards and that InfiLaw and CSL admitted these students solely to enlarge their profits.  *Id.*

The October 2015 follow-up article claimed that InfiLaw's entrance requirements fell even further between 2013 and 2015.  *Exhibit 2*.   The report argued that such practices should

---

[15]     The Court may consider the documents cited in the following pages because "[c]ourts may take judicial notice of publicly filed documents, [such as newspaper articles,] at the Rule 12(b)(6) stage" to assess the applicability of the Bar.  *Osheroff*, 776 F.3d at 811-12 & n.4; *see also* Fed. R. Evid. 201(b)-(d) (permitting judicial notice).   Defendants submit these articles for the "purpose of determining which statements the documents contain (but not for determining the truth of those statements)" – a proper purpose for requesting judicial notice.  *Id.* at 811 n.4; *see also Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir. 1999).   For the Court's convenience, the documents referenced in this section are attached as exhibits.

[16]     Paul Campos, *The Law School Scam*, The Atlantic (Sept. 2014),
https://www.theatlantic.com/magazine/archive/2014/09/the-law-school-scam/375069/ (*Exhibit 1*); Paul Campos, *The Law School Scam Continues*, The Atlantic (Oct. 23, 2015),
https://www.theatlantic.com/education/archive/2015/10/law-school-scam-getting-worse/412159/ (*Exhibit 2*).

lead to these schools losing their accreditation, and that federal regulators should "take a more aggressive role in protecting both severely underqualified prospective law students and American taxpayers" from these practices. *Id.* A number of other news articles and websites have repeated or expanded on the same theme.[17]

All of these articles – and there are many more[18] – criticizing the admissions model at InfiLaw and CSL were published well *before* Bernier filed the Complaint. Bernier's allegations about CSL's admissions practices are based on the same information, and therefore qualify as substantially the same for purposes of the Bar. *Cooper*, 19 F.3d at 567-68 & n.10; *Osheroff*, 776 F.3d at 814. As in *Osheroff*, the public disclosures here discuss the same "essential allegations" that Bernier alleges, *i.e.*, that CSL and InfiLaw allegedly admitted students who were underqualified and incapable of passing the bar and thus

---

[17]    David Frakt, *David Frakt on His Shorter Than Expected Presentation at Florida Coastal School of Law*, The Faculty Lounge (Aug. 8, 2014), http://www.thefacultylounge.org/2014/08/david-frakt-on-his-shorter-than-expected-presentation-at-florida-coastal-school-of-law.html (*Exhibit 3*) (asserting that InfiLaw admitted poorly-qualified students, predicting that InfiLaw schools' bar passage statistics would suffer as a result, opining that ABA let InfiLaw schools "backslide" into non-compliance with accreditation standards after initially earning ABA approval, and that InfiLaw schools' current practices violate such standards); *Guest Post by a Former Charlotte Law Professor, Part  2*, Outside the Law School Scam (Sept. 15, 2014), http://outsidethelawschoolscam.blogspot.com/2014/09/guest-post-by-former-charlotte-law-prof_15.html (*Exhibit 4*). (decrying the admission of students who scored in the 10-20 percentile on the LSAT); David Frakt, *Don't Say I Didn't Warn You, Florida Coastal*, The Faculty Lounge (Nov. 13, 2014), http://www.thefacultylounge.org/2014/11/dont-say-i-didnt-warn-you-florida-coastal.html (*Exhibit  5*) (suggesting bar passage rates would drop because of admitting students with high-risk entrance statistics and wondering whether low admission standards and poor bar passage results would motivate ABA to take action against InfiLaw schools); David Frakt, *How Low Can You Go, InfiLaw?*, The Faculty Lounge (Dec. 18, 2014), http://www.thefacultylounge.org/2014/12/how-low-can-you-go-infilaw.html (*Exhibit 6*) (noting drop in bar passage scores, criticizing CSL's admissions policies, and demanding investigations by ABA, Department of Education, state attorneys general, and Department of Justice); Debra Cassens Weiss, *This Law School Had a 30% Bar Pass Rate; Do Lower Standards Presage Troubled Times for Law Grads?*, ABA Journal (Oct. 26, 2015), http://www.abajournal.com/news/article/this_law_school_had_a_30_bar_pass_rate_is_it_a_sign_of_more_widespread_fail/ (*Exhibit 7*) (discussing qualifications of students admitted to CSL and other InfiLaw schools, observing drops in bar passage at InfiLaw schools, blaming low admission standards for results, and claiming over 50% of CSL students are at "extreme" risk of failing future bar exams).

[18]    *See, e.g.*, archived articles with the tags "InfiLaw" or "Charlotte Law School" beginning in at least March 2013 on Above the Law, www.abovethelaw.com.

allegedly violated ABA standards.   776 F.3d at 814.   It does not matter whether Bernier included the additional detail that the conduct was allegedly fraudulent, as the accusations in the various media sources also "raise an inference of fraud."   *Id.*; *see also Payton*, 2017 WL 3910434, at *6-7 (dismissing case because relator "merely offer[ed] greater detail" and there was "significant overlap" with the public disclosures).

***InfiLaw involvement in school admissions***:   Bernier alleges that one reason low-scoring students were admitted is that *InfiLaw* controlled the admissions process, instead of CSL's faculty.   Compl. ¶¶ 57-58, 100(a), (h).   This allegation also was reported in the media before the Complaint was filed.   In fact, *The Atlantic's* 2014 article claimed that all InfiLaw schools had identical median and bottom-quarter LSAT scores, "suggesting that these [admission requirement] numbers were chosen somewhere higher up on the corporate ladder."   *Exhibit 1.*   *The Atlantic's* 2015 follow-up article refers to all three schools simply as "InfiLaw schools" without distinguishing among them.   *Exhibit 2.*   Other publications have repeated the same allegations.[19]

In a substantially similar allegation, Bernier contends that "[a]dmissions decisions and the number of law students to admit to [CSL] are entirely controlled by InfiLaw."   Compl. ¶ 57.   Bernier also recycles the prior public allegations that CSL and InfiLaw purportedly violated ABA standards for the admission of students.   This is the same, of

---

[19]     Julie Rose, *After 8 Years, Charlotte School Of Law Has Become NC's Largest. So What's Value Of Degree?*, WFAE (Sept. 12, 2013), http://wfae.org/post/after-8-years-charlotte-school-law-has-become-ncs-largest-so-whats-value-degree (*Exhibit 8*) ("The trend among [InfiLaw] institutions is to tout themselves an alternative for the 'underserved,' as InfLaw emphasized in an email response to questions.   They typically accept students with much lower grades and LSAT scores . . . and they accept a lot more students than most schools." (ellipsis in original)); *Exhibit 5* ("Will these results finally cause InfiLaw to change their admission policies, and stop admitting huge numbers of high-risk students?   One can always hope, but I wouldn't bet on it."); *Exhibit 7* ("All of [InfiLaw's] law schools began slashing admissions standards in 2012, and now their students are paying the price.").

course, as alleging that each school's faculty is not making such decisions, but even if Bernier's claim about the role of the faculty were considered new, it "merely offers greater detail." *Payton*, 2017 WL 3910434, at *6 ("Merely providing additional detail is simply not enough."). Additionally, putting a new label on an old contention – like claiming these practices violate "ABA Rule 205(b)" – does not transform them into something new or distinct. "Indeed, the court believes it to generally be the province of lawyers and courts to create legal theories from a certain set of facts, not the province of *qui tam* relators." *U.S. ex rel. Brown v. BankUnited Tr. 2005-1*, 235 F. Supp. 3d 1343, 1361 (S.D. Fla. 2017).

