Coleman W. Watson, Esq.
Watson LLP
189 S. Orange Avenue, Suite 810
Orlando, FL 32801
coleman@watsonllp.com

## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF FLORIDA

## ORLANDO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, *EX REL.*, BARBARA BERNIER, <br><br> Plaintiff, <br><br> vs. <br><br> INFILAW CORPORATION; CHARLOTTE SCHOOL OF LAW, LLC, <br><br> Defendants. | § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § |

Case No.:  6:16-cv-00970-RBD-TBS

**AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

Relator, BARBARA BERNIER, files suit on behalf of the UNITED STATES OF

AMERICA and sues Defendants, INFILAW CORPORATION ("Infilaw") and

CHARLOTTE SCHOOL OF LAW ("CSOL"), and alleges:

## <u>NATURE OF THE ACTION</u>

1.      This is a *qui tam* action, pursuant to the False Claims Act, 31 U.S.C. §

3729, *et seq.*, to recover damages from false claims Defendants made to the United States

Department of Education, in violation of Title IV of the Higher Education Act ("HEA"),

20 U.S.C. §§ 1070, *et seq.*, to receive payment directly or indirectly from the United

AMENDED COMPLAINT- 1
Case No.:  6:16-cv-00970-RBD-TBS

**WATSON LLP**
189 S. Orange Avenue, Suite 810
Orlando, FL 32801
Tel: (407) 377-6634 / Fax: (407) 377-6688

States Department of the Treasury.  The fraudulent conduct underlying the allegations herein likely exceeds the sum of $500 million dollars.

## PARTIES

2.      Relator, BARBARA BERNIER ("Bernier"), is *sui juris* and is an adult citizen of the State of Florida.  At all times material, Relator was a Professor of Law at CSOL, and is the original source of the allegations contained herein.  CSOL hired Relator as a Professor of Law, effective January 1, 2013.  Relator originally earned tenure in 1996 at a different law school, and such tenure was formalized at CSOL on May 5, 2014.  At CSOL, Relator instructed law students in the following legal courses: Constitutional Law, First Amendment, Property, International Comparative Law, and Ethics.  In addition to working as a law professor, CSOL required Relator to directly engage in almost all CSOL departments, including, but not limited to, CSOL's Financial Aid and Admissions Departments.   In doing so, Relator was privy to CSOL and Infilaw's policies, procedures, and conduct for CSOL's financial aid and admissions practices that are not typically available to a law professor.

3.      Bernier brings this action on behalf of the UNITED STATES OF AMERICA, pursuant to 31 U.S.C. § 3730(b)(2).  In addition, Relator, in filing this action, has engaged in protected conduct, pursuant to 31 U.S.C. § 3730(h), because the allegations contained herein are sufficient to support a reasonable conclusion that Infilaw and CSOL could fear being reported to the federal government for fraud or sued in a *qui tam* action.

AMENDED COMPLAINT- 2
Case No.:  6:16-cv-00970-RBD-TBS

**WATSON LLP**
189 S. Orange Avenue, Suite 810
Orlando, FL 32801
Tel: (407) 377-6634 / Fax: (407) 377-6688

4.      Defendant, INFILAW CORPORATION, is a domestic corporation organized under the laws of the State of Florida, with its principal place of business located in Naples, Florida.  At all times material, Infilaw's managerial employees acted within the scopes of their employment and knowingly furthered the conduct described herein, in prohibition of the False Claims Act.

5.      Defendant, CSOL, is a foreign limited liability company organized under the laws of the State of North Carolina.  CSOL has six members: (a) JAY CONISON is *sui juris* and is an adult citizen of North Carolina; (b) SHIRLEY FULTON is *sui juris* and is an adult citizen of North Carolina; (c) JAMES J. HANKS, JR. is *sui juris* and is an adult citizen of the State of Maryland; (d) INFILAW CORPORATION is a Florida corporation with its principal place of business located in Florida; (e) CHIDI OGENE is *sui juris* and is an adult citizen of North Carolina; and, (f) TOM WIPPMAN is *sui juris* and is an adult citizen of the State of Illinois.  At all times material, CSOL's managerial employees acted within the scopes of their employment and knowingly furthered the conduct described herein, in prohibition of the False Claims Act.

## **JURISDICTION**

6.      The court has jurisdiction over the subject matter in this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3730(b) because this action arises under the laws of the United States, and this action is brought by a private citizen for false claims made to the United States.

7.      The court has *in personam* jurisdiction over Infilaw and CSOL, pursuant to 31 U.S.C. § 3732, because they can be found and transact business in the State of

Florida.  Alternatively, both Infilaw and CSOL consented to the jurisdiction of this court by defending this action without challenging *in personam* jurisdiction.

**VENUE**

8.      Venue is proper in this court, pursuant to 28 U.S.C. § 1391 and 31 U.S.C. § 3732, because at least one of the Defendants reside in this judicial district and acts proscribed by 31 U.S.C. § 3729 occurred in this judicial district.  Alternatively, both Infilaw and CSOL consented to venue in this federal district by defending this action without challenging venue.

**FACTUAL ALLEGATIONS**

*The Higher Education Act*

9.      Under Title IV of the HEA, the federal government operates a number of programs that disburse financial aid to students to help defray the costs of higher education.  These programs include the Federal Pell Grant, the Federal Family Educational Loan Program, William D. Ford Federal Direct Loan Program, the Federal Perkins Loan, and the Graduate PLUS Loan.  Financial aid disbursed under these programs are only available to students who attend qualifying schools.

10.      Qualifying schools must enter into Program Participation Agreements ("PPAs") with the United States Department of Education, which such agreements certify that the qualifying school will adhere to requirements of applicable federal statutes and regulations.  Qualifying schools are required to enter into the PPA initially, and then re-affirm their duties, obligations, and promises under the PPA on an annual basis. Executing the PPA and agreeing to comply with applicable federal statutes and

regulations are prerequisites and are the *sine qua non* of federal funding for one basic reason: if a qualifying school does not agree to comply with the federal statutes and regulations thereunder, then the school will not receive federal student aid under Title IV of the HEA.

11.     Qualifying schools must also obtain accreditation from an approved accrediting agency that is recognized by the United States Secretary of Education.  The Section of Legal Education and Admissions to the Bar of the American Bar Association ("ABA") is the recognized accrediting agency by the United States Department of Education for programs that lead to the degrees of juris doctor and master of laws.

12.     Becoming a qualifying school is significant, as it then allows law students attending a qualifying school to obtain 100% financing of their higher education from the federal government.

13.     Under Section 487(a)(20) of the HEA, and its implementing regulations at 34 CFR § 668.14(b)(22), an accredited law school must agree that it will not provide incentive compensation to employees and third parties based, in any part, on their success in securing student enrollments or awarding Title IV, HEA program funds (the "Incentive Compensation Ban").  This strict ban on providing incentive compensation for performing such activities is part of a larger set of Program Integrity Rules issued by the United States Department of Education.  These rules cover a broad array of issues intended to promote integrity in Title IV, HEA programs by protecting students as consumers and stemming potential abuses of Title IV program funds by institutions.

AMENDED COMPLAINT- 5
Case No.:  6:16-cv-00970-RBD-TBS

**WATSON LLP**
189 S. Orange Avenue, Suite 810
Orlando, FL 32801
Tel: (407) 377-6634 / Fax: (407) 377-6688

These rules apply to all Title IV eligible institutions and thus applied to CSOL, as a participant in Title IV HEA programs.

14.     Under the Incentive Compensation Ban, an accredited law school such as CSOL may not make any commission, bonus, or other incentive payment based in any part, directly or indirectly, upon success in securing enrollments or awarding financial aid, to any person or entity engaged in any student recruitment or admission activity, or in making decisions regarding the award of Title IV, HEA program funds.

15.     Under the HEA, a "commission, bonus, or other incentive payment" means a sum of money or something of value, other than a fixed salary or wages, paid or given to an entity or a person for services rendered.  Also under the HEA, the phrase "securing enrollments or awarding financial aid" means activities that an entity or a person engages in at any point in time through completion of an educational program for the purpose of the admission or matriculation of students for any period of time or the award of financial aid to students.  These activities include contact in any form with a prospective student, such as, but not limited to, contact through preadmission or advising activities, scheduling an appointment to visit the enrollment office or any other office of the institution, attendance at such an appointment, or involvement in a prospective student's signing of an enrollment agreement or financial aid application.

16.     The HEA also requires that accredited law schools, as proprietary institutions of higher education, must agree that they will derive not less than ten percent of their revenues from sources other than funds provided under Title IV of the HEA. This is known as the "90/10 rule."

