**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

_____   )
                                       )
UNITED STATES OF AMERICA,              )
*ex rel.* BARBARA BERNIER,             )
                                       )
      Plaintiff,               )      Case No. 6:16-cv-00970-RBD-TBS
                                       )
v.                                     )      **MOTION TO DISMISS &**
                                       )      **MEMORANDUM OF LAW**
INFILAW CORPORATION, a Florida         )
Corporation, and CHARLOTTE SCHOOL      )      **ORAL ARGUMENT REQUESTED**
OF LAW, LLC, a foreign limited liability )
company,                               )
                                       )
      Defendants.              )
_____   )

**DEFENDANTS INFILAW CORPORATION AND CHARLOTTE SCHOOL
OF LAW, LLC'S MOTION TO DISMISS AMENDED COMPLAINT AND
SUPPORTING MEMORANDUM OF LAW**

## Table of Contents

**Page**

INTRODUCTION ................................................................................................ 1

FACTUAL & PROCEDURAL BACKGROUND .................................................. 3

STANDARD OF REVIEW .................................................................................. 8

ARGUMENT ....................................................................................................... 9

    I.      BERNIER HAS NO PLAUSIBLE BASIS TO PREMISE FCA CLAIMS ON CSL'S ENTRY INTO OR ALLEGED RE-CERTIFICATIONS OF THE PPA. ............................................... 9

    II.     ALL THREE COUNTS ARE BARRED BECAUSE THE UNDERLYING ALLEGATIONS WERE PUBLICLY DISCLOSED AND BERNIER IS NOT AN ORIGINAL SOURCE. ................................. 13

          A.     The Public Disclosure Bar ................................................. 14

          B.     Bernier's Allegations Are Substantially the Same as Prior Public Disclosures in Various News Sources. ................................. 15

          C.     Bernier Is Not an Original Source ...................................... 25

    III.    COUNTS I & II FAIL TO STATE A CLAIM FOR VIOLATION OF FCA SUBSECTIONS 3729(A)(1)(A) AND (A)(1)(B). ............................... 29

          A.     Bernier Offers Only Bare Conclusory Assertions of Knowledge ...... 29

          B.     The Complaint Fails to Meet the Falsity Requirement ..................... 32

          C.     Bernier Is Unable to Point to Even a Single False Claim Presented to the Government Under § 3729(a)(1)(A) ...................... 39

    IV.    BERNIER ALLEGES NO FACTS TO SUPPORT HER CONSPIRACY CLAIM ............................................................. 44

CONCLUSION ................................................................................................... 45

## Table of Authorities

**Page(s)**

**Cases**

*Ambrosia Coal & Constr. Co. v. Pages Morales,*
   482 F.3d 1309 (11th Cir. 2007) ...........................................................32, 41

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009).........................................................................3, 8, 11

*U.S. ex rel. Aquino v. Univ. of Miami,*
   250 F. Supp. 3d 1319 (S.D. Fla. 2017) ...............................................42

*U.S. ex rel. Atkins v. McInteer,*
   470 F.3d 1350 (11th Cir. 2006) .................................................40, 42, 43

*U.S. ex rel. Bain v. Georgia Gulf Corp.,*
   386 F.3d 648 (5th Cir. 2004) .................................................................38

*U.S. ex rel. Barber v. Paychex, Inc.,*
   2010 WL 2836333 (S.D. Fla. 2010) ....................................................15

*U.S. ex rel. Barrett v. Beauty Basics, Inc.,*
   2015 WL 3650960 (N.D. Ala. 2015) ..............................................12, 34

*Battle v. Bd. of Regents,*
   468 F.3d 755 (11th Cir. 2006) ..............................................................26

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007)................................................................8, 11, 30

*Bernier v. Florida A&M Univ.,*
   Case No. 13-CA-3239 (Cir. Ct. Leon County) (filed Nov. 11, 2013) .................4

*Bernier v. Florida A&M Univ.,*
   No. 4:14-cv-00108-RH-CAS (N.D. Fla. Feb. 28, 2014).......................4

*Bernier v. Mattox, et al.,*
   Case No. 15-CA-3070 (Cir. Ct. Leon County) (filed Dec. 30, 2015)................4

*U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.,*
   501 F.3d 493 (6th Cir. 2007) .................................................................39

*U.S. ex rel. Bott v. Silicon Valley Colleges,*
   262 F. App'x 810 (9th Cir. 2008) .........................................................39

**Table of Authorities**
(continued)

Page(s)

*Brooks v. Blue Cross and Blue Shield of Fl., Inc.,*
116 F.3d 1364 (11th Cir. 1997) ................................................................32, 41

*U.S. ex rel. Brooks v. Lockheed Martin Corp.,*
423 F. Supp. 2d 522 (D. Md. 2006) ..................................................................45

*U.S. ex rel. Brown v. BankUnited Tr.
2005-1,* 235 F. Supp. 3d 1343 (S.D. Fla. 2017) ..................................19, 23, 27

*U.S. ex rel. Brown v. Walt Disney World Co.,*
361 F. App'x 66 (11th Cir. 2010) ....................................................................27

*Bryant v. Avado Brands, Inc.,*
187 F.3d 1271 (11th Cir. 1999) ........................................................................16

*Cade v. Progressive Cmty. Healthcare, Inc.,*
2011 WL 2837648 (N.D. Ga. 2011) .................................................................42

*Chandler v. Sec'y of Fla. Dep't of Transp.,*
695 F.3d 1194 (11th Cir. 2012) ..........................................................................3

*U.S. ex rel. Clausen v. Lab. Corp. of Am., Inc.,*
290 F.3d 1301 (11th Cir. 2002) ................................................................ *passim*

*Cooper v. Blue Cross and Blue Shield of Fla., Inc.,*
19 F.3d 562 (11th Cir. 1994) ....................................................................15, 18

*Corsello v. Lincare, Inc.,*
428 F.3d 1008 (11th Cir. 2005) ................................................................ *passim*

*U.S. ex rel. Devlin v. State of California,*
84 F.3d 358 (9th Cir. 1996) .............................................................................27

*U.S. ex rel. Fine v. MK-Ferguson Co.,*
99 F.3d 1538 (10th Cir. 1996) .........................................................................26

*U.S. ex rel. Florida Soc'y of Anesthesiologists v. Choudhry,*
2017 WL 2591399 (M.D. Fla. 2017) ..........................................................41, 43

*U.S. ex rel. Forcier v. Computer Sciences Corp.,*
183 F. Supp. 3d 510 (S.D.N.Y. 2016) .............................................................12

*Friedman v. F.D.I. C.,*
1995 WL 608462, at *3 (E.D. La. Oct. 16, 1995 ............................................38

**Table of Authorities**
(continued)

**Page(s)**

*U.S. ex rel. Gatsiopoulos v. Kaplan Career Inst., ICM Campus,*
   2011 WL 3489443 (S.D. Fla. 2011) ..........................................................10, 35

*U.S. ex rel. Hafter D.O. v. Spectrum Emergency Care, Inc.,*
   190 F.3d 1156 (10th Cir. 1999) ...................................................................28

*U.S. ex. rel. Harris v. Lockheed Martin Corp.,*
   905 F. Supp. 2d 1343 (N.D. Ga. 2012)........................................................45

*U.S. ex rel. Hendow v. Univ. of Phoenix,*
   461 F.3d 1166 (9th Cir. 2006) ....................................................................39

*Hill v. Morehouse Med. Assocs.,*
   82 F. App'x 213 (11th Cir. 2003) ...............................................................41

*Hopper v. Solvay Pharm., Inc.,*
   590 F. Supp. 2d 1352 (M.D Fla. 2008)........................................................14

*U.S. ex rel. Hoggett v. Univ. of Phoenix,*
   2014 WL 3689764 (E.D. Cal. 2014) ...........................................................28

*Jacobs v. Bank of Am. Corp.,*
   2017 WL 2361943 (S.D. Fla. 2017) ............................................................28

*Jallali v. Nova Se. Univ., Inc.,*
   486 F. App'x 765 (11th Cir. 2012) ........................................................10, 43

*Jallali v. Sun Healthcare Grp.,*
   667 F. App'x 745 (11th Cir. 2016) .............................................................43

*U.S. ex rel. John Doe v. Health First, Inc.,*
   2016 WL 3959343 (M.D. Fla. Jul. 22, 2016) (Dalton, J.) ......................9, 32, 33

*U.S. ex rel. Jones v. Collegiate Funding Servs., Inc.,*
   2011 WL 129842 (E.D. Va. 2011)...............................................................28

*U.S. ex rel. Keeler v. Eisai, Inc.,*
   2013 WL 12049080 (S.D. Fla. 2013), *aff'd,* 568 F. App'x 783 (11th Cir.
   2014) (per curiam) ...............................................................................27, 30

*Krebs v. CSL,*
   Case No. 3:17-cv-00190-GCM (W.D.N.C.) (filed Dec. 22, 2016)...................8

*U.S. ex rel. Lee v. Corinthian Colls.,*
   655 F.3d 984 (9th Cir. 2011) .............................................................32, 38, 39

**Table of Authorities**
(continued)

Page(s)

*U.S. ex rel. Lewis v. Walker*,
 438 F. App'x. 885 (11th Cir. 2011) .......................................................26, 27

*U.S. ex rel. Main v. Oakland City Univ.*,
 426 F.3d 914 (7th Cir. 2005) .......................................................................10

*U.S. ex rel. Mastej v. Health Mgmt. Assocs., Inc.*,
 591 F. App'x 693 (11th Cir. 2014) ............................................................9, 10

*McAndrew v. Lockheed Martin Corp.*,
 206 F.3d 1031 (11th Cir. 2000) ...................................................................45

*U.S. ex rel. Miller v. Weston Educ., Inc.*,
 840 F.3d 494 (8th Cir. 2016) .......................................................................11

*Mitchell v. Beverly Enterprises, Inc.*,
 248 F. App'x 73 (11th Cir. 2007) .................................................................42

*Moore v. Baker*,
 989 F.2d 1129 (11th Cir. 1993) ...................................................................39

*In re Nat. Gas Royalties*,
 562 F.3d 1032 (10th Cir. 2009) ...................................................................27

*U.S. ex rel. Orgnon v. Chang*,
 2016 WL 715746 (E.D. Va. 2016) ...............................................................30

*U.S. ex rel. Osheroff v. Humana Inc.*,
 2012 WL 4479072 (S.D. Fla. 2012), *aff'd* 776 F.3d 805 (11th Cir. 2015)............15, 26, 29

*U.S. ex rel. Osheroff v. Humana, Inc.*,
 776 F.3d 805 (11th Cir. 2015) ................................................................ *passim*

*U.S. ex rel. Payton v. Pediatric Servs. of Am., Inc.*,
 2017 WL 3910434 (S.D. Ga. 2017).......................................................... *passim*

*U.S. ex rel. Peretz v. Humana, Inc.*,
 2011 WL 11053884 (D. Ariz. 2011).............................................................45

*U.S. ex rel. Phalp v. Lincare Holdings, Inc.*,
 857 F.3d 1148 (11th Cir. 2017) ...................................................................29

*U.S. ex rel. Pilecki-Simko v. Chubb Inst.*,
 2010 WL 1076228 (D.N.J. 2010), *aff'd*, 443 F. App'x. 754 (3d Cir. 2011).....................31

**Table of Authorities**
(continued)

Page(s)

*U.S. ex rel. Pilecki-Simko v. Chubb Inst.*,
   443 F. App'x 754 (3d Cir. 2011) ....................................................................45

*U.S. ex rel. Reagan v. E. Texas Med. Ctr. Reg'l Healthcare Sys.*,
   274 F. Supp. 2d 824 (S.D. Tex. 2003), *aff'd*, 384 F.3d 168 (5th Cir. 2004) ...................39

*Rizzo-Alderson v. Eihab H. Tawfik, M.D., P.A.*,
   2017 WL 4410096 (M.D. Fla. Oct. 4, 2017) (Dalton, J.) ................................31

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004) ..........................................................................12

*Rutledge v. Aveda*,
   2015 WL 2238786 (N.D. Ala. 2015) ..........................................................31, 43

*Rutledge v. Aveda*,
   2015 WL 9826462 (N.D. Ala. 2015) .............................................................31

*U.S. ex rel. Saldivar v. Fresenius Med. Care Holdings, Inc.*,
   841 F.3d 927 (11th Cir. 2016) .................................................................25, 27

*U.S. ex rel. Scharber v. Golden Gate Nat'l Senior Care LLC*,
   135 F. Supp. 3d 944 (D. Minn. 2015) ...........................................................45

*Schindler Elevator Corp. v. U.S. ex rel. Kirk*,
   563 U.S. 401 (2011)......................................................................................14

*U.S. ex rel. Schubert v. All Children's Health Sys., Inc.*,
   2013 WL 1651811 (M.D. Fla. 2013) .............................................................42

*U.S. ex rel. Schubert v. All Children's Health Sys., Inc.*,
   941 F. Supp. 2d 1332 (M.D. Fla. 2013)....................................................24, 27

*Sealey v. Stidham*,
   2015 WL 5083992 (M.D. Ala. 2015) .............................................................34

*U.S. ex rel. Sharpe v. Americare Ambulance*,
   2017 WL 2840574 (M.D. Fla. 2017) ..........................................................29, 32

*U.S. ex rel. Stepe v. RS Compounding LLC*,
   2017 WL 5178183 (M.D. Fla. 2017) .............................................................42

*U.S. ex rel. Thomas v. Lockheed Martin Aeroparts, Inc.*,
   2016 WL 47882 (W.D. Pa. 2016) ..................................................................34

**Table of Authorities**
(continued)

**Page(s)**

*Thulin v. Shopko Stores Operating Co., LLC*,
    771 F.3d 994 (7th Cir. 2014) ........................................................................30

*U.S. ex rel. Torres v. Kaplan Higher Educ. Corp.*,
    2011 WL 3704707 (S.D. Fla. 2011) ..............................................................39

*Universal Health Servs., Inc. v. U.S. ex rel. Escobar*,
    136 S. Ct. 1989 (2016)..............................................................................32, 33

*Urquilla-Diaz v. Kaplan Univ.*,
    780 F.3d 1039 (11th Cir. 2015) .............................................................. *passim*

*U.S. ex rel. Urquilla-Diaz v. Kaplan, Univ.*,
    2017 WL 2992197 (S.D. Fla. 2017) ..............................................................28

*U.S. v Alcan Elec. and Eng'g, Inc.*,
    197 F.3d 1014 (9th Cir. 1999) ................................................................27, 28

*U.S. v. Healogics, Inc.*,
    2016 WL 2744949 (M.D. Fla. 2016) .............................................................44

*U.S. v. King-Vassel*,
    728 F.3d 707 (7th Cir. 2013) ........................................................................30

*U.S. v. LifePath Hospice, Inc.*,
    2016 WL 5239863 (M.D. Fla. 2016) .............................................................44

*U.S. v. Sanford-Brown, Ltd.*,
    788 F.3d 696 (7th Cir. 2015), *reinstated in part and superseded in part*,
    *U.S. v. Sanford-Brown, Ltd.*, 840 F.3d 445 (7th Cir. 2016)...................... *passim*

*U.S. ex rel. Whatley v. Eastwick Coll.*,
    2015 WL 4487747 (D.N.J. 2015) .................................................................39

*U.S. ex rel. Wilhelm v. Molina Healthcare of Fla., Inc.*,
    2015 WL 5562313 (S.D. Fla. 2015), *aff'd sub nom.*, *Wilhelm v. Molina*
    *Healthcare of Fla., Inc.*, 674 F. App'x 960 (11th Cir. 2017) (per curiam)......26

