UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA, *ex rel.*,
BARBARA BERNIER,

    Plaintiff,

v.                                          Case No. 6:16-cv-970-Orl-37TBS

INFILAW CORPORATION; and
CHARLOTTE SCHOOL OF LAW, LLC.,

    Defendants.

## **ORDER**

What goes up must come down. This case concerns the rise and fall of Charlotte School of Law, LLC ("**CSL**"), a now-defunct for-profit law school owned by the private entity InfiLaw Corporation ("**InfiLaw**") (collectively, "**Defendants**"). (Doc. 48, ¶¶ 35–36.) After flying too close to the sun, CSL was expelled from the federal student loan program and its educational license revoked. (*Id.* ¶ 48.) Amidst its downfall, CSL's former professor Plaintiff Barbara Bernier initiated this *qui tam* action against Defendants under the False Claims Act ("**FCA**"), 31 U.S.C. § 3729, *et seq.*, alleging fraudulent conduct in connection with federal loan funding Defendants received from the United States Department of Education ("**DOE**"). (*See* Doc. 1.)

After some investigation, the United States declined to intervene on Bernier's behalf (Doc. 14),[1] so the Court unsealed the complaint (Doc. 16) and Defendants moved

---

[1] Before reporting that it declined to intervene, the United States sought several

to dismiss (Doc. 45). With leave, Plaintiff filed an amended complaint (Doc. 48 ("**Amended Complaint**")), now before the Court on Defendants' motion to dismiss (Doc. 53 ("**Motion**")).

## I. BACKGROUND

InfiLaw formed in 2006. (Doc. 48, ¶ 24.) Its stated mission was "to establish the benchmark of inclusive excellence in professional education for the 21st Century." (*Id.* ¶ 30.) To that end, InfiLaw acquired three for-profit law schools: Florida Coastal School of Law ("**Florida Coastal**"), Arizona Summit School of Law ("**Arizona Summit**"), and CSL ("**InfiLaw Schools**"); and began implementing a "disruptive," non-traditional law school model at each school ("**Model**"). (*See id.* ¶¶ 31, 35.) What apparently sets the Model apart is that its academic programs focus on placing "graduates into the stream of commerce," as opposed to "theory only programs" that lack practice competencies. (*Id.* ¶ 31.)

Touting this model, InfiLaw structures its operations differently from other law schools: from its admissions practices, curriculum design, academic requirements and bar exam preparation initiatives, InfiLaw certainly has its own way of doing things. (*See id.* ¶¶ 23–31, 38–40, 42.) Yet one area where InfiLaw sticks to the well-trod path is by having its schools participate in federal loan programs under **Title IV** of the Higher Education Act ("**HEA**"), 20 U.S.C. § 1070, *et seq.*—meaning that students can obtain federal funding to cover *all* of their education-related expenses. (*Id.* ¶¶ 9, 12, 51.) For law

---

extensions for its time to investigate and decide whether to intervene, which the Court granted. (*See* Docs. S-8, 10–13.) As the United States' investigation is ongoing, several portions of the record remain sealed. (*See* Docs. 15–16.)

schools, eligibility for this money hinges on accreditation by the American Bar Association ("**ABA**") and execution of a Program Participation Agreement ("**PPA**") with the DOE, whereby the institution agrees, among other things, to maintain certain standards and comply with federal statutes and regulations while receiving funds. (*Id.* ¶¶ 10–22.) Such standards speak to admissions practices, academic progress, employment outcomes, and institutional management—not only to ensure student success and enable loan repayment, but also to stem potential program abuse and promote the integrity of Title IV. (*Id.* ¶¶ 13–22.) Suffice it to say that the disbursement of federal funds is highly regulated and has many strings attached. (*See id.*)

According to Plaintiff, Defendants did not comply with Title IV's statutory and regulatory requirements, but took federal funds anyway. (*See id.* ¶¶ 111–131.) She claims that Defendants violated the FCA by: (1) knowingly presenting or causing to be presented a false or fraudulent claim for payment or approval; (2) knowingly making, using, or causing to be used a false record or statement material to a false or fraudulent claim; and (3) conspiracy. (*See id.* ¶¶ 111–49 (alleging violations of §§ 3729(a)(1)(A)–(C)).) Claiming that Defendants' conduct netted over $285 million in federal funds ("**Funds**"), Plaintiff brings suit to recover a percentage of the Funds, plus interest and attorney fees. (*Id.* ¶¶ 128, 131, 142, 149.)