**CSL and InfiLaw use an alternative admissions test to circumvent low LSAT scores**: Bernier alleges CSL admitted unqualified students by using an alternative to the LSAT called AAMPLE. Compl. ¶¶ 63-65, 100(b), (h). This challenge to InfiLaw's AAMPLE program made the rounds in news media years before Bernier filed suit. *The Atlantic* highlighted this alternative admissions program in September 2014. *Exhibit 1*. *Outside the Law School Scam* suggested in September 2014 that many students were required to take a "pre-1L program" before they could "participate in actual classes." *Exhibit 4*. In 2015, the *National Law Journal* wrote about a lawsuit filed against an InfiLaw school which alleged, among other things, that all the InfiLaw schools (including CSL) were using AAMPLE to admit students with low LSAT scores or undergraduate grades.[20]

**Extended bar review living stipends**: Bernier alleges that Defendants "engage[] in generous incentives to prevent students from taking the bar exam if they appear statistically

---

[20]     Karen Sloan, *Lawsuit: InfiLaw Paying Law Grads to Put Off Bar Exam*, National Law Journal (June 4, 2015), http://www.nationallawjournal.com/id=1202728422268/Lawsuit-Infilaw-Paying-Law-Grads-To-Put-Off-Bar-Exam?slreturn=20170911160002 (*Exhibit 9*).

unlikely to pass" in order to "manipulate its statistic for first-time takers."  Compl. ¶ 79, 83, 100(h), (i).  These programs in fact assisted students who needed more time to prepare for the bar exam by providing a living stipend so they could afford to study rather than quit and return to work, and they were disclosed and dissected in 2015 through coverage of a prior lawsuit.  *Exhibit 9*.  This coverage included the allegation – which Bernier repeats – that deans at InfiLaw schools called students the night before the bar to persuade them to defer, *id.*, which several other publications also had reported.[21]  Further, any argument that Bernier has provided more details specific to CSL is of no moment, because such detail does not expose a new scheme or materially add to publicly disclosed allegations.  *Payton*, 2017 WL 3910434, at \*6-7.

*Poor Bar Passage Results*:  Bernier claims that InfiLaw graduates, including CSL graduates, have suffered a "marked decline" in bar passage rates from 2010 to 2016, and that these rates may constitute a violation of ABA standards.  Compl. ¶ 81-82, 100(h).  These too were previously disclosed.  *The Atlantic's* 2015 article focused on InfiLaw's bar results, claiming that "[b]ar-passage rates at the InfiLaw schools are now in free fall," before reviewing some of the same statistics Bernier includes.  *Exhibit 2*.  The article also theorized

---

[21]     Staci Zaretsky, *Which Law Schools Allegedly Paid Students Not To Take The Bar Exam?*, Above the Law (June 5, 2015), p. 1,  https://abovethelaw.com/2015/06/which-law-schools-allegedly-paid-students-not-to-take-the-bar-exam/?rf=1 (*Exhibit 10*); *Infilaw Allegedly Paid Graduates Not to Take the Bar; Faces Fraud and Discrimination Allegations*, Outside the Law School Scam (June 6, 2015), http://outsidethelawschoolscam.blogspot.com/2015/06/infilaw-allegedly-paid-graduates-not-to.html  (*Exhibit 11*); Karen Sloan, *Arizona Summit Defends Encouraging Grads to Delay Bar Exam*, National Law Journal (June 11, 2015),  http://www.nationallawjournal.com/id=1202729108185/Arizona-Summit-Defends-Encouraging-Grads-to-Delay-Bar-Exam (*Exhibit 12*); Staci Zaretsky, *Law School Dean Allegedly Begged Graduates Not to Take the Bar Exam*, Above the Law (Jul. 28, 2015), https://abovethelaw.com/2015/07/law-school-dean-allegedly-begged-graduates-not-to-take-the-bar-exam-on-the-day-before-the-test/ (*Exhibit 13*).

that "a law school with a low enough bar-passage rate is at risk of losing its accreditation, and therefore access to federal student loans."  *Id.*[22]

These articles – like the Complaint – put a deleterious and flawed spin on InfiLaw's programs, which were voluntary programs designed to assist students who needed more time to study for the bar but could not afford the living expenses.  Regardless, the articles, like Bernier, all suggested the program was designed to improve bar passage rates.[23]  And several other public sources similarly criticized InfiLaw's bar statistics.[24]  These publications make the same allegations Bernier repeats, *i.e.*, purportedly producing graduates with poor chances of passing the bar, and suggesting low passage rates may violate ABA standards.

***Hiring CSL graduates to improve employment statistics***:  Bernier's allegations that CSL and InfiLaw hired graduates merely to improve employment statistics (Compl.  ¶ 80; 100(f)) were also previously reported.[25]  Bernier's allegations are therefore barred.[26]

---

[22]     *See also Exhibit 5* (comparing actual bar results to predictions from a post about admission statistics); David Frakt, *Three Myths Used to Justify Predatory Admission Practices - The Instructive Example of InfiLaw*, The Faculty Lounge (June 3, 2016), http://www.thefacultylounge.org/2016/06/three-myths-used-to-justify-predatory-admission-practices-the-instructive-example-of-infilaw-.html (*Exhibit 14*) (recapping low scores on the February 2016 bar exam).

[23]     *Exhibit 9* (claiming InfiLaw attempted to "prop up declining bar-passage rates" and that InfiLaw's advertised bar-passage rate was 40 percentage points higher than the actual pass rate); *Exhibit 10*, p. 1 (listing the passage rates for each InfiLaw school); *Exhibit 12* ("The school's first-time pass rate for the July 2013 sitting had dropped to 68 percent—13 percentage points below the state average for all graduates of ABA-accredited law schools who took the Arizona bar. The first-time pass rate landed below 55 percent for each of the three subsequent administrations, ranging from 12 to 20 percent below the state average."); *Exhibit 13* (claiming poor results).

[24]     Kathryn Rubino, *Law School Dean Blames Lazy Students for Terrible Bar Passage Statistics*, Above the Law (Sept. 2, 2015), https://abovethelaw.com/2015/09/law-school-dean-blames-lazy-students-for-terrible-bar-passage-rate/ (*Exhibit 15*) (claiming CSL's bar passage rate was 20% below statewide average); *Exhibit 7* (suggesting InfiLaw bar passage results were evidence of harm by lower admission standards); Editorial Board, *The Law School Debt Crisis*, N.Y. Times (Oct. 24, 2015), https://www.nytimes.com/2015/10/25/opinion/sunday/the-law-school-debt-crisis.html (*Exhibit 16*) (highlighting InfiLaw bar passage rates).