AMENDED COMPLAINT- 6
Case No.:  6:16-cv-00970-RBD-TBS

**WATSON LLP**
189 S. Orange Avenue, Suite 810
Orlando, FL 32801
Tel: (407) 377-6634 / Fax: (407) 377-6688

1

2        17.    The HEA requires academic institutions, including law schools, to review

3   their students' academic progress at the end of each academic period.  In order to be

4   eligible for continuing federal financial aid under the HEA, students must achieve

5   academic standing that is consistent with the institution's requirements for graduation.

6        18.    The HEA also requires that, in the case of institutions that advertise job

7   placement rates as a means of attracting students to enroll in the institution, the institution

8   will make available to prospective students, at or before the time of application (a) the

9   most recent available data concerning employment statistics, graduation statistics, and

10  any other information necessary to substantiate the truthfulness of the advertisements,

11  and (b) relevant State licensing requirements of the State in which such institution is

12  located for any job for which the course of instruction is designed to prepare such

13  prospective students.

14       19.    In addition, the HEA requires that, in the case of an institution that

15  participates in federal loan programs under Title 20 of the United States Code, the

16  institution will develop a code of conduct, with which the institution's officers,

17  employees, and agents shall comply, that prohibits a conflict of interest with the

18  responsibilities of an officer, employee, or agent of an institution with respect to such

19  loans; publish such code of conduct prominently on the institution's website; and,

20  administer and enforce such code of conduct by, at a minimum, requiring that all of the

21  institution's officers, employees, and agents with responsibilities with respect to such

22  loans be annually informed of the provisions of the code of conduct.

23

24

25

AMENDED COMPLAINT- 7
Case No.:  6:16-cv-00970-RBD-TBS

**WATSON LLP**
189 S. Orange Avenue, Suite 810
Orlando, FL 32801
Tel: (407) 377-6634 / Fax: (407) 377-6688

20.     The United States Department of Education requires that any funded program at a qualified school should enable a graduate to earn a sufficient income to service the debt of the program within specific parameters of disposable income percentages.

21.     Under ABA Standard 205(b), the dean and faculty of a law school shall jointly formulate and administer admissions decisions and academic standards for retention.  As stated by Interpretation 205-2 to Standard 205(b), "[a]dmission of a student to a law school without the approval of the dean and faculty of the law school violates the [ABA] Standards."

22.     Under ABA Standard 501(b), a law school should not admit applicants who do not appear capable of satisfactorily completing its program of legal education and being admitted to the bar.  As stated by Interpretation 501-1 to Standard 501(b), "in assessing compliance with Standard 501(b) are the academic and admission test credentials of the law school's entering students, the academic attrition rate of the law school's students, the bar passage rate of its graduates, and the effectiveness of the law school's academic support program."  Interpretation 501-4 to Standard 501(b) states that "[a] law school may not permit financial considerations detrimentally to affect its admission and retention policies and their administration.  A law school may face a conflict of interest whenever the exercise of sound judgment in the application of admission policies or academic standards and retention policies might reduce enrollment below the level necessary to support the program."

**WATSON LLP**
189 S. Orange Avenue, Suite 810
Orlando, FL 32801
Tel: (407) 377-6634 / Fax: (407) 377-6688

*Infilaw Corporation*

23.     Legal education is like no other institution of higher learning.  It is highly profitable for the school itself, parent institution or university—public or private.  Law schools have always provided a high return on investment or expense.  Most law school graduates know little about the business of the school, how it is governed, accredited, and what regulatory structure might apply.

24.     Infilaw was organized under Florida law in 2006.  Infilaw was created to acquire the Florida Coastal School of Law.

25.     Infilaw is a for-profit corporation; it is not an academic institution.  Infilaw's for-profit framework and culture dominate and overshadow academic issues, and profitability is determinative.  Investors, not students, are top-of-mind to Infilaw.

26.     Early in its history, Infilaw held itself out to prospective faculty that it was an environment that valued ideas, experience and entrepreneurial initiative.  Infilaw bought legitimacy for its three private law schools through the credentials of faculty that it recruited from law schools that were higher-ranked that Infilaw's three private law schools.  Now, Infilaw has little, if any, respect for academically accomplished faculty.

27.     Infilaw recruited several Board members and Officers with significant connections to high-levels of the ABA, including Dennis Archer, the former Chair of the ABA Counsel on Legal Education and former Chair of the ABA Task Force for Student Financial Aid.  Within the ABA, Archer had duties concerning accreditation and financial reviews of law schools, including CSOL.  Archer, at all times material, sat on the Board of Infilaw, and currently sits on the Board of Infilaw.

**WATSON LLP**
189 S. Orange Avenue, Suite 810
Orlando, FL 32801
Tel: (407) 377-6634 / Fax: (407) 377-6688

28.     Infilaw also recruited Joseph Harbaugh who sat on the ABA Task Force on the Future of Legal Education, as well as Jay Conison, who sat on the ABA Section on Legal Education and Admission to the Bar and the ABA Special Committee on Accreditation Transparency.

29.     Infilaw is self-described as "a consortium that includes an independent network of ABA-approved law schools and companies that provide management solutions, new educational programs, and pioneering, technology-driven course delivery to law schools and higher education institutions nationally and internationally."

30.     Infilaw describes its mission as "to establish the benchmark of inclusive excellence in professional education for the 21st Century," which is allegedly supported by three key pillars (a) centering on "serving the underserved," (b) providing an education that is "student-outcome centered," and (c) graduating students who are "practice-ready."

31.     As a marketing function and response for creating law programs that do not specifically follow a traditional model, Infilaw asserts that its programs are allegedly "disruptive" to legal education and law professors.  Infilaw uses this "disruption" model to describe its operating model as challenging that of long standing more highly-ranked law schools.  Under this umbrella of marketing, Infilaw focuses its alleged academic programs as programs that immediately place its graduates into the stream of commerce. This model is offered comparatively to traditional "theory only" programs, that allegedly do not prepare graduates for immediate practice competencies.

AMENDED COMPLAINT- 10
Case No.:  6:16-cv-00970-RBD-TBS

**WATSON LLP**
189 S. Orange Avenue, Suite 810
Orlando, FL 32801
Tel: (407) 377-6634 / Fax: (407) 377-6688

32.     Infilaw has several private investors, one of whom is the Sterling Partners, a Chicago based venture capital firm with a portfolio valued at more than $4 billion. Sterling Partners holds several investments in the education and education management sectors.

33.     Infilaw is interconnected with Sterling Partners through its Chief Executive Officer, Rick Inatome, who also sits on the Board of Sterling Partners.

34.     Sterling Partners' owns an 88% position in Infilaw, and states that it is "well positioned to benefit from future liquidity opportunities as [Infilaw's] business continues to grow."  According to Sterling Partners, Infilaw enjoys 90+% job placement and bar passage rates at each of its law schools.  This representation, however, is grossly inaccurate for the reasons alleged herein.

35.     Infilaw owns three private, for-profit law schools: Florida Coastal School of Law, located in Jacksonville, Florida; Arizona Summit School of Law, located in Phoenix, Arizona; and, CSOL, located in Charlotte, North Carolina.  Infilaw collectively refers to these three law schools as the "Consortium of Law Schools."

36.     CSOL is now defunct, and became so only after Relator provided a written disclosure to the United States and met with the United States in or about April 2016. The written disclosure provided to the United States a list of more than ten witnesses to support the allegations herein, as well as a list of documents that are supportive of the claims herein.

37.     Within Infilaw, employees informally refer to the corporate headquarters as "Central Services," which provides a variety of services to the Consortium of Law

AMENDED COMPLAINT- 11
Case No.:  6:16-cv-00970-RBD-TBS

**WATSON LLP**
189 S. Orange Avenue, Suite 810
Orlando, FL 32801
Tel: (407) 377-6634 / Fax: (407) 377-6688

Schools and their employees, including marketing, information technology, management services, educational design, human resources and employee benefit services.

38.     The Consortium of Law Schools are not autonomous; each law school, including CSOL, strictly adheres to Infilaw's policies and procedures.  Infilaw executives are present at every law school, including CSOL, as a "President," who have superior rank over the Dean of each of the Consortium of Law Schools.  Thus, Infilaw directly controls all significant financial and managerial decisions at the Consortium of Law Schools.  Within the past year, Infilaw replaced all employees of the Financial Aid Department at CSOL with its own Infilaw employees.  This creates a conflict of interest between Infilaw employees and CSOL as to, among other things, improper trust accounting for Title IV funds, as explained below.

39.     Infilaw's Consortium of Law Schools accepts applicants who not only represent the lowest LSAT percentiles, but who also have amongst the lowest grade point averages nationwide.  Although the LSAT proposes to predict only likelihood of success in the first year of law school, according to statistics from the Law School Admission Council ("LSAC"), the lowest LSAT score ranges correlate more closely with bar exam failures.