**Statutes**

20 U.S.C. § 1099b...........................................................................................34

**Table of Authorities**
(continued)

Page(s)

31 U.S.C.
  § 3729(a)(1)(A)......................................................................................7, 29, 39
  § 3729(a)(1)(B).............................................................................................7
  § 3729(a)(1)(C)...........................................................................................44
  § 3729(b)(1)(A)...........................................................................................27
  § 3729(b)(4)................................................................................................38
  § 3730(e)(4)(A)..............................................................................14,15,25
  § 3730(e)(4)(B)..................................................................................26, 27, 28
  § 3731(b)....................................................................................................38

**Rules and Regulations**

34 C.F.R.
  § Part 600...................................................................................................34
  § Part 668.............................................................................................12, 34

Federal Rules of Civil Procedure

  8(a).............................................................................................1, 30, 33
  9(b).......................................................................................... *passim*
  12(b)(6)........................................................................................................1
  12(f)...........................................................................................................34

Fed. R. Evid. 201(b)-(d)..................................................................................2

**Other Authorities**

ABA Section of Legal Education and Admission to the Bar, *Notice of
  Probation and Specific Remedial Action* (Nov. 14, 2016)...................................6

Chris Kirkham, *Corinthian Colleges Tells Investors It Is Facing a Criminal
  Probe*, Los Angeles Times (Aug. 13, 2014) .................................................11

*Council Action on Charlotte School of Law, August 11, 2017* (Aug. 11, 2017)......................6

Alia Wong, *The Downfall of For-Profit Colleges*, The Atlantic (Feb. 23,
  2015) ......................................................................................................11

Ashley A. Smith, *The End for ITT Tech*, Inside Higher Ed (Sept. 7, 2016)............................11

Charlotte School of Law, *Charlotte School of Law Fast Facts* (Jul. 1, 2015).......................23

U.S. Dep't of Educ., *U.S. Department of Education Heightens Oversight of
  Corinthian Colleges* (June 19, 2014)..............................................................11

**Table of Authorities**
(continued)

Page(s)

U.S. Dept't of Educ., *Letter on Denial of Application to Participate in the Federal Student Financial Assistance Programs* (Dec. 19, 2016) ....................................7

**Exhibits**

*Exhibit 1*, Paul Campos, *The Law-School Scam, The Atlantic* (Sept. 2014) .................. *passim*

*Exhibit 2*, Paul Campos, *The Law-School Scam Continues*, The Atlantic (Oct. 23, 2015) ...................................................................................... *passim*

*Exhibit 3*, David Frakt, *David Frakt on His Shorter Than Expected Presentation at Florida Coastal School of Law*, The Faculty Lounge (Aug. 8, 2014) ..........................................................................................17, 22

*Exhibit 4*, *Guest Post by a Former Charlotte Law Professor, Part 2*, Outside the Law School Scam (Sept. 15, 2014) ........................................................17, 19

*Exhibit 5*, David Frakt, *Don't Say I Didn't Warn You, Florida Coastal*, The Faculty Lounge (Nov. 13, 2014)....................................................................17, 18, 21

*Exhibit 6*, David Frakt, *How Low Can You Go, InfiLaw?*, The Faculty Lounge (Dec. 18, 2014) ........................................................................................................17

*Exhibit 7*, Debra Cassens Weiss, *This Law School Had a 30% Bar Pass Rate; Do Lower Standards Presage Troubled Times for Law Grads?*, ABA Journal (Oct. 26, 2015) ..........................................................................17, 18, 22

*Exhibit 8*, Julie Rose, *After 8 Years, Charlotte School Of Law Has Become NC's Largest. So What's Value Of Degree*, WFAE (Sept. 12, 2013)................................18

*Exhibit 9*, Karen Sloan, *Lawsuit: InfiLaw Paying Law Grads to Put Off Bar Exam*, National Law Journal (June 4, 2015)....................................................19, 21

*Exhibit 10*, Phillip Bantz, *Charlotte School of Law under Fire: Suit Accuses School of Bribing Ill-Prepared Grads to Postpone Bar Exam*, North Carolina Lawyers Weekly (June 11, 2015) ....................................................20, 21

*Exhibit 11*, David Donovan, *Charlotte School of Law: Let's Make a Deal*, N.C. Lawyers Weekly (July 20, 2012) ............................................................20

*Exhibit 12*, Heath Hamacher, *ABA Considering Tougher Bar Passage Standards*, N.C. Lawyers Weekly (Mar. 7, 2016) ...........................................20

*Exhibit 13*, Staci Zaretsky, *Which Law Schools Allegedly Paid Students Not To Take The Bar Exam?*, Above the Law (June 5, 2015).....................................20, 21, 25

**Table of Authorities**
(continued)

*Exhibit 14*, *Infilaw Allegedly Paid Graduates Not to Take the Bar; Faces Fraud and Discrimination Allegations*, Outside the Law School Scam (June 6, 2015)..................................................................................................20

*Exhibit 15*, Karen Sloan, *Arizona Summit Defends Encouraging Grads to Delay Bar Exam*, National Law Journal (June 11, 2015) ...................................21

*Exhibit 16*, Staci Zaretsky *Law School Dean Allegedly Begged Graduates Not to Take the Bar Exam*, Above the Law (Jul. 28, 2015)......................................21

*Exhibit 17*, David Frakt, *Three Myths Used to Justify Predatory Admission Practices - The Instructive Example of InfiLaw*, The Faculty Lounge (June 3, 2016).....................................................................................................21

*Exhibit 18*, Kathryn Rubino, *Law School Dean Blames Lazy Students for Terrible Bar Passage Rate*, Above the Law (Sept. 2, 2015) ..............................22

*Exhibit 19*, Editorial Board, *The Law School Debt Crisis*, N.Y. Times (Oct. 24, 2015) ................................................................................................22, 25

*Exhibit 20*, Stephen J. Harper, *Too Many Law Students, Too Few Legal Jobs*, The N.Y. Times (Aug. 25, 2015) ......................................................................22

*Exhibit 21*, Jordan Weissmann, *The Jobs Crisis at Our Best Law Schools Is Much, Much Worse Than You Think*, The Atlantic (Apr. 9, 2013)....................22

*Exhibit 22*, Ry Rivard, *Poaching Law Students: The Law School Transfer Market Heats Up, Getting Some Deans Hot Under the Collar*, Inside Higher Ed (Feb. 4, 2015) ..............................................................................23

*Exhibit 23*, Paul Bowers, *InfiLaw, Charleston School of Law, and the Rise of For-Profit Colleges*, Charleston City Paper (Aug. 14, 2013)...........................24

*Exhibit 24*, Paul Campos, *Does Your Conscience Bother You?*, Lawyers Guns & Money (Jul. 6, 2013).......................................................................................24

*Exhibit 25*, Kyle McEntee, *Caveat Venditor: Empty Threats from Notorious For-Profit Law Schools*, Above the Law (May 26, 2016)................................24

*Exhibit 26*, Charlotte School of Law, *Why Charlotte School of Law* (Mar. 7, 2016) ................................................................................................25

*Exhibit 27*, The Charlotte Post, *Out & About* (Mar. 5, 2015)................................25

Defendants InfiLaw Corporation ("InfiLaw") and Charlotte School of Law, LLC ("CSL") (collectively, "Defendants") hereby move to dismiss Plaintiff Barbara Bernier's Amended Complaint with prejudice pursuant to Federal Rules of Civil Procedure 8(a), 9(b), and 12(b)(6).  Defendants request oral argument.

## INTRODUCTION

Relator Barbara Bernier's second attempt to assert claims under the False Claims Act ("FCA") against Defendants fares no better than her first.  As Defendants demonstrated with regard to the Complaint, the Amended Complaint is fundamentally flawed for three independent reasons:  (1) Bernier lacked any personal or firsthand knowledge of Defendants' purported fraudulent conduct; (2) Bernier's claims were previously disclosed and Bernier is not an original source; and (3) Bernier has failed to meet the threshold requirements of either Rule 8 or Rule 9(b).  The Amended Complaint should be dismissed with prejudice.

Bernier, a former professor at CSL, seeks to capitalize on the misfortune of her former employer, which closed earlier this year.  Without any relevant personal knowledge or basis for her claims, Bernier recklessly accuses CSL and its corporate parent (InfiLaw) – institutions committed to helping underserved and minority students gain access to the legal profession – of engaging in a scheme to defraud the government.  Not only is Bernier uninformed and wrong, but her claims are legally flawed and the Amended Complaint fails to allege a claim under the FCA.

The FCA is designed to encourage private citizens with personal knowledge of fraudulent claims for federal payments to present that knowledge to the government in exchange for a substantial portion of any recovery.  Congress recognized that this incentive

creates the potential for baseless lawsuits, however, so it set a high threshold for such "relators" to proceed in court.  And even before the complaint can be served, it must be filed under seal so the government can investigate and, if it so chooses, intervene and prosecute the case.  Here, the government declined to intervene.

The Amended Complaint should be dismissed for several independent reasons.  First, the FCA requires, and Bernier entirely lacks, first-hand knowledge of an allegedly fraudulent certification or claim for payment.  Bernier premises her case on (a) CSL's entry into a Program Participation Agreement ("PPA") with the Department of Education ("Department"), execution of which makes students eligible to receive federal financial aid, and (b) supposed subsequent annual re-certifications.  Bernier alleges that, *from the very beginning*, when CSL executed its PPA in 2011, CSL fraudulently intended not to honor it.  This remarkable (and false) accusation is entirely unfounded.  In fact, Bernier does not and cannot assert any factual basis for such a claim because *she didn't start at CSL until 2013*.  In addition, according to her Amended Complaint, Bernier worked as a professor her entire time at CSL, never working on PPA certifications or supposed "re-certifications" (which do not exist), nor in the financial aid, billing, or admissions departments (despite her blanket assertion of "direct engage[ment] in almost all CSOL departments"), further proving she lacks knowledge of any supposed fraudulent claim for payment or false certification.  And while Bernier speculates that InfiLaw (CSL's parent) actually controls all substantive decisions related to the PPA, Bernier *never worked at InfiLaw at all*, in any capacity.

In short, Bernier has no personal knowledge of Defendants' actions either at the time of the allegedly fraudulent execution of the PPA or later upon any supposed "annual" re-

certifications, so her conclusory (and erroneous) assertion that Defendants all along intended to defraud the Government or later submitted false claims or statements are unsupported, implausible and legally insufficient.  This fundamental deficiency alone requires dismissal.

Second, the FCA's "public disclosure bar" requires dismissal because Bernier's claims are based on information that was previously publicly disclosed well before Bernier filed suit, and she is not an original source.  The Amended Complaint merely repackages a litany of allegations leveled against Defendants in the media – typically from sources hostile to the for-profit model of higher education – for years before Bernier's filing.  As detailed below, every material allegation is substantially similar to an allegation asserted well before the Amended Complaint was filed.  And Bernier does not qualify as an original source because she does not and cannot plead first-hand, independent knowledge of any fraudulent acts or false claims.  Bernier is precisely the type of removed former employee with nothing but second-hand speculation and pre-existing criticism from the media that the FCA excludes.

Finally, Bernier fails to state FCA claims because she cannot plead the necessary statutory elements of scienter, falsity, presentment, or proper parties to a conspiracy. Accordingly, the Amended Complaint should be dismissed in its entirety.

## **FACTUAL & PROCEDURAL BACKGROUND**[1]

CSL opened in 2006.  Amended Complaint ("AC") ¶ 47.  Since inception, CSL envisioned a unique mission with respect to enabling minorities and other underrepresented populations to access the legal profession, striving to advance "inclusive excellence" by

---

[1]  Defendants take the facts as alleged in the Amended Complaint only for purposes of this motion, as they must.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

"creat[ing] an environment for persons of all backgrounds and life experiences."[2]   The *National Jurist* recognized CSL as "one of the nation's most diverse law schools," a recognition that "attests to the importance" CSL placed on diversity, *id.*, which the ABA encouraged.

InfiLaw's consortium "includes an independent network of ABA-approved law schools and companies that provide management solutions, new educational programs, and pioneering, technology-driven course delivery to law schools and higher education institutions nationally and internationally."   AC ¶ 29.   Its mission is "to establish the benchmark of inclusive excellence in professional education for the 21st Century," "supported by three key pillars[:]  (a) centering on 'serving the underserved,' (b) providing education that is 'student-outcome centered,' and (c) graduating students who are 'practice-ready.'"  *Id.* ¶ 30.  One of InfiLaw's three law schools is CSL.  *Id.* ¶ 35.

Any school that wishes to be eligible for federal student aid under Title IV of the Higher Education Act ("HEA") must execute a PPA.   The Amended Complaint alleges implicitly that CSL executed its PPA in 2011.  *See* AC ¶¶ 54-55 (alleging CSL's students have been eligible for federal aid since it was fully accredited in 2011).  Bernier joined CSL on January 1, 2013, and worked at CSL as a law professor.  *See id.* ¶ 2.[3]  Bernier does not

---

[2]     Charlotte School of Law, *Why Charlotte School of Law* (Mar. 7, 2016), http://www.charlottelaw.edu/why-charlotte-school-of-law/
[https://web.archive.org/web/20160307170910/http://www.charlottelaw.edu:80/why-charlotte-school-of-law/].

[3]     In 2013, the same year she joined CSL as a professor, Bernier sued her prior employer, Florida A&M, alleging discrimination and retaliation.  *See Bernier v. Florida A&M Univ.*, Case No. 13-CA-3239 (Cir. Ct. Leon County, Fla.) (filed Nov. 20, 2013), removed to federal court at *Bernier v. Florida A&M Univ.*, No. 4:14-cv-108-RH-CAS (N.D. Fla. Feb. 28, 2014).   In late 2015, Bernier sued the attorney and law firm that represented her against Florida A&M for legal malpractice.  *See Bernier v. Mattox, et al.*, Case No. 15-CA-3070 (Cir. Ct. Leon County, Fla.) (filed Dec. 30, 2015).

4

allege she ever worked with PPA certifications, "re-certifications" or claims for payment from the government, ever worked in the admissions or financial aid office at CSL, or ever worked at InfiLaw.  In her Amended Complaint, Bernier first adds a conclusory allegation that she "directly engage[d] in almost all CSOL departments, including … CSOL's Financial Aid and Admissions Department[,]" in an apparent attempt to establish that she "was privy to CSOL and InfiLaw's policies, procedures, and … financial aid and admissions practices[,]" but she provides no allegations of fact to support this conclusion.  *Id.*  She never alleges any personal activity or facts related to the 2011 PPA certification or "re-certifications," or financial aid, and her "engage[ment]" with admissions was limited to talking to prospective students, teaching pre-enrollment courses, and attending faculty meetings where others discussed admissions.  *Id.* at ¶ 63.

Like her complaint, the Amended Complaint is premised on CSL's alleged fraudulent entry into the PPA.  Bernier has replaced her original assertion that Defendants entered the PPA in "bad faith" with formulaic language straight from the FCA statute that Defendants entered the PPA "with deliberate ignorance or reckless disregard."  She also alleges, for the first time, that Defendants submitted annual re-certifications affirming the PPA and did so with the same fraudulent intent (*i.e.*, deliberate ignorance or reckless disregard).  *Id.* at ¶¶ 114, 116-17, 133.

Bernier was not employed at CSL when it entered the PPA in 2011.  *Id.* at ¶¶ 2, 55. The Amended Complaint does not allege any facts whatsoever showing that Bernier had knowledge of CSL's entry into the PPA in 2011, let alone any knowledge of InfiLaw or CSL's intent at that time.  Nor does the Amended Complaint allege the timing, content, or

person responsible for the so-called "annual" re-certification of CSL's PPA, or any basis for Bernier to conclude that annual re-certifications even occurred, let alone her supposed knowledge of Defendants' intent at those times.