In response, Defendants move to dismiss Plaintiff's Amended Complaint with prejudice. (Doc. 53.) Having been fully briefed (Docs. 56, 59), the matter is now ripe. Upon review, the Court finds that the Motion is due to be granted in part.

## II. LEGAL STANDARDS

Under the minimum pleading requirements of the Federal Rules of Civil Procedure, plaintiffs must provide short and plain statements of their claims with simple and direct allegations set out in numbered paragraphs and distinct counts. *See* Fed. R. Civ. P. 8(a), 8(d), & 10(b). If a complaint does not comport with these minimum pleading requirements, if it is plainly barred, or if it otherwise fails to set forth a plausible claim, then it is subject to dismissal under Rule 12(b)(6). *See Ashcroft v. Iqbal*, 556 U.S. 662, 672, 678–79 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

Plausible claims must be founded on sufficient "factual content" to allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *See Iqbal*, 556 U.S. at 678; *see also Miljkovic v. Shafritz & Dinkin, P.A.*, 791 F.3d 1291, 1297 (11th Cir. 2015). When resolving a Rule 12(b)(6) motion to dismiss, courts must consider only the complaint, its exhibits, "documents incorporated into the complaint by reference," and matters that are subject to judicial notice. *See Telltabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). In the FCA context, courts may take judicial notice of documents such as newspaper articles and information on publicly available websites "for the limited purpose of determining which statements the documents contain (but not for determining the truth of those statements)." *See United States ex. rel. Osheroff v. Humana, Inc.*, 776 F.3d 805, 812 n.4 (11th Cir. 2015).

Generally, courts should dismiss a claim if the sufficiently pled "factual content" of the complaint does not allow the court to "draw the reasonable inference that the defendant[s] [are] liable for the misconduct alleged" in the claim. *See Ashcroft v. Iqbal*, 556

U.S. 662, 678–79 (2009). "Liability under the [FCA] arises from the submission of a fraudulent claim to the government, not the disregard of government regulations or failure to maintain proper internal policies." *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1012 (11th Cir. 2005). To that end, the U.S. Court of Appeals for the Eleventh Circuit requires that each element of a FCA claim meet the heightened pleading standard of Rule 9(b). *See id.* at 1012 (citing *Clausen*, 290 F.3d at 1308–09); *see also Jallali v. Sun Healthcare Grp., Sundance Rehab. Agency, Inc.*, 667 F. App'x 745, 745–46 (11th Cir. 2016). Thus, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). This means that a plaintiff "must plead . . . 'the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them.'" *Clausen*, 290 F.3d at 1310 (quoting *Cooper v. Blue Cross Blue Shield of Florida, Inc.*, 19 F.3d 562, 567–68 (11th Cir. 1994)). And because the "*sine qua non* of a [FCA] violation" is the submission of a false or fraudulent claim for payment, *id.* at 1311, "that submission must be pleaded with particularity and not inferred from the circumstances." *Corsello*, 428 F.3d at 1013. Without this, a plaintiff fails to state a claim under the FCA. *See id.* at 1013; *Clausen*, 290 F.3d at 1311–12.