[25]     *E.g.*, *Exhibit 1* ("And even this [unemployment] figure [for InfiLaw schools] is, as a practical matter, an understatement:  approximately one in eight of their putatively employed graduates were in temporary jobs

***Grading curve used to pass students who should have failed***:  Bernier alleges several incidents where CSL and InfiLaw supposedly set the grading curve to pass students who (she believes) should have failed, and thus "falsely certified" these students as achieving "satisfactory academic progress," a regulatory requirement ("SAP").   Compl. ¶¶ 66-70; 100(g),(h).   The erroneous contention that InfiLaw schools pass students who should be academically dismissed is not new.   This accusation appeared in a 2014 article that opined InfiLaw sets its grading curves at a level based on a population of students that is more qualified than the students admitted by the schools' actual admissions standards.  *See Exhibit 3.*  The article alleges that the result of the allegedly inappropriate curve is undesirable grade inflation that passes and graduates students who would be incapable or unqualified to pass a bar exam and ostensibly should not continue in law school.  *Id.*  The author argues that such practices would eventually lead to noncompliance with ABA standards and academic probation.  *Id.*

Bernier makes the same "essential allegation" that InfiLaw admits underqualified students and that its grading practices and policies pass students who should fail.  This is the theory Frakt and others previously espoused, and thus Bernier's allegations are substantially similar.  The prior public disclosures also are sufficient to raise an inference of fraud around InfiLaw's grading practices because they imply that the schools are manipulating grades.

---

created by the schools and usually funded by tuition from current students."); Steven J. Harper, *Too Many Law Students, Too Few Legal Jobs*, N.Y. Times (Aug. 25, 2015), https://www.nytimes.com/2015/08/25/opinion/too-many-law-students-too-few-legal-jobs.html (*Exhibit 17*) (explicitly removing school-funded jobs from InfiLaw schools' employment statistics).

[26]    Similar public allegations have been made against other law schools.  *See, e.g.*, Jordan Weissmann, *The Jobs Crisis at Our Best Law Schools Is Much, Much Worse Than You Think*, The Atlantic (Apr. 9, 2013), https://www.theatlantic.com/business/archive/2013/04/the-jobs-crisis-at-our-best-law-schools-is-much-much-worse-than-you-think/274795/#main-content (*Exhibit 18*).

*Osheroff*, 776 F.3d at 814.  And, as noted before, Bernier cannot escape the Bar by "[m]erely providing additional detail" about specific incidents (*see Payton*, 2017 WL 3910434, at \*6), or by placing a new label (wrongfully certifying SAP) on the same grade curve activity (*see BankUnited Tr. 2005-1*, 235 F. Supp. 3d at 1361).  The "significant overlap" between Bernier's allegations and the public articles – both alleging the same grade curve policies – invokes the "quick trigger" of the Bar and require Bernier to demonstrate she is an original source.  *Payton*, 2017 WL 3910434, at \*7; *Osheroff*, 776 F.3d at 814.

    ***Allegations related to graduates' amount of debt or earning capacity*** (Compl. ¶¶ 17, 48-49, 100(k)):  This issue has been widely debated in numerous publications, both for the legal industry as a whole and for InfiLaw specifically.[27]  Bernier's allegations about CSL graduates' debt load use a structure and calculation nearly identical to these articles.  *Compare, e.g.*, Compl. ¶¶ 48-49 (detailing costs and calculating debt loads) *with Exhibit 1, supra*.[28]  Such blatant repetition easily falls within the Bar.  *See U.S. ex rel. Schubert v. All*

---

[27]    Paul Bowers, *InfiLaw, Charleston School of Law, and the Rise of For-Profit Colleges*, Charleston City Paper (Aug. 14, 2013), https://www.charlestoncitypaper.com/charleston/infilaw-charleston-school-of-law-and-the-rise-of-for-profit-colleges/Content?oid=4700624 (*Exhibit 19*) ("Increasingly, potential law students must weigh the risks and consider whether incurring tens of thousands of dollars in student loan debt is worth it in the long run.  This is especially true at for-profit law schools, where tuition tends to be higher."); Paul Campos, *Does Your Conscience Bother You?*, Lawyers Guns & Money (Jul. 6, 2013), http://www.lawyersgunsmoneyblog.com/2013/07/does-your-conscience-bother-you (*Exhibit 20*) ("All [Infilaw schools] feature atrocious employment statistics, sky high tuition, enormous class sizes, and graduates with massive debt loads."); *Exhibit 1* (claiming InfiLaw schools "admit large numbers of severely underqualified students; these students in turn take out hundreds of millions of dollars in loans annually, much of which they will never be able to repay.  Eventually, federal taxpayers will be stuck with the tab"; and trying to estimate graduate salaries based on size of employers); *Exhibit 2*  ("InfiLaw is not only exploiting these students, but also taxpayers who will foot the bill when these students cannot repay the hundreds of millions of dollars they borrow."); Kyle McEntee, *Caveat Venditor: Empty Threats from Notorious For-Profit Law Schools*, Above The Law  (May  26,  2016),  https://abovethelaw.com/2016/05/caveat-venditor-empty-threats-from-notorious-for-profit-law-schools/ (*Exhibit 21*) (guessing that few InfiLaw graduates make large enough salary to pay law school debts).

[28]    Although Bernier asserts a claim for violation of the standard regarding graduates' abilities to earn a sufficient income, she does not make any factual allegations about CSL or InfiLaw graduates' salaries and thus fails to state a claim.  *See* Compl. ¶¶ 17, 100(k); *infra*, section III.B & n.43.

*Children's Health Sys., Inc.*, 941 F. Supp. 2d 1332, 1335 (M.D. Fla. 2013) (applying Bar where the allegations quote or reference publicly disclosed information).   The differences between the Complaint and the articles are insignificant updates or tweaks to the calculations. Such details do not suffice to avoid the Bar.[29]

**InfiLaw and CSL accepted federal student loans**:   All of Bernier's allegations rely on the underlying fact that CSL and InfiLaw received federal funds through federal student loans.   Compl. ¶¶ 95-125.   Plainly, this is not a new allegation, as CSL published this information on its own website,[30] and this fact has been widely publicized in several sources discussed above.   *E.g.*, *Exhibit 1*; *Exhibit 16*.   Indeed, the very idea of bringing a *qui tam* lawsuit on the basis of InfiLaw and CSL accepting federal loans and purportedly engaging in the practices described above was previously debated in public fora.[31]   These sources "raised an inference of fraud," because they reported that Infilaw used the same practices to admit and retain students and to profit from federal student loans as Bernier alleges, even if the articles did not explicitly accuse InfiLaw of wrongdoing.   *See Osheroff*, 776 F.3d at 814 (complaint barred where a public disclosure revealed substantially the same facts without asserting Defendants committed wrongdoing).

Accordingly, all of Bernier's claims are barred unless she is an original source.

---

[29]    *Osheroff*, 776 F.3d at 814 ("[T]he significant overlap between Mr. Osheroff's allegations and the public disclosures is sufficient to show that the disclosed information forms the basis of this lawsuit and is substantially similar to the allegations in the complaint."); *Payton*, 2017 WL 3910434, at *6-7.

[30]    *E.g.* Charlotte School of Law, *Charlotte School of Law Fast Facts* (Jul. 1, 2015), http://www.charlottelaw.edu:80/wp-content/uploads/2014/11/FastFacts-2014.pdf [https://web.archive.org/web/20150701204016/http://www.charlottelaw.edu:80/wp-content/uploads/2014/11/FastFacts-2014.pdf] (*Exhibit 22*) (showing average federal student loan debt).

[31]    *Exhibit 10*, p. 6 (commenter in article postulating that "the real money [in] these is going to be under the False Claims Act," with follow-up comments related to the merits of such a lawsuit).