40.     Infilaw operates akin to a consulting firm.  Many Infilaw employees, including Adam Cota, the Vice President of Academics for the Consortium of Law Schools, have neither educational nor legal training.  Vice President Cota is tasked with designing law school curriculum at the Consortium of Law Schools, and is directed by Infilaw to purposefully differ the curriculum from traditional programs at other law

AMENDED COMPLAINT- 12
Case No.:  6:16-cv-00970-RBD-TBS

**WATSON LLP**
189 S. Orange Avenue, Suite 810
Orlando, FL 32801
Tel: (407) 377-6634 / Fax: (407) 377-6688

schools by restructuring credits earned and by eliminating major topics from core classes. This results in non-transferable course credit, creating an atmosphere where it became virtually impossible for CSOL law students to transfer to other law schools after their first year of studies.  On those occasions when CSOL students did make an attempted transfer, Infilaw deployed a law school retention team, whose sole purpose was to stop the transfer by offering significant financial incentives to the law students.

41.     Aside from the Consortium of Law Schools, Infilaw's portfolio includes Infilaw Management Solutions and iLawVentures.

42.     Infilaw Management Solutions allegedly seeks to engage in services agreements with law schools to build lasting relationships with law schools and universities whereby it focuses on the administrative responsibilities, to enable the law schools to focus their core academic program.  Infilaw Management Solutions claims to provide accreditation support, bar preparation programs, career services planning, emotional intelligence workshop facilitation, faculty and staff engagement, management engagement, student acquisition programs, and student engagement.

43.     iLawVentures allegedly is a leading partner for online juris doctor, post-juris doctor, and non-juris doctor programs.  iLawVentures claims to diversify revenue streams and build up surpluses that support a law school's core J.D. mission.

44.     Infilaw's most recent acquisitions are Phillips Graduate University ("PGU") (formerly Phillips Graduate Institute), a psychology school, and Inspiras California LLC.  PGU houses Inspiras California LLC, a shared services company that provides administrative services for Infilaw and the Consortium of Law Schools.

**WATSON LLP**
189 S. Orange Avenue, Suite 810
Orlando, FL 32801
Tel: (407) 377-6634 / Fax: (407) 377-6688

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

### *Infilaw's Trust Accounting*

45.     Federal student aid monies for CSOL law students were disbursed electronically by the United States Department of the Treasury into CSOL's bank account.  CSOL was paid to administer the loans, and once student enrollment statuses were confirmed, CSOL deducted tuition and administrative fees owed, and then disbursed the remaining balance to law students.

46.     Infilaw instructed the Financial Aid Department staff at CSOL to hold student financial aid money and not disburse any such funds to students until the course drop-add period closes.  But the monies disbursed by the United States Department of the Treasury did not remain in CSOL's bank account, and thus, were not immediately available for transfer to the law students.  Rather, Infilaw accessed the CSOL bank accounts, transferred substantially all of the funds to its own bank accounts and for its own uses in the interim.  On one occasion, the Financial Aid Department staff, including Ese Lyesi, was so concerned that CSOL's bank account was depleted that staff called Infilaw headquarters and were told that such moving of funds was the usual course of business for Infilaw.  Thereafter, the Financial Aid Office staff was forced to constantly check the balance of the bank account to monitor when they could write and disburse checks for the law students.  Until Infilaw replaced the money in the CSOL bank account, Infilaw instructed the Financial Aid Office staff to tell students that that the "checks were not in yet."

### *Formation and Accreditation of CSOL*

47.     CSOL opened in 2006.

AMENDED COMPLAINT- 14
Case No.:  6:16-cv-00970-RBD-TBS

**WATSON LLP**
189 S. Orange Avenue, Suite 810
Orlando, FL 32801
Tel: (407) 377-6634 / Fax: (407) 377-6688

48.  CSOL was an authorized educational institution by the State of North Carolina, until the State revoked its license to operate in August 2017.  The State revoked CSOL's license to operate because it could not demonstrate to the State that it was financially viable.  CSOL was not financially viable because in December 2015, it became the first accredited law school in the United States to be expelled from the federal student loan program.  CSOL was expelled from the federal student loan program due, in large part, to the allegations herein that Relator disclosed to the United States.

49.  Since 2007, CSOL grew to be the largest law school in the State of North Carolina.

50.  CSOL was ranked in the fourth-tier of all American law schools.  Despite this ranking, CSOL's tuition was on par with many first-tier American law schools.  Infilaw, at all times material, set and adjusted what CSOL's tuition amount would be.

51.  CSOL tuition increased from $30,000 in 2010 to more than $41,000 in 2015.  The total cost per student at CSOL, considering living expenses, fees, and federal loan origination costs was $106,050 in 2010 and more than $134,000 in 2015.

52.  Approximately 90% of graduates from CSOL, conservatively, amassed more than $238,000 in student loan debt, each, based on a calculated full time of study for three years of legal studies, with accrued interest at prevailing rates.

53.  CSOL offered campus-based full-time and part-time juris doctor and masters of laws programs.  CSOL also offered a certificate in paralegal studies program, as well as an online corporate compliance certificate program.

**WATSON LLP**
189 S. Orange Avenue, Suite 810
Orlando, FL 32801
Tel: (407) 377-6634 / Fax: (407) 377-6688

54.     CSOL received provisional accreditation from the ABA in 2008 and full accreditation in June 2011.  The ABA performed a site inspection of CSOL in 2014.

55.     CSOL law students, since 2011 when the school attained full accreditation through the ABA, have been eligible to obtain 100% financing from the federal government for their entire legal education.

56.     Within three months of becoming fully accredited and site-certified, CSOL Dean Jay Conison instituted buy-outs of faculty and staff, which dramatically altered the nature of the law school as it existed at the time when it achieved full accreditation from the ABA.  During the first buy-out, in January 2015, more than thirty employees left the law school.  And during the Summer 2015 and Spring 2016, CSOL bought out several more faculty members.

57.     Every semester and intercession, Infilaw instructed faculty and staff at CSOL to openly violate copyright laws for course textbooks.  As a result of denying CSOL law students their student loan disbursements in a timely manner, students often started the semester without the funds required to purchase course materials and textbooks.  In fact, many students did not have text books for several weeks into a semester, which placed them at a severe disadvantage.  Infilaw and CSOL instructed the faculty and staff to photocopy and post copies of needed chapters online.  This was easily hundreds of pages of materials in the first week alone.  Compounding matters further, CSOL Dean Jay Conison cut the CSOL library budget, disallowing any purchase of course textbooks.  Most law school libraries typically retain at least one or two copies of all course books on hand and make them available for students.  Any CSOL faculty or

AMENDED COMPLAINT- 16
Case No.:  6:16-cv-00970-RBD-TBS

**WATSON LLP**
189 S. Orange Avenue, Suite 810
Orlando, FL 32801
Tel: (407) 377-6634 / Fax: (407) 377-6688

1

2   staff who pointed out this problem to CSOL were greeted by a response from Infilaw that

3   they were thinking outside of the "Infilaw culture," which was a real threat to the

4   person's employment future.

5                           *Student Admissions And Recruitment At CSOL*

6          58.    CSOL engaged in a pattern and practice of admitting academically

7   unqualified students, for the benefit of Infilaw, who had a financial interest in CSOL

8   admitting as many students as possible and obtaining as much federal financial aid under

9   Title IV of the HEA as possible, for the benefit of Infilaw's investors.  After CSOL

10  admitted its first class, Infilaw began to demonstrate an intense drive to increase law

11  student admissions and set aside known, long-standing data from the LSAC, in favor of

12  tripling and quadrupling the first year entering class, even though the national pool of

13  applicants was in sharp decline.  Infilaw's acts were financially motivated, rather than

14  academically motivated and in the best interests of CSOL.

15         59.    The average grade point averages and LSAT scores of incoming first year

16  law students at CSOL declined precipitously, while the number of first year students at

17  CSOL increased dramatically—all juxtaposed against a significant decline in the number

18  of law student applicants nationwide.  The student population at CSOL peaked in 2013, at

19  approximately 1,600 students.  During a period of decreasing numbers of law school

20  applicants nationwide, the student populations at the Consortium of Law Schools, overall,

21  grew by 10–18.3% per year until 2014.

22         60.    LSAC's statistical database is significant.  LSAC has shown through its

23  data the historical growth and recent decline in law school applicants—as well as

24

25

**WATSON LLP**
189 S. Orange Avenue, Suite 810
Orlando, FL 32801
Tel: (407) 377-6634 / Fax: (407) 377-6688

providing certain predictions for future LSAT takers.  Given LSAC's history of collecting data, the statistical analysis of the data for the legal education market is accurate.  According to the LSAC National Longitudinal Bar Passage Study published in 1998 by LSAC, law school grade point averages and LSAT scores are the best predictors of bar passage rates.