Instead, the Amended Complaint lists a scattershot of activities in which Bernier presumes Defendants engaged – apparently ranging from 2011 through 2016 – all unspecific as to who or when:  admission practices and accepting academically underqualified students (*id*. ¶¶ 58-62, 68, 118(b)-(c), (i)), InfiLaw's control over CSL's admission decisions (*id*. ¶¶ 61-62, 118(i)), use of alternative admissions practices to "avoid" conventional metrics (*id*. ¶¶ 68-71, 118(c), (i)), offering students living stipends so they can prepare for the bar exam on an extended schedule (*id*. ¶¶ 94-95, 99, 118(i)), manipulating bar passage rates (*id*. ¶¶ 97-98, 118(i)), hiring graduates in the library (*id*. ¶¶ 96, 118(g)), application of a grading curve and other measures to retain students who might otherwise be dismissed (*id*. ¶¶ 74-82, 118(h)-(i)), providing "gift aids" (like laptops) to prospective students (*id*. ¶ 73), and issues with graduates' debt load and earnings (*id*. ¶¶ 20, 51-52, 118(l)).

As detailed in Section II, *infra*, these allegations are substantially the same as allegations previously publicly asserted in news articles, reports and websites.  Bernier also alleges improper trust accounting (*id*. ¶¶ 46, 118(e)-(f), (k)), copyright violations (*id*. ¶¶ 57, 118(j)), a re-entry program (*id*. ¶¶ 83-86, 118(d)), recruitment of minorities (*id*. ¶ 64), travel classes (*id*. ¶ 87), new allegations of rewards to admissions staff for achieving class size mandates and firing of staff who did not (*id*. ¶¶ 65-67, 72, 118(a)), bar preparation classes (*id*. ¶ 88), and noncompliance with the "90/10" rule (*id*. ¶¶ 89-93).

Count I asserts that CSL entered and (allegedly) annually re-certified the PPA while in "deliberate ignorance or reckless disregard" of its obligations to comply with Title IV of the HEA and its implementing regulations, allegedly resulting in the submission of "false claims" to the government in violation of FCA § 3729(a)(1)(A).  *Id*. ¶¶ 112, 114-121.[4]  Count II alleges that Defendants entered and annually re-certified the PPA "with deliberate ignorance or reckless disregard for its statutory and regulatory duties and obligations under Title IV," allegedly making the PPA a "false record" and poisoning all subsequent claims for payment in violation of FCA § 3729(a)(1)(B).  *Id*. ¶¶ 132-142.  Count III alleges that InfiLaw conspired with its subsidiary CSL to violate FCA §§ 3729(a)(1)(A) and (B).  *Id*. ¶¶ 143-149.  Bernier asserts that, as a result, the government improperly paid CSL over $285 million, "based on approximately 1,355 academically underqualified [CSL] students obtaining federal financial aid from 2010 to present."  *Id*. ¶ 128.  She does not identify a single underqualified student or claim for payment, or how she determined that all 1,355 students were academically underqualified.

On November 14, 2016, the ABA Council of the Section of Legal Education and Admissions to the Bar ("ABA") placed CSL on probation, finding CSL had not demonstrated compliance with ABA Standards 301(a), 501(a) and 501(b).[5]  CSL remained accredited while

---

[4]      Count I (¶ 118) includes a laundry list of alleged violations of Title IV, but save for one allegation (¶ 118(d)), Bernier never identifies the specific applicable regulation that Defendants allegedly violated.

[5]      ABA Section of Legal Education and Admission to the Bar, , *Council Decision - Notice of Probation and Specific Remedial Action – Charlotte School of Law – October 2016* (Nov. 14, 2016), https://www.americanbar.org/content/dam/aba/administrative/legal_education_and_admissions_to_the_bar/PublicNoticeAnnouncements/2016_november_charlotte_probation_public_notice.authcheckdam.pdf.

on probation.[6]  Despite remaining accredited, the Department denied CSL's recertification of eligibility for Title IV student loans on December 19, 2016.[7]  CSL closed in August 2017.[8] Bernier filed her original Complaint on June 6, 2016.  Dkt. No. 1.  The Government declined to intervene in this case on August 14, 2017.  Dkt. No. 14 at 1.[9]  The Amended Complaint was filed on November 9, 2017.  Dkt No. 48.

## STANDARD OF REVIEW

To survive a Rule 12(b)(6) motion, the Amended Complaint must plead facts sufficient to state a claim that is plausible on its face.  *Iqbal*, 556 U.S. at 678; *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  FCA claims are subject to the strict pleading standard of Rule 9(b).  *U.S. ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1308-09 (11th Cir. 2002).  An FCA complaint fails to satisfy Rule 9(b) unless it sets forth "facts as to time, place, and substance of the defendant's alleged fraud, specifically the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them."  *Id.* at 1310 (internal quotations and citation omitted).  "When an FCA claim is at issue, district courts must disregard assertions of law and conclusory statements of fact regarding a

---

[6]       *See* ABA Council of the Section of Legal Education and Admission to the Bar, *Council Action on Charlotte School of Law, August 11, 2017* (Aug. 11, 2017), https://www.americanbar.org/content/dam/aba/administrative/legal_education_and_admissions_to_the_bar/cou ncil_reports_and_resolutions/August2017OpenSessionMaterials/2017_august_statement_on_charlotte_school_ of_law.authcheckdam.pdf.

[7]       U.S. Dep't of Educ., *Letter on Denial of Application to Participate in the Federal Student Financial Assistance Programs* (Dec. 19, 2016), https://studentaid.ed.gov/sa/sites/default/files/csl-recert-denial.pdf.

[8]       Charlotte School of Law, *Closure Notice* (Aug. 11, 2017), http://www.charlottelaw.edu/404.html (last visited Dec. 4, 2017).

[9]       The Government was conducting an investigation of most of the same allegations in the complaint well before Bernier "disclosed" her allegations to it.  Dkt. No. 12 at 4.  Thus, Bernier's claim of responsibility for the events of late 2016 through CSL's closure in August 2017 are self-serving, *post hoc ergo propter hoc* assumptions.  AC ¶¶ 36, 48, 126.  Additionally, former CSL students have filed several lawsuits relating to the school's closure (*e.g.*, *Krebs v. CSL*, Case No. 3:17-cv-00190-GCM (W.D.N.C.) (filed Dec. 22, 2016)).

defendant's alleged fraudulent submissions to the Government."  *U.S. ex rel. John Doe v. Health First, Inc.*, 2016 WL 3959343, at *4 (M.D. Fla. 2016) (Dalton, J.) (citation omitted).

**ARGUMENT**

## I.    BERNIER HAS NO PLAUSIBLE BASIS TO PREMISE FCA CLAIMS ON CSL'S ENTRY INTO OR ALLEGED RE-CERTIFICATIONS OF THE PPA.

Bernier alleges that *from the very beginning* when CSL executed its foundational contract with the Department it fraudulently intended not to honor its commitment under the PPA.  This fundamental accusation permeates all three causes of action:  that "at or before the time" CSL entered its PPA, "Infilaw and CSOL had deliberate ignorance or reckless disregard to [*sic*] comply with Title IV and its implementing regulations" and therefore "knowingly defrauded" the government.  AC ¶¶ 114, 121, 133, 145-46.  This allegedly tainted all subsequent claims for disbursement of Title IV funds.  *Id.* ¶ 134.  The same is true, according to Bernier, of CSL's so-called annual re-certifications of its PPA.  *Id.* ¶¶ 112, 116-17, 133-34.

Bernier does not allege a single fact about either CSL or InfiLaw's knowledge or intent when the PPA was executed.  She alleges implicitly that CSL entered the PPA in 2011, when Bernier claims CSL's students became eligible for federal funding.  *Id.* ¶ 55.[10]  Bernier was not hired at CSL until 2013.  *Id.* ¶ 2.  Thus, Bernier has not alleged (and does not have) personal, first-hand knowledge regarding CSL's entry into its PPA.  Personal knowledge is a prerequisite to maintaining an FCA claim without indicia of reliability to support relator's allegations, which are also absent.  *See U.S. ex rel. Mastej v. Health Mgmt. Assocs., Inc.*, 591 F. App'x 693, 709 (11th Cir. 2014) (dismissing FCA claims related to activity of former

---

[10]       Bernier later alleges CSL students obtained "federal financial aid" commencing in 2010.  *Id.* ¶ 128.

employer that occurred outside date range of employment); *Jallali v. Nova Se. Univ., Inc.*, 486 F. App'x 765, 767 (11th Cir. 2012) (affirming dismissal of relator's complaint for lack of personal knowledge of practices alleged to be fraudulent); *U.S. ex rel. Gatsiopoulos v. Kaplan Career Inst., ICM Campus*, 2011 WL 3489443, at *1 n.3 (S.D. Fla. 2011) (limiting allegations of fraudulent conduct to time of employment).  This incurable defect alone requires dismissal.

And directly applicable here, a relator must establish the entry into the PPA was fraudulent to use such entry as the premise of her claims.  *See U.S. v. Sanford-Brown, Ltd.*, 788 F.3d 696, 709 (7th Cir. 2015), *reinstated in part and superseded in part*, *U.S. v. Sanford-Brown, Ltd.*, 840 F.3d 445 (7th Cir. 2016) ("[R]elator must establish the defendants' mindset at the time of entry into the PPA. . . . In other words, [relator needs] to prove that [defendants] *knowingly* entered into the PPA *to defraud the government*."); *U.S. ex rel. Main v. Oakland City Univ.*, 426 F.3d 914, 917 (7th Cir. 2005) ("To prevail in this suit [relator] must establish that the University not only knew, when it signed the [application for eligibility], that [the relevant violations] are forbidden, but also planned to continue [the violations] while keeping the Department of Education in the dark.").

Not surprisingly, given her indisputable lack of personal knowledge, Bernier offers only bare, formulaic legal conclusions that "at or before" the time CSL entered the PPA, both Defendants "had deliberate ignorance or reckless disregard" for Title IV's requirements and "knowingly defrauded the Government."  AC ¶¶ 114, 121, 133.  The Amended Complaint lacks any facts or plausible basis for these conclusory allegations, and therefore they must be disregarded as a matter of law.  *See Mastej*, 591 F. App'x at 709 (relator's general and

conclusory allegations of activity outside dates of employment with defendant were insufficient where he "articulated no factual basis for his assertion[s]"); *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 570.

Bernier also alleges that Defendants' entry into the PPA was fraudulent based on CSL's alleged failure to comply with accreditation standards and regulations *after* it entered the PPA. This is flawed as a matter of law. It is well settled that subsequent noncompliance cannot be used to support a contention that a PPA was entered fraudulently. *Sanford-Brown, Ltd.*, 788 F.3d at 709 ("[P]romises of future performance do not become false due to subsequent non-compliance." (citation omitted)); *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1058-63 (11th Cir. 2015) (affirming dismissal where relators failed to present evidence establishing scienter at the time of the PPA). "[I]t is not enough to show that [the school] did not comply with the PPA; Relators must show that [the school], when signing the PPA, knew [what was] required, and that [the school] intended not to" comply. *U.S. ex rel. Miller v. Weston Educ., Inc.*, 840 F.3d 494, 500 (8th Cir. 2016). The decision in *U.S. ex rel. Miller* is instructive because, unlike Bernier, the relators there not only established pre- and post-PPA activity in support of their claims, but also demonstrated firsthand knowledge of the alleged noncompliant conduct. *Id.* at 498-499, 500-503.

The only other basis Bernier asserts to support her false claims theory – asserted for the first time in her Amended Complaint – is that Defendants entered what Bernier calls "annual re-certifications" of the PPA with deliberate ignorance or reckless disregard for Title IV's requirements and therefore knowingly defrauded the Government. This theory also fails for the simple reason that Bernier does not and cannot identify any such "annual re-

certification" by either Defendant.  This is not surprising because there is no requirement that PPAs be recertified annually (revealing Bernier's lack of knowledge of the PPA process).[11] Indeed, Bernier fails to cite any fact, regulation, rule or standard that defines or explains any such annual re-certification requirement or process or any annual re-certification that Defendants submitted – because none exists.  As with the 2011 PPA, Bernier alleges no basis for having any knowledge of or involvement with subsequent alleged "re-certifications."

This pleading failure also requires dismissal, especially under Rule 9(b)'s exacting particularity standard, because Bernier fails to allege facts regarding who signed or submitted the PPA or the "annual re-certifications"; when, where, or what statements were made therein; or any other specifics – all of which is independently fatal to her claims.  *See Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1012 (11th Cir. 2005) (relator must allege specific "'facts as to [the] time, place, and substance of the defendant's alleged fraud'" in addition to "'the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them'" (quoting *Clausen*, 290 F.3d at 1310)).  "[T]o satisfy Rule 9(b)'s particularity requirement a [relator] must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'"  *U.S. ex rel. Forcier v. Computer Sciences Corp.*, 183 F. Supp. 3d 510, 520 (S.D.N.Y. 2016) (quoting *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004)).  The decision in *U.S. ex rel. Barrett v. Beauty Basics, Inc.*, 2015 WL 3650960, *1 (N.D. Ala. 2015), is instructive.  The court dismissed an FCA case related to the receipt of Title IV funds:

---

[11]      In fact, PPAs are effective from the date that the Department Secretary signs them for up to six years. 34 C.F.R. §§ 668.14(e), (b)(1).

> [P]laintiffs fail to state which individual submitted the certifications, what that individual certified, or when the certifications were sent to the government. Simply stating that defendant certified that it met [accreditation] standards and policies does not provide the necessary specificity.

*Id.* at *3. Like Bernier, relators there "failed to allege any express false certification with specificity," *id.*, and their attempt to proceed on an implied false certification theory similarly failed. *Id.* at *3-4. Bernier's inability to identify any actionable express or implied certifications is even more clear and cannot survive Rule 9(b) scrutiny.

Without facts and a basis for knowledge, this case cannot proceed. Bernier cannot proceed based upon murky and opaque references to an "initial PPA" that pre-dated her employment, subsequent alleged non-compliance, or so-called "annual re-certifications" that she imagines must have occurred. The Amended Complaint demonstrates that Bernier lacks personal knowledge of CSL's entry into the PPA, its state of mind when it entered the PPA, or any subsequent alleged "re-certifications" of the PPA. Because these allegations underlie all three Counts, the Amended Complaint must be dismissed.

## II. ALL THREE COUNTS ARE BARRED BECAUSE THE UNDERLYING ALLEGATIONS WERE PUBLICLY DISCLOSED AND BERNIER IS NOT AN ORIGINAL SOURCE.

For several years, the for-profit model for institutions of higher education has been the subject of intense media criticism and regulatory scrutiny, notwithstanding statutes and regulations authorizing proprietary schools and acknowledging their benefits.[12] Proprietary

---

[12] *E.g.*, Alia Wong, *The Downfall of For-Profit Colleges*, The Atlantic (Feb. 23, 2015), https://www.theatlantic.com/education/archive/2015/02/the-downfall-of-for-profit-colleges/385810/; *see also* U.S. Dep't of Educ., *U.S. Department of Education Heightens Oversight of Corinthian Colleges* (June 19, 2014), https://www.ed.gov/news/press-releases/us-department-education-heightens-oversight-corinthian-colleges; Chris Kirkham, *Corinthian Colleges Tells Investors It Is Facing a Criminal Probe*, Los Angeles Times (Aug. 13, 2014), http://www.latimes.com/business/la-fi-corinthian-colleges-20140814-story.html;

law schools, including CSL, have not escaped this scrutiny.  Like many others, both CSL and InfiLaw have been the focus of numerous stories, articles, and editorials – often egregiously slanted or grossly inaccurate – regarding admissions practices, student quality, tuition costs, financial aid, preparation for bar passage, and other issues.  Regardless of whether these claims have merit (they do not), these public disclosures legally bar the Amended Complaint. The FCA does not permit a relator to proceed if her allegations were already public.  Here, the Amended Complaint is a compendium of recycled contentions that repeat or minimally embellish on prior public allegations.[13]  Consequently, and because Bernier is not an original source, her Amended Complaint must be dismissed.