### III. DISCUSSION

In support of their Motion, Defendants' raise three principal arguments: (1) Plaintiff lacks personal or firsthand knowledge of the allegedly fraudulent conduct; (2) Plaintiff's claims are foreclosed by the FCA's public disclosure bar, and Plaintiff is not an original source ("**Bar Argument**"); and (3) the Amended Complaint does not satisfy Rule

9(b) ("**9(b) Argument**"). (*Id.* at 12.) To support the Bar Argument, Defendants submitted voluminous exhibits. (*See* Docs. 53-1–53-27.) Finding the Bar Argument persuasive, the Court addresses that first, followed by the 9(b) Argument.[2]

### A.     Bar Argument

The FCA bars private *qui tam* suits based on publicly disclosed information ("**Public Disclosure Bar**"). *See* 31 U.S.C. § 3730(e)(4); *Osheroff*, 776 F.3d at 809. Under the Public Disclosure Bar:

> The court shall dismiss an action or claim . . . if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed—
>
> (i)    in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;
> (ii)   in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or
> (iii)  from the news media,
>
> unless the action is brought by the Attorney General or the person bringing the action is an original source of the information. . . .
>
> For purposes of this paragraph, "original source" means an individual who either (i) prior to a public disclosure . . . has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) [*sic*] who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section.

§§ 3730(e)(4)(A)–(B). In *Osheroff*, the Eleventh Circuit recognized three steps for the public

---

[2] Plaintiff's three claims rely on the same underlying allegations, so the Court evaluates the allegations' sufficiency to determine whether Plaintiff's claims survive. (*See* Doc. 48, ¶¶ 111–49.)

source inquiry: (1) have the allegations made by the plaintiff been publically disclosed; (2) if so, are the plaintiff's allegations substantially the same as allegations or transactions contained in the public disclosures; and (3) if yes, is the plaintiff an "original source" of that information. *See* 776 F.3d at 812 (describing three-part test from *Cooper*, 19 F.3d at 555 n.4 and re-framing for updated version of FCA). The Court proceeds under this analysis.

   1.   **Public disclosures**

First things first, the Court finds that most allegations made by Plaintiff in the Amended Complaint have been publically disclosed. This is clear based on a review of Defendant's exhibits, which the Court may—over Plaintiff's objection—take judicial notice of in this Motion for "the limited purpose of determining which statements the documents contain," not their truth.[3] *See Osheroff*, 776 F.3d at 811 n.4, 812.

To categorize, Defendant's twenty-seven exhibits consist of: (1) articles from periodicals, accessed online (Docs. 53-1, 2, 7, 8, 9, 10, 11, 12, 15, 19, 20, 21, 23, 27); (2) postings on blogs run by law-school faculty (Docs. 53-3, 5, 6, 17, 24); (3) articles from online publishers focused on legal news (Docs. 53-13, 16, 18, 22, 25); (4) two other blog posts, one from a former CSL professor, and one discussing a lawsuit against Arizona Summit from a former employee (Docs. 53-4, 14); and (5) an informational brochure from CSL (Doc. 53-26). Thirteen exhibits are from 2015; six from 2014; four from 2013; three from 2016; and one is from 2012. On the whole, the exhibits provide detailed insight into

---

[3] To the extent Plaintiff lobs an authenticity challenge (Doc. 56, p. 19), the Court overrules it. *See Osheroff*, 776 F.3d at 811 n.4 ("Even if [the plaintiff] had preserved an objection to the defendants' motion, the court properly took notice of these documents.").

InfiLaw's policies and practices at its three locations, some with responses by InfiLaw's executives and school officials, with many specific allegations about CSL. Synthesizing their content, Defendants' exhibits speak to four groups of issues: (1) admissions; (2) matriculation, academic progress, and grading; (3) bar passage and employment; and (4) treatment of faculty, each discussed in turn.

    *a.    Admissions*

For admissions, Defendants' exhibits expose how after InfiLaw's Schools received ABA accreditation and started participating in federal funding programs, enrollment figures skyrocketed. (*E.g.*, Docs. 53-1, 2, 3, 4, 5, 6, 7, 8, 12, 17, 19, 20, 24.) CSL's enrollment almost tripled between 2009 and 2011. (Doc. 53-1.) The growth is explained as InfiLaw's means of obtaining as much "taxpayer-supplied law-school tuition revenue" as possible, achieved "by taking large numbers of students that almost no other ABA-accredited law school would consider admitting." (*Id.*) These students InfiLaw admitted had extremely low GPAs and LSAT scores, which are the standards traditionally used by Admissions Offices to predict aptitude for legal studies and legal reasoning ("**Admissions Standards**"). (*Id.*; *see also* Doc. 53-3.) The exhibits charge that InfiLaw, by lowering Admissions Standards and accepting students with little chance of success, perpetrated a scheme to capture all the federal funding it could and reap enormous profit while students suffered. (*E.g.* Docs. 53-1, 2, 3, 5, 6.) Through this, InfiLaw and CSL knowingly deceived their students, the ABA, and the DOE. (Doc. 53-6.)