### C.     Bernier Is Not an Original Source.

Because Bernier's allegations are substantially the same as prior public disclosures, she may only maintain her action if she qualifies as an original source of the allegations.   § 3730(e)(4)(A); *see U.S. ex rel. Saldivar v. Fresenius Med. Care Holdings, Inc.*, 841 F.3d 927, 934 (11th Cir. 2016) (if publicly disclosed information "in any part" forms the basis for a relator's claims, relator must establish that he is an original source).   An original source is someone who "either (i) prior to a public disclosure [], has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) [*sic*] who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section."   § 3730(e)(4)(B).

Plainly, Bernier is not an original source under the first prong because she disclosed her claims to the Government on June 1, 2016, well after the public disclosures occurred. Compl. ¶ 92.

Bernier also cannot satisfy the second prong as a matter of law.   A relator must have "knowledge that is independent of and materially adds to" the existing public disclosures.[32] A relator has "independent" knowledge only if her knowledge derives from something other than the prior public disclosures.[33]   Knowledge is "independent" when the relator presents facts showing that she would have found the information on which she relies even absent the

---

[32]     *Osheroff*, 776 F.3d at 815.

[33]     *U.S. v. Molina Healthcare of Fla., Inc.*, 2015 WL 5562313, at *8 (S.D. Fla. 2015), *aff'd sub nom.*, *Wilhelm v. Molina Healthcare of Fla., Inc.*, 674 F. App'x 960 (11th Cir. 2017) (*per curiam*); *Battle*, 468 F.3d at 762-63 (requiring a factual basis for establishing relator's independent knowledge of otherwise publicly disclosed information and finding relator lacked "independent" knowledge because she failed to provide facts showing that she "participated in the state audits on which she relie[d]").

public disclosure.[34]   To be "material," the relator's allegations must disclose "essential elements comprising the fraudulent transaction . . . so as to raise a reasonable inference of fraud" that are not found in previous public disclosures.  *Payton*, 2017 WL 3910434, at *7-8 (citation omitted).   Merely providing background information about previously disclosed allegations is insufficient.  *U.S. ex rel. Osheroff v. Humana Inc.*, 2012 WL 4479072, at *12 (S.D. Fla. 2012), *aff'd* 776 F.3d at 815.  Bernier "must allege specific facts – as opposed to mere conclusions" that establish her status as an original source.[35]

Bernier cannot satisfy this test.  First, she relies entirely on her conclusory declaration that she "is the original source of the allegations contained herein."  Compl. ¶ 2.  This is insufficient as a matter of law.  *Lewis*, 438 F. App'x at 888 (rejecting original source claim where "[t]oward the end of Appellants' brief . . . Appellants make the conclusory assertion that they were the 'original source' of the information and therefore it would not matter whether the information was ultimately held to be publicly disclosed").[36]  Indeed, Bernier fails to explain how or when she learned of the alleged events and cannot establish that they

---

[34]      *See, e.g.*, *U.S. ex rel. Lewis v. Walker*, 438 F. App'x. 885, 888 (11th Cir. 2011); *U.S. ex rel. Fine v. MK-Ferguson Co.*, 99 F.3d 1538, 1547 (10th Cir. 1996) ("[I]ndependent knowledge is knowledge which is not secondhand knowledge.").

[35]      *BankUnited Tr. 2005-1*, 235 F. Supp. 3d at 1359–60 (dismissing original source allegations that "do not describe how or when he obtained any alleged direct or independent knowledge of the Defendants' fraudulent acts; rather, they simply conclude that he obtained such knowledge"); *see also U.S. ex rel. Keeler v. Eisai, Inc.*, 2013 WL 12049080, at *16 (S.D. Fla. 2013) ("[A] relator cannot segue into discovery simply by filing prolix but unsubstantiated claims."), *aff'd*, 568 F. App'x 783 (11th Cir. 2014) (*per curiam*).

[36]      *See also Schubert*, 941 F. Supp. 2d at 1336 (finding allegation "Relator is an original source as defined by [] § 3730(e)(4)(B)" is "a legal conclusion … not entitled to the presumption of truth") (citation omitted)); *In re Nat. Gas Royalties*, 562 F.3d 1032, 1045 (10th Cir. 2009) ("To establish source status knowledge, a *qui tam* plaintiff must allege specific facts—as opposed to mere conclusions—showing exactly how and when he or she obtained direct and independent knowledge of the fraudulent acts alleged in the complaint and support those allegations with competent proof." (citation omitted)); *BankUnited Tr. 2005-1*, 235 F. Supp. 3d at 1359–60 ("The Court will not consider the Relators original sources based on a single, unsupported allegation that they were privy to nonpublic information." (internal quotation and citation omitted)).

were derived from something other than existing public disclosures. *See BankUnited Tr. 2005-1*, 235 F. Supp. 3d at 1359–60; *U.S. ex rel. Brown v. Walt Disney World Co.*, 361 F. App'x 66, 68 (11th Cir. 2010) ("And Plaintiff provided nothing, other than her own conclusory allegation, to show that she was an original source of the information on which her complaint was based.").

Second, Bernier cannot qualify as an original source because she offers only "[s]econdhand information, speculation, background information, or collateral research" which "do not satisfy a relator's burden of establishing the requisite knowledge" to be an original source. *In re Nat. Gas Royalties*, 562 F.3d at 1045 (cited with approval in *Saldivar*, 841 F.3d at 935).[37]  If the relator "never participated in the negotiating, drafting or implementation" of the allegedly fraudulent program – here CSL's alleged "bad faith" entry into the PPA – she necessarily lacks such knowledge. *Alcan Elec. and Eng'g, Inc.*, 197 F.3d at 1021.[38]

---

[37]    *See also U.S. v Alcan Elec. and Eng'g, Inc.*, 197 F.3d 1014, 1021 (9th Cir. 1999) (affirming dismissal where relator "never participated in the negotiating, drafting, or implementation of the" allegedly fraudulent program nor "played any role in submitting false claims to the government"); *Saldivar*, 841 F.3d at 935 (placing "extreme limit" on secondhand knowledge); *U.S. ex rel. Devlin v. State of California*, 84 F.3d 358, 361 & n.4 (9th Cir. 1996) (relators not original sources because they did not see fraud personally or obtain knowledge through their own labor, but derived secondhand).

Although the 2010 amendment to the FCA removed the word "direct" from the requirement that an original source have "direct and independent knowledge of the information on which the allegations are based" (31 U.S.C. § 3730(e)(4)(B)(2006)), the 11th Circuit applies the same standards to determine whether an original source has "independent knowledge" under the current version. *See, e.g. Osheroff*, 776 F.3d 815-16 (applying similar standards to pre- and post-amendment claims); *Payton*, 2017 WL 3910434, at *7-8 (same); *Jacobs v. Bank of Am. Corp.*, 2017 WL 2361943, at *7 (S.D. Fla. 2017) (applying pre-amendment standard for "independent" prong of post-amendment claim).

[38]    *See also U.S. ex rel. Urquilla-Diaz*, 2017 WL 2992197, at *8 (S.D. Fla. 2017) (rejecting original source argument because relator was not "directly involved in the development" of an allegedly fraudulent plan); *U.S. v. Univ. of Phoenix*, 2014 WL 3689764, at *8-9 (E.D. Cal. 2014) (holding relators were not original source based on same reasoning); *U.S. ex rel. Jones v. Collegiate Funding Servs., Inc.*, 2011 WL 129842, at *11 (E.D. Va. 2011) ("Relators must show that they gained their knowledge through their own efforts and did not derive those allegations from prior public disclosures.").