61.     Although there was a CSOL Faculty Admissions Committee, CSOL insulated the Committee so that it did not review all student applications, as is traditionally done in most law schools and required by ABA Standard 205(b). Admissions decisions and the number of law students to admit to CSOL were entirely controlled by Infilaw, and it was in Infilaw's financial interest to admit students, irrespective of their indicators of likely success, or lack thereof, in law school.

62.     The CSOL Faculty Admissions Committee had very limited involvement in admission decisions, and was not involved in admissions decisions for academically underqualified students.  A single member of the faculty was assigned to review student applications from a single LSAT score group.

63.     Relator had directly involvement with the CSOL Admissions Department, and was privy to CSOL's policies, procedures, and conduct student admissions procedures.  For example, CSOL required Relator to participate in student recruitment via telephone contacts, travel from Charlotte, North Carolina to other cities to personally meet with students who were considering admission, through personal meetings at the law school, by teaching "mock" law school classes to prospective students.  CSOL also required Relator to teach admissions courses for prospective law students under the

AMENDED COMPLAINT- 18
Case No.:  6:16-cv-00970-RBD-TBS

**WATSON LLP**
189 S. Orange Avenue, Suite 810
Orlando, FL 32801
Tel: (407) 377-6634 / Fax: (407) 377-6688

"Alternative Admission Model Placement Law Exam" ("AAMPLE"), which CSOL marketed as an LSAT admission "alternative." Relator, from 2013 through 2016, also personally attended CSOL faculty meetings wherein CSOL Deans, Associate Deans, and Admissions Personnel openly discussed student admissions.

64.    Infilaw has repeatedly identified minority students from Historically Black Colleges and Universities ("HBCUs") as a major source of students and a significant revenue stream. Infilaw actively courted HBCU Presidents to promote CSOL to HBCU students. For example, in 2013 and 2014, CSOL held recruitment events at Livingston College in Salisbury, North Carolina. Subsequently, CSOL indiscriminately admitted approximately 40 students in 2013 and 50 students from 2014 from Livingston College to CSOL. Both sets of students failed at an extremely high rate, and most did not make it through a second semester. In Spring 2016, CSOL held a two-day event at Livingston College that was an all-expense paid recruitment conference for HBCU Pre-Law Advisors from more than twenty colleges and universities. CSOL spared no expenses on the recruitment conference. These facts were openly discussed during faculty meetings where Relator was personally present.

65.    CSOL Admissions Department staff who achieved recruitment numbers set by Infilaw were rewarded indirectly with in-kind incentive payments for their efforts, in the form of lavish dinners and gifts, which were given by CSOL to Admissions Department Staff shortly after the fall and spring recruitment seasons ended.

66.    Simply put, it was no secret that CSOL falsely certified to the United States Department of Education compliance with the Incentive Compensation Ban that it

AMENDED COMPLAINT- 19
Case No.:  6:16-cv-00970-RBD-TBS

**WATSON LLP**
189 S. Orange Avenue, Suite 810
Orlando, FL 32801
Tel: (407) 377-6634 / Fax: (407) 377-6688

submitted annually to the Government.  In fact, during a faculty meeting where Relator was present, former CSOL President Don Lively openly boasted that he knew "how to get around the rules governing admissions incentivizing."

67.    The CSOL Admissions Department had a very high rate of employee dismissals at the end of each recruiting cycle, generally in September of each year. Admissions Department staff that failed to meet recruitment numbers were terminated. Prior to the fall admissions cycle, Infilaw issued an expected class size mandate to the CSOL Admissions Department staff, who know their jobs were dependent on meeting the admissions number directives set by Infilaw.

68.    Many candidates for admission at CSOL were academically unqualified, and would be improbable candidates for admission in most other law schools.  There are a few law schools that admit applicants from lower statistical tiers, but not as low as those admitted by CSOL.  The median LSAT score for CSOL law students, for example, was 142, as reported by Infilaw and CSOL.  This score, however, is both deceptive and misleading, as it failed to acknowledge that since 2015, the majority of CSOL's student body gained admission to the law school via AAMPLE, and thus, never took the LSAT.

69.    While admission to law school via the LSAT is the norm, CSOL avoided using the LSAT as an admission metric through implementation of AAMPLE, which CSOL marketed as an LSAT admission alternative.  For unqualified applicants, this was a second chance at going to law school, as all they were required to do for admission to CSOL was pass a two class, online program for one month.

AMENDED COMPLAINT- 20
Case No.:  6:16-cv-00970-RBD-TBS

**WATSON LLP**
189 S. Orange Avenue, Suite 810
Orlando, FL 32801
Tel: (407) 377-6634 / Fax: (407) 377-6688

70.     CSOL used AAMPLE as a way to increase admissions of minority students.  Traditionally, at CSOL, law student admission via AAMPLE amounted to just 10% of all admissions, which was in compliance with the ABA rule limiting the percentage of students admitted through a conditional admission or alternate admission program to a 10% maximum.  In 2015, more than 70% of first year law students entering CSOL gained admission through AAMPLE.

71.     Infilaw relies on AAMPLE as an alternate standard for certifying that a student is qualified to study law, and that the student will, more likely than not, pass a bar exam.  During a faculty meeting in Spring 2015, the CSOL Director of Bar Preparation disclosed to Relator, and others present at the meeting, that even if a student who enters CSOL through AAMPLE does exceptionally well academically, such students still only have a 25% chance of passing a bar exam, even if they ultimately achieve a grade point average of 3.2–3.5 at CSOL.  The Director also stated to Relator that these statistics apply to all students at CSOL, not just those who enter the law school through AAMPLE.

72.     Starting in Fall 2011, CSOL became increasingly aggressive with its recruitment practices and illegally compensated its staff based upon enrollment activities through trips, gifts, and other incentive-based compensation in flagrant violation of the Title IV Incentive Compensation Ban.

73.     CSOL also began testing creative ways to get around Title IV regulations concerning the use of "gift aids" by accredited universities.  Specifically, on or around 2011, CSOL's Director of Financial Aid, Lauren Mack and the Director of Admissions, Carrie Mansfield, began to offer incentive "gift-aids" to prospective students who were

AMENDED COMPLAINT- 21
Case No.:  6:16-cv-00970-RBD-TBS

**WATSON LLP**
189 S. Orange Avenue, Suite 810
Orlando, FL 32801
Tel: (407) 377-6634 / Fax: (407) 377-6688

considering matriculation at CSOL.  The "gift aids" were in the form of iPads and

laptops; however, instead of deducting the value of gift aids from students' financial aid

packages, CSOL instead ignored this requirement and allowed students to obtain full

financial aid, notwithstanding the value of the gift aids.  This practice continued with

every fall and spring semester from 2011 through 2016.

### *False Certifications Of Students Lacking Satisfactory Academic Progress*

74.     The CSOL student handbook changed several times after the school

launched, generally to downwardly adjust the minimum grade point average that law

students must attain before being subject to academic dismissal.  This process was

designed to allow students to remain at the law school, and continue to receive federal

financial aid, when they should have been academically dismissed.  The operative student

handbook originally required students to attain a grade point average ("GPA") of 2.00 in

order to be in good academic standing.

75.     Interestingly enough, part-time students never had to satisfy a GPA

minimum from the inception of the school until September 2015.  Relator confirmed this

in a direct, in person, conversation with Associate Dean Camille Davidson.  What this

means is that not only were part-time students not subject to any academic standards that

were imposed on full-time students to measure their satisfactory progress, but part-time

students could also borrow federal student aid infinitely.

76.     Over time, the 2.00 minimum GPA fell to a 1.50.  Thereafter, the CSOL

faculty voted to change the 1.50 minimum back to 1.90.

AMENDED COMPLAINT- 22
Case No.:  6:16-cv-00970-RBD-TBS

**WATSON LLP**
189 S. Orange Avenue, Suite 810
Orlando, FL 32801
Tel: (407) 377-6634 / Fax: (407) 377-6688

77.     Based on the requirements of the CSOL student handbook, 157 students at CSOL from Fall 2015 should have been academically dismissed because they failed to achieve the minimum GPA of 1.90 to remain in good academic standing.  In a February 2016 faculty meeting with CSOL faculty and staff after grades from the Fall 2015 semester grades had been released and recorded, CSOL President Chidi Ogene announced that it was "unacceptable" to Infilaw to fail so many students whose grade point averages fell below the 1.90 standard required to maintain good academic standing.

78.     CSOL President Ogene is an Infilaw executive, and he is Infilaw's former general counsel.

79.     To retain students who should have been academically dismissed based on their Fall 2015 grades, CSOL President Ogene summarily changed the minimum passing grade point average of 1.90 downward to 1.50.  CSOL President Ogene took this action without faculty agreement and without any formality.  The result was that instead of academically dismissing the 157 students, CSOL would only have to dismiss 92 students. Ultimately, this decision by CSOL re-certified 65 students to the United States Department of Education as making satisfactory progress under the relevant guidelines, when they should have been academically dismissed from the law school.  The students then received additional federal financial aid, despite that they should have been academically dismissed from CSOL and not certified to borrow federal student aid.