## A.     The Public Disclosure Bar.

The FCA requires that a complaint be dismissed "if substantially the same allegations or transactions" "were publicly disclosed" in the news media, unless the relator "is an original source of the information."  31 U.S.C. § 3730(e)(4)(A).  As the Supreme Court explained, this public disclosure bar (the "Bar") reflects "an effort to strike *a balance* between encouraging private persons to root out fraud and stifling parasitic lawsuits." *Schindler Elevator Corp. v. U.S. ex rel. Kirk*, 563 U.S. 401, 413 (2011) (citation omitted).[14]

---

Ashley   A.   Smith,   *The   End   for   ITT   Tech*,   Inside   Higher   Ed   (Sept.   7,   2016), https://www.insidehighered.com/news/2016/09/07/itt-tech-shuts-down-all-campuses.

[13]     Although her allegations regarding copyright issues, incentive compensation, accounting procedures, a re-entry program, travel and bar classes, and accepting or retaining minorities and military veterans are not subsumed within the public disclosure bar, as discussed *infra* Section III.B, they do not provide a basis for any violation of the FCA.

[14]     *See also Hopper v. Solvay Pharm., Inc.*, 590 F. Supp. 2d 1352, 1358 (M.D. Fla. 2008) ("The purpose [] is to prevent opportunistic lawsuits by individuals with no personal knowledge of fraud who gathered their information from the public domain."), *aff'd* 588 F.3d 1318 (11th Cir. 2009).  As part of amendments to the FCA in 2010, the Bar was changed from a jurisdictional Bar to an affirmative defense.  *See U.S. ex rel. Osheroff v. Humana, Inc.*, 776 F.3d 805, 810 (11th Cir. 2015) (holding that the amended statute "creates grounds for dismissal for failure to state a claim rather than for lack of jurisdiction").

This Circuit requires dismissal when (1) the relator's allegations already have been publicly disclosed; (2) the disclosed information was substantially the same as that in relator's suit; and (3) relator is not an "original source" of that information. *Osheroff*, 776 F.3d at 812.

**B.   Bernier's Allegations Are Substantially the Same as Prior Public Disclosures in Various News Sources.**

The vast majority of Bernier's allegations merely repeat previously waged attacks on Defendants in news media sources, including newspapers and magazines.[15]   Public websites also fall within the "broad sweep" of news media under the Bar.   *Id.* at 813.   The publicly disclosed information need not be identical to a relator's allegations for the Bar to apply; they need only be "substantially the same."   § 3730(e)(4)(A).   This prong is simply a "quick trigger to get to the more exacting original source inquiry," and it is satisfied if the claims are based "in any part" on public disclosures, regardless of whether relator actually viewed or relied upon the publicly disclosed information.   *Cooper v. Blue Cross and Blue Shield of Fla., Inc.*, 19 F.3d 562, 567-68 & n.10 (11th Cir. 1994) (citation omitted)).[16]

Similarly, prior public disclosures need not allege fraud but need only be sufficient to "raise an inference of fraud" to trigger the Bar.   *Osheroff*, 776 F.3d at 814.   In *Osheroff*, the Eleventh Circuit applied the Bar even though the relator "include[d] some details that [were] not present in the public disclosures."   *Id.* at 814-15.   The court held the public disclosures were "substantially similar" to the relator's allegations because they disclosed the "essential

---

[15]      *See Osheroff*, 776 F.3d at 813 ("Newspaper articles clearly qualify as news media."); *U.S. ex rel. Barber v. Paychex, Inc.*, 2010 WL 2836333, at *8-9 (S.D. Fla. 2010) (including magazine articles and websites in list of public disclosures barring relator's claims).

[16]      *See also Osheroff*, 776 F.3d at 814 (adopting the same *Cooper* analysis); *U.S. ex rel. Payton v. Pediatric Servs. of Am., Inc.*, 2017 WL 3910434, at * 6 (S.D. Ga. 2017) (determining whether public disclosures are substantially the same "is not particularly exacting").

allegations" of the complaint.  *Id.* at 814 (citation omitted).  Such disclosures were sufficient to raise "an inference of fraud" and invoke the Bar.  *Id.*; *see Payton*, 2017 WL 3910434, at *6-7 (applying Bar because relator's new allegations "merely offer[ed] greater detail," and there was "significant overlap" with public disclosures).

Bernier's allegations are substantially similar to those made previously in public:[17]

***Admitting academically unqualified students***:  One of Bernier's primary allegations is that CSL admitted students who were academically underqualified, or incapable of passing the bar exam.  AC ¶¶ 58-60, 68, 118(c), (i).  Such contentions – often biased and uninformed – have been leveled at CSL and InfiLaw for years prior to this suit.  Two articles published in *The Atlantic* by Paul Campos – well before the Complaint – made these very same contentions.[18]  In fact, the entire thrust of the Amended Complaint largely mimics these two articles.  Campos' September 2014 article purported to investigate the admissions practices at InfiLaw (including CSL), suggesting (incorrectly) that they "tak[e] large numbers of students that almost no other ABA-accredited law school would consider admitting."  *Exhibit 1.*  He cited each InfiLaw school's LSAT scores.  *Id.*  The author, a law school professor like Bernier, asserted that, due to their purportedly meager qualifications, a large proportion of InfiLaw's students would never be capable of passing the bar.  *Id.*  He also argued

---

[17]     The Court may consider the documents cited in the following pages because "[c]ourts may take judicial notice of publicly filed documents, [such as newspaper articles,] at the Rule 12(b)(6) stage" to assess the applicability of the Bar.  *Osheroff*, 776 F.3d at 811-12 & n.4; *see also* Fed. R. Evid. 201(b)-(d) (permitting judicial notice).  Defendants submit these articles for the "purpose of determining which statements the documents contain (but not for determining the truth of those statements)" – a proper purpose for requesting judicial notice.  *Osheroff*, 776 F.3d at 811 n.4; *see also Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir. 1999).  For the Court's convenience, the documents referenced in this section are attached as exhibits.

[18]     Paul Campos, *The Law-School Scam*, The Atlantic (Sept. 2014), https://www.theatlantic.com/ magazine/archive/2014/09/the-law-school-scam/375069/ (*Exhibit 1*); Paul Campos, *The Law-School Scam Continues*, The Atlantic (Oct. 23, 2015), https://www.theatlantic.com/education/archive/2015/10/law-school-scam-getting-worse/412159/ (*Exhibit 2*).

(incorrectly) that these practices appeared to violate ABA's standards and that InfiLaw and CSL admitted these students solely to enlarge their profits. *Id.*

The October 2015 follow-up article claimed that InfiLaw's entrance requirements fell even further between 2013 and 2015. *Exhibit 2.* The report argued that such practices should lead to these schools losing their accreditation, and that federal regulators should "take a more aggressive role in protecting both severely underqualified prospective law students and American taxpayers" from these practices. *Id.* A number of other news articles and websites have repeated or expanded on the same theme.[19]

All of these articles – and there are many more[20] – criticized the admissions model at InfiLaw and CSL and were published well *before* Bernier filed this case. Bernier's allegations about CSL's admissions practices are based on the same information, and

---

[19]    *See, e.g.*, David Frakt, *David Frakt on His Shorter Than Expected Presentation at Florida Coastal School of Law*, The Faculty Lounge (Aug. 18, 2014), http://www.thefacultylounge.org/2014/08/david-frakt-on-his-shorter-than-expected-presentation-at-florida-coastal-school-of-law.html (*Exhibit 3*) (asserting InfiLaw admitted poorly-qualified students, predicting InfiLaw schools' bar passage statistics would suffer as a result, opining ABA let InfiLaw schools "backslide" into non-compliance with accreditation standards after initially earning ABA approval, and InfiLaw schools' current practices violate such standards); *Guest Post by a Former Charlotte Law Professor, Part 2*, Outside the Law School Scam (Sept. 15, 2014), http://outsidethelawschoolscam.blogspot.com/2014/09/guest-post-by-former-charlotte-law-prof_15.html (*Exhibit 4*) (decrying admission of students scoring in 10-20 percentile on LSAT); David Frakt, *Don't Say I Didn't Warn You, Florida Coastal*, The Faculty Lounge (Nov. 13, 2014), http://www.thefacultylounge.org/2014/11/dont-say-i-didnt-warn-you-florida-coastal.html (*Exhibit 5*) (suggesting bar passage rates would drop because of admitting students with high-risk entrance statistics and wondering whether low admission standards and poor bar passage would motivate ABA to act against InfiLaw schools); David Frakt, *How Low Can You Go, InfiLaw?*, The Faculty Lounge (Dec. 18, 2014), http://www.thefacultylounge.org/2014/12/how-low-can-you-go-infilaw.html (*Exhibit 6*) (noting drop in bar passage, CSL's median LSAT of 142, criticizing CSL's admissions policies, and demanding investigations by ABA, Department, state attorneys general, and DOJ); Debra Cassens Weiss, *This Law School Had a 30% Bar Pass Rate; Do Lower Standards Presage Troubled Times for Law Grads?*, ABA Journal (Oct. 26, 2015), http://www.abajournal.com/news/article/this_law_school_had_a_30_bar_pass_rate_is_it_a_sign_of_more_widespread_fail (*Exhibit 7*) (discussing qualifications of students admitted to CSL and other InfiLaw schools, observing drops in bar passage at InfiLaw schools, blaming low admission standards for results, and claiming over 50% of CSL students are at "extreme" risk of failing future bar exams).

[20]    *See, e.g.*, archived articles with the tags "InfiLaw" or "Charlotte School of Law" beginning in at least March 2013 on Above the Law, www.abovethelaw.com.

therefore qualify as substantially the same for purposes of the Bar. *Cooper*, 19 F.3d at 567-68 & n.10; *Osheroff*, 776 F.3d at 814. As in *Osheroff*, the public disclosures here discuss the same "essential allegations" that Bernier makes, *i.e.*, that CSL and InfiLaw admitted underqualified students incapable of passing the bar, thus allegedly violating ABA standards. 776 F.3d at 814. It does not matter whether she included the additional detail that the conduct was allegedly fraudulent, as the public accusations also "raise an inference of fraud." *Id.*; *see also Payton*, 2017 WL 3910434, at *6-7 (dismissing case because relator "merely offer[ed] greater detail" and there was "significant overlap" with the public disclosures).

*InfiLaw involvement in school admissions*: Bernier alleges that one reason low-scoring students were admitted is that *InfiLaw* controlled the admissions process, instead of CSL's faculty. AC ¶¶ 61-62, 118(a), (i). This allegation also was reported in the media before the original Complaint. *The Atlantic's* 2014 article claimed that all InfiLaw schools had identical median and bottom-quarter LSAT scores, "suggesting that these [admission] numbers were chosen somewhere higher up on the corporate ladder." *Exhibit 1*. *The Atlantic's* 2015 follow-up article refers to all three schools as "InfiLaw schools" without distinguishing among them. *Exhibit 2*. Other publications have repeated these allegations.[21]

In a substantially similar allegation, Bernier contends "[a]dmissions decisions and the number of law students to admit to [CSL] are entirely controlled by InfiLaw." AC ¶ 61.

---

[21]    Julie Rose, *After 8 Years, Charlotte School Of Law Has Become NC's Largest. So What's Value Of Degree?*, WFAE (Sept. 12, 2013), http://wfae.org/post/after-8-years-charlotte-school-law-has-become-ncs-largest-so-whats-value-degree (*Exhibit 8*) ("The trend among [InfiLaw] institutions is to tout themselves an alternative for the 'underserved,' . . . . They typically accept students with much lower grades and LSAT scores . . . and they accept a lot more students than most schools." (ellipsis in original)); *Exhibit 5* ("Will these results finally cause InfiLaw to change their admission policies, and stop admitting huge numbers of high-risk students? One can always hope, but I wouldn't bet on it."); *Exhibit 7* ("All of [InfiLaw's] law schools began slashing admissions standards in 2012, and now their students are paying the price.").

Bernier also recycles the prior public allegations that CSL and InfiLaw purportedly violated ABA standards for the admission of students. *Id.* ¶¶ 61, 118(b), (c). This is the same, of course, as alleging that each school's faculty is not making such decisions, but even if Bernier's claim about the role of the faculty were considered new, it "merely offers greater detail." *Payton*, 2017 WL 3910434, at *6 ("Merely providing additional detail is simply not enough."). Additionally, putting a new label on an old contention – like claiming these practices violate "ABA Standard 205(b)" – does not transform them into something new or distinct. "Indeed, the court believes it to generally be the province of lawyers and courts to create legal theories from a certain set of facts, not the province of *qui tam* relators." *U.S. ex rel. Brown v. BankUnited Tr. 2005-1*, 235 F. Supp. 3d 1343, 1361 (S.D. Fla. 2017).

*Defendants allegedly use alternative admissions to circumvent low LSATs*: Bernier alleges CSL admitted unqualified students using an admission alternative called AAMPLE. AC ¶¶ 68-71, 118(c), (i). This challenge to the AAMPLE program made the rounds in news media years ago. *The Atlantic* highlighted it in September 2014. *Exhibit 1*. *Outside the Law School Scam* suggested in September 2014 that many students were required to take a "pre-1L program" before they could "participate in actual classes." *Exhibit 4*. In 2015, the *National Law Journal* covered a lawsuit against an InfiLaw school that alleged, among other things, that all InfiLaw schools (including CSL) were using AAMPLE to admit students with low LSAT scores or undergraduate grades.[22] Other articles covered related allegations that

---

[22]     Karen Sloan, *Lawsuit: InfiLaw Paying Law Grads to Put Off Bar Exam*, National Law Journal (June 4, 2015), http://www.nationallawjournal.com/id=1202728422268/Lawsuit-Infilaw-Paying-Law-Grads-To-Put-Off-Bar-Exam?slreturn=20170911160002 (*Exhibit 9*).

Bernier now repeats, including that CSL's admission statistics were "deceptive and misleading" and that a majority of students gained admission through AAMPLE.[23]

***Offering educational tools to prospects***:   Bernier alleges that CSL offered prospective students "gift aids," including iPads or laptops, and "ignored" unspecified Title IV regulations in the process.  AC ¶ 73.  This was alleged before Bernier joined CSL.[24]

***Mandatory Bar Review Courses*** (AC ¶ 88):  Bernier's allegation that CSL required students to pass bar prep courses to graduates was previously reported in 2016.[25]

***Extended bar review living stipends***:  Bernier alleges that Defendants "engage[] in generous incentives to prevent students from taking the bar exam if they appear statistically unlikely to pass" in order to "manipulate its statistic for first-time takers."  AC ¶¶ 94-95, 118(i).  These programs in fact assisted students who needed more time to prepare for the bar exam by providing a living stipend so they could afford to study rather than quit and return to work, and they were disclosed and dissected in 2015 through coverage of a prior lawsuit. *Exhibit 9*.  This coverage even included the allegation – which Bernier repeats – that deans at InfiLaw schools called students the night before the bar to persuade them to defer.  *Id*.[26]  Any

---

[23]     Phillip Bantz, *Charlotte School of Law under Fire: Suit Accuses School of Bribing Ill-Prepared Grads to Postpone Bar Exam*, North Carolina Lawyers Weekly (June 11, 2015), https://nclawyersweekly.com/2015/06/11/charlotte-school-of-law-under-fire-suit-accuses-school-of-bribing-ill-prepared-grads-to-postpone-bar-exam/ (*Exhibit 10*) (noting Paula Lorona alleges AAMPLE "allows the schools to publish misleading entrance standards" and CSL admitted "roughly half" of its students through AAMPLE).