What is more, the exhibits uncover an alternative admissions program ("**AAMPLE**") developed by InfiLaw to bypass traditional admissions metrics, including

the LSAT. (*E.g.*, Docs. 53-1, 4, 9, 10, 26.) All InfiLaw Schools used AAMPLE, a pre-1L program that involved passing a class or two before entering 1L. (*See id.*) AAMPLE allowed students who didn't take the LSAT, or scored extremely poorly, to gain admission; and was specifically crafted to balloon enrollment figures and allow InfiLaw's Schools to publish misleading admissions statistics. (Docs. 53-4, 9, 10.) With AAMPLE, InfiLaw concocted another way to draw in the warm bodies who brought more federal funds. (*See e.g.*, Docs. 53-1, 4, 9, 10.)

On top of this, InfiLaw employed deceptive marketing to lure in students. One exhibit details how CSL would "gift" students for enrolling. (Doc. 53-11.) In exchange for enrolling, CSL offered reimbursement funds for moving expenses, a laptop, or an iPad. (*Id.*) CSL also had a rolling admissions program, seeking admissions a month before the term started—especially for students with high LSAT scores. (*Id.*) These students were sent last-minute solicitations with steep tuition discounts to coax them to join the upcoming class. (*Id.*)

CSL also actively recruited students from Historically Black Colleges and Universities, exclusively offering them a "Pre-Law Academy" program. (Doc. 53-26.) And CSL expected its faculty to market the school to prospective students by calling them directly to "entice them." (Doc. 53-4.) InfiLaw's corporate staff prepared special key-point tip sheets for faculty to discuss in these calls, filled with exaggerations and lies to make students believe they can get certain types of employment if they enroll. (*Id.*) Plus, InfiLaw's general marketing materials, developed by its corporate headquarters, contained misleading employment statistics and inflated bar passage rates. (Docs. 53-4,

9, 13, 17.) As the exhibits report, this was all a sham, part of InfiLaw's scheme to game the system and get more federal loans. (*E.g.* Docs. 53-4, 7, 9, 13, 17, 18, 19.)

    b.  *Matriculation, Academic Progress, and Grading*

After students matriculated, the exhibits report the lengths InfiLaw went to for retention, to keep the federal funds flowing. (*E.g.*, Docs. 53-1, 2, 3, 4, 10, 12, 15, 17, 19, 20, 22, 23, 24.) First, InfiLaw actively discouraged and sought to prevent students from transferring out. (*See* Doc. 53-4.) This was accomplished in several ways: (1) reordering classes in the first-year curriculum to not offer traditional courses required for transfers; (2) combining first-year courses to offer fewer classes per semester, making it harder for students to achieve high GPAs; (3) requiring students interested in transferring to meet with a school administrator before releasing their transcripts; and (4) instructing faculty members to refuse letters of recommendation requests. (*See* Docs. 53-4 (CSL); 53-22 (Arizona Summit and Florida Coastal); *see also* Doc. 53-23.) Anything to retain.

Yet despite these hurdles, most students at the top of the class transferred out, leaving behind students with very low performance. (*E.g.*, Docs. 53-1, 3.) Some of these students lacked competencies "such as writing and critical thinking, that are crucial to law school success." (Doc. 53-12; *see also* Doc. 53-4.) To compensate, InfiLaw's Schools lowered grading standards and allowed students who should have been academically dismissed to leave for a semester and start fresh the next year. (*E.g.*, Docs. 53-3, 4, 12, 17, 19.) They admitted high rates of part-time students (over 20% of an incoming class) with even lower entrance credentials to maintain enrollment figures. (Docs. 53-6, 15.) They also kept in place the mandatory grading curve, set when entering classes had much stronger

credentials. (Doc. 53-3.) Not recalibrating the curve increased the likelihood of grade inflation, and the curve was already skewed by admitting students through AAMPLE. (*Id.*; Doc. 53-10.) As these exhibits display, CSL made its student body's aptitude appear higher than it actually was—fabricating academic progress. (Doc. 53-10.)