The Complaint lacks any allegation that Bernier was involved in the PPA process, nor could she have been because she started *after* Defendant's alleged "bad faith" entry into the PPA.  *Supra*, Section I.  Bernier was a faculty member; she never worked in admissions, on financial aid issues, on grading requirements, on PPA certifications, or on submitting claims for payment.  Simply put, the "knowledge" upon which the Complaint is based is "derivative of the information of others" or dependent on a "public disclosure."  *U.S. ex rel. Hafter D.O. v. Spectrum Emergency Care, Inc*., 190 F.3d 1156, 1160, 1162 (10th Cir. 1999).

Finally, Bernier's (second-hand) allegations do not materially add to the publicly disclosed information; they merely re-hash old criticisms of InfiLaw and CSL.  To the extent Bernier offers any new information, it consists of incremental details and background information that does nothing to "alert the government of a fraud which would have otherwise gone unnoticed."  *Humana, Inc.*, 2012 WL 4479072, at *12 ("Relator fails to persuade the Court that the allegations about which he claims to have independent knowledge materially add to the information already in the public domain."); *Osheroff*, 776 F.3d at 815 ("The amended complaint includes some details that are not present in the public disclosures. . . . [Relator's] information does not materially add to the public disclosures, which were already sufficient to give rise to an inference [of FCA violations].").  Because Bernier is not the original source of the publicly disclosed allegations, all of her FCA claims are barred and must be dismissed.

### III.    COUNTS I & II FAIL TO STATE A CLAIM FOR VIOLATION OF FCA SUBSECTIONS 3729(A)(1)(A) AND (A)(1)(B).

In addition to the independent grounds for dismissal shown above, Counts I and II must be dismissed because Bernier has not sufficiently alleged scienter, falsity, or materiality under 31 U.S.C. § 3729(a)(1)(A) and (B), or the additional element of presentment required under § 3729(a)(1)(A), all of which (except scienter) must be plead with particularity.[39]

#### A.    Bernier Offers Only Bare Conclusory Assertions of Knowledge.

Bernier's allegations with respect to Defendants' knowledge are nothing but unsupported conclusions, which are legally insignificant.  "Although the FCA uses the seemingly straightforward word 'knowingly,' the statute's state of mind element is actually quite nuanced."  *Sanford-Brown, Ltd.*, 788 F.3d at 700-01 (citation omitted).  The FCA defines "knowingly" to require actual knowledge, deliberate ignorance, or reckless disregard. 31 U.S.C. § 3729(b)(1)(A).

And while knowledge may be alleged generally, allegations of scienter must consist of more than "formulaic recitation[s] of the elements of a cause of action[,]" and "conclusory allegations [and] legal conclusions masquerading as facts."  *Keeler*, 568 F. App'x at 792-93 (quoting *Twombly*, 550 U.S. at 555).  Specifically, "relator must establish the defendants' mindset at the time of entry into the PPA. . . . In other words, [relator needs] to prove that [the defendants] *knowingly* entered into the PPA *to defraud the government*[.]"  *Sanford-Brown, Ltd.*, 788 F.3d at 709.  This, Bernier cannot do.  As demonstrated in Section I, *supra*, Bernier cannot make allegations regarding InfiLaw or CSL's mindset at the time CSL

---

[39]    *U.S. ex rel. Phalp v. Lincare Holdings, Inc.*, 857 F.3d 1148, 1154 (11th Cir. 2017); *U.S. ex rel. Sharpe v. Americare Ambulance*, 2017 WL 2840574, at *4 (M.D. Fla. 2017) (citation omitted); Rule 9(b).

entered into the PPA in 2011, because that was long before Bernier joined CSL. Even for alleged conduct that post-dated the PPA, Bernier offers no factual allegations related to Defendants' purported knowledge of the activity or that Defendants knew that the activity purportedly rendered claims for payment false.

Instead, Bernier makes only sweeping and conclusory allegations of "knowledge" on the part of Defendants. *See* Compl. ¶¶ 100 ("Infilaw and CSOL knowingly violated Title IV of the HEA, its implementing regulations. . . and the PPA."), 101 ("Infilaw and CSOL knowingly defrauded the federal government"), 104 ("Infilaw and CSOL made fraudulent claims with knowledge that such claims would be tied to an increase in funds."); 111 ("CSOL knowingly entered into the initial PPA . . . in bad faith."); 116 ("Infilaw and CSOL made the false record with knowledge that the initial PPA was made in bad faith, and would be tied to an increase in funds.").

Where, as here, a relator "has made no allegations to support a finding Defendants had knowledge of the falsity of its certification and the resulting claims[,]" her Complaint must be dismissed. *See Rutledge v. Aveda*, 2015 WL 2238786, *10 (N.D. Ala. 2015) (finding it insufficient "to make only conclusory allegations of knowledge" and that relator "allege[d] no facts at all to support this element"); *U.S. ex rel. Pilecki-Simko v. Chubb Inst.*, 443 F. App'x 754, 760-61 (3d Cir. 2011) (conclusory allegations that defendant "knew" or "knowingly" acted were insufficient).

In addition, Bernier does not and cannot identify the person or persons at InfiLaw or CSL who allegedly had the requisite knowledge, and she fails to differentiate between the two Defendants, and Counts I and II should be dismissed for this additional reason. *Rutledge*

*v. Aveda*, 2015 WL 9826462, at *5 (N.D. Ala. 2015) (citing relator's failure to "allege any particular defendant had knowledge of any particular statement's falsity").

**B.    The Complaint Fails to Meet the Falsity Requirement.**

To satisfy the falsity element of the FCA, Bernier appears to be proceeding on an "implied false certification" theory, whereby a defendant may be liable if it fails "to disclose its non-compliance with a material statutory, regulatory, or contractual provision[.]" *Sharpe*, 2017 WL 2840574, at *6.  This Court has held that "two conditions must exist to impose liability under the Certification Theory:  'first, the claim does not merely request payment, but also makes specific representations about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contract requirements makes those representations misleading half-truths.'"  *U.S. ex rel. John Doe*, 2016 WL 3959343, at *3 (quoting *Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 136 S. Ct. 1989, 2001 (2016) ("*Escobar*")).  The Complaint fails this test.

As described in Section III.A, *supra*, Bernier cannot rely on the initial PPA as an allegedly "false record" (Compl. ¶ 113), since it exceeds the scope of her personal knowledge.[40]  However, even within the time period of her employment, Bernier fails to allege the content of any request for payment from the government that Defendants made, let

---

[40]    Bernier also improperly lumps the Defendants together in her causes of action.  For example, under Count II, she claims CSL entered into the PPA (the allegedly "false record"), but then says both Defendants "made" it, "caused" it to be submitted to the government, and "used" it to submit false claims.  Compl. ¶¶ 111-112, 114, 116.  She does not elaborate on InfiLaw's role in doing so if CSL was the signatory, in violation of Rule 9(b).  *Ambrosia Coal & Constr. Co. v. Pages Morales*, 482 F.3d 1309, 1317 (11th Cir. 2007) ("in a case involving multiple defendants . . . the complaint should inform each defendant of the nature of [its] alleged participation in the fraud" (quoting *Brooks v. Blue Cross and Blue Shield of Fl., Inc.*, 116 F.3d 1364, 1381 (11th Cir. 1997))); *see also U.S. ex rel. Lee v. Corinthian Colls.*, 655 F.3d 984, 998 (9th Cir. 2011) (relator must specify each defendant's role in making a false statement to the government and how each defendant "participated in certifying HEA compliance . . . for the purpose of receiving federal funds").

alone whether those requests made "specific representations about the goods or services provided," or how those representations were "misleading half-truths." *See Sanford-Brown, Ltd.*, 840 F.3d at 447 (noting relator failed to establish defendant "made any representations at all in connection with its claims for payment, must less false or misleading representations"). Thus, she fails the two-pronged *Escobar* test adopted by this Court.