80.     During the February 2016 faculty meeting where Relator was present, CSOL Dean Conison, with respect to CSOL President Ogene's actions, specifically stated that President Ogene took such action because "the company [Infilaw] could not

tolerate the financial loss or harm to its reputation."  Ogene made this statement because

he knew that Infilaw, above all else, valued dollars over students.

81.     The CSOL student handbook also rarely reflects other *ad hoc*

administrative changes made by or at the direction of the CSOL President, an Infilaw

executive.  For example, according to one version of the CSOL handbook, in order for

law students to participate in certain upper level and online summer courses, they must

have achieved a certain minimum GPA.  But when Infilaw realized that application of

this rule would reduce its projected revenue, it simply directed that the minimum GPA as

stated in the CSOL student handbook must be lowered.  The amendment to this rule was

never authorized by a vote of the faculty, and the *ad hoc* revision generated

approximately $500,000.00 of profit for Infilaw.  CSOL students were generally unaware

of what the student handbook required because it was unilaterally changed at the

direction of Infilaw to suit its financial needs.

82.     CSOL also implemented work around measures to the federal student aid

requirements, through procedures surrounding Spring 2016 and Summer 2016 grades.

With respect to Spring 2016 grades, Infilaw directed the CSOL Registrar and Financial

Aid Department staff to allow students who had failing GPAs at the end of the semester

to place the Spring 2016 grade point average "on hold," then to apply for federal financial

aid for the first session of Summer 2016.  Infilaw also instructed the CSOL Registrar's

Department staff to combine students' grades from the first session of Summer 2016 with

their failing grades from Spring 2016, in hopes that averaging the two sets of grades

would yield a passing grade point average.  Under these new guidelines implemented by

AMENDED COMPLAINT- 24
Case No.:  6:16-cv-00970-RBD-TBS

**WATSON LLP**
189 S. Orange Avenue, Suite 810
Orlando, FL 32801
Tel: (407) 377-6634 / Fax: (407) 377-6688

CSOL, law students obtained federal student aid despite their failure to meet satisfactory progress under the relevant HEA guidelines.

83.     To capitalize on a recent revision to ABA Standard 505, which formerly required academically dismissed students to endure a two-year period before re-applying for entry to law school, CSOL also implemented a re-entry program.  CSOL piloted the program in Spring 2016.  Under the program, academically dismissed students were simply allowed to "start over."  After dismissal, CSOL gave law students the option to either appeal their failing grades (and if successful) continue at the school, or just "re-enter" the law school.  Under the re-entry option, CSOL "wiped" the dismissed students' academic records clean for a new first year start.  Re-entry students surrendered all previous credits earned, if any, and CSOL deleted the students' prior academic record.

84.     The CSOL re-entry program had no effect on the debt that law students already previously incurred, which was received from the Government.  After re-entry, law students applied for financial aid, again, to finance their first year of legal studies, again.  So essentially, CSOL, and Infilaw, designed a system where they profited from students who were academically unqualified and had not made satisfactory progress towards graduation, demonstrated by their prior academic dismissal from the school. Nonetheless, CSOL re-certified the same students to the United States Department of Education as having made satisfactory progress.  This led to financial disaster for the students forced to repay federal loans while CSOL collected the federal funds for these fraudulently "enrolled" students.

**WATSON LLP**
189 S. Orange Avenue, Suite 810
Orlando, FL 32801
Tel: (407) 377-6634 / Fax: (407) 377-6688

85.     Had the United States Department of Education been aware of this practice, it would have denied federal aid to CSOL, which it ultimately did in November 2016 after Relator filed this *qui tam* action.

86.     On or around February 2016, a faculty member in the CSOL Academic Support Department disclosed to Relator that CSOL sent students to the Department that had been academically dismissed from the law school three times, and yet, were still given the opportunity to re-enter the law school and borrow federal financial aid under Title IV of the HEA.

87.     In addition to the foregoing, CSOL created "travel classes" to destinations such as New Orleans, LA, Washington, D.C., and New York, NY, that lacked any lecture or classroom components.  They were nothing more than field trips without substance, and students received federal student aid for the classes without any educational component.  The travel classes were administratively delegated, and not listed in any permanent course catalog.  They were described in brief and only prior to the offering, and then "disappeared."  These classes were not reviewed or considered by a curriculum committee, and the credits associated with the courses are arbitrary and, therefore, as a consequence were never reviewed by ABA Accreditation Committee.

88.     CSOL, as a requirement of graduation, also made law students pass a Bar Exam Preparation Course.  However, this requirement was not made known to students, and instructors in the course were required to fail a certain number of students.  Upon failure and unbeknownst of the requirement the students proceeded to graduation, only to learn from CSOL that they would not be allowed to graduate and must return to CSOL

AMENDED COMPLAINT- 26
Case No.:  6:16-cv-00970-RBD-TBS

**WATSON LLP**
189 S. Orange Avenue, Suite 810
Orlando, FL 32801
Tel: (407) 377-6634 / Fax: (407) 377-6688

the following semester.  Compounding matters further, CSOL required these students to enroll as full-time students in order to obtain federal student aid, which caused students to ultimately graduate with credits in excess of what was needed to graduate.  If students refused to return to the school to take the Bar Exam Preparation Course, CSOL threatened to academically dismiss them, which would trigger their student loan repayment status immediately, all without a juris doctor degree and no way to register for the Bar exam.  In essence, this entire process caused the United States Department of Education to pay for an excessive number of student credits that were not required to graduate.

### *CSOL's Efforts to Maximize on Veterans to Avoid the 90/10 Rule*

89.    A regulatory loophole in Title IV of the HEA permits eligible institutions for federal aid to exclude other forms of federal funding, such as that received by active duty and veterans of the United States Military, from their revenue calculation for purposes of compliance with the 90/10 rule.

90.    Infilaw and CSOL actively exploited veterans and active military to end-run the 90/10 rule, all in the name of profit.  CSOL targeted veterans and active military members in its admission process, and then treated those students more academically favorable than those who borrow federal student aid.  For example, at CSOL, active duty and veteran law students were allowed to continue even though they had not met the GPA requirement as readily as those who borrow federal student aid.  The admission of one military veteran would offset ten (10) students who borrow 100% federal financial aid to satisfy the 90/10 rule.

**WATSON LLP**
189 S. Orange Avenue, Suite 810
Orlando, FL 32801
Tel: (407) 377-6634 / Fax: (407) 377-6688

91.     In 2013, a law student and military veteran, obtained a GPA of 1.60 after his first year of law school, which was well below the 1.90 academic standard to maintain enrollment status, at that time, under the CSOL student handbook.  The student filed an appeal for admissions.  As a result of the appeal process, CSOL's Dean of Admissions allowed the student back into CSOL despite the student's unfavorable success rate to finish CSOL's law program for purposes of compliance with the 90/10 rule.  In fact, CSOL was always in such a delicate balance with the 90/10 rule that the loss of more than a few students would cause CSOL to openly run afoul the rule.  To get around this, CSOL employed any tactics to retain active duty and veteran students, and continued to re-certify them for federal student aid even when such active duty and veteran students were not making satisfactory progress and should have been academically dismissed and precluded.

92.     This is just one of many examples of several military veterans and students who self-paid their tuition, including a medical doctor from South Carolina who was also a law student, that were allowed to continue even though they had a failing GPA.

93.     CSOL falsely misrepresented to the Department of Education compliance of the 90/10 rule to condition payment for Title IV funds.

### CSOL's Manipulation of Bar Exam and Employment Statistics

94.     CSOL engaged in generous incentives to prevent law students from taking the bar exam if they appeared statistically unlikely to pass.  In fact, one of CSOL's primary goals was to ensure that graduates were excludes from the group of "first time

AMENDED COMPLAINT- 28
Case No.:  6:16-cv-00970-RBD-TBS

**WATSON LLP**
189 S. Orange Avenue, Suite 810
Orlando, FL 32801
Tel: (407) 377-6634 / Fax: (407) 377-6688

test takers" so that their Bar exam statistics would never be counted for purposes of CSOL's Bar passage rate.

95.     The CSOL Dean's Office even went so far as to telephone graduates the night before the Bar exam to actively discourage them from taking the exam the next day. The CSOL Dean's Office offered compensation for the lost bar exam registration fees in the form of a $5,000 stipend, and an opportunity to study more intensively until the next administration of the bar exam.  If the graduate accepted the offer and opted not take the bar exam the next day, he or she lost their status as a "first-time taker" because the graduate was already registered for the bar exam.  Thereafter, upon sitting for the exam the graduate becomes a "second-time taker," and their scores, passing or failing, were not required to be reported in the CSOL's statistics under ABA guidelines.  This tactic allowed CSOL to manipulate its statistic for first time takers, and the ultimate statistic reported to the public is misleading.