[24]     David Donovan, *Charlotte School of Law: Let's Make a Deal*, N.C. Lawyers Weekly (July 20, 2012), https://nclawyersweekly.com/2012/07/20/charlotte-school-of-law-lets-make-a-deal/ (*Exhibit 11*).

[25]     Heath Hamacher, *ABA Considering Tougher Bar Passage Standards*, N.C. Lawyers Weekly (Mar. 7, 2016), https://nclawyersweekly.com/2016/03/07/aba-considering-tougher-bar-passage-standards/ (*Exhibit 12*).

[26]     Staci Zaretsky, *Which Law Schools Allegedly Paid Students Not To Take The Bar Exam?*, Above the Law (June 5, 2015), https://abovethelaw.com/2015/06/which-law-schools-allegedly-paid-students-not-to-take-the-bar-exam/?rf=1 (*Exhibit 13*); *Infilaw Allegedly Paid Graduates Not to Take the Bar; Faces Fraud and Discrimination Allegations*, Outside the Law School Scam (June 6, 2015), http://outsidethelawschoolscam.blogspot.com/2015/06/infilaw-allegedly-paid-graduates-not-to html   (*Exhibit*

argument that Bernier has provided more details specific to CSL is irrelevant, because such detail does not expose a new scheme or materially add to publicly disclosed allegations. *Payton*, 2017 WL 3910434, at *6-7.

***Poor Bar Pass Results***: Bernier claims that InfiLaw and CSL graduates have suffered a "marked decline" in bar passage rates from 2010 to 2016, and that these rates may violate ABA standards.  AC ¶ 97-99, 118(i).  This too was previously reported.  *The Atlantic's* 2015 article focused on InfiLaw's bar results, claiming "[b]ar-passage rates at the InfiLaw schools are now in free fall," before reviewing some of the same statistics Bernier uses.  *Exhibit 2.*  The article also theorized that "a law school with a low enough bar-passage rate is at risk of losing its accreditation, and therefore access to federal student loans."  *Id.*[27]

These articles – like the Amended Complaint – put a deleterious and flawed spin on InfiLaw's extended bar review programs, which were voluntary programs designed to assist students who wanted more time to study for the bar but could not afford the living expenses; and they suggested the program was designed to improve poor bar passage rates as well.[28]

---

*14*); Karen Sloan, *Arizona Summit Defends Encouraging Grads to Delay Bar Exam*, National Law Journal (June 11, 2015), http://www.nationallawjournal.com/id=1202729108185/Arizona-Summit-Defends-Encouraging-Grads-to-Delay-Bar-Exam (*Exhibit 15*); Staci Zaretsky, *Law School Dean Allegedly Begged Graduates Not to Take the Bar Exam on the Day Before the Test*, Above the Law (Jul. 28, 2015), https://abovethelaw.com/2015/07/law-school-dean-allegedly-begged-graduates-not-to-take-the-bar-exam-on-the-day-before-the-test/ (*Exhibit 16*); *Exhibit 10*.

[27]   *See also Exhibit 5* (comparing bar results to predictions from a post about admission statistics); David Frakt, *Three Myths Used to Justify Predatory Admission Practices - The Instructive Example of InfiLaw*, The Faculty Lounge (June 3, 2016), http://www.thefacultylounge.org/2016/06/three-myths-used-to-justify-predatory-admission-practices-the-instructive-example-of-infilaw- html (*Exhibit 17*) (recapping low February 2016 scores).

[28]   *Exhibit 9* (claiming InfiLaw attempted to "prop up declining bar-passage rates" and that its advertised bar-passage rate was 40 percentage points higher than the actual pass rate); *Exhibit 13* (listing the passage rates for each InfiLaw school); *Exhibit 15* ("The school's first-time pass rate for the July 2013 sitting had dropped to 68 percent—13 percentage points below the state average for all graduates of ABA-accredited law schools who took the Arizona bar.  The first-time pass rate landed below 55 percent for each of the three subsequent administrations, ranging from 12 to 20 percent below the state average."); *Exhibit 16* (claiming poor results).

Several other public sources similarly criticized InfiLaw's bar statistics.[29]  Bernier repeats these allegations, *i.e.*, that InfiLaw produces graduates with poor chances of passing the bar and that low passage rates may violate ABA standards.

     ***Hiring CSL graduates to improve employment statistics***:  Bernier's allegations that CSL and InfiLaw hired graduates merely to improve employment statistics (AC ¶¶ 96; 118(g)) were also previously reported.[30]

     ***Grading curve used to pass students who should have failed***:  Bernier alleges several incidents where Defendants supposedly set the grading curve to pass students who (she believes) should have failed, and thus "falsely certified" these students as achieving "satisfactory academic progress" ("SAP"), a regulatory requirement.  AC ¶¶ 74-82; 118 (h)-(i).  This erroneous contention is not new.  It appeared in a 2014 article that opined InfiLaw sets its grading curves at a level based on a population of students that is more qualified than the students admitted by the schools' actual admissions standards.  *See Exhibit 3*.  The article alleges that the result is undesirable grade inflation that graduates students who would be incapable or unqualified to pass a bar exam and ostensibly should not continue in law school.

---

[29]     Kathryn Rubino, *Law School Dean Blames Lazy Students for Terrible Bar Passage Rate*, Above the Law (Sept. 2, 2015), https://abovethelaw.com/2015/09/law-school-dean-blames-lazy-students-for-terrible-bar-passage-rate/ (*Exhibit 18*) (claiming CSL's bar passage rate was 20% below statewide average); *Exhibit 7* (suggesting InfiLaw bar passage results were evidence of harm by lower admission standards); Editorial Board, *The Law School Debt Crisis*, N.Y. Times (Oct. 24, 2015), https://www.nytimes.com/2015/10/25/opinion/sunday/ the-law-school-debt-crisis.html (*Exhibit 19*) (highlighting InfiLaw bar passage rates).

[30]     *E.g.*, *Exhibit 1* ("And even this [unemployment] figure [for InfiLaw schools] is, as a practical matter, an understatement:  approximately one in eight of their putatively employed graduates were in temporary jobs created by the schools and usually funded by tuition from current students."); Steven J. Harper, *Too Many Law Students, Too Few Legal Jobs*, N.Y. Times (Aug. 25, 2015), https://www.nytimes.com/2015/08/25/opinion/too-many-law-students-too-few-legal-jobs.html (*Exhibit 20*) (explicitly removing school-funded jobs from InfiLaw schools' employment statistics).  Similar public allegations have been made against other law schools.  *See, e.g.*, Jordan Weissmann, *The Jobs Crisis at Our Best Law Schools Is Much, Much Worse Than You Think*, The Atlantic (Apr. 9, 2013), https://www.theatlantic.com/business/archive/2013/04/the-jobs-crisis-at-our-best-law-schools-is-much-much-worse-than-you-think/274795/#main-content (*Exhibit 21*).

*Id.* The author argues that such practices would eventually lead to noncompliance with ABA standards and academic probation. *Id.*

Bernier makes the same "essential allegation" that InfiLaw admits underqualified students and that its grading practices and policies pass students who should fail. This is the same theory Frakt and others previously espoused. The prior public disclosures also are sufficient to raise an inference of fraud because they imply the InfiLaw schools are manipulating grades. *Osheroff*, 776 F.3d at 814. And, as noted before, Bernier cannot escape the Bar by "[m]erely providing additional detail" about specific incidents (*see Payton*, 2017 WL 3910434, at *6), or by placing a new label (wrongfully certifying SAP) on the same activity (*see BankUnited Tr. 2005-1*, 235 F. Supp. 3d at 1361). The "significant overlap" between Bernier's allegations and the public articles invokes the "quick trigger" and requires Bernier to demonstrate she is an original source. *Payton*, 2017 WL 3910434, at *7.

***Efforts to retain students***: Bernier alleges that InfiLaw directed CSL to change its curriculum and "deployed a law school retention team" to try and convince students not to transfer. AC ¶ 40.[31] This was discussed in a 2015 article about the national market for law school transfer students.[32] Therefore, any claims resting on these allegations are barred.

***Allegations related to graduates' amount of debt or earning capacity*** (AC ¶¶ 20, 50-52, 118(l)): This issue has been widely debated in numerous publications, both for the legal

---

[31]    Bernier does not allege these practices violate any statute or rule, and these allegations can be dismissed on that basis.

[32]    Ry Rivard, *Poaching Law Students: The Law School Transfer Market Heats Up, Getting Some Deans Hot Under the Collar*, Inside Higher Ed (Feb. 4, 2015), https://www.insidehighered.com/news/2015/02/04/law-school-transfer-market-heats-getting-some-deans-hot-under-collar?width=775&height=500&iframe=true (*Exhibit 22*).

（空白）

industry as a whole and for InfiLaw specifically.[33]   Bernier's allegations about CSL

graduates' debt load use a structure and calculation nearly identical to these articles.

*Compare, e.g.*, AC ¶¶ 51-52 (detailing costs and calculating debt loads) *with Exhibit 1*,

*supra*.[34]  Such blatant repetition easily falls within the Bar.  *See U.S. ex rel. Schubert v. All*

*Children's Health Sys., Inc.*, 941 F. Supp. 2d 1332, 1335 (M.D. Fla. 2013) (applying Bar

where allegations quote or reference publicly disclosed information).   The differences are

insignificant updates or tweaks to the articles' calculations, insufficient to avoid the Bar.[35]

    ***InfiLaw and CSL accepted federal student loans***:  All of Bernier's claims rely on the

underlying allegation that CSL and InfiLaw received funds through federal student loans.

*See generally* AC ¶¶ 112-149.  Plainly, this is not a new allegation, as CSL published this

---

[33]     Paul Bowers, *InfiLaw, Charleston School of Law, and the Rise of For-Profit Colleges*, Charleston City
Paper (Aug. 14, 2013), https://www.charlestoncitypaper.com/charleston/infilaw-charleston-school-of-law-and-
the-rise-of-for-profit-colleges/Content?oid=4700624 (*Exhibit 23*) ("Increasingly, potential law students must
weigh the risks and consider whether incurring tens of thousands of dollars in student loan debt is worth it in the
long run.  This is especially true at for-profit law schools, where tuition tends to be higher."); Paul Campos,
*Does Your Conscience Bother You?*, Lawyers Guns & Money (Jul. 6, 2013),
http://www.lawyersgunsmoneyblog.com/2013/07/does-your-conscience-bother-you (*Exhibit 24*) ("All [Infilaw
schools] feature atrocious employment statistics, sky high tuition, enormous class sizes, and graduates with
massive debt loads."); *Exhibit 1* (claiming InfiLaw schools "admit large numbers of severely underqualified
students; these students in turn take out hundreds of millions of dollars in loans annually, much of which they
will never be able to repay.  Eventually, federal taxpayers will be stuck with the tab"; and trying to estimate
graduate salaries based on size of employers); *Exhibit 2*  ("InfiLaw is not only exploiting these students, but
also taxpayers who will foot the bill when these students cannot repay the hundreds of millions of dollars they
borrow."); Kyle McEntee, *Caveat Venditor: Empty Threats from Notorious For-Profit Law Schools*, Above the
Law (May 26, 2016), https://abovethelaw.com/2016/05/caveat-venditor-empty-threats-from-notorious-for-
profit-law-schools/ (*Exhibit 25*) (guessing that few InfiLaw graduates make large enough salary to pay law
school debts).

[34]     Although Bernier asserts a claim for violation of the standard regarding graduates' abilities to earn a
sufficient income, she does not make any factual allegations about CSL or InfiLaw graduates' salaries and thus
fails to state a claim.  *See* AC ¶¶ 17, 100(k); *infra*, section III.B & n.59.

[35]     *Osheroff*, 776 F.3d at 814 ("[T]he significant overlap between Mr. Osheroff's allegations and the
public disclosures is sufficient to show that the disclosed information forms the basis of this lawsuit and is
substantially similar to the allegations in the complaint."); *Payton*, 2017 WL 3910434, at *6-7.

information on its own website,[36] and this fact has been widely publicized in several sources discussed above.  *E.g.*, *Exhibit 1*; *Exhibit 19*.  Indeed, the very idea of bringing a *qui tam* lawsuit on the basis of InfiLaw and CSL accepting federal loans and purportedly engaging in the practices described above was previously debated in public.[37]  These sources "raised an inference of fraud" because they reported that Infilaw used the same practices to admit and retain students and to profit from federal loans as Bernier alleges, even if the articles did not explicitly accuse InfiLaw of wrongdoing.  *See Osheroff*, 776 F.3d at 814 (complaint barred where public disclosure revealed substantially same facts without asserting wrongdoing).[38]

Accordingly, Bernier's claims are barred unless she is an original source.

### C.      Bernier Is Not an Original Source.

Because Bernier's allegations are substantially the same as prior public disclosures, she may only maintain her action if she qualifies as an original source.  § 3730(e)(4)(A).[39] An original source is someone who "either (i) prior to a public disclosure [], has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) [*sic*] who has knowledge that is independent of and materially adds to the

---

[36]      *E.g.* Charlotte School of Law, *Charlotte School of Law Fast Facts* (Jul. 1, 2015), http://www.charlottelaw.edu:80/wp-content/uploads/2014/11/FastFacts-2014.pdf [https://web.archive.org/web/20150701204016/http://www.charlottelaw.edu:80/wp-content/uploads/2014/11/FastFacts-2014.pdf] (*Exhibit 26*) (showing average federal student loan debt).

[37]      *Exhibit 13*, p. 6 (commenter in article postulating "the real money [in] these is going to be under the False Claims Act," with follow-up comments related to the merits of such a lawsuit).

[38]      Bernier suggests that a pro bono program in Haiti was somehow improper (AC ¶¶ 100-107).  Putting aside that she never identified a statutory or regulatory violation (an independent basis for dismissal), the pro bono partnership with the human rights organization Institut Dwa Tout Moun (Institute for Rights of All People) was disclosed in the Charlotte Post.  *Out & About*, The Charlotte Post, Mar. 5, 2015, at B5 (*Exhibit 27*).

[39]      *See U.S. ex rel. Saldivar v. Fresenius Med. Care Holdings, Inc.*, 841 F.3d 927, 934 (11th Cir. 2016) (if publicly disclosed information "in any part" forms the basis for a relator's claims, relator must establish that he is an original source).

publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section."  § 3730(e)(4)(B). Plainly, Bernier is not an original source under the first prong because she disclosed her claims to the Government on June 1, 2016, well after the public disclosures.  AC ¶ 108.[40]

Bernier also cannot satisfy the second prong.  A relator must have "knowledge that is independent of and materially adds to" the public disclosures.[41]  A relator has "independent" knowledge only if her knowledge derives from something other than the prior disclosures.[42] Knowledge is "independent" when the relator presents facts showing she would have found the information even absent the public disclosure.[43]  To be "material," the relator's allegations must disclose "essential elements comprising the fraudulent transaction . . . so as to raise a reasonable inference of fraud" that are not found in previous disclosures.[44]  Merely providing background information about previously disclosed allegations is insufficient.[45]

---

[40]     Bernier also alleges she met with and provided a written disclosure to the Government in April 2016. AC ¶ 36.  This change is immaterial, as (a) all the allegations subject to the Bar were publicly disclosed before April 2016 (*supra*, Section II.B), (b) this allegation is internally inconsistent with another allegation in the Amended Complaint (AC ¶ 108), and (c) the original Complaint only alleged June 1, 2016 as the date Bernier submitted her allegations to the Government (Dkt. No. 1, ¶ 92).