   *c.*  *Bar Passage and Employment*

Together, these admissions practices and retention policies brewed the perfect storm, slated to strike when it came time to pass the bar exam and find a job. This is the main event, the key to CSL's downfall, and the focus of Defendants' exhibits. These exhibits offer incredible detail about InfiLaw's practices and problems surrounding bar passage and student employment, which are metrics the ABA uses to maintain accreditation. (*See* Docs. 53-1–10, 53-12–53-25.) Basically InfiLaw's Schools charged students a pretty penny to attend—on the Government's dime—but the students and the Government didn't get any bang for their buck.

To offer a snapshot, InfiLaw developed a "bar exam failure predictor formula" to determine which students were unlikely to pass the bar exam. (Doc. 53-9.) These students were called the night before the bar exam by a school administrator, sometimes the law school's dean, and offered stipends ranging from $5000 to $10,000 to delay taking the bar exam and enroll in InfiLaw's "Unlock Potential" program ("**UL Program**"). (*Id.*, Docs. 53-2, 10, 13, 15, 16.) The UL Program offered enhanced bar preparation courses and individual bar exam coaches for students enrolled. (Doc. 53-16.) Payment hinged on participating in the UL Program and a student's declared intent to sit for the bar exam. (*Id.*) According to the exhibits, all of this was aimed at maintaining the façade that

InfiLaw's Schools students' passed the bar exam, to not threaten their ABA accreditation or tarnish their reputations, which could lead to lower applications and dry up their federal funding stream. (*See* Docs. 53-1–10, 53-12–53-25.)

Despite these tactics, bar exam passage rates continued to plummet. (*E.g.* Doc. 53-2 (CSL falling from 78% to 47%).) When the ABA accredited InfiLaw's Schools, it looked at bar passage rates from classes with high performing students. (*E.g.* Docs. 53-2, 3.) The schools then opened their admissions floodgates, but it took at least a full admissions cycle to realize the effects of these lower credentialed students. (Doc. 53-3.) And although the cat was now out of the bag, InfiLaw's Schools dug in their heels, doing whatever they could to prevent low-achieving students from taking the bar exam while allowing them to stay in school and continue to funnel them federal funds. (*E.g.*, Docs. 53-1, 3, 4, 13, 14, 17, 18, 19, 20.)

Beyond skewing bar passage rates, InfiLaw's Schools manipulated employment statistics. (Docs. 53-1, 3, 8, 9, 19, 20, 24.) Because the ABA requires schools to report employment rates nine months after graduation, InfiLaw's Schools scrambled to place its students in jobs. (Doc. 53-1.) To meet the nine-month mark, CSL created "temporary" jobs for its students, "the legal equivalent of manual labor," and certainly "not the kind of work someone spends three years and thousands of dollars to get." (Doc. 53-8.) These jobs "don't even require a law degree." (*Id.*) And higher salary jobs were essentially out of the question for the majority of CSL's students, meaning they would not be able to pay back law school debt. (*Id.*)

Of course, this harsh employment reality was not reflected in InfiLaw's reported employment figures, which just showed total employment rates, not types of jobs. (*Id.*; *see also* Doc. 53-1.) Without these "deceptive employment rates," InfiLaw's wouldn't be able "to entice potential future students to enroll"—meaning less future federal funding. (*Id.*) As the New York Times explained, the lure of federal funding was too powerful of an incentive to keep InfiLaw's stalling out Schools going, despite "dismal" employment outcomes, because the Schools have no responsibility for the debt students take on to attend. (Doc. 53-20.) With their deceptive employment rates, the InfiLaw Schools were free to take the money and run. (*See id.*, Docs. 53-19, 22, 24.) So they did, all the while deceiving their students, the ABA, and the DOE. (Docs. 53-1, 2, 3, 4, 5, 10, 12, 20, 22, 25.)