In addition, Bernier faces another insurmountable obstacle: her allegations of purported misconduct do not describe violations of Title IV, its implementing regulations, or the PPA. In fact, the vast majority of Bernier's allegations do not relate to activity that she contends violated a specific rule or regulation.[41] And, as shown below, the remaining allegations describe conduct Defendants allegedly engaged in *after* CSL entered into its PPA, none of which sufficiently alleges that Defendants actually violated Title IV, its implementing regulations, or a PPA provision. Thus, Bernier fails to plead plausibly, much less with particularity, the falsity element of Counts I and II.

First, for many of the supposed misdeeds that CSL and InfiLaw allegedly committed, Bernier does not allege *how* the conduct (even if true) violated Title IV. For example, she references alleged copyright violations, improper trust accounting procedures, and a Haitian pro bono program, with no explanation whatsoever of how such activities violated Title IV. Compl. ¶¶ 43, 54, 84-91, 100(d)-(e), (i). While Bernier categorically claims that the entirety of Defendants' activity "violated Title IV of the HEA, its implementing regulations under 34

---

[41] Most of the Complaint prior to the actual causes of action is dedicated to background information and describing Defendants' general business models and relationships, none of which Bernier connects to allegedly fraudulent conduct. *See* Compl. ¶¶ 1-42, 44-53, 59-60, 68, 71, 76-78, 84-94. Nevertheless, Bernier improperly incorporates by reference all of her general allegations into her causes of action. *Id.* ¶ 95 (incorporating "paragraphs 1 through 94"); *see U.S. ex rel. John Doe*, 2016 WL 3959343, at *4 ("[A]ll seven counts … improperly incorporate by reference the same 192 paragraphs. . . . [O]nly a very small fraction of those 192 paragraphs address the purportedly actionable claims submitted to the U.S." (citations omitted)).

C.F.R. § Part 600 and 34 C.F.R. § Part 668, and the PPA[,]" together those citations encompass an enormous array of complex regulations and standards, and she fails to allege *how* the conduct violated any of the cited provisions.  *See Sealey v. Stidham*, 2015 WL 5083992, at *13 n.6 (M.D. Ala. 2015) ("[A]lthough Plaintiff cites to numerous provisions of the United States Code . . . he does not explain specifically how Defendants' actions violated such code provisions.").

In addition, Bernier alleges Defendants admitted academically underqualified students, running afoul of ABA Rules 205(b) and 501(b),[42] and that CSL's bar passage statistics do not comply with ABA Rule 301(a).  Compl. ¶¶ 55-58, 62-65, 79, 81-83, 100(a)-(b), (h).  Part H of Title IV of the HEA directs accreditors to establish certain standards (*see* 20 U.S.C. § 1099b), but nowhere in Part H (or anywhere else in the HEA) is there a requirement that schools must at all times "maintain the accreditation standards set by the ABA" (*see* Compl. ¶ 100(h)) in order to participate in Title IV programs.  To the contrary, institutions may be given time to remedy and respond to accreditation standards issues without losing their accredited status.  *See* § 1099b(a)(6), (j); *see also U.S. ex rel. Barrett v. Beauty Basics, Inc.*, 2015 WL 3650960, at *4 (N.D. Ala. 2015) (violation of accreditor's standards "does not necessarily result in defendant's ineligibility to receive funds from the government," thus relator needed more specificity to demonstrate how violation of accreditor's standards rendered claims false).

---

[42]     There is no "ABA Rule 205(b)" or "ABA Rule 501(b)"; these appear to refer to standards.  *See ABA Standards and Rules of Procedure for Approval of Law Schools,* 2009-2010 through 2016-2017 eds. (available at https://www.americanbar.org/groups/legal_education/resources/standards.html and https://www.americanbar.org/groups/legal_education/resources/standards/standards_archives.html).

Second, Bernier claims that InfiLaw issues "expected class size requirements" to CSL admissions staff, whose jobs allegedly are dependent on meeting those mandates. Compl. ¶ 61. But Bernier never explains how this alleged conduct actually would violate Title IV, and Bernier never alleges that it does (it does not). Similarly, Bernier suggests that Defendants "exploit veterans and active military" by recruiting them to the school, because Title IV does not require schools to count funds received from other federal sources (like the military) towards the maximum of 90% of an institution's revenue that can be made up of Title IV funds. Compl. ¶¶ 13, 77-78. In other words, Bernier is alleging that CSL properly accounted for revenue from veterans and active military. *See Urquilla-Diaz*, 780 F.3d at 1056 ("[Relator] failed to allege facts that, if true, would establish that [] certification of compliance with the 90/10 rule was false.").

A third category of allegations in the Complaint simply fails to provide information sufficient to allege that the conduct would result in noncompliance with any standard or rule. Thus, Bernier recites the HEA requirement that students make satisfactory academic progress towards graduation to maintain eligibility for federal aid. Compl. ¶¶ 14, 66-67, 69-75, 100(c), (g). However, Bernier never describes CSL's actual academic requirements for graduation. Without such allegations of fact, it is impossible to infer that students were not making satisfactory academic progress towards those requirements. *See Urquilla-Diaz*, 780 F.3d at 1055 ("[B]ecause [relator] included no allegations about [defendant's] graduation requirements, it is impossible to plausibly infer that the students were not making satisfactory progress consistent with those requirements but for [defendant's] alleged grade-inflation scheme.").

Likewise, Bernier claims that CSL's job placement rates are misleading, because CSL allegedly categorized graduates offered a "residency" to study for the bar as employees of the library.  Compl. ¶¶ 80, 100(f).  But the HEA requirement on which Bernier relies is that schools that advertise job placement rates to attract prospective students must make available to those students the most recent data available regarding employment statistics "and any other information necessary to substantiate the truthfulness of the advertisements[.]"  *Id.* ¶ 15.  Bernier alleges neither that CSL actually advertised using job placement rates, nor that CSL refused on any occasion to make available to a prospective student any underlying substantiating data.  *See, e.g.*, *Gatsiopoulos*, 2011 WL 3489443, at *6 (relators "have not provided a single specific example, including the who, what, when, where, and how, of Defendants' alleged failure to provide this information").[43]

Lastly, Bernier's descriptions of CSL and InfiLaw's activity in the Complaint is utterly unspecific as to when these events occurred, where it happened, who was involved, what students may have been impacted, or any other detail that would come close to providing the particularity necessary to survive dismissal.  *Corsello*, 428 F.3d at 1012, 1014.

### C.      Bernier Has Not Plead Materiality.

Bernier pays little attention to the FCA's materiality requirement.  "[A] mis-representation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the False Claims Act."  *Escobar*, 136 S. Ct. at 2002.  This materiality requirement is "rigorous" and

---

[43]      Two remaining sets of allegations – related to creating a code of conduct to prevent conflicts of interest and failing to enable graduates to earn sufficient incomes to service their law school debt – are so generic and unsupported with fact, *e.g.*, regarding CSL or InfiLaw graduates' salaries, that they fail to state a claim on their face.  *See* Compl. ¶¶ 16, 34, 100(j)-(k).