96.     In addition to the foregoing, CSOL offered graduates a "residency" to study for the bar exam.  This allowed CSOL to report its recent graduates as employed. The CSOL graduates that accepted the offers were placed in a specified area of the law school library to "study," and were characterized as employees of the library.  CSOL librarians, however, were instructed not to request these "employees" to perform any work.  This tactic allowed CSOL to manipulate its employment statistic for its recent graduates, and the ultimate statistic reported to the public was misleading.

97.     There was a marked decline of bar passage rates at Infilaw's Consortium of Law Schools from more than 75% to below 35% in North Carolina between 2010 and

2016.  No other American law school has had a similar decrease in bar passage.  The passage rate for the July 2015 North Carolina Bar Exam was 47% for CSOL first time takers, compared to a statewide pass rate of 67.1% for the same group.  The CSOL bar passage rate for the February 2016 North Carolina Bar Exam was 34.7%; 45.2% for the July 2017 North Carolina Bar Exam; 21.08% for the February 2017 North Carolina Bar Exam; and 34.04% for the July 2017 North Carolina Bar Exam.

98.     The bar passage rate at CSOL was in a declining trend for the last four years of its existence, and the bar passage rate at CSOL was out of compliance with ABA Standard 301(a), which requires that "[a] law school shall maintain an educational program that prepares its students for admission to the bar, and effective and responsible participation in the legal profession."  Interpretation 301-6 to ABA Standard 301(a) provides as follows:

A.     A law school's bar passage rate shall be sufficient, for purposes of Standard 301(a), if the school demonstrates that it meets any one of the following tests:

1)     That for students who graduated from the law school within the five most recently completed calendar years:

(a)  75 percent or more of these graduates who sat for the bar passed a bar examination, or

(b)  in at least three of these calendar years, 75 percent of the students graduating in those years and sitting for the bar have passed a bar examination.

In demonstrating compliance under sections (1)(a) and (b), the school must report bar passage results from as many jurisdictions as necessary to account for at least 70% of its graduates each year, starting with the jurisdiction in which the highest number of graduates took the bar exam and proceeding in descending order of frequency.

AMENDED COMPLAINT- 30
Case No.:  6:16-cv-00970-RBD-TBS

**WATSON LLP**
189 S. Orange Avenue, Suite 810
Orlando, FL 32801
Tel: (407) 377-6634 / Fax: (407) 377-6688

2)     That in three or more of the five most recently completed calendar years, the school's annual first-time bar passage rate in the jurisdictions reported by the school is no more than 15 points below the average first-time bar passage rates for graduates of ABA-approved law schools taking the bar examination in these same jurisdictions.

In demonstrating compliance under section (2), the school must report first-time bar passage data from as many jurisdictions as necessary to account for at least 70 percent of its graduates each year, starting with the jurisdiction in which the highest number of graduates took the bar exam and proceeding in descending order of frequency.  When more than one jurisdiction is reported, the weighted average of the results in each of the reported jurisdictions shall be used to determine compliance.

B.     A school shall be out of compliance with the bar passage portion of 301(a) if it is unable to demonstrate that it meets the requirements of paragraph A (1) or (2).

99.     CSOL, by intentionally manipulating the statistics for first time bar exam takers, demonstrated an effort to avoid compliance with ABA Standard 301(a).

### Unusual Connections Between Infilaw, CSOL, And A Candidate For The Haitian Presidency

100.     Several incidents that occurred over the past several years suggested the possibility that Infilaw was likely engaged in inappropriate behaviors with foreign persons and organizations relating to specific business transactions with Infilaw.  The most significant of such incidents involved the pro bono program between CSOL and Haiti.

101.     CSOL Associate Dean Dan Piar approached Relator in Spring 2014 about an upcoming business trip that he had to visit Haiti.  CSOL Associate Dean Piar described the purpose of trip—to explore the possibility of Infilaw establishing a gold mining contract with the Haitian government because the gold mining contracts

**WATSON LLP**
189 S. Orange Avenue, Suite 810
Orlando, FL 32801
Tel: (407) 377-6634 / Fax: (407) 377-6688

established under the prior government administration had been recently canceled by Haiti's Parliament.  CSOL Associate Dean Piar provided significant detail including the fact that Infilaw would be superior because it would pay the Haitian Government 6% rather than the 4% of the mined material offered by Canadian mining companies.  CSOL Associate Dean Piar also suggested a "tie-in" of CSOL students by placing them in-country for Infilaw "presence and visibility."

102.    Approximately two weeks later and after his Haiti trip, CSOL Associate Dean Piar spoke again with Relator.  CSOL Associate Dean Piar offered details from his travels—that he made contact with the relevant persons connected to the Haitian government, they discussed the gold mining contracts, and other arrangements.

103.    Former CSOL President Don Lively, an Infilaw executive and investor, and the current President of the Arizona Summit School of Law, contacted Relator in January 2015 to schedule a meeting concerning establishing the Haiti pro bono program. Former CSOL President Lively described the program as law students traveling to Haiti to participate in a program associated with one of Chantal Volcy Ceant's foundations. Volcy Ceant is the wife of Jean Henri Ceant, who at the time of establishing the CSOL Haiti pro bono program was a candidate for the Haitian presidency.  According to CSOL Associate Dean Piar, under the pro bono program, CSOL law students would provide legal service to enforce child support payments and receive school credits (and borrow federal student aid to pay tuition for the program to generate more money for CSOL, according to Former CSOL President Lively).  Relator pointed out the difficulties that the program would encounter with the language barriers, as French and Creole are the

AMENDED COMPLAINT- 32
Case No.:  6:16-cv-00970-RBD-TBS

**WATSON LLP**
189 S. Orange Avenue, Suite 810
Orlando, FL 32801
Tel: (407) 377-6634 / Fax: (407) 377-6688

primary languages spoken in Haiti, and also that the law students did not have any

training or understanding of the Haitian civil legal system.  Former CSOL President

Lively summarily dismissed Relator's concerns.

104.    A few months after the meeting with Former CSOL President Lively,

CSOL held a major event at CSOL in honor of the Ceants.  The event was billed as a

"Signing Ceremony."  The event culminated with Former CSOL President Lively and the

Ceants signing an agreement of understanding concerning the CSOL Haiti pro bono

program.

105.    Former CSOL President Lively assigned the formation of the pro bono

program to CSOL Associate Dean for Experimental Learning, Kama Pierce.

106.    Approximately ten students went to Haiti in June 2015, all of whom did so

with the use of federal student aid that was borrowed for educational purposes but used

for travel expenses.  The students who went to Haiti attended meetings, court hearings,

and met with government officials, yet, they did not perform any legal work.

107.    In preparation for the Summer 2016 Haiti pro bono program, CSOL

retained a Haitian attorney, Ludwig LeBlanc to provide a crash course to law students on

the Haitian civil legal system.  LeBlanc is related to and is the law partner of Camille

LeBlanc, who along with Jean Henri Ceant, is the co-founder of a major Haitian political

party.

108.    Relator served a confidential written disclosure statement on the

Government on June 1, 2016, pursuant to 31 U.S.C. § 3730(b)(2), containing

AMENDED COMPLAINT- 33
Case No.:  6:16-cv-00970-RBD-TBS

**WATSON LLP**
189 S. Orange Avenue, Suite 810
Orlando, FL 32801
Tel: (407) 377-6634 / Fax: (407) 377-6688

substantially all material evidence and information Relator possesses related to the conduct described herein.

109.    All general and statutory conditions precedent has either occurred or been waived by operation of law.

110.    Relator retained the law firm of Watson LLP to litigate her interests in this action, and is obligated to pay such firm reasonable attorneys' fees for its services. Watson LLP is entitled to recover its attorneys' fees and costs from Defendants, pursuant to 31 U.S.C. § 3730(d).

### COUNT I
### Violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A)
### (Infilaw and CSOL)

111.    Relator re-alleges and incorporates the allegations contained in paragraphs 1 through 110, as though fully set forth herein.

112.    Good faith entry into a PPA is a condition of payment, and re-affirmation of its duties, obligations, and promises under the PPA upon CSOL's submission of certification of compliance on an annual basis was necessary for CSOL to receive federal student aid under Title IV of the HEA.

113.    CSOL entered into an initial PPA with the United States Department of Education, in exchange for distribution of federal financial aid under Title IV of the HEA.  Infilaw is a third-party service provider under the PPA, and controls financial aid at CSOL.