[41]     *Osheroff*, 776 F.3d at 815.

[42]     *U.S. ex rel. Wilhelm v. Molina Healthcare of Fla., Inc.*, 2015 WL 5562313, at *8 (S.D. Fla. 2015), *aff'd sub nom.*, *Wilhelm v. Molina Healthcare of Fla., Inc*., 674 F. App'x 960 (11th Cir. 2017) (*per curiam*); *Battle v. Bd. of Regents*, 468 F.3d 755, 762-63 (11th Cir. 2006) (requiring a factual basis for establishing relator's independent knowledge of otherwise publicly disclosed information and finding relator lacked "independent" knowledge because she failed to provide facts showing that she "participated in the state audits on which she relie[d]").

[43]     *See, e.g.*, *U.S. ex rel. Lewis v. Walker*, 438 F. App'x. 885, 888 (11th Cir. 2011); *U.S. ex rel. Fine v. MK-Ferguson Co.*, 99 F.3d 1538, 1547 (10th Cir. 1996) ("[I]ndependent knowledge is knowledge which is not secondhand knowledge.").

[44]     *Payton*, 2017 WL 3910434, at *8 (citation omitted).

[45]     *U.S. ex rel. Osheroff v. Humana Inc.*, 2012 WL 4479072, at *12 (S.D. Fla. 2012), *aff'd* 776 F.3d at 815.

Bernier "must allege specific facts – as opposed to mere conclusions" that establish her status as an original source.[46]

Bernier cannot satisfy this test.  First, she relies entirely on her conclusory declaration – which is unchanged from her original complaint – that she "is the original source of the allegations contained herein."  AC ¶ 2.  This is insufficient as a matter of law.[47] Indeed, Bernier fails to explain how or when she learned of the alleged events and cannot establish that they were derived from something other than existing public disclosures.[48]

Second, Bernier cannot qualify as an original source because she offers only "[s]econdhand information, speculation, background information, or collateral research" which "do not satisfy a relator's burden of establishing the requisite knowledge" to be an original source.[49]   If the relator "never participated in the negotiating, drafting or

---

[46]     *BankUnited Tr. 2005-1*, 235 F. Supp. 3d at 1359–60 (dismissing original source allegations that "do not describe how or when he obtained any alleged direct or independent knowledge of the Defendants' fraudulent acts; rather, they simply conclude that he obtained such knowledge"); *see also U.S. ex rel. Keeler v. Eisai, Inc.*, 2013 WL 12049080, at *16 (S.D. Fla. 2013) ("[A] relator cannot segue into discovery simply by filing prolix but unsubstantiated claims."), *aff'd*, 568 F. App'x 783 (11th Cir. 2014) (*per curiam*).

[47]     *Lewis*, 438 F. App'x at 888 (rejecting original source claim where "[t]oward the end of Appellants' brief . . . Appellants make the conclusory assertion that they were the 'original source' of the information and therefore it would not matter whether the information was ultimately held to be publicly disclosed"); *see also Schubert*, 941 F. Supp. 2d at 1336 (finding original "Relator is an original source as defined by [] § 3730(e)(4)(B)" is "a legal conclusion … not entitled to the presumption of truth") (citation omitted)); *In re Nat. Gas Royalties*, 562 F.3d 1032, 1045 (10th Cir. 2009) ("To establish original source status knowledge, a *qui tam* plaintiff must allege specific facts—as opposed to mere conclusions—showing exactly how and when he or she obtained direct and independent knowledge of the fraudulent acts alleged in the complaint and support those allegations with competent proof." (citation omitted)); *BankUnited Tr. 2005-1*, 235 F. Supp. 3d at 1359–60 ("The Court will not consider the Relators original sources based on a single, unsupported allegation that they were privy to nonpublic information." (internal quotation and citation omitted)).

[48]     *See BankUnited Tr. 2005-1*, 235 F. Supp. 3d at 1359–60; *U.S. ex rel. Brown v. Walt Disney World Co.*, 361 F. App'x 66, 68 (11th Cir. 2010) ("And Plaintiff provided nothing, other than her own conclusory allegation, to show that she was an original source of the information on which her complaint was based.").

[49]     *In re Nat. Gas Royalties*, 562 F.3d at 1045 (cited with approval in *Saldivar*, 841 F.3d at 935); *see also U.S. v Alcan Elec. and Eng'g, Inc.*, 197 F.3d 1014, 1021 (9th Cir. 1999) (affirming dismissal where relator "never participated in the negotiating, drafting, or implementation of the" allegedly fraudulent program nor "played any role in submitting false claims to the government"); *Saldivar*, 841 F.3d at 935 (placing "extreme limit" on secondhand knowledge); *U.S. ex rel. Devlin v. State of California*, 84 F.3d 358, 361 & n.4 (9th Cir.

implementation" of the allegedly fraudulent program – here CSL's alleged fraudulent entry into, and "annual" re-certifications of, the PPA – she necessarily lacks such knowledge.[50]

The Amended Complaint lacks any allegation or plausible basis to suggest that Bernier was involved in the PPA process, nor could she have been because she started *after* Defendant's alleged fraudulent 2011 entry into the PPA (and after the supposed annual re-certification that occurred in 2012). *Supra*, Section I.  Bernier was a faculty member; she never worked in the admissions or financial aid departments, and her conclusory assertions of "engage[ment]" with those functions are not credible (*see* Section III.A, *infra*).[51]  She does not allege any participation with or knowledge of PPA certifications, or submitting claims for payment.  Simply put, the "knowledge" upon which the Amended Complaint is based is "derivative of the information of others" or dependent on a "public disclosure."[52]

---

1996) (relators not original sources because they did not see fraud personally or obtain knowledge through their own labor, but derived secondhand). Although the 2010 amendment to the FCA removed the word "direct" from the requirement that an original source have "direct and independent knowledge of the information on which the allegations are based" (31 U.S.C. § 3730(e)(4)(B)(2006)), the 11th Circuit applies the same standards to determine whether an original source has "independent knowledge" under the current version.  *See, e.g. Osheroff*, 776 F.3d at 815-16 (applying similar standards to pre- and post-amendment claims); *Payton*, 2017 WL 3910434, at *7-8 (same); *Jacobs v. Bank of Am. Corp.*, 2017 WL 2361943, at *7 (S.D. Fla. 2017) (applying pre-amendment standard for "independent" prong of post-amendment claim).

[50]     *Alcan Elec. and Eng'g, Inc.*, 197 F.3d at 1021; *see also U.S. ex rel. Urquilla-Diaz v. Kaplan Univ.*, 2017 WL 2992197, at *8 (S.D. Fla. 2017) (rejecting original source argument because relator was not "directly involved in the development" of an allegedly fraudulent plan); *U.S. ex rel. Hoggett v. Univ. of Phoenix*, 2014 WL 3689764, at *8-9 (E.D. Cal. 2014) (holding relators were not original source based on same reasoning); *U.S. ex rel. Jones v. Collegiate Funding Servs., Inc.*, 2011 WL 129842, at *11 (E.D. Va. 2011) ("Relators must show that they gained their knowledge through their own efforts and did not derive those allegations from prior public disclosures.").

[51]     Bernier's claim that she had "directly involvement [*sic*] with the CSOL Admissions Department" and was "privy to CSOL's policies, procedures, and conduct [*sic*] student admissions procedures" (AC ¶ 63) is internally inconsistent with her claim that "[a]dmissions decisions . . . were entirely controlled by Infilaw" (AC ¶ 61) and the CSL Faculty Admissions Committee "was not involved in admission decisions for academically underqualified students."  AC ¶ 62.

[52]     *U.S. ex rel. Hafter D.O. v. Spectrum Emergency Care, Inc.*, 190 F.3d 1156, 1160, 1162 (10th Cir. 1999).

Finally, Bernier's (second-hand) allegations do not materially add to the publicly disclosed information; they merely re-hash old criticisms of Defendants.  To the extent Bernier offers anything new, it consists of incremental details and background that does nothing to "alert the government of a fraud which would have otherwise gone unnoticed."[53] Because Bernier is not an original source, all her FCA claims are barred.

## III.   COUNTS I & II FAIL TO STATE A CLAIM FOR VIOLATION OF FCA SUBSECTIONS 3729(A)(1)(A) AND (A)(1)(B).

In addition to the independent grounds for dismissal above, Counts I and II must be dismissed because Bernier has not sufficiently alleged scienter or falsity, § 3729(a)(1)(A) and (B), or the additional element of presentment required under § 3729(a)(1)(A), all of which (except scienter) must be plead with particularity.  *U.S. ex rel. Phalp v. Lincare Holdings, Inc.*, 857 F.3d 1148, 1154 (11th Cir. 2017); *U.S. ex rel. Sharpe v. Americare Ambulance*, 2017 WL 2840574, at *4 (M.D. Fla. 2017) (citation omitted); Rule 9(b).

### A.   Bernier Offers Only Bare Conclusory Assertions of Knowledge.

Bernier's allegations with respect to Defendants' knowledge are nothing but legally insufficient, unsupported conclusions.   "Although the FCA uses the seemingly straightforward word 'knowingly,' the statute's state of mind element is actually quite nuanced."  *Sanford-Brown, Ltd.*, 788 F.3d at 700-01 (citation omitted).  The FCA defines "knowingly" to require "actual knowledge," or that a person "acts in deliberate ignorance" or "reckless disregard of the truth or falsity of [] information."  31 U.S.C. § 3729(b)(1)(A).

---

[53]     *Humana, Inc.*, 2012 WL 4479072, at *12 ("Relator fails to persuade the Court that the allegations about which he claims to have independent knowledge materially add to the information already in the public domain."); *Osheroff*, 776 F.3d at 815 ("The amended complaint includes some details that are not present in the public disclosures. . . . [Relator's] information does not materially add to the public disclosures, which were already sufficient to give rise to an inference [of FCA violations].").

Liability may not stem from "innocent mistakes or simple negligence." *Urquilla-Diaz*, 780 F.3d at 1058 (citing *United States v. King-Vassel*, 728 F.3d 707, 712 (7th Cir. 2013)).  At the very least, an "aggravated form of gross negligence [is] needed to show scienter under the False Claims Act." *Id*. at 1057.

And while knowledge may be alleged generally under Rule 9(b), allegations of scienter must still satisfy Rule 8, consisting of more than "formulaic recitation[s] of the elements of a cause of action" and "conclusory allegations [and] legal conclusions masquerading as facts." *Keeler*, 568 F. App'x at 792-93 (quoting *Twombly*, 550 U.S. at 555). FCA cases are routinely dismissed for failure adequately to plead scienter. *See, e.g.*, *Thulin v. Shopko Stores Operating Co., LLC*, 771 F.3d 994, 1000 (7th Cir. 2014) (affirming dismissal of FCA claim because "vague allegations that a corporation acted with reckless disregard" "do not clear even [the] lower pleading threshold" of Rule 8); *U.S. ex rel. Orgnon v. Chang*, 2016 WL 715746, *3 (E.D. Va. 2016) (failure to plead facts supporting allegations that defendant acted with deliberate ignorance or reckless disregard was fatal to claims).

Specifically relevant here, "relator must establish the defendants' mindset at the time of entry into the PPA. . . . In other words, [relator needs] to prove that [the defendants] *knowingly* entered into the PPA *to defraud the government*[.]"  *Sanford-Brown, Ltd.*, 788 F.3d at 709.  This, Bernier cannot do.  As shown above, Bernier cannot make any factual allegations regarding CSL or InfiLaw's mindset at the time CSL entered the PPA in 2011, because she didn't join CSL until 2013.  Even for alleged subsequent conduct, Bernier offers no facts showing that Defendants knew their activity rendered claims for payment false.

Instead, Bernier simply parrots the FCA with sweeping and conclusory allegations of "knowledge" and "deliberate ignorance or reckless disregard."[54]

Where, as here, a relator "has made no allegations to support a finding Defendants had knowledge [as defined by the FCA] of the falsity of its certification and the resulting claims[,]" the complaint must be dismissed. *See Rutledge v. Aveda*, 2015 WL 2238786, *10 (N.D. Ala. 2015) (finding it insufficient "to make only conclusory allegations of knowledge" and that relator "allege[d] no facts at all to support this element"); *U.S. ex rel. Pilecki-Simko v. Chubb Inst.*, 443 F. App'x 754, 760-61 (3d Cir. 2011) (conclusory allegations that defendant "knew" or "knowingly" acted were insufficient); *see also Rizzo-Alderson v. Eihab H. Tawfik, M.D., P.A.*, 2017 WL 4410096, at *2 (M.D. Fla. Oct. 4, 2017) (Dalton, J.) (granting dismissal "because Plaintiff's allegations are largely conclusory or simply parrot statutory language").

Lastly, Bernier still has not identified the person or persons at InfiLaw or CSL who allegedly had the requisite knowledge (or when they had it), and she fails to differentiate between the two Defendants. Counts I and II should be dismissed for this additional reason. *Rutledge v. Aveda*, 2015 WL 9826462, at *5 (N.D. Ala. 2015) (citing relator's failure to "allege any particular defendant had knowledge of any particular statement's falsity").

---

[54]     *See* AC ¶¶ 114 ("Infilaw and CSOL had deliberate ignorance or reckless disregard to [*sic*] comply with Title IV and its implementing regulations."); 118 ("Infilaw and CSOL knowingly violated Title IV of the HEA, its implementing regulations. . . and the PPA."), 120 & 136 ("Infilaw and CSOL knowingly violated requirements under Title IV"), 121 ("Infilaw and CSOL knowingly defrauded the Government" and "entered into the PPA with deliberate ignorance or reckless disregard for its compliance obligations under Title IV"), 124 ("Infilaw and CSOL made fraudulent claims with knowledge that such claims would be tied to an increase in funds."); 133 ("CSOL entered into the initial PPA . . . with deliberate ignorance or reckless disregard for its statutory and regulatory duties and obligations under Title IV."); 140 ("Infilaw and CSOL made the false record with knowledge that the initial PPA was made with deliberate ignorance or reckless disregard, and would be tied to an increase in funds").

B.      **The Complaint Fails to Meet the Falsity Requirement.**

As described in Sections I and III.C, Bernier fails sufficiently to allege the existence of an expressly false statement, record, or claim necessary to support Counts I or II.[55]  To satisfy the falsity element, Bernier also attempts to invoke an "implied false certification" theory (*see, e.g.*, AC ¶¶ 117, 119, 125, 133, 135), whereby a defendant may be liable if it fails "to disclose its non-compliance with a material statutory, regulatory, or contractual provision[.]"  *Sharpe*, 2017 WL 2840574, at *6.  This Court has held that "two conditions must exist to impose liability under the Certification Theory:  'first, the claim does not merely request payment, but also makes specific representations about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contract requirements makes those representations misleading half-truths.'"  *U.S. ex rel. John Doe*, 2016 WL 3959343, at *3 (quoting *Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 136 S. Ct. 1989, 2001 (2016) ("*Escobar*")).  The Amended Complaint fails this test.