### d. Treatment of Faculty

Last but not least, the exhibits report poor treatment of faculty at InfiLaw's Schools. (Docs. 53-1, 4, 22, 23.) Specifically, the exhibits assert: (1) issues with faculty members' tenure; (2) eliminating faculty involvement in admissions; (3) scrutinizing how faculty members conduct classes and requiring all doctrinal courses to give midterms; (4) coercing faculty to make recruitment calls with misleading and false information; (5) instructing faculty members to discourage students from transferring by telling students that CSL was the best place for their tuition money; and (6) drilling into faculty that obtaining tuition money was the most important focus. (*Id.*) Essentially, the exhibits tell how InfiLaw's corporate headquarters and school administrators ran the show and the faculty had to sit back and watch. (*Id.*) Once the schools received accreditation, InfiLaw cleared house. (Doc. 53-1.) All of this was profit-motivated. (*Id.*)

Looking at all of these exhibits together, the Court finds that the news media unearthed InfiLaw and CSL's fraudulent scheme to obtain federal funding. With painstaking detail, an avalanche of allegations was leveled against InfiLaw and CSL before Plaintiff provided a written disclosure to the Government and initiated this action. (*See* Doc. 48, ¶¶ 36, 108 (alternatively stating that Plaintiff provided a written disclose to the Government in April 2016 and June 2016).) Now, the Court compares Plaintiff's allegations with those publically disclosed.

Plaintiff generally alleges these false claims:

1. CSL doled out incentive payments to recruitment staff (*id.* ¶ 118a);

2. Defendants admitted academically unqualified students without the dean and faculty's approval (*id.* ¶¶ 118b–c);

3. Defendants altered students grades through CSL's re-entry program (*id.* ¶118d);

4. InfiLaw carried out improper trust accounting procedures that CSL allowed (*id.* ¶¶e–f);

5. CSL juked its employment stats (*id.* ¶ 118g);

6. CSL impliedly certified academically underqualified students as having made satisfactory academic process to receive federal funds (*id.* ¶ 118h);

7. CSL failed to maintain ABA accreditation standards as required (*id.* ¶ 118i);

8. Defendants failed to implement a written plan to combat misuse of copyrighted works (*id.* ¶ 118j);

9. CSL failed to create or abide by a code of conduct to prevent conflicts of

> interests concerning federal funding (*id.* ¶ 118k); and
>
> 10. CSL failed to equip its graduates with the ability to pay back their mountains of debt (*id.* ¶ 118l).

Apart from these, the Amended Complaint contains additional facts not alleged as false claims: (1) CSL created "travel classes" that were field trips for which students received federal aid (*id.* ¶ 87); (2) Defendants admitted veterans to ensure compliance with DOE's 90/10 rule and retained them despite low academic achievement (*id.* ¶¶ 89–93); and (3) CSL set up a suspect pro bono program in Haiti (*id.* ¶¶ 100–07).

Not all of these allegations were explicitly publicly disclosed. Specifically, the exhibits do not reference: (1) the incentive payments to staff; (2) improper trust accounting procedures; (3) misuse of copyrighted works; (4) an absent code of conduct; (5) CSL's travel classes; (6) veterans admissions; and (7) the Haiti program. The rest were—albeit Plaintiff added some window dressing here and there to confirm that InfiLaw's practices at CSL mirrored those at Florida Coastal and Arizona Summit. (*Compare, e.g.*, Doc. 48, ¶¶ 68–71 (Plaintiff alleging CSL used AAMPLE to avoid using the LSAT as an admission metric) *with* Doc. 53-9 (reporting lawsuit filed by former Arizona Summit employee discussing AAMPLE).) The Public Disclosure Bar bar operates if "substantially the same allegations or transactions . . . were publicly disclosed." § 3730 (e)(4)(A). That is the case here—but also with one of Plaintiff's "new" allegations, concerning veteran admissions. Plaintiff's veterans admissions allegations are substantially the same as publicly disclosed allegations describing how Defendants did whatever it took to retain students. (*E.g.*, Docs. 53-3, 4, 12, 17, 19.) This includes specific

allegations that Defendants failed to dismiss students who were barely scraping by academically, which is the substance of Plaintiff's veterans admissions allegations. (*See* Docs. 53-4, 12.) So this too the Court finds has been publicly disclosed.