"demanding."  *Id*. at 2002-03, 2004 n.6.  Establishing that "the Government would have the option to decline to pay if it knew of the defendant's noncompliance" is insufficient.  *Id*. at 2003.[44]

Bernier alleges generically and conclusively that "[e]xecuting the PPA and agreeing to comply with applicable federal statutes and regulations are prerequisites . . . of federal funding."  Compl. ¶ 9.  In effect, Bernier asks this Court to assume that *any* violation of *any* underlying statute or regulation would cause the government to decide not to disburse *any* Title IV funds.  Bernier has not sufficiently alleged how and why the specific violations Defendants allegedly committed would have been material to the government's payment decision.  *See Jallali*, 486 F. App'x at 767 (relator failed to allege that school's noncompliance with the particular regulations it allegedly violated would render it "ineligible to receive federal student aid payments"); *Rutledge*, 2015 WL 2238786, at *9 (relator "never specifically alleges how and why noncompliance with the regulations allegedly violated would prevent payment by the government").

**D.     Bernier is Unable to Point to Even a Single False Claim Presented to the Government Under § 3729(a)(1)(A).**

For Count I to pass muster under Rule 9(b), Bernier also was required to allege with particularity the actual presentment of a claim, "meaning particular facts about the who, what, where, when, and how of fraudulent submissions to the government."  *Urquilla-Diaz*, 780 F.3d at 1052 (quoting *Corsello*, 428 F.3d at 1014 (internal quotations omitted)).  "Without the *presentment* of such a claim, while the practices of an entity that provides

---

[44]     *See also* § 3729(b)(4) (defining "material," as used in § 3729(a)(1)(B), as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property").

services to the Government may be unwise or improper, there is simply no actionable damage to the public fisc as required under the False Claims Act." *Clausen*, 290 F.3d at 1311. Thus a relator, cannot "merely [] describe a private scheme in detail but then [] allege simply and without any stated reason for [her] belief that claims requesting illegal payments must have been submitted, were likely submitted, or should have been submitted to the government." *Id*.

Bernier does precisely what *Clausen* and its progeny say relators cannot do – she describes various internal practices of the Defendants that allegedly violate Title IV and its implementing regulations, but then generally alleges merely that CSL signed a PPA and received Title IV funds. Compl. ¶¶ 97, 103-104. This is an improper attempt to have the Court infer that "claims requesting illegal payments must have been submitted." *Clausen*, 290 F.3d at 1311. Bernier does not and cannot provide any specifics about the PPA, *e.g.*, when it was signed, by whom, where, how it was submitted to the government, or the surrounding circumstances. *See* Section I, *supra*. Bernier also fails to identify even a single subsequent improper request for payment that Defendants made to the government, much less one that was rendered "false" as a result of some underlying noncompliance. *See U.S. ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1359 (11th Cir. 2006) ("The particularity requirement of Rule 9 is a nullity if Plaintiff gets a ticket to the discovery process without identifying a single claim." (citation omitted)). Bernier provides no detail regarding who submitted what

claims, for which students, when and how such claims were submitted, or the content of any such claims.  *Urquilla-Diaz*, 780 F.3d at 1052.[45]

Without these particulars, the Complaint lacks any indicia of reliability "to support the allegation of *an actual false claim* for payment being made to the Government."  *Clausen*, 290 F.3d at 131.  Bernier, a law professor, played no role in billing, financial aid, admissions, or any other function through which she could have gained firsthand knowledge of the Defendants' submissions of claims for financial aid, nor does she purport to have that knowledge.[46]  And Bernier did not even work for InfiLaw, which she claims controlled CSL and made the decision to engage in the allegedly fraudulent acts.[47]

Bernier's claims are even more deficient than claims previously dismissed in this Circuit.  *See, e.g.*, *Atkins*, 470 F.3d at 1359 (upholding dismissal where plaintiff did "not profess to have firsthand knowledge of the defendants' submission of false claims" and his allegations were based only on "rumors from staff"); *Cade v. Progressive Cmty. Healthcare, Inc.*, 2011 WL 2837648, at *8 (N.D. Ga. 2011) ("When it comes to the actual submission of claims . . . the person or persons actually submitting the claim remain a mystery.  She cites 'discussions with other individuals involved in the billing process,' but . . . she does not

---

[45]     As with prior allegations, Bernier also improperly lumps Defendants together under Count I, claiming both InfiLaw and CSL made, and caused to be presented, false claims to the government.  Compl. ¶¶ 100-101.  The Complaint does not specify each Defendant's role with respect to presentment and should be dismissed on this basis alone.  *See Ambrosia Coal & Constr. Co.*, 482 F.3d at 1317 (quoting *Brooks*, 116 F.3d at 1381).

[46]     *See, e.g.*, *U.S. ex rel. Florida Soc'y of Anesthesiologists v. Choudhry*, 2017 WL 2591399, *6 (M.D. Fla. 2017) ("Relator fails to plead any facts suggesting that it has direct, first-hand knowledge of [defendants' billing practices]." (internal quotation and citation omitted)); *cf. Hill v. Morehouse Med. Assocs.*, 82 F. App'x 213, *5 (11th Cir. 2003) (per curium) (relator had "firsthand information" about the defendant's billing practices as a former employee in the billing department).

[47]     *See U.S. ex rel. Schubert v. All Children's Health Sys., Inc.*, 2013 WL 1651811, at *4 (M.D. Fla. 2013) (dismissing FCA claim for lack of knowledge and particularity required under 9(b), and noting relator "did not even work for the same company that is alleged to have presented [the] false claims").

identify with whom she spoke or otherwise provide details that would support the allegations." (internal citations omitted)).

*Rutledge*, 2015 WL 2238786, is instructive.   There, an instructor brought an FCA case against a school that had entered into a PPA with the government and received federal funds.   The court dismissed in part based on the same deficiencies present here:

> Rutledge's complaint never directly alleges any presentment of claims.   She alleges there are federally funded students at the school, but she never alleges any facts to support her knowledge of that fact or the (presumably implied) fact that claims are being made to the government for educational grants and loans.   She certainly never makes any direct allegations of particular instances of claims being presented.   Nor does she make any specific allegations of indicia of reliability to support her implied allegation.   Although Rutledge alleges she is an instructor at the school, she does not allege that she has access to Defendants' records or billing practices or that she spoke with someone in management with knowledge of the presentment of claims.

*Id.* at *12 (internal citations omitted); *see also Jallali*, 486 F. App'x at 767 (affirming dismissal of FCA case against school, pointing to relator's lack of personal knowledge of the school's billing practices).

Plaintiff's "failure to allege with any specificity if – or when – any actual improper claims were submitted to the Government is indeed fatal to [her] complaint[]." *Clausen*, 290 F.3d at 1311-12; *see also Jallali v. Sun Healthcare Grp.*, 667 F. App'x  745, 746 (11th Cir. 2016) (relator "fails to allege the 'who, what, where, when, and how' of any specific false claim for payment").   Bernier "merely speculates that an unlawful [private] scheme exists and, by extension, asserts that all [federal aid] claims were tainted[,]" failing to connect the alleged scheme to the actual submission of a specific claim.   *Florida Soc'y of Anesthesiologists*, 2017 WL 2591399, at *8 (internal quotation and citation omitted); *Atkins*,

470 F.3d at 1358-59.  Thus, her presentment claim fails as matter of law.  *Corsello,* 428 F.3d at 1012, 1014.

Consequently, Counts I and II fail to state an FCA claim and must be dismissed.