AMENDED COMPLAINT- 34
Case No.:  6:16-cv-00970-RBD-TBS

**WATSON LLP**
189 S. Orange Avenue, Suite 810
Orlando, FL 32801
Tel: (407) 377-6634 / Fax: (407) 377-6688

114.     CSOL entered into the initial PPA to establish Title IV eligibility, and at or before the time of entering into the PPA, Infilaw and CSOL had deliberate ignorance or reckless disregard to comply with Title IV and its implementing regulations.

115.     By entering into the PPA, CSOL, as an eligible institution within the meaning of the HEA, agreed that it would comply with all statutory provisions of or applicable to Title IV, all applicable regulatory provisions of Title IV, including the requirements set forth in 34 C.F.R. § Part 600 and 34 C.F.R. § Part 668, and the terms and provisions of the PPA.

116.     Thereafter, CSOL failed to disclose noncompliance of material regulatory requirements under the ABA accreditation standards that the United States Department of Education expressly designated as a condition of payment on an annual basis under Title IV of the HEA.

117.     CSOL impliedly certified with each annual re-certification of the PPA that it was in compliance with Title IV.

118.     Infilaw and CSOL knowingly violated Title IV of the HEA, its implementing regulations under 34 C.F.R. § Part 600 and 34 C.F.R. § Part 668, and the PPA by making, among other fraudulent claims, the following fraudulent claims:

        a.   CSOL falsely and impliedly represented every year that it was in compliance with Title IV of the HEA's prohibition against using incentive payments for its staff for recruiting activities, which is a core prerequisite for eligibility of Title funds.

AMENDED COMPLAINT- 35
Case No.:  6:16-cv-00970-RBD-TBS

**WATSON LLP**
189 S. Orange Avenue, Suite 810
Orlando, FL 32801
Tel: (407) 377-6634 / Fax: (407) 377-6688

Case 6:16-cv-00970-RBD-TBS   Document 48   Filed 11/09/17   Page 36 of 46 PageID 416

b. Infilaw and CSOL admitted academically underqualified students to
CSOL without the approval of the dean and faculty of the law school,
in violation of ABA Standard 205(b);

c. Infilaw and CSOL admitted academically underqualified students to
CSOL, in violation of ABA Standard 501(b) that a law school should
not admit applicants who do not appear capable of satisfactorily
completing its program of legal education and being admitted to the
bar;

d. Infilaw and CSOL altered law students' grades through the CSOL re-
entry program, in violation of 34 C.F.R. § 668.34, as such students
failed to achieve satisfactory progress to maintain the continued
receipt of federal student aid under Title IV of the HEA;

e. CSOL breached its fiduciary duty to use federal student aid monies
received from the United States Department of Education when
Infilaw used improper trust accounting procedures and depleted
CSOL's bank accounts containing federal student aid, and then used
such funds for Infilaw's own benefit;

f. CSOL failed to display financial responsibility by allowing Infilaw to
use improper trust accounting procedures to deplete CSOL's bank
accounts containing federal student aid, and then used such funds for
Infilaw's own benefit;

AMENDED COMPLAINT- 36
Case No.:  6:16-cv-00970-RBD-TBS

**WATSON LLP**
189 S. Orange Avenue, Suite 810
Orlando, FL 32801
Tel: (407) 377-6634 / Fax: (407) 377-6688

g.  CSOL, in advertising job placement rates, failed to make available to prospective law students the most recent data concerning employment statistics by failing to disclose that graduates were "employed" by the law school to study for the bar exam, and as a result, engaged in misleading career placement performance with materially misleading employment statistics;

h.  CSOL made re-certifications of academically underqualified students at the end of each academic reporting period and impliedly certified such students as having made satisfactory progress, as a condition for the continued receipt of federal financial aid;

i.  CSOL failed to maintain the accreditation standards set by the ABA, pursuant to Part H if Title IV of the HEA, even though it impliedly represented that it would, as a condition of payment of federal student aid money to CSOL;

j.  Infilaw and CSOL failed to implement a written plan to combat the unauthorized distribution of copyrighted material by users of the law school's network;

k.  CSOL failed to create or follow any a code of conduct, to prohibit conflicts of interest with the responsibilities of its officers, employees, or agents with respect to Title IV financial aid; and

**WATSON LLP**
189 S. Orange Avenue, Suite 810
Orlando, FL 32801
Tel: (407) 377-6634 / Fax: (407) 377-6688

l.   CSOL failed to enable its graduates to earn sufficient incomes to service the debt of its academic program within specific parameters of disposable income percentages.

119.   Infilaw and CSOL failed to disclose material violations of Title IV and its implementing regulations, as well as the PPA and re-certifications, to the United States Department of Education.  By making claims to the Government without disclosing these violations, Infilaw and CSOL impliedly certified compliance with Title IV, which made such representations misleading.

120.   Infilaw and CSOL knowingly violated requirements under Title IV that they knew were material to the United States Department of Education's decision to disburse federal student aid to CSOL.

121.   In performing the foregoing acts, Infilaw and CSOL knowingly defrauded the Government by causing false claims to be presented to the United States Department of Education for payment or approval, in violation of 31 U.S.C. § 3729, *et seq*., when CSOL was not in compliance with the statutory and regulatory requirements of Title IV of the HEA, did entered into the PPA with deliberate ignorance or reckless disregard for its compliance obligations under Title IV.

122.   As a result, Infilaw and CSOL caused the United States Department of the Treasury to pay money to Infilaw and CSOL based upon CSOL's material representations of compliance under Title IV of the HEA.

123.   Infilaw, through CSOL, received federal student aid monies under Title IV of the HEA from the United States Department of Education.

**WATSON LLP**
189 S. Orange Avenue, Suite 810
Orlando, FL 32801
Tel: (407) 377-6634 / Fax: (407) 377-6688

124. Infilaw and CSOL made fraudulent claims with knowledge that such claims would be tied to an increase in funds to Infilaw and CSOL under Title IV of the HEA.

125. By entering into the PPA, and impliedly re-affirming its statutory and regulatory duties, obligations, and promises to the United States Department of Education on an annual basis, CSOL is required to return any Title IV funds to the United States Department of Education, along with interest and any special costs incurred by the United States Department of Education.

126. Clearly, the United States Department of the Treasurey would not have made the decision to distribute federal funding to CSOL based upon Infilaw and CSOL's material noncompliance of the ABA's regulations and violation of Title IV of the HEA. In fact, once the Government became aware of Infilaw and CSOL's admissions and financial practices after reviewing Relator's disclosures, it ultimately terminated distribution of Title IV funds to CSOL in December 2016.

127. In December 2016, the United States Department of Education found that CSOL was out of compliance with ABA standards and that the noncompliance was both "substantial" and "persistent."  The Department went on to find that CSOL made "substantial misrepresentations" regarding the nature of its academic programs.

128. As a direct and proximate cause of Infilaw and CSOL's false claims to the Government, the United States Department of the Treasury, with respect to CSOL, has directly or indirectly paid over $285 million, based on approximately 1,355 academically underqualified CSOL law students obtaining federal financial aid from 2010 to present.

AMENDED COMPLAINT- 39
Case No.:  6:16-cv-00970-RBD-TBS

**WATSON LLP**
189 S. Orange Avenue, Suite 810
Orlando, FL 32801
Tel: (407) 377-6634 / Fax: (407) 377-6688

The estimated amount of fraudulently obtained funds considers assumptions such as the attrition rate, number of law students who were re-admitted after failure, and those admitted off-season, other than a fall admit.

129.    The total amount that Infilaw wrongfully received from the Government from the Consortium of Law Schools due to its false claims likely exceeds $500 million, based upon the amount of tuition per underqualified student multiplied by the total number of admitted and underqualified students at the Consortium of Law Schools, decreased by the percentage of scholarships awarded to such students, and from the dates of full accreditation by the ABA for Florida Coastal School of Law (2002), Arizona Summit School of Law (2010), and CSOL (2011).

130.    All fraudulent claims submitted to the Government by Infilaw and CSOL are subject to a civil fine under 31 U.S.C. § 3729(a).

131.    The Government is entitled to the full value of the fraudulent and false claims submitted Infilaw and CSOL for payment.

**WHEREFORE,** Relator, BARBARA BERNIER, on behalf of the UNITED STATES OF AMERICA, demands judgment against Defendants, INFILAW CORPORATION and CHARLOTTE SCHOOL OF LAW, and respectfully requests that the court enter judgment in favor of the United States in an amount equal to three times the amount of damages the federal government has sustained because of Infilaw and CSOL's actions, pursuant to 31 U.S.C. § 3729(a); statutory civil penalties for each violation, pursuant to 31 U.S.C. § 3729(a); that Relator be awarded reasonable attorneys' fees and costs, pursuant to 31 U.S.C. § 3730(d); that Relator be awarded with the

AMENDED COMPLAINT- 40
Case No.:  6:16-cv-00970-RBD-TBS

**WATSON LLP**
189 S. Orange Avenue, Suite 810
Orlando, FL 32801
Tel: (407) 377-6634 / Fax: (407) 377-6688

applicable percentage of award, pursuant to 31 U.S.C. § 3730(d); that Relator and the United States be awarded with pre-judgment and post-judgment interest; and any such further relief as the court deems just and proper.