Even within the time period of her employment, Bernier fails to allege the content of any submission to or request for payment from the government that Defendants made, let alone whether those contained "specific representations about the goods or services

---

[55]      Bernier also improperly lumps the Defendants together in Counts I and II.  For example, in Count II, she claims CSL entered into the PPA (the allegedly "false record"), but then says both Defendants "made" it, "caused" it to be submitted to the government, and "used" it to submit false claims. AC ¶¶ 133-134, 138, 140.  She does not elaborate on InfiLaw's role in doing so if CSL was the signatory, in violation of Rule 9(b).  *Ambrosia Coal & Constr. Co. v. Pages Morales*, 482 F.3d 1309, 1317 (11th Cir. 2007) ("in a case involving multiple defendants . . . the complaint should inform each defendant of the nature of [its] alleged participation in the fraud" (quoting *Brooks v. Blue Cross and Blue Shield of Fl., Inc.*, 116 F.3d 1364, 1381 (11th Cir. 1997)));  *see also U.S. ex rel. Lee v. Corinthian Colls.*, 655 F.3d 984, 998 (9th Cir. 2011) (relator must specify each defendant's role in making a false statement to the government and how each defendant "participated in certifying HEA compliance . . .").

provided," or how those representations were "misleading half-truths." *See Sanford-Brown, Ltd.*, 840 F.3d at 447 (noting relator failed to establish defendant "made any representations at all in connection with its claims for payment, must less false or misleading representations").   Instead, the Amended Complaint parrots the *Escobar* test, but only by adding conclusory allegations, with no supporting facts. *See, e.g.*, AC ¶¶ 116, 119, 135.

Furthermore, Bernier's allegations of purported misconduct also do not describe violations of Title IV, its implementing regulations, or the PPA.  In fact, the vast majority of her allegations do not relate to activity that she contends violated a specific rule or regulation.[56]   And, as shown below, while the remaining allegations describe conduct Defendants allegedly engaged in, none of it alleges that Defendants actually violated Title IV, its implementing regulations, or a PPA provision.  Thus, Bernier fails to plead plausibly, much less with particularity, the falsity element of Counts I and II.

First, for many of Defendants' supposed misdeeds, Bernier does not allege *how* the conduct (even if true) violated Title IV.  For example, she references alleged copyright violations, improper trust accounting procedures, recruitment of minority students, giving "gift aids" to prospective students, travel classes, a bar preparation course, and a pro bono program,[57] with no explanation whatsoever of how such activities violated Title IV (they did

---

[56]     Most of the Amended Complaint prior to the causes of action is dedicated to background and describing Defendants' general business models and relationships, none of which Bernier connects to allegedly fraudulent conduct.  *See* AC ¶¶ 2-45, 47-56, 63-64, 78, 81, 87--89, 100-110.  Nevertheless, Bernier improperly incorporates by reference all of her general allegations into her causes of action.  *Id.* ¶¶ 111, 132, 143 (incorporating "paragraphs 1 through 110"); *see U.S. ex rel. John Doe*, 2016 WL 3959343, at *4 ("[A]ll seven counts … improperly incorporate by reference the same 192 paragraphs. . . . [O]nly a very small fraction of those 192 paragraphs address the purportedly actionable claims submitted to the U.S." (citations omitted)).

[57]     Bernier's allegations relating to the pro bono program do not even attempt to satisfy Rule 8 let alone Rule 9(b) as they are purely speculative and, in Bernier's own words, only "suggest[] the possibility" that Infilaw was likely engaged in inappropriate behaviors with foreign persons and organizations." AC ¶ 100. This

not).  AC ¶¶ 46, 57, 64, 73, 87-88, 100-107, 118(e)-(f), (j)-(k).  While Bernier categorically

claims that the entirety of Defendants' activity "violated Title IV of the HEA, its

implementing regulations under 34 C.F.R. § Part 600 and 34 C.F.R. § Part 668, and the PPA"

(AC ¶ 118), together those citations encompass an enormous array of complex regulations

and standards, and she fails to allege *how* the conduct violated any of the cited provisions,

which is fatal to her claims.  *See Sealey v. Stidham*, 2015 WL 5083992, at *13 n.6 (M.D. Ala.

2015) ("[A]lthough Plaintiff cites to numerous provisions of the United States Code . . . he

does not explain specifically how Defendants' actions violated such code provisions.").

Likewise, Bernier alleges Defendants admitted academically underqualified students,

running afoul of ABA Standards 205(b) and 501(b), and that CSL's bar passage statistics do

not comply with ABA Standard 301(a).  AC ¶¶ 58-62, 68-71, 94-95, 97-99, 118(b)-(c), (i).

Part H of Title IV of the HEA directs accreditors to establish certain standards (*see* 20 U.S.C.

§ 1099b), but nowhere in Part H (or anywhere else in the HEA) is there a requirement that

schools must at all times "maintain the accreditation standards set by the ABA" (*see* AC. ¶

118(i)) in order to participate in Title IV programs.  To the contrary, institutions may be

given time to remedy and respond to accreditation standards issues without losing their

accredited status.  *See* § 1099b(a)(6), (j); *see also Beauty Basics*, 2015 WL 3650960, at *4

(violation of accreditor's standards "does not necessarily result in defendant's ineligibility to

---

wildly speculative accusation, akin to those made on "information and belief," is not allowed in an FCA
pleading.  *See, e.g.*, *Corsello*, 428 F.3d at 1013–14 (holding that FCA claims alleged "on information and
belief" did not meet Rule 9(b)); *U.S. ex rel. Thomas v. Lockheed Martin Aeroparts, Inc.*, 2016 WL 47882, at *9
(W.D. Pa. 2016) ("[C]ursory allegations, made on information and belief alone, are unquestionably
insufficient." (citations omitted)).  It also constitutes inappropriately scandalous material. *See* Rule 12(f)).  For
these reasons, in addition to Bernier's failure to identify a regulatory violation, the Court should, at the very
least, strike paragraphs 100-107 from the Amended Complaint. *Id.*

receive funds from the government," thus relator needed more specificity to demonstrate how violation of accreditor's standards rendered claims false).

A second category of allegations simply fails to provide information sufficient to show noncompliance with a legal obligation.  Thus, Bernier recites the HEA requirement that students make "satisfactory academic progress" towards graduation to maintain eligibility for federal aid, and suggests some subset of students was not.  AC ¶¶ 17, 74-77, 79-86, 118(d), (h).  However, she never describes CSL's academic requirements for graduation, which is a prerequisite to any finding that students were not making satisfactory academic progress toward those requirements.  *See Urquilla-Diaz*, 780 F.3d at 1055 ("[B]ecause [relator] included no allegations about [defendant's] graduation requirements, it is impossible to plausibly infer that the students were not making satisfactory progress consistent with those requirements but for [defendant's] alleged grade-inflation scheme.").

Likewise, Bernier claims that CSL's job placement rates are misleading because it allegedly categorized graduates offered a "residency" to study for the bar as employees of the library.  AC ¶¶ 96, 118(g).  But the HEA requirement on which Bernier relies is that schools that advertise job placement rates to attract prospective students must make available to those students the most recent data available regarding employment statistics "and any other information necessary to substantiate the truthfulness of the advertisements[.]"  *Id*. ¶ 18.  Bernier alleges neither that CSL actually advertised using job placement rates, nor that CSL failed on any occasion to make available to a prospective student any underlying substantiating data.  *See, e.g., Gatsiopoulos*, 2011 WL 3489443, at *6 (relators "have not

provided a single specific example, including the who, what, when, where, and how, of Defendants' alleged failure to provide this information").

Third, the allegations in support of Bernier's contention that CSL violated the "90/10 rule" do not, in fact, plausibly show noncompliance, despite her legal conclusion to the contrary. AC ¶ 93. According to Bernier, the HEA requires that schools derive at least 10% of their revenue from sources other than Title IV funds. *Id.* ¶ 16. Bernier suggests that Defendants "exploited veterans and active military" by recruiting them to the school, because "the HEA permits [schools] to exclude other forms of federal funding" – like funding for veterans and active military – from the revenue an institution may derive from Title IV. *Id.* ¶¶ 89-90. For this reason, she claims CSL "employed any tactics" to retain such students, such as allowing one to return after appealing his academic dismissal "for purposes of compliance with the 90/10 rule," as "the loss of more than a few students" could cause CSL to lose its "delicate [90/10] balance." *Id.* ¶ 91. In other words, Bernier alleges CSL properly accounted for revenue from veterans and active military and took measures to maintain 90/10 compliance.[58] Even taken at face value, these allegations do not state an HEA violation. *See Urquilla-Diaz*, 780 F.3d at 1056 ("[Relator] failed to allege facts that, if true, would establish that [] certification of compliance with the 90/10 rule was false.").[59]

---

[58]      As part of these allegations, Bernier also suggests that some military students were purportedly allowed to continue at CSL despite low GPAs, which may be an attempt to describe additional violations of the satisfactory academic progress requirements (addressed above). *See* AC ¶¶ 91-92. If so, the allegations are nonsensical and internally inconsistent – she says in paragraph 92 that these students "self-paid their tuition," which is why CSL favored them for 90/10 purposes, but paragraph 91 alleges that CSL improperly recertified these same students "for federal student aid even when [they] were not making satisfactory progress[.]" *Id.*

[59]      Two remaining sets of allegations – related to creating a code of conduct to prevent conflicts of interest and failing to enable graduates to earn sufficient incomes to service their law school debt – are so generic and unsupported with fact, *e.g.*, regarding CSL or InfiLaw graduates' salaries, that they fail to state a claim on their face. *See* AC ¶¶ 19, 38, 52, 118(k)-(l).

Similarly, Bernier describes a "re-entry" program CSL supposedly created in Spring 2016 to allow previously academically dismissed students to begin anew with a clean slate, allegedly in violation of the SAP requirements (addressed above).   AC ¶¶ 83-86, 118(d). These allegations fail to support a plausible inference of noncompliance.   First, Bernier says the program was created "[t]o capitalize on a recent revision to ABA Standard 505," *id*. ¶ 83, suggesting the program complied with, rather than violated, a regulatory change.   Second, Bernier claims a faculty member "disclosed to" her that this program, which she alleges commenced in Spring 2016 (AC ¶ 83),  resulted in CSL sending "students to the Department that had been academically dismissed from the law school three times." *Id*. ¶ 86.   Bernier fails to identify the faculty member, however, and does not explain how a student could have used the re-entry program repeatedly when it began the same semester as this alleged conversation.   Third, Bernier alleges CSL recertified these students as making satisfactory academic progress (*id*. ¶ 84) without identifying which or how many students this impacted, tying the allegations to a particular false claim, or providing any indicia of reliability that CSL knowingly and improperly requested federal financial aid funds for these students. Fourth, Bernier does not identify how this program can be the basis of a FCA violation because she never identifies an associated false claim for payment.

Lastly, the Amended Complaint is fundamentally defective as the vast majority of Bernier's descriptions of Defendants' activity is utterly unspecific as to when these events occurred, where they happened, who was involved, what students were impacted, the basis

for Bernier's knowledge, or any other detail that would come close to providing the particularity necessary to survive dismissal.[60]  *Corsello*, 428 F.3d at 1012, 1014.

For example, Bernier claims CSL violated the ban on incentive compensation.  AC ¶¶ 13-15, 66, 72, 118(a).  As support, Bernier alleges that "[s]tarting in Fall 2011," CSL "illegally compensated staff based upon enrollment activities through trips, gifts, and other incentive-based compensation," and CSL admissions "staff who achieved recruitment numbers set by Infilaw were rewarded indirectly with in-kind incentive payments for their efforts, in the form of lavish dinners and gifts" "shortly after the fall and spring recruitment seasons ended."  *Id*. ¶¶ 65, 72.  But the Amended Complaint is devoid of facts:  Who received such incentives, who gave them, *when did this occur* (besides beginning before she started at CSL),[61] what were the gifts or trips, what and where were the "lavish dinners," was

---

[60]     Some claims introduced for the first time in the Amended Complaint are not substantially the same as any allegations in the original Complaint, including those related to incentive compensation (AC ¶¶ 65-66, 72), "gift aids" for prospective students (AC ¶ 73), required pass bar preparation courses (AC ¶ 88), application of academic dismissal requirements to students who self-paid their tuition (AC ¶ 92), and re-certifications of the PPA (AC ¶¶ 114, 116-17, 133).  These claims should also be dismissed because Bernier failed to file the Amended Complaint under seal and disclose them to the Government before submitting them publicly.  *See U.S. ex rel. Wilson v. Bristol Myers Squibb, Inc.*, 2011 WL 2462469, at *7 (D. Mass. June 16, 2011) (refusing leave to amend because "[t]he inclusion of a new relator, as well *as the new allegations*, violates the FAC's filing and sealing provision and requires rejecting the proposed TAC" (emphasis added)), *aff'd sub nom. U.S. ex rel. Wilson v. Bristol-Myers Squibb, Inc.*, 750 F.3d 111 (1st Cir. 2014); *U.S. ex rel. Bain v. Georgia Gulf Corp.*, 386 F.3d 648, 658 n.10 (5th Cir. 2004) ("We also note that it is questionable whether Bain has complied with 31 U.S.C. § 3730(b)(2) & (4) with respect to . . . a matter alleged for the first time in Bain's amended complaint."); *Friedman v. F.D.I.C.*, 1995 WL 608462, at *3 (E.D. La. Oct. 16, 1995) (agreeing that "this in camera filing requirement is jurisdictional and that the intervenors' dereliction in this regard warrants dismissal").

[61]     The "when" of the activity Bernier describes is particularly important.  First, as described in Section I, *supra*, Bernier is not entitled to rely on events that occurred (a) before she arrived at CSL or after her departure in 2016, because she has no personal knowledge, or (b) after any certification of compliance to the government (to the extent she points to certifications as the basis for her causes of action, as opposed to subsequent "claims" for payment, addressed in Section III.C, *infra*), because subsequent noncompliance with a contract does not establish fraudulent entry.  Second, the relevant regulatory requirements have changed over time.  For example, the incentive compensation ban had a safe harbor provision in place until mid-2011, *Corinthian Colleges*, 655 F.3d at 989 n.1, covering a portion of the timeframe to which Bernier alludes.  AC ¶ 72 ("Starting in Fall 2011…").  Exactly when specific conduct is alleged to have taken place is thus critical to Defendants' defense and the Court's resolution of Bernier's claims.  Third, any new claims in the Amended Complaint are barred if they took place before November 9, 2011.  31 U.S.C. § 3731(b).  Bernier's new allegations related to incentive

this CSL's practice or *ad hoc*, and how does Bernier know these events occurred?  Again, Bernier was not employed by CSL until 2013.

In short, Bernier's claims cannot withstand Rule 9(b).  *See U.S. ex rel. Whatley v. Eastwick Coll.*, 2015 WL 4487747, at *7-8 (D.N.J. 2015) (dismissing FCA complaint alleging incentive compensation violations based on staff "publicly rewarded" for meeting recruitment quotas through "cash bonuses at the . . . annual holiday party,"); *compare with, e.g., Urquilla-Diaz*, 780 F.3d at 1054 (incentive comp claim not dismissed where it included names and "specific facts about four former [school] employees whose salaries were increased or decreased based on the number of enrollments"); *U.S. ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1169, 1175 (9th Cir. 2006) (two former enrollment counselors "allege[d] specific instances of violation" where they personally were rewarded for meeting enrollment targets with salary increases, trips, and home electronics).[62]

### C.   Bernier is Unable to Point to Even a Single False Claim Presented to the Government Under § 3729(a)(1)(A).

For Count I to pass muster under Rule 9(b), Bernier must allege with particularity the actual presentment of a claim, "meaning particular facts about the who, what, where, when, and how of fraudulent submissions to the government."  *Urquilla-Diaz*, 780 F.3d at 1052

---

compensation (AC ¶¶ 65-66, 72), "gift aids" for prospective students (AC ¶ 73), required pass bar preparation courses (AC ¶ 88), application of academic dismissal requirements to students who self-paid their tuition (AC ¶ 92)  and re-certifications of the PPA (AC ¶¶ 114, 116-17, 133) would be barred if they took place before this date because they did not arise "out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading."  *Moore v. Baker*, 989 F.2d 1129, 1131 (11th Cir. 1993) (citing Fed. R. Civ. P. 15(c)); *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 518-19 (6th Cir. 2007) (dismissing new FCA allegations because "[n]othing in the original complaint, the FAC, or Relator's Disclosure Statement addresses the FCA violations that Relator alleges in these paragraphs").