Now, unless Plaintiff qualifies as an "original source," she is barred from asserting all of these publicly disclosed allegations—admitting unqualified students, altering student grades, juking employment stats, certifying satisfactory academic progress, failing to maintain ABA standards, failing to equip students with the means to pay back debt, and admitting and retaining veterans for revenue purposes.[4] § 3730(e)(4)(B); *Osheroff*, 776 F.3d at 815–16. The Court turns to this.

### 2. Original source

There are two ways to be an original source. § 3730(e)(4)(B). The first is by voluntarily disclosing information to the Government that forms the basis of an FCA claim *prior to* a public disclosure. *See id.* That is not the case here. Plaintiff provided a written disclosure to the Government in either April or June 2016 (*see* Doc. 48, ¶¶ 36, 108), and she initiated suit on June 6, 2016 (*see* Doc. 1). The public disclosures date back to 2012, with most of them from 2014 and 2015. (*See* Docs. 53-1–53-27.) Two of them were published after April 2016, one on May 26, (Doc. 53-25), the other on June 3 (Doc. 53-17), and both recite the already-identified litany of issues with InfiLaw's Schools (*see* Docs. 53-17, 25). So no, Plaintiff's written disclosure in 2016 does not qualify her as an original source the first way.

---

[4] Plaintiff's remaining six allegations are addressed in the next section, *infra* Pt. III.B.

The second way to qualify an original source has two requirements: (1) the source must have "knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions"; and (2) the source must have "voluntarily provided the information to the Government before filing an action." § 3730(e)(4)(B). The dispute here lies over the first part: whether Plaintiff's knowledge was independent and whether it materially adds to the public disclosures.

To show independent knowledge, Plaintiff claims she came by her allegations "through faculty meetings." (Doc. 56, p. 23.) Yet the Amended Complaint only mentions Plaintiff's attendance at faculty meetings as the source of her information for *some* allegations, not all. (*See, e.g.*, Doc. 48, ¶¶ 63, 64, 80.) The bulk of her allegations do not trace the source of Plaintiff's knowledge, although she does start out by saying, "[CSL] required [Plaintiff] to directly engage in almost all [CSL] departments, including, but not limited to, [CSL's] Financial Aid and Admissions department. In doing so, [Plaintiff] was privy to [Defendants'] policies, procedures, and conduct for [CSL's] financial aid and admission that are not typically available to a law professor." (*Id.* ¶ 2.) Fine, the Court accepts Plaintiff's contention that she has independent knowledge. But even giving her this, the Court finds that her allegations do not materially add to the public disclosures.

Indeed, the public disclosures "were already sufficient to give rise to an inference" that Defendants were defrauding the Government of federal funds. *See Osheroff*, 776 F.3d at 815 (defining "materially adds"). With great detail, the public disclosures expose the various means Defendants employed to execute this scheme, all the while linking Defendants' conduct to the overriding goal of squeezing as much money as possible from

the federal government. (*See* Docs. 53-1–10, 53-12–25.) They clearly outline "the essential elements comprising [Defendants'] fraudulent [conduct] . . . so as to raise a reasonable inference of fraud." *See Osheroff*, 776 F.3d at 815 (quoting *United States ex rel. Kraxberger v. Kan. City Power Light & Co.*, 756 F.3d 1075, 1079 (8th Cir. 2014)); *see also United States ex rel. Saldivar v. Fresenius Med. Care Holdings, Inc.*, 841 F.3d 927, 932 n.1 (considering original source inquiry under newer version of the FCA). Against this backdrop, Plaintiff's additions contribute little, let alone anything "material."[5]

Absent any material addition, Plaintiff is not an original source for those publicly disclosed allegations, and her three claims cannot proceed based on those allegations. *See* § 3730 (e)(4)(A). Those comprise the bulk of her Amended Complaint, but not all. Next, the Court evaluates the remainder.