## IV.    BERNIER ALLEGES NO FACTS TO SUPPORT HER CONSPIRACY CLAIM

Bernier fails to plead the necessary elements of a conspiracy claim:  "(1) the defendant conspired with at least one person to get a false or fraudulent claim paid by the government; and (2) at least one of the conspirators performed an overt act to get a false or fraudulent claim paid."  *U.S. v. LifePath Hospice, Inc.*, 2016 WL 5239863, at *8 (M.D. Fla. 2016).   "'Conspire' in this context requires a meeting of the minds to defraud the government."  *Id.* (internal quotation and citation omitted).   Conspiracy claims under the FCA are subject to Rule 9(b).  *Corsello*, 428 F.3d at 1014.

First, as a threshold matter, Count III fails because Bernier does not and cannot allege an underlying violation of the FCA.  *LifePath Hospice, Inc.*, 2016 WL 5239863, at *9.

Second, Bernier fails to allege with particularity the existence of any agreement between the Defendants.   Instead, she merely states that InfiLaw and CSL conspired to violate the FCA, that through their executives (Chidi Ogene and Jay Conison) they had an "unlawful agreement" to defraud the government, and that other managers and employees executed this "unlawful agreement."   Compl. ¶¶ 120-122.   Such bare conclusions are insufficient to survive a motion to dismiss.  *See, e.g.*, *Corsello*, 428 F.3d at 1014.  Similarly, as detailed above, Bernier has insufficient knowledge of the mindset of InfiLaw or CSL at the relevant time and therefore cannot plausibly plead that they entered into such an agreement with the specific intent to defraud the government, as required to establish a

conspiracy under 31 U.S.C. § 3729(a)(1)(C).  *U.S. v. Healogics, Inc.*, 2016 WL 2744949, at

*7 (M.D. Fla. 2016).

Finally, Count III fails under the intra-corporate conspiracy doctrine, which holds that

a corporation cannot conspire with its own wholly-owned subsidiary or its own employees to

establish a conspiracy.  *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir.

2000).  No court in the Eleventh Circuit has addressed whether this doctrine applies to bar an

alleged FCA conspiracy between a parent and its wholly-owned subsidiary,[48] but most courts

to address the issue have applied the doctrine and dismissed claims of intra-corporate

conspiracies.[49]  Because Bernier alleges CSL is owned and controlled by InfiLaw (Compl. ¶

34), she cannot establish a conspiracy between the two companies.

---

[48]     The Eleventh Circuit recognizes an exception to the intra-corporate conspiracy doctrine between a corporation and its employees.  *McAndrew,* 206 F.3d at 1038-39.  This exception has been extended to the False Claims Act.  *E.g., U.S. ex rel. Harris v. Lockheed Martin Corp.*, 905 F. Supp. 2d 1343, 1355-56 (N.D. Ga. 2012).  These cases are inapposite, however, as Bernier only alleges a conspiracy between two corporations (which are necessarily implemented through employees), not a conspiracy with the employees.

[49]     *E.g., U.S. ex rel. Scharber v. Golden Gate Nat'l Senior Care LLC*, 135 F. Supp. 3d 944, 967 (D. Minn. 2015) ("As for the conspiracy claims in Count IV, the defendants rightly note the substantial precedent that holds that a parent company and subsidiary/affiliated companies cannot conspire with each other."); *U.S. ex rel. Peretz v. Humana, Inc.*, 2011 WL 11053884, at *10-11 (D. Ariz. 2011) ("Relator's conspiracy claim fails . . . because a parent corporation cannot conspire with its wholly owned subsidiary when the parent and the subsidiary have a complete unity of interest."); *U.S. ex rel. Pilecki-Simko v. Chubb Inst.*, 2010 WL 1076228, at *10 (D.N.J. 2010) ("[T]he Court agrees, that the law deems a parent corporation and its subsidiaries legally incapable of forming a conspiracy with one another." (internal quotation and citation omitted)), *aff'd*, 443 F. App'x. 754 (3d Cir. 2011); *U.S. ex rel. Brooks v. Lockheed Martin Corp.*, 423 F. Supp. 2d 522, 528 (D. Md. 2006) (dismissing FCA conspiracy claim because "[a] parent corporation and its wholly owned subsidiaries, however, are legally incapable of forming a conspiracy with one another"); *U.S. ex rel. Reagan v. E. Texas Med. Ctr. Reg'l Healthcare Sys.*, 274 F. Supp. 2d 824, 856 (S.D. Tex. 2003) ("[I]t is a matter of law that a parent corporation cannot conspire with its own subsidiary."), *aff'd*, 384 F.3d 168 (5th Cir. 2004).

## CONCLUSION

Based on the foregoing, Defendants respectfully request that the Court dismiss the

Complaint in its entirety, with prejudice.

Dated: October 26,  2017                          Respectfully submitted,

                                                 */s/*
                                                 _____
                                                 **David E. Mills, Esq.**
                                                 **COOLEY LLP**
                                                 1299 Pennsylvania Avenue
                                                 Washington, D.C. 20004
                                                 Tel: (202) 842-7800
                                                 Fax: (202) 842-7899
                                                 Email: dmills@cooley.com
                                                 ***Trial Counsel***

                                                 **Mazda K. Antia, Esq.**
                                                 **COOLEY LLP**
                                                 4401 Eastgate Mall
                                                 San Diego, CA 92121
                                                 Tel: 858-550-6000
                                                 Fax: 858-550-6420
                                                 Email: mantia@cooley.com

                                                 **Vincent A. Citro, Esq.**
                                                 Florida Bar. No. 0468657
                                                 **LAW OFFICES OF MARK L.**
                                                 **HORWITZ, P.A.**
                                                 17 East Pine Street
                                                 Orlando, FL 32801
                                                 Tel: (407) 843-7733
                                                 Fax: (407) 849-1321
                                                 Email: vince@mlhorwitzlaw.com

                                                 *Counsel for Defendants InfiLaw Corporation and*
                                                 *Charlotte School of Law, LLC*

## REQUEST FOR ORAL ARGUMENT

Defendants respectfully request oral argument on their Motion to Dismiss, pursuant to Local Rule 3.01(j).  Defendants estimate one hour will be required for such argument.

## CERTIFICATE OF CONFERENCE

I HEREBY CERTIFY that on October 25, 2017, I conferred with counsel for Plaintiff on the issues raised in the Motion to Dismiss but we could not reach an agreement.

*/s/ Mazda K. Antia*
Mazda K. Antia, Esq.
*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 26, 2017, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record, including the following:

> Coleman W. Watson, Esq.
> Watson LLP
> 189 S. Orange Avenue, Suite 810
> Wilmington, DE  19808
>
> *Counsel for Plaintiff Barbara Bernier*
>
>
> Jeremy Ronald Bloor
> US Attorney's Office
> Suite 3100
> 400 W Washington St
> Orlando, FL 32801
>
> *Counsel for United States of America*


> */s/ David E. Mills*
> David E. Mills, Esq.
> *Counsel for Defendants*