### COUNT II
**Violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B)**
**(Infilaw and CSOL)**

132.    Relator re-alleges and incorporates the allegations contained in paragraphs 1 through 110, and paragraphs 112 through 113, as though fully set forth herein.

133.    CSOL entered into the initial PPA agreement with the United States Department of Education with deliberate ignorance or reckless disregard for its statutory and regulatory duties and obligations under Title IV.  CSOL also impliedly certified to the Government on an annual basis that it was in compliance with its statutory and regulatory duties under Title IV.

134.    Infilaw and CSOL then, thereafter, intended to use the initial PPA and re-certifications of same to submit false claims for payment.  All subsequent claims made by Infilaw and CSOL to the United States Department of Education incident to the initial PPA were poisoned by deliberate ignorance and reckless disregard underlying the PPA and annual re-certifications.

135.    Infilaw and CSOL failed to disclose material violations of Title IV and its implementing regulations, as well as the PPA and re-certifications, to the United States Department of Education.  By making claims to the Government without disclosing these violations, Infilaw and CSOL impliedly certified compliance with Title IV, which made such representations misleading.

AMENDED COMPLAINT- 41
Case No.:  6:16-cv-00970-RBD-TBS

**WATSON LLP**
189 S. Orange Avenue, Suite 810
Orlando, FL 32801
Tel: (407) 377-6634 / Fax: (407) 377-6688

136.   Infilaw and CSOL knowingly violated requirements under Title IV that they knew were material to the United States Department of Education's decision to disburse federal student aid to CSOL.

137.   The initial PPA is a false record, within the meaning of 31 U.S.C. § 3729(a)(1)(B).

138.   Infilaw and CSOL caused the initial PPA to be submitted to the United States Department of Education, in order to receive financial aid subsidies from the Government.

139.   As a result of a false record, Infilaw and CSOL caused the United States Department of the Treasury to pay money to Infilaw and CSOL that it was not obligated to pay.

140.   Infilaw and CSOL made the false record with knowledge that the initial PPA was made with deliberate ignorance or reckless disregard, and would be tied to an increase in funds to Infilaw and CSOL under Title IV of the HEA.

141.   All fraudulent records submitted to the Government by Infilaw and CSOL are subject to a civil fine under 31 U.S.C. § 3729(a).

142.   The Government is entitled to the full value of the fraudulent and false records submitted Infilaw and CSOL for payment.

**WHEREFORE,** Relator, BARBARA BERNIER, on behalf of the UNITED STATES OF AMERICA, demands judgment against Defendants, INFILAW CORPORATION and CHARLOTTE SCHOOL OF LAW, and respectfully requests that the court enter judgment in favor of the United States in an amount equal to three times

**WATSON LLP**
189 S. Orange Avenue, Suite 810
Orlando, FL 32801
Tel: (407) 377-6634 / Fax: (407) 377-6688

the amount of damages the federal government has sustained because of Infilaw and

CSOL's actions, pursuant to 31 U.S.C. § 3729(a); statutory civil penalties for each

violation, pursuant to 31 U.S.C. § 3729(a); that Relator be awarded reasonable attorneys'

fees and costs, pursuant to 31 U.S.C. § 3730(d); that Relator be awarded with the

applicable percentage of award, pursuant to 31 U.S.C. § 3730(d); that Relator and the

United States be awarded with pre-judgment and post-judgment interest; and any such

further relief as the court deems just and proper.

### COUNT III
### Violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(C)
### (Infilaw and CSOL)

143.    Relator re-alleges and incorporates the allegations contained in paragraphs

1 through 110, paragraphs 112 through 114, and paragraph 118, as though fully set forth

herein.

144.    Infilaw and CSOL conspired to violate Sections 3729(a)(1)(A) and

3729(a)(1)(B) of the False Claims Act, in violation of 31 U.S.C. § 3729(a)(1)(C).

145.    More specifically, Infilaw, through its executives, CSOL President Ogene,

had an unlawful agreement to conspire with CSOL, through CSOL Dean Jay Conison, to

defraud the federal government, and in doing so, the conspiracy made false or fraudulent

claims to the United States Department of Education, in violation of 31 U.S.C. §

3729(a)(1)(A).

146.    In addition, Infilaw, through its executives, had an unlawful agreement to

conspire with CSOL, through its managerial employees, to defraud the federal

government, and in doing so, CSOL entered into the initial PPA with the United States

**WATSON LLP**
189 S. Orange Avenue, Suite 810
Orlando, FL 32801
Tel: (407) 377-6634 / Fax: (407) 377-6688

Department of Education, with deliberate ignorance or reckless disregard to defraud the Government, in violation of 31 U.S.C. § 3729(a)(1)(B).

147.    The conspirators knowingly took acts in furtherance of the conspiracy, to get false or fraudulent claims and fraudulent records allowed by the United States Department of Education and paid by the United States Department of the Treasury.

148.    All false claims and false records submitted to the federal government by the conspiracy are subject to a civil fine under 31 U.S.C. § 3729(a).

149.    The federal government is entitled to the full value of the false claims and false records submitted by the conspiracy for payment.

**WHEREFORE,** Relator, BARBARA BERNIER, on behalf of the UNITED STATES OF AMERICA, demands judgment against Defendants, INFILAW CORPORATION and CHARLOTTE SCHOOL OF LAW, and respectfully requests that the court enter judgment in favor of the United States in an amount equal to three times the amount of damages the federal government has sustained because of Infilaw and CSOL's actions, pursuant to 31 U.S.C. § 3729(a); statutory civil penalties for each violation, pursuant to 31 U.S.C. § 3729(a); that Relator be awarded reasonable attorneys' fees and costs, pursuant to 31 U.S.C. § 3730(d); that Relator be awarded with the applicable percentage of award, pursuant to 31 U.S.C. § 3730(d); that Relator and the United States be awarded with pre-judgment and post-judgment interest; and any such further relief as the court deems just and proper.

**DATED** on November 9, 2017

1

2          Respectfully submitted,

3          /s/ Coleman Watson
           **Coleman W. Watson, Esq.**
4          Florida Bar. No. 0087288
           California Bar No. 266015
5          Georgia Bar No. 317133
           New York Bar No. 4850004
6          Email:  coleman@watsonllp.com
                        docketing@watsonllp.com
7          **Leia V. Leitner, Esq.**
           Florida Bar. No. 0105621
8          Email:  leia@watsonllp.com
           **Alberto T. Montequin, Esq.**
9          Florida Bar No. 0093795
           Email:  alberto@watsonllp.com
10         **Ronika J. Carter, Esq.**
           Florida Bar No. 0122358
11         Email:  ronika@watsonllp.com

12
           **WATSON LLP**
13         189 S. Orange Avenue, Suite 810
           Orlando, FL 32801
14         Tel: (407) 377-6634
           Fax: (407) 377-6688
15

16         *Attorneys for Relator,*
           BARBARA BERNIER
17

18

19

20

21

22

23

24

25

AMENDED COMPLAINT- 45
Case No.:  6:16-cv-00970-RBD-TBS

**WATSON LLP**
189 S. Orange Avenue, Suite 810
Orlando, FL 32801
Tel: (407) 377-6634 / Fax: (407) 377-6688

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 9, 2017, pursuant to Fed. R. Civ. P. 5, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send an electronic notice to the following lead counsel of record in this proceeding:

**LAW OFFICES OF MARK L. HORWITZ, P.A.**
**Vincent A. Citro, Esq.**
17 East Pine Street
Orlando, FL 32801
Email: vince@mlhorwitzlaw.com

**COOLEY, LLP**
**David Mills, Esq.**
1299 Pennsylvania Avenue
Washington, D.C. 20004
Email: dmills@cooley.com
*Admitted Pro Hac Vice*

**COOLEY, LLP**
**Mazda K. Anita, Esq.**
4401 Eastgate Mall
San Diego, CA 92121
Email: mantia@cooley.com
*Admitted Pro Hac Vice*

**UNITED STATES ATTORNEY'S OFFICE**
**MIDDLE DISTRICT OF FLORIDA**
**Jeremy Bloor, Esq.**
400 N. Tampa Street, Suite 3200
Tampa, FL 33602
Email: jeremy.bloor@usdoj.gov

*/s/ Coleman Watson*
Coleman W. Watson, Esq.

AMENDED COMPLAINT- 46
Case No.:  6:16-cv-00970-RBD-TBS

**WATSON LLP**
189 S. Orange Avenue, Suite 810
Orlando, FL 32801
Tel: (407) 377-6634 / Fax: (407) 377-6688