[62]      Bernier's allegation staff who fail to meet recruitment numbers were fired (AC ¶ 67) is irrelevant as adverse employment actions do not run afoul of the incentive compensation ban.  *See Corinthian Colleges*, 655 F.3d at 992-93 (citing *U.S. ex rel. Bott v. Silicon Valley Colleges*, 262 F. App'x. 810, 812 (9th Cir. 2008)); *U.S. ex rel. Torres v. Kaplan Higher Educ. Corp.*, 2011 WL 3704707, *3 (S.D. Fla. 2011).

(quoting *Corsello*, 428 F.3d at 1014 (internal quotations omitted)).  "Without the *presentment* of such a claim, while the practices of an entity that provides services to the Government may be unwise or improper, there is simply no actionable damage to the public fisc as required under the False Claims Act."  *Clausen*, 290 F.3d at 1311.  Thus a relator cannot "merely [] describe a private scheme in detail but then [] allege simply and without any stated reason for [her] belief that claims requesting illegal payments must have been submitted, were likely submitted, or should have been submitted to the government."  *Id.*

Bernier does precisely what *Clausen* and its progeny prohibit:  she describes various internal practices that allegedly violated Title IV and its implementing regulations, but then generally alleges merely that CSL signed a PPA and received Title IV funds.  AC ¶¶ 113, 123.  This is an improper attempt to have the Court infer that "claims requesting illegal payments must have been submitted."  *Clausen*, 290 F.3d at 1311.  Bernier does not and cannot provide any specifics about the PPA or purported annual re-certifications, *e.g.*, when they were signed, by whom, where, how they were submitted to the government, or the surrounding circumstances.  *See* Section I, *supra*.  Bernier also fails to identify even a single subsequent improper request for payment that Defendants made to the government, much less one that was rendered "false" as a result of some underlying noncompliance, relying instead on obscure references to "claims."  *E.g.*, AC ¶¶ 119 ("By making claims to the Government"), 121 ("causing false claims to be presented"); *see U.S. ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1359 (11th Cir. 2006) ("The particularity requirement of Rule 9 is a nullity if Plaintiff gets a ticket to the discovery process without identifying a single claim." (citation omitted)).  Bernier provides no detail regarding who submitted what claims, for

which students, when and how such claims were submitted, or the content of any such claims. *Urquilla-Diaz*, 780 F.3d at 1052.[63]

Without these particulars, the Amended Complaint lacks any indicia of reliability "to support the allegation of *an actual false claim* for payment being made to the Government." *Clausen*, 290 F.3d at 1311 (emphasis in original). Bernier, a law professor, was not a member of the departments responsible for billing, financial aid, admissions, or any other function through which she could have gained firsthand knowledge of the Defendants' submissions of PPAs or claims for financial aid.[64] The fact that Bernier added a blanket statement that she "directly engage[d] in almost all CSOL departments, including … Financial Aid and Admissions[,]" attempting to establish that she "was privy to CSOL and Infilaw's policies, procedures, and . . . practices," (AC ¶ 2) does not help her because her factual allegations do not bear this out. She never discloses any activity related to financial aid, and her "engage[ment]" with admissions was limited to talking to prospective students, teaching pre-enrollment courses, and attending faculty meetings where others discussed admissions. *Id.* at 63. This does not show direct or relevant involvement with admissions.[65] And Bernier never worked in any capacity for InfiLaw, which she claims controlled and

---

[63]     As with prior allegations, Bernier also improperly lumps Defendants together under Count I, claiming both InfiLaw and CSL made, and caused to be presented, false claims to the government. AC ¶¶ 118-119, 121. She does not specify each Defendant's role with respect to presentment, and her claims should be dismissed on this basis alone. *See Ambrosia Coal & Constr. Co.*, 482 F.3d at 1317 (quoting *Brooks*, 116 F.3d at 1381).

[64]     *See, e.g.*, *U.S. ex rel. Florida Soc'y of Anesthesiologists v. Choudhry*, 2017 WL 2591399, *6 (M.D. Fla. 2017) ("Relator fails to plead any facts suggesting that it has direct, first-hand knowledge of [defendants' billing practices]." (internal quotation and citation omitted)); *cf. Hill v. Morehouse Med. Assocs.*, 82 F. App'x 213, at *5 (11th Cir. 2003) (per curium) (relator had "firsthand information" about the defendant's billing practices as a former employee in the billing department).

[65]     In fact, the Amended Complaint contradicts this notion in the immediately preceding paragraphs, where Bernier alleges that InfiLaw "entirely controlled" admissions at CSL, with little if any involvement of CSL's admissions personnel. AC ¶¶ 61-62.

directed acts at CSL.[66]  Thus, her allegations "do not support an inference that [relator] had firsthand knowledge of actual submissions of false claims for payment."  *U.S. ex rel. Aquino v. Univ. of Miami*, 250 F. Supp. 3d 1319, 1331 (S.D. Fla. 2017).

Bernier's claims are even more deficient than claims previously dismissed in this Circuit.  *See, e.g.*, *id*. at 1334 (citations omitted) (dismissing FCA claim for lack of firsthand knowledge regarding any false submissions despite relator's attempt to demonstrate a role in billing department); *Mitchell v. Beverly Enters., Inc.*, 248 F. App'x 73, 75 (11th Cir. 2007) ("Although the complaint alleges '[relator] observed and participated in a billing process' . . . he failed to assert any specific facts regarding the actual submission of claim[s.]"); *Atkins*, 470 F.3d at 1359 (upholding dismissal where plaintiff did "not profess to have firsthand knowledge of the defendants' submission of false claims" and his allegations were based only on "rumors from staff"); *Corsello*, 428 F.3d at 1014 (relator's allegation that he was "aware" of defendant's billing practices was insufficient as unmoored from any particular, specific false claim and unsupported with facts); *U.S. ex rel. Stepe v. RS Compounding LLC,* 2017 WL 5178183, *6 (M.D. Fla. 2017) ("Although [relator] focuses on her status as an insider . . . that status, without more, does not provide sufficient indicia of reliability" (citations omitted)); *Cade v. Progressive Cmty. Healthcare, Inc.*, 2011 WL 2837648, at *8-9 (N.D. Ga. 2011) (FCA claim dismissed despite relator's protestations about her role in billing because "[w]hen it comes to the actual submission of claims . . . the person or persons actually submitting the claim remain a mystery.  She cites 'discussions with other individuals

---

[66]     *See U.S. ex rel. Schubert v. All Children's Health Sys., Inc.,* 2013 WL 1651811, at *4 (M.D. Fla. 2013) (dismissing FCA claim for lack of knowledge and particularity required under 9(b), and noting relator "did not even work for the same company that is alleged to have presented [the] false claims").

involved in the billing process,' but . . . she does not . . . provide details that would support the allegations." (internal citations omitted)).

The decision in *Rutledge*, 2015 WL 2238786, is instructive. There, an instructor brought an FCA case against a school that had entered a PPA and received federal funds. The court dismissed in part based on the same deficiencies present here:

> Rutledge's complaint never directly alleges any presentment of claims. She alleges there are federally funded students at the school, but she never alleges any facts to support her knowledge of that fact or the (presumably implied) fact that claims are being made to the government for educational grants and loans. She certainly never makes any direct allegations of particular instances of claims being presented. Nor does she make any specific allegations of indicia of reliability to support her implied allegation.

*Id.* at *12 (internal citations omitted); *see also Jallali*, 486 F. App'x at 767 (affirming dismissal of FCA case against school, as relator lacked personal knowledge of school's billing practices).

Bernier's "failure to allege with any specificity if – or when – any actual improper claims were submitted to the Government is indeed fatal to [her] complaint[]." *Clausen*, 290 F.3d at 1311-12; *see also Jallali v. Sun Healthcare Grp.*, 667 F. App'x 745, 746 (11th Cir. 2016) (relator "fails to allege the 'who, what, where, when, and how' of any specific false claim for payment"). Bernier "merely speculates that an unlawful [private] scheme exists and, by extension, asserts that all [federal aid] claims were tainted[,]" failing to connect the alleged scheme to the actual submission of a specific claim. *Florida Soc'y of Anesthesiologists*, 2017 WL 2591399, at *8 (internal quotation and citation omitted); *Atkins*, 470 F.3d at 1358-59. Thus, her presentment claim fails as matter of law. *Corsello,* 428 F.3d at 1012, 1014.

43

Consequently, Counts I and II fail to state an FCA claim and must be dismissed.

## IV.   BERNIER ALLEGES NO FACTS TO SUPPORT HER CONSPIRACY CLAIM

Bernier fails to plead the necessary elements of a conspiracy claim:   "(1) the defendant conspired with at least one person to get a false or fraudulent claim paid by the government; and (2) at least one of the conspirators performed an overt act to get a false or fraudulent claim paid."   *U.S. v. LifePath Hospice, Inc.*, 2016 WL 5239863, at *8 (M.D. Fla. 2016).   "Conspire in this context requires a meeting of the minds to defraud the government." *Id.* (internal quotations and citation omitted).   Conspiracy claims under the FCA are subject to Rule 9(b).   *Corsello*, 428 F.3d at 1014.

First, as a threshold matter, Count III fails because Bernier does not and cannot allege an underlying violation of the FCA.   *LifePath Hospice, Inc.*, 2016 WL 5239863, at *9. Second, Bernier fails to allege with particularity the elements of an FCA conspiracy, including the existence of any agreement between Defendants.   Instead, she merely states that InfiLaw and CSL conspired to violate the FCA, through their executives they had an "unlawful agreement" to defraud the government, and other managers and employees executed this "unlawful agreement."   AC ¶¶ 144-147.   Such bare conclusions are insufficient to survive a motion to dismiss.   *See, e.g.*, *Corsello*, 428 F.3d at 1014.   Similarly, as detailed above, Bernier has insufficient knowledge of the mindset of InfiLaw or CSL at the relevant time and therefore cannot plausibly plead that they entered such an agreement with the specific intent to defraud the government, as required to establish a conspiracy under 31 U.S.C. § 3729(a)(1)(C).   *U.S. v. Healogics, Inc.*, 2016 WL 2744949, at *7 (M.D. Fla. 2016).

Finally, Count III fails under the intra-corporate conspiracy doctrine, which holds that a corporation cannot conspire with its own wholly-owned subsidiary or its own employees to establish a conspiracy.  *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir. 2000).  No court in the Eleventh Circuit has addressed whether this doctrine applies to bar an alleged FCA conspiracy between a parent and its wholly-owned subsidiary,[67] but most courts to address the issue have applied the doctrine and dismissed claims of intra-corporate conspiracies.[68]  Because Bernier alleges CSL is owned and controlled by InfiLaw (AC ¶ 38), she cannot establish a conspiracy between the two companies.

## CONCLUSION

Based on the foregoing, Defendants respectfully request that the Court dismiss the Complaint in its entirety, with prejudice.

---

[67]   The Eleventh Circuit recognizes an exception to the intra-corporate conspiracy doctrine between a corporation and its employees.  *McAndrew,* 206 F.3d at 1038-39.  This exception has been extended to the False Claims Act.  *E.g.,* *U.S. ex rel. Harris v. Lockheed Martin Corp.*, 905 F. Supp. 2d 1343, 1355-56 (N.D. Ga. 2012).  These cases are inapposite, however, as Bernier only alleges a conspiracy between two corporations (which are necessarily implemented through employees), not a conspiracy with the employees.

[68]   *E.g.,* *U.S. ex rel. Scharber v. Golden Gate Nat'l Senior Care LLC*, 135 F. Supp. 3d 944, 967 (D. Minn. 2015) ("As for the conspiracy claims in Count IV, the defendants rightly note the substantial precedent that holds that a parent company and subsidiary/affiliated companies cannot conspire with each other."); *U.S. ex rel. Peretz v. Humana, Inc.*, 2011 WL 11053884, at \*10-11 (D. Ariz. 2011) ("Relator's conspiracy claim fails . . . because a parent corporation cannot conspire with its wholly owned subsidiary when the parent and the subsidiary have a complete unity of interest."); *U.S. ex rel. Pilecki-Simko v. Chubb Inst.*, 2010 WL 1076228, at \*10 (D.N.J. 2010) ("[T]he Court agrees, that the law deems a parent corporation and its subsidiaries legally incapable of forming a conspiracy with one another." (internal quotation and citation omitted)), *aff'd*, 443 F. App'x. 754 (3d Cir. 2011); *U.S. ex rel. Brooks v. Lockheed Martin Corp.*, 423 F. Supp. 2d 522, 528 (D. Md. 2006) (dismissing FCA conspiracy claim because "[a] parent corporation and its wholly owned subsidiaries, however, are legally incapable of forming a conspiracy with one another"); *U.S. ex rel. Reagan v. E. Texas Med. Ctr. Reg'l Healthcare Sys.*, 274 F. Supp. 2d 824, 856 (S.D. Tex. 2003) ("[I]t is a matter of law that a parent corporation cannot conspire with its own subsidiary."), *aff'd*, 384 F.3d 168 (5th Cir. 2004).

Dated: December 4, 2017

Respectfully submitted,

/s/ David E. Mills
**David E. Mills, Esq.**
**COOLEY LLP**
1299 Pennsylvania Avenue
Washington, D.C. 20004
Tel: (202) 842-7800
Fax: (202) 842-7899
Email: dmills@cooley.com
*Trial Counsel*

**Mazda K. Antia, Esq.**
**COOLEY LLP**
4401 Eastgate Mall
San Diego, CA 92121
Tel: 858-550-6000
Fax: 858-550-6420
Email: mantia@cooley.com

**Vincent A. Citro, Esq.**
Florida Bar. No. 0468657
**LAW OFFICES OF MARK L.**
**HORWITZ, P.A.**
17 East Pine Street
Orlando, FL 32801
Tel: (407) 843-7733
Fax: (407) 849-1321
Email: vince@mlhorwitzlaw.com

*Counsel for Defendants InfiLaw Corporation*
*and Charlotte School of Law, LLC*

## REQUEST FOR ORAL ARGUMENT

Defendants respectfully request oral argument on their Motion to Dismiss, pursuant to Local Rule 3.01(j).  Defendants estimate one hour will be required for such argument.

## CERTIFICATE OF CONFERENCE

I HEREBY CERTIFY that on December 1, 2017, I conferred with counsel for Plaintiff on the issues raised in the Motion to Dismiss but we could not reach an agreement.

*/s/ Mazda K. Antia*
Mazda K. Antia, Esq.
*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 4, 2017, I electronically filed the
foregoing with the Clerk of the Court by using the CM/ECF system which will send a
notice of electronic filing to all counsel of record, including the following:

Coleman W. Watson, Esq.
Watson LLP
189 S. Orange Avenue, Suite 810
Wilmington, DE  19808

*Counsel for Plaintiff Barbara Bernier*

Jeremy Ronald Bloor
US Attorney's Office
Suite 3100
400 W Washington St
Orlando, FL 32801

*Counsel for United States of America*

/s/ David E. Mills
David E. Mills, Esq.
*Counsel for Defendants*