**B.      9(b) Argument**

Since the Public Disclosure Bar rids the Amended Complaint of most allegations, the Court need only consider whether the remaining allegations satisfy Rule 9(b)'s particularity requirement. These allegations are: (1) incentive payments to staff; (2) improper trust accounting procedures; (3) misuse of copyrighted works; (4) no code of conduct; (5) CSL's travel classes; and (6) the Haiti program. (Doc. 48, ¶¶ 45–46, 57, 65–66, 72, 87, 100–07.) To meet Rule 9(b), Plaintiff must plead with particularity the

---

[5] *Cf. United States ex rel. Patel v. GE Healthcare, Inc.*, No. 8:14-cv-120-T-33TGW, 2017 WL 4310263, at *4 (M.D. Fla. Sept. 28, 2017) (alternatively finding that Relator qualified as an original source because he alleged that Defendant "effectively continued the fraudulent scheme—through its own nuclear pharmacies—after settling [a previous FCA] action," which materially added to publicly disclosed allegations).

circumstances surrounding the fraudulent submission of these claims, and that these false statements were made in connection with Defendants' funding requests. *See Clausen*, 290 F.3d at 1309.

Right off the bat, Rule 9(b) knocks out two of these allegations: CSL's travel classes and Haiti program. Neither allegation is tied to a "fraudulent claim" submitted by Defendants to the government, or an implied certification. (*Compare* Doc. 48, ¶¶ 87, 100–07 *with* ¶ 118.) Both allegations lack any indication how this conduct violates Title IV. (*See id.* ¶¶ 87, 100-07.) Without such crucial information, these allegations do not support an FCA claim; frankly, the Court questions why they were included.

The remaining four allegations fare no better. Rule 9(b) requires a plaintiff to allege "the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them." *Corsello*, 428 F.3d at 1012 (quoting *Clausen*, 290 F.3d at 1310 (citation omitted)). Rather than comply with this requirement, Plaintiff provides just vague allegations that these incidents occurred and Defendants were responsible. (*See* Doc. 48, ¶¶ 45–46, 57, 65–66, 72.) What is more, most allegations again do not identify why the conduct constituted fraud or how it impacted Defendants' ability to receive federal funds. *See Clausen*, 290 F.3d at 1301. Thus, the remaining four allegations do not support Plaintiff's FCA claims.[6]

---

[6] Because Plaintiff's three claims rely on all of these faulty allegations, none can proceed. (*See* Doc. 48, ¶¶ 111–49.) But putting this aside, it is clear that Counts II and III were due to be dismissed from the get-go for failure to comply with Rule 9(b). Count II alleges that CSL submitted a false record, *i.e.* the initial PPA, and then annually re-certified the PPA to receive federal funds. (*Id.* ¶¶ 132–42.) Yet Plaintiff provides absolutely no detail about this entry process or the certifications—their time, place, or

In short, Plaintiff adopted the kitchen-sink approach. This has failed—for all of her claims. Although Amended Complaint must be dismissed, the Court will grant Plaintiff an opportunity to re-plead.

### IV. CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Defendants' Motion to Dismiss (Doc. 53) is **GRANTED IN PART.**

2. Plaintiff's Amended Complaint (Doc. 48) is **DISMISSED WITHOUT PREJUDICE**.

3. On or before Monday, **May 7, 2018**, Plaintiff may file a second amended complaint. Failure to remedy the deficiencies identified in this Order or otherwise state a plausible claim will lead to dismissal of this action with prejudice.

**DONE AND ORDERED** in Chambers in Orlando, Florida, on April 23, 2018.



ROY B. DALTON JR.
United States District Judge

Copies to:
Counsel of Record
The United States

---

substance. *See Corsello*, 428 F.3d at 1008. The same goes for Count III, where Plaintiff blanketly asserts a conspiracy claim with essentially no details. (*See* Doc. 48, ¶¶ 143–49.) These seemingly unfounded claims fit Plaintiff's indiscriminate approach to this action.