Coleman W. Watson, Esq.
coleman@watsonllp.com
WATSON LLP
189 S. Orange Avenue, Suite 810
Orlando, FL 32801
Telephone: 407.377.6634
Facsimile: 407.377.6688
*Attorneys for Relator/Plaintiff Barbara Bernier and Plaintiff Ese Love*

# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF FLORIDA

### ORLANDO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, EX REL. BARBARA BERNIER; BARBARA BERNIER; and, ESE LOVE, <br><br> Relator/Plaintiffs, <br><br> vs. <br><br> INFILAW CORPORATION; CHARLOTTE SCHOOL OF LAW, LLC; AMERICAN BAR ASSOCIATION, d/b/a COUNCIL OF THE SECTION OF LEGAL EDUCATION AND ADMISSIONS TO THE BAR; and AMERICAN BAR ASSOCIATION, d/b/a ACCREDITATION COMMITTEE OF THE SECTION OF LEGAL EDUCATION AND ADMISSIONS TO THE BAR, <br><br> Defendants. | Case No.: 6:16-cv-00970-RBD-TBS <br><br> **SECOND AMENDED COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Relator, BARBARA BERNIER, on behalf of the UNITED STATES OF AMERICA, and

Plaintiffs, BARABRA BERNIER and ESE LOVE, sue Defendants, INFILAW

CORPORATION, CHARLOTTE SCHOOL OF LAW, and the AMERICAN BAR

ASSOCIATION, d/b/a COUNCIL OF THE SECTION OF LEGAL EDUCATION AND

ADMISSIONS TO THE BAR and ACCREDITATION COMMITTEE OF THE SECTION OF

LEGAL EDUCATION AND ADMISSIONS TO THE BAR, and alleges as follows:

1

**NATURE OF THE ACTION**

2   1.   This is a *qui tam* action, pursuant to the False Claims Act (the "FCA"), 31 U.S.C.

3   § 3729, *et seq.*, to recover damages from false claims Defendants Infilaw and CSOL made to the

4   United States Department of Education (the "DOE"), in violation of Title IV of the Higher

5   Education Act ("HEA"), 20 U.S.C. §§ 1070, *et seq.*, to receive payment directly or indirectly

6   from the United States Department of the Treasury under the auspices of federal student aid

7   programs for law school students.

8   2.   This is also an action for negligence, gross negligence, and fraud in the

9   inducement, based on common law.

10   **PARTIES**

11   3.   Relator and Plaintiff, BARBARA BERNIER ("Bernier"), is *sui juris* and is an

12   adult citizen of the State of Florida.  At all times material, Bernier was a Professor of Law at

13   CSOL, and is the original source of the allegations contained herein.  CSOL hired Bernier as a

14   Professor of Law, effective January 1, 2013.  Bernier originally earned tenure in 1996 at a

15   different law school, and such tenure was formalized at CSOL on May 5, 2014.  At CSOL,

16   Bernier instructed law students in the following legal courses: Constitutional Law, First

17   Amendment, Property, International Comparative Law, and Ethics.  In addition to working as a

18   law professor, CSOL required Bernier to directly engage in almost all CSOL departments,

19   including, but not limited to, CSOL's Financial Aid and Admissions Departments.   In doing so,

20   Bernier was privy to CSOL and Infilaw's policies, procedures, and conduct for CSOL's

21   financial aid and admissions practices that are not typically available to a law professor.

22   4.   Bernier brings the FCA portion of this action on behalf of the UNITED STATES

23   OF AMERICA, pursuant to 31 U.S.C. § 3730(b).  In addition, Bernier, in filing this action,

24   engaged in protected conduct, pursuant to 31 U.S.C. § 3730(h), because the allegations

25   contained herein are sufficient to support a reasonable conclusion that Infilaw and CSOL could

26   fear being reported to the federal government for fraud or sued in a *qui tam* action in federal

27   district court.

28

5.      Plaintiff, ESE LOVE ("Love"), is *sui juris* and is an adult citizen of the State of North Carolina.  Love is a former employee of CSOL and also a former law student at CSOL.

6.      Defendant, INFILAW CORPORATION ("Infilaw"), is a domestic corporation organized under the laws of the State of Florida, with its principal place of business located in Naples, Florida.  At all times material, Infilaw's managerial employees acted within the scopes of their employment and knowingly furthered the conduct described herein, in prohibition of the FCA.

7.      Defendant, CHARLOTTE SCHOOL OF LAW ("CSOL"), is a foreign limited liability company organized under the laws of the State of North Carolina.  Upon information and belief, CSOL has six members: (a) JAY CONISON, who is *sui juris* and is an adult citizen of North Carolina; (b) SHIRLEY FULTON, who is *sui juris* and is an adult citizen of North Carolina; (c) JAMES J. HANKS, JR., who is *sui juris* and is an adult citizen of the State of Maryland; (d) INFILAW CORPORATION, who is a Florida corporation with its principal place of business located in Florida; (e) CHIDI OGENE, who is *sui juris* and is an adult citizen of North Carolina; and, (f) TOM WIPPMAN, who is *sui juris* and is an adult citizen of the State of Illinois.  At all times material, CSOL's managerial employees acted within the scopes of their employment and knowingly furthered the conduct described herein, in prohibition of the FCA.

8.      Defendant, AMERICAN BAR ASSOCIATION ("ABA"), d/b/a COUNCIL OF THE SECTION OF LEGAL EDUCATION AND ADMISSIONS TO THE BAR ("Council"), is a foreign corporation organized under the laws of the State of Illinois, with its principal place of business located in Illinois.  The Council grants provisional and full accreditation to law schools located in the United States, its territories, and possessions.  The Council promulgates the Standards and Rules of Procedure for Approval of Law Schools (the "Standards") with which law schools must comply in order to be ABA-approved.  The Standards establish requirements for providing a sound program of legal education.  The law school approval process established by the Council is designed to provide a careful and comprehensive evaluation of a law school and its compliance with the Standards.

9.     Defendant, AMERICAN BAR ASSOCIATION, d/b/a ACCREDITATION COMMITTEE OF THE SECTION OF LEGAL EDUCATION AND ADMISSIONS TO THE BAR ("Accreditation Committee"), is a foreign corporation organized under the laws of the State of Illinois, with its principal place of business located in Illinois.  The Accreditation Committee assists the Council in evaluating schools seeking provisional or full accreditation and monitoring such schools.

### SUBJECT MATTER JURISDICTION

10.     This court has original jurisdiction over the subject matter in this action, pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3730(b), because this action involves claim under the FCA that arises under the laws of the United States, and this action is brought by a private citizen for false claims made to the United States.

11.     This court has supplemental jurisdiction over the non-FCA claims in this action, pursuant to 28 U.S.C. § 1367(a), because such claims are so related to the FCA claims that they form part of the same case or controversy under Article III of the United States Constitution.

### PERSONAL JURISDICTION

12.     This court has *in personam* jurisdiction over Infilaw and CSOL, pursuant to 31 U.S.C. § 3732, because they are found in the State of Florida, and they transact or transacted business in Florida.  Alternatively, both Infilaw and CSOL consented to the jurisdiction of this court by defending this action to date, without challenging *in personam* jurisdiction.

13.     This court has general *in personam* jurisdiction over the ABA, the Council, and the Accreditation Committee in the State of Florida because the ABA, the Council, and the Accreditation Committee have continuous and systematic contacts with Florida through business relationships with multiple law schools located in Florida.  The ABA derives/derived significant fees from law schools in Florida in exchange for undergoing the law school accreditation process: https://www.americanbar.org/groups/legal_education/accreditation/schedule-of-law-school-fees.html.

14.     This court also has specific *in personam* jurisdiction over the ABA, the Council, and the Accreditation Committee, pursuant to Section 48.193, Florida Statutes, because the ABA

committed a tortious act in the State of Florida, or by causing injury to Bernier, a Florida citizen, from an act or omission caused by the ABA outside of Florida, as alleged below.

## VENUE

15.    Venue is proper in this court, pursuant to 28 U.S.C. § 1391 and 31 U.S.C. § 3732, because at least one of the Defendants reside in this judicial district, and certain acts proscribed by 31 U.S.C. § 3729 occurred in this judicial district.  Infilaw and CSOL have also already consented to venue in this federal district by defending this action to date, without challenging venue.

16.    Venue is also proper in this court because the Defendants are subject to this court's *in personam* jurisdiction in this judicial district, pursuant to 28 U.S.C. § 1391(b)(3).

## GENERAL FACTUAL ALLEGATIONS

### *The Higher Education Act*

17.    Under Title IV of the HEA, the federal government operates a number of programs that disburse financial aid to students to help defray the costs of higher education. These programs include the Federal Pell Grant, the Federal Family Educational Loan Program, William D. Ford Federal Direct Loan Program, the Federal Perkins Loan, and the Graduate PLUS Loan.  Financial aid disbursed under these programs are only available to students who attend qualifying schools.

18.    Qualifying schools must enter into Program Participation Agreements ("PPAs") with the DOE, which such agreements certify that the qualifying school will adhere to certain requirements of applicable federal statutes and regulations.  Qualifying schools are required to enter into the PPA initially, and then re-affirm their duties, obligations, and promises under the PPA on an annual basis.  Executing the PPA and agreeing to comply with applicable federal statutes and regulations are prerequisites and are the *sine qua non* of federal funding for one basic reason: if a qualifying school does not agree to comply with the federal statutes and regulations thereunder, then the school will not receive federal student aid under Title IV of the HEA.

19.     Qualifying schools must also obtain accreditation from an approved accrediting agency that is recognized by the Secretary of the DOE.

20.     Under the HEA, accreditation means the status of public recognition that an accrediting agency grants to an educational institution or program that meets the agency's standards and requirements.  An accrediting agency means a legal entity, or that part of a legal entity, that conducts accrediting activities through voluntary, non-Federal peer review and makes decisions concerning the accreditation or pre-accreditation status of institutions, programs, or both.

21.     Since 1952, the ABA, through the Council, has voluntarily undertaken the duties and obligations of a specialized accrediting agency under Title IV of the HEA for the field of law.  The DOE describes the scope of the Council's accreditation powers as follows:

> [T]he accreditation throughout the United States of programs in legal education that lead to the first professional degree in law, including those offered via distance education, as well as freestanding law schools offering such programs.  This recognition also extends to the Accreditation Committee of the Section of Legal Education (Accreditation Committee) for decisions involving continued accreditation (referred to by the agency as "approval") of law schools, including those offered via distance education.  Title IV Note: Only freestanding law schools may use accreditation by this agency to establish eligibility to participate in Title IV programs.

22.     Becoming a qualifying school is significant, as it then allows law students attending a qualifying school to finance 100% of their higher education from the federal Government.

23.     The HEA requires that, in the case of institutions that advertise job placement rates as a means of attracting students to enroll in the institution, the institution will make available to prospective students, at or before the time of application (a) the most recent available data concerning employment statistics, graduation statistics and any other information necessary to substantiate the truthfulness of the advertisements; and (b) relevant State licensing requirements of the State in which such institution is located for any job for which the course of instruction is designed to prepare such prospective students.

24.     The DOE requires that any funded program at a qualifying school should enable a graduate to earn a sufficient income to service the debt of the program within specific parameters of disposable income percentages.

25.     The HEA requires that any qualifying school that has executed a PPA will serve as a fiduciary of any funds disbursed by the federal Government.

26.     In addition, the HEA requires that, in the case of an institution that participates in federal loan programs under Title 20 of the United States Code, the institution will develop a code of conduct, with which the institution's officers, employees, and agents shall comply, that prohibits a conflict of interest with the responsibilities of an officer, employee, or agent of an institution with respect to such loans; publish such code of conduct prominently on the institution's website; and, administer and enforce such code of conduct by, at a minimum, requiring that all of the institution's officers, employees, and agents with responsibilities with respect to such loans be annually informed of the provisions of the code of conduct.

### *Infilaw*

27.     Legal education is like no other institution of higher learning.  It is highly profitable for the school itself, parent institution or university—public or private.  Law schools have always provided a high return on investment or expense.  Most law school graduates know little about the business of the school, how it is governed, accredited, and what regulatory structure might apply.

28.     Infilaw was organized under Florida law in 2006.  Infilaw was created to acquire the Florida Coastal School of Law.

29.     Infilaw is a for-profit corporation; it is not an academic institution.  Infilaw's for-profit framework and culture dominate and overshadow academic issues, and profitability is determinative.  Investors, not students, are top-of-mind to Infilaw.

30.     Early in its history, Infilaw held itself out to prospective faculty that it was an environment that valued ideas, experience and entrepreneurial initiative.  Infilaw "bought" legitimacy for its three private law schools through the credentials of faculty that it recruited

from law schools that were higher-ranked that Infilaw's three private law schools.  Now, Infilaw has little, if any, respect for academically accomplished faculty.

31.     Infilaw recruited several Board members and Officers with significant connections to high-levels of the American Bar Association, including Dennis Archer, the former Chair of the ABA Counsel on Legal Education and former Chair of the ABA Task Force for Student Financial Aid.  Within the ABA, Archer had duties concerning accreditation and financial reviews of law schools, including CSOL.  Archer, at all times material, also sat on the Board of Infilaw while conducting such duties, and currently sits on the Board of Infilaw.

32.     Infilaw also recruited Joseph Harbaugh who sat on the ABA Task Force on the Future of Legal Education, as well as Jay Conison, who sat on the ABA Section on Legal Education and Admission to the Bar and the ABA Special Committee on Accreditation Transparency.

33.     Infilaw is self-described as "a consortium that includes an independent network of ABA-approved law schools and companies that provide management solutions, new educational programs, and pioneering, technology-driven course delivery to law schools and higher education institutions nationally and internationally."

34.     Infilaw describes its mission as "to establish the benchmark of inclusive excellence in professional education for the 21st Century," which is allegedly supported by three key pillars (a) centering on "serving the underserved," (b) providing an education that is "student-outcome centered," and (c) graduating students who are "practice-ready."

35.     As a marketing function and response for creating law programs that do not specifically follow a traditional model, Infilaw asserts that its programs are allegedly "disruptive" to legal education and law professors.  Infilaw uses this "disruption" model to describe its operating model as challenging that of long standing more highly-ranked law schools.  Under this umbrella of marketing, Infilaw focuses its alleged academic programs as programs that immediately place its graduates into the stream of commerce.  This model is offered comparatively to traditional "theory only" programs, that allegedly do not prepare graduates for immediate practice competencies.

36.     Infilaw has several private investors, one of whom is the Sterling Partners, a Chicago based venture capital firm with a portfolio valued at more than $4 billion.  Sterling Partners holds several investments in the education and education management sectors.

37.     Infilaw is interconnected with Sterling Partners through its Chief Executive Officer, Rick Inatome, who also sits on the Board of Sterling Partners.

38.     Sterling Partners' owns an 88% position in Infilaw, and states that it is "well positioned to benefit from future liquidity opportunities as [Infilaw's] business continues to grow."  According to Sterling Partners, Infilaw enjoys 90+% job placement and bar passage rates at each of its law schools.  This representation, however, is grossly inaccurate for the reasons alleged herein.

39.     Infilaw owns three private, for-profit law schools: Florida Coastal School of Law, located in Jacksonville, Florida; Arizona Summit School of Law, located in Phoenix, Arizona; and, CSOL, located in Charlotte, North Carolina.  Infilaw collectively refers to these three law schools as the "Consortium of Law Schools."

40.     Within Infilaw, employees informally refer to the corporate headquarters as "Central Services," which provides a variety of services to the Consortium of Law Schools and their employees, including marketing, information technology, management services, educational design, human resources and employee benefit services.

41.     The Consortium of Law Schools are not autonomous; each law school, including CSOL, strictly adheres to Infilaw's policies and procedures.  Infilaw executives are present at every law school, including CSOL, as a "President," who have superior rank over the Dean of each of the Consortium of Law Schools.  Thus, Infilaw directly controls all significant financial and managerial decisions at the Consortium of Law Schools.  Within the past year, Infilaw replaced all employees of the Financial Aid Department at CSOL with its own Infilaw employees.  This creates a conflict of interest between Infilaw employees and CSOL as to, among other things, improper trust accounting for Title IV funds, as alleged below.

42.     Infilaw's Consortium of Law Schools accepts applicants who not only represent the lowest LSAT percentiles, but who also have amongst the lowest grade point averages

nationwide.  Although the LSAT proposes to predict only likelihood of success in the first year of law school, according to statistics from the Law School Admission Council ("LSAC"), the lowest LSAT score ranges correlate more closely with bar exam failures.

43.     Infilaw operates akin to a consulting firm.  Many Infilaw employees, including Adam Cota, the Vice President of Academics for the Consortium of Law Schools, have neither educational nor legal training.  Vice President Cota is tasked with designing law school curriculum at the Consortium of Law Schools and is directed by Infilaw to purposefully differ the curriculum from traditional programs at other law schools by restructuring credits earned and by eliminating major topics from core classes.  This results in non-transferable course credit, creating an atmosphere where it became virtually impossible for CSOL law students to transfer to other law schools after their first year of studies.  On those occasions when CSOL students did make an attempted transfer, Infilaw deployed a law school retention team, whose sole purpose was to stop the transfer by offering significant financial incentives to the law students.

### *CSOL*

44.     CSOL opened in 2006.

45.     CSOL was an authorized educational institution by the State of North Carolina, until North Carolina revoked its license to operate in August 2017.  North Carolina revoked CSOL's license to operate because it could not demonstrate to North Carolina that it was financially viable.  CSOL was not financially viable because in December 2015, it became the first accredited law school in the United States to be expelled from the federal student loan program.  CSOL was expelled from the federal student loan program due, in large part, to the allegations herein that Bernier disclosed to the United States.

46.     From 2007, CSOL grew to be the largest law school in the State of North Carolina.

47.     CSOL was ranked in the fourth-tier of all American law schools.  Despite this ranking, CSOL's tuition was on par with many first-tier American law schools.  Infilaw, at all times material, set and adjusted what CSOL's tuition amount would be.

48.     CSOL tuition increased from $30,000 in 2010 to more than $41,000 in 2015.  The total cost per student at CSOL, considering living expenses, fees, and federal loan origination costs was $106,050 in 2010 and more than $134,000 in 2015.

49.     Approximately 90% of graduates from CSOL, conservatively, amassed more than $238,000 in student loan debt, each, based on a calculated full time of study for three years of legal studies, with accrued interest at prevailing rates.

50.     CSOL offered campus-based full-time and part-time juris doctor and master of laws programs.  CSOL also offered a certificate in paralegal studies program, as well as an online corporate compliance certificate program.

51.     CSOL received provisional accreditation from the ABA in 2008 and full accreditation in June 2011.

52.     The ABA performed a site inspection of CSOL in 2014.

53.     CSOL law students, since 2011 when the school attained full accreditation through the ABA, were eligible to obtain 100% financing from the federal government for their entire legal education.

54.     Within three months of becoming fully accredited and site-certified, CSOL Dean Jay Conison instituted buy-outs of faculty and staff, which dramatically altered the nature of the law school as it existed at the time when it achieved full accreditation from the ABA.  During the first buy-out, in January 2015, more than thirty employees left the law school.  And during the Summer 2015 and Spring 2016, CSOL bought out several more faculty members.

55.     CSOL engaged in a pattern and practice of admitting academically unqualified students, for the benefit of Infilaw, who had a financial interest in CSOL admitting as many students as possible and obtaining as much federal financial aid under Title IV of the HEA as possible, for the benefit of Infilaw's investors.  After CSOL admitted its first class, Infilaw began to demonstrate an intense drive to increase law student admissions and set aside known, long-standing data from the LSAC, in favor of tripling and quadrupling the first year entering class, even though the national pool of applicants was in sharp decline.  Infilaw's acts were financially motivated, rather than academically motivated and in the best interests of CSOL.

56.     The average grade point averages and LSAT scores of incoming first year law students at CSOL declined precipitously, while the number of first year students at CSOL increased dramatically—all juxtaposed against a significant decline in the number of law student applicants nationwide.

57.     The CSOL Faculty Admissions Committee had very limited involvement in admission decisions and was not involved in admissions decisions for academically underqualified students.  A single member of the faculty was assigned to review student applications from a single LSAT score group.

58.     Instead of using the LSAT as a predominant metric to measure law school admission, CSOL instead used the "Alternative Admission Model Placement Law Exam" ("AAMPLE"), which CSOL marketed as an LSAT admission "alternative."  In 2015, more than 70% of first year law students entering CSOL gained admission through AAMPLE.

59.     Many candidates for admission at CSOL were academically unqualified and would be improbable candidates for admission in most other law schools.  The median LSAT score for CSOL law students, for example, was 142, as reported by Infilaw and CSOL.  This score, however, is both deceptive and misleading, as it failed to acknowledge that since 2015, the majority of CSOL's student body gained admission to the law school via AAMPLE, and thus, never took the LSAT.

60.     CSOL engaged in generous incentives to prevent law students from taking the bar exam if they appeared statistically unlikely to pass.  In fact, one of CSOL's primary goals was to ensure that graduates were excludes from the group of "first time test takers" so that their Bar exam statistics would never be counted for purposes of CSOL's Bar passage rate.

61.     The CSOL Dean's Office even went so far as to telephone graduates the night before the Bar exam to actively discourage them from taking the exam the next day.  The CSOL Dean's Office offered compensation for the lost bar exam registration fees in the form of a $5,000 stipend, and an opportunity to study more intensively until the next administration of the bar exam.  If the graduate accepted the offer and opted not take the bar exam the next day, he or she lost their status as a "first-time taker" because the graduate was already registered for the bar

exam.  Thereafter, upon sitting for the exam the graduate becomes a "second-time taker," and their scores, passing or failing, were not required to be reported in the CSOL's statistics under ABA guidelines.  This tactic allowed CSOL to manipulate its statistic for first time takers, and the ultimate statistic reported to the public is misleading.

62.     In addition to the foregoing, CSOL offered graduates a "residency" to study for the bar exam.  This allowed CSOL to report its recent graduates as employed.  The CSOL graduates that accepted the offers were placed in a specified area of the law school library to "study," and were characterized as employees of the library.  CSOL librarians, however, were instructed not to request these "employees" to perform any work.  This tactic allowed CSOL to manipulate its employment statistic for its recent graduates, and the ultimate statistic reported to the public was misleading.

63.     There was a marked decline of bar passage rates at Infilaw's Consortium of Law Schools from more than 75% to below 35% in North Carolina between 2010 and 2016.  No other American law school has had a similar decrease in bar passage.  The passage rate for the July 2015 North Carolina Bar Exam was 47% for CSOL first time takers, compared to a statewide pass rate of 67.1% for the same group.  The CSOL bar passage rate for the February 2016 North Carolina Bar Exam was 34.7%; 45.2% for the July 2017 North Carolina Bar Exam; 21.08% for the February 2017 North Carolina Bar Exam; and 34.04% for the July 2017 North Carolina Bar Exam.

64.     The bar passage rate at CSOL was in a declining trend for the last four years of its existence.

65.     CSOL, by intentionally manipulating the statistics for first time bar exam takers, demonstrated an effort to avoid compliance with ABA Standard 301(a).

66.     Bernier served a confidential written disclosure statement on the Government, pursuant to 31 U.S.C. § 3730(b)(2), containing substantially all material evidence and information that Bernier possesses related to the conduct described herein.

67.     All general and statutory conditions precedent has either occurred or been waived by operation of law.

**COUNT I**
**Presentment of False Claims in**
**Violation of 31 U.S.C. § 3729(a)(1)(A)**
**(Infilaw and CSOL)**

68.     Bernier re-alleges and incorporates the allegations contained in paragraphs 3 through 67, as though fully set forth herein.

69.     Good faith entry into a PPA is a condition of payment, and re-affirmation of its duties, obligations, and promises under the PPA upon CSOL's submission of certification of compliance on an annual basis was necessary for CSOL to receive federal student aid under Title IV of the HEA.

70.     CSOL entered into an initial PPA with the DOE in exchange for distribution of federal financial aid under Title IV of the HEA.

71.     Infilaw is a third-party service provider under the PPA, and controls financial aid at CSOL.

72.     By entering into the PPA, CSOL, as an eligible institution within the meaning of the HEA, agreed that it would comply with all statutory provisions of or applicable to Title IV, all applicable regulatory provisions of Title IV, including the requirements set forth in 34 C.F.R. § Part 600 and 34 C.F.R. § Part 668, and the terms and provisions of the PPA.

73.     Thereafter, CSOL failed to disclose noncompliance of material regulatory requirements under the ABA accreditation standards that the DOE expressly designated as a condition of payment on an annual basis under Title IV of the HEA.

74.     CSOL impliedly certified with each annual re-certification of the PPA that it was in compliance with Title IV, and by doing so, presented false claims to the federal Government for payment of federal student aid monies on behalf of CSOL law students.

75.     CSOL entered into the initial PPA with the DOE in Fall 2008/Spring 2009 under the guidance and control of Infilaw.  Love completed the initial PPA on behalf of CSOL.  At that time, Gene Clark was the Dean of CSOL.  Love signed the PPA on behalf of CSOL for the Financial Aid staff.  Clark executed the PPA on behalf of CSOL as the Dean and and Renee Hill executed same on behalf of CSOL as the Academic Dean.

76.     CSOL's most recent PPA expired in June 2015, a true and authentic copy of which is attached hereto as **Exhibit "A"** and incorporated herein by reference.

77.     To establish Title IV eligibility, and at or before the time of entering into the PPA, Infilaw and CSOL had deliberate ignorance or reckless disregard to comply with Title IV and its implementing regulations, more specifically, the provisions of the PPA directed to the obligations to serve as a fiduciary of federal funds, the obligation to have and adhere to a code of conduct, and the obligation to develop and implement written plans to combat the unauthorized distribution of copyrighted material.

### *Improper Trust Accounting of Federal Funds*

78.     Under CSOL's initial PPA and with each re-certification of the PPA, CSOL agreed to be a fiduciary, responsible for administering federal funds to law students.

79.     Despite this express obligation in the PPA, CSOL failed to serve as a fiduciary of federal funds.

80.     Federal student aid monies for CSOL law students were disbursed electronically by the United States Department of the Treasury into CSOL's bank account every semester – Fall, Spring, and Summer, beginning in Spring 2009.  CSOL drew $65,238,752 in Title IV funds during the 2014-15 award year and $48,537,250 for the 2015-16 award year.

81.     CSOL was paid to administer the loans, and once student enrollment statuses were confirmed, CSOL, as a fiduciary, was then obligated under the PPA to deduct tuition and administrative fees owed and disburse the remaining balance to law students.

82.     Despite this fiduciary obligation, Infilaw instructed the Financial Aid Department staff at CSOL—including Frank Toliver, the former Chief Financial Officer at CSOL, Linda Pickett, and LaNaria Barnes—from every semester from Spring 2009 through Fall 2016 to hold student financial aid money and not disburse any such funds to students until the course drop-add period closed.  But the monies disbursed by the United States Department of the Treasury did not remain in CSOL's bank account during any of the semesters from Spring 2009 through Fall 2016, and thus, were not immediately available for transfer to the law students.  Rather, Infilaw accessed the CSOL bank accounts during these semesters and transferred substantially

all of the funds to its own bank accounts during each of these semesters effectively for use as a slush fund for Infilaw's own purposes in the interim and while collecting interest on such funds disbursed by the federal Government for the benefit of the CSOL law students.

83.   Upon information and belief, Infilaw employees Scott Thompson (previous Infilaw Chief Financial Officer), Chris Schmitz (Infilaw Finance employee), and Ted (last name unknown, who was also a previous Infilaw Chief Financial Officer) authorized or caused to authorize the transfer of trust funds from the CSOL bank account to the Infilaw bank account.

84.   On one occasion, the Financial Aid Department staff, including Love, was concerned that CSOL's bank account was so depleted that staff called Infilaw headquarters in Florida, and were told that such moving of funds was the usual course of business for Infilaw.

85.   There are two disbursements Federal Stafford Loan Program ($10,141 per semester-covered about 50% of the tuition and fees) and the Federal Direct Plus covered the remainder of tuition and living expenses).  When the DOE posted the federal funds to CSOL's bank account, Infilaw immediately withdrew the funds from CSOL at each semester from Spring 2009 through Fall 2016 and transferred dame to the Infilaw account, thus leaving insufficient funds to disbursements to law students.  In an effort to try to keep more funds in the CSOL account, LaNaria Barnes who worked in the CSOL Financial Aid Office would repeatedly attempt to low ball the projected amount of incoming funds to Infilaw, thus hoping to preserve enough balance in the CSOL account to disburse some funds to law students.

86.   In Fall 2016 Infilaw sought to change the disbursement schedule so that all of the schools in the Consortium of Law Schools would disburse at the same time even though every school started on a different date.  Infilaw wanted to disburse ten (10) days before the beginning of the semester because this gave Infilaw the opportunity to have earlier access to federal funds.

87.   However, law students would have notice from the posting of that information by the federal Government on their financial aid accounts.  This action caused serious problems because Infilaw used the federal funds for its own purposes and the Stafford loan was disbursed ten days later.  This delayed students' ability to have access to federal funds and caused panic amongst both CSOL's Financial Aid Office staff, and CSOL's law students.  In short, Infilaw,

not CSOL, had access to federal student aid funds, but students did not.  Compounding matters further, many students were so desperate for their federal fund disbursement that they were sleeping in their own cars and without any means to obtain housing until disbursement of federal funds.

### Code of Conduct

88.     Under CSOL's initial PPA and with each re-certification of the PPA, CSOL agreed to develop, publish, administer, and enforce a code of conduct with respect to loans made, insured or guaranteed under Title IV and to inform its officers, employees, and agents with responsibilities with respect to loans made, insured or guaranteed under Title IV.

89.     Despite this obligation, CSOL failed to create or follow any a code of conduct as required by Title IV of the HEA to prohibit conflicts of interest with the responsibilities of its officers, employees, or agents with respect to Title IV financial aid.  As a result, under the initial PPA and recertifications of same, CSOL was not in compliance with Title IV of the HEA, but received and continued to receive federal funds from 2012 through 2016.

### Copyrighted Material

90.     Under CSOL's initial PPA and with each re-certification of the PPA, CSOL agreed to implement a written plan to combat the unauthorized distribution of copyrighted material by users of the law school's network.

91.     Nonetheless, from every semester from Fall 2012 through Fall 2015, Infilaw and CSOL, including Dean Kama Pierce and Dean Camille Davidson, instructed faculty and staff at CSOL to openly violate copyright laws for course textbooks.

92.     In 2013, Dean Davidson, at a faculty meeting, announced to Bernier and other faculty members that each faculty member's program assistants should copy coursebooks.

93.     As a result of denying CSOL law students their student loan disbursements in a timely manner, students often started the semesters from Fall 2012 through Fall 2015 without the funds required to purchase course materials and textbooks.  In fact, many students did not have text books for several weeks into each of these semesters, which placed them at a severe disadvantage academically.

94.     Infilaw and CSOL instructed the faculty and staff to photocopy and post copies of needed chapters online.  This was easily hundreds of pages of materials in the first week alone.

95.     Compounding matters further, CSOL Dean Jay Conison cut the CSOL library budget, disallowing any purchase of course textbooks.

96.     Most law school libraries typically retain at least one or two copies of all course books on hand and make them available for students.  Any CSOL faculty, including Bernier, or staff who pointed out this problem to CSOL were greeted by a response from Infilaw that they were thinking outside of the "Infilaw culture," which was a real threat to the person's employment future.

97.     Infilaw and CSOL failed to disclose material violations of Title IV and its implementing regulations, as well as the PPA and re-certifications, to the DOE.  By presenting claims to the federal Government without disclosing these violations, Infilaw and CSOL impliedly certified compliance with Title IV, which made such representations misleading.

98.     Infilaw and CSOL knowingly violated requirements under Title IV that they knew were material to the DOE's decision to disburse federal student aid to CSOL.

99.     In performing the foregoing acts, Infilaw and CSOL knowingly defrauded the federal Government by causing false claims to be presented to the DOE for payment or approval, in violation of 31 U.S.C. § 3729, *et seq.*, when CSOL was not in compliance with the PPA, nor the statutory and regulatory requirements of Title IV of the HEA.

100.    As a result, Infilaw and CSOL caused the United States Department of the Treasury to pay money to Infilaw and CSOL based upon CSOL's material representations of compliance under Title IV of the HEA.

101.    Infilaw, through CSOL, wrongfully received federal student aid monies under Title IV of the HEA from the DOE.

102.    Infilaw and CSOL made fraudulent claims with knowledge that such claims would be tied to an increase in funds to Infilaw and CSOL under Title IV of the HEA.

103.    By entering into the PPA, and impliedly re-affirming its statutory and regulatory duties, obligations, and promises to the DOE on an annual basis, CSOL is required to return any Title IV funds to the DOE, along with interest and any special costs incurred by the DOE.

104.    The United States Department of the Treasurey would not have made the decision to distribute federal funding to CSOL based upon Infilaw and CSOL's material noncompliance with the fiduciary, code of conduct, and copyrighted materials obligations of the PPA.  In fact, once the federal Government became aware of Infilaw and CSOL's noncompliance with these issues, the DOE ultimately terminated distribution of Title IV funds to CSOL in December 2016.

105.    In December 2016, the DOE found that CSOL was out of compliance with ABA standards and that the noncompliance was both "substantial" and "persistent."  The DOE went on to find that CSOL made "substantial misrepresentations" regarding the nature of its academic programs.

106.    As a direct and proximate cause of Infilaw and CSOL's false claims to the federal Government, the United States Department of the Treasury, with respect to CSOL, directly or indirectly paid federal funds that it was not obligated to pay, for noncompliance with the PPA.

107.    All fraudulent claims presented to the federal Government by Infilaw and CSOL are subject to a civil fine under 31 U.S.C. § 3729(a).

108.    The federal Government is entitled to the full value of the fraudulent and false claims that Infilaw and CSOL presented for payment.

**WHEREFORE,** Relator, BARBARA BERNIER, on behalf of the UNITED STATES OF AMERICA, demands judgment against Defendants, INFILAW CORPORATION and CHARLOTTE SCHOOL OF LAW, and respectfully requests that the court enter judgment in favor of the United States in an amount equal to three times the amount of damages the federal government has sustained because of Infilaw and CSOL's actions, pursuant to 31 U.S.C. § 3729(a); statutory civil penalties for each violation, pursuant to 31 U.S.C. § 3729(a); that Bernier be awarded reasonable attorneys' fees and costs, pursuant to 31 U.S.C. § 3730(d); that Bernier be awarded with the applicable percentage of award, pursuant to 31 U.S.C. § 3730(d); that

Bernier and the United States be awarded with pre-judgment and post-judgment interest; and any such further relief as the court deems just and proper.

<u>**COUNT II**</u>
**False Record or Statement in**
**Violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B)**
**(Infilaw and CSOL)**

109.    Bernier re-alleges and incorporates the allegations contained in paragraphs 3 through 67 and paragraphs 75 through 96, as though fully set forth herein.

110.    CSOL entered into the initial PPA agreement with the DOE with deliberate ignorance or reckless disregard for its statutory and regulatory duties and obligations under Title IV.  CSOL also impliedly certified to the federal Government on an annual basis that it was in compliance with its statutory and regulatory obligations under Title IV.

111.    Infilaw and CSOL then, thereafter, intended to use the initial PPA and re-certifications of same to submit false claims for payment.  All subsequent claims made by Infilaw and CSOL to the United States Department of Education incident to the initial PPA were poisoned by deliberate ignorance and reckless disregard underlying the PPA and annual re-certifications.

112.    Infilaw and CSOL failed to disclose material violations of Title IV alleged above and its implementing regulations, as well as the PPA and re-certifications, to the DOE.  By making claims to the Government without disclosing these violations, Infilaw and CSOL impliedly certified compliance with Title IV, which made such representations misleading.

113.    Infilaw and CSOL knowingly violated requirements under Title IV that they knew were material to the DOE's decision to disburse federal student aid to CSOL.

114.    The initial PPA is a false record or statement, within the meaning of 31 U.S.C. § 3729(a)(1)(B), and each re-certification of the PPA, including the most recent certification in 2015, is a false record or statement

115.    Infilaw and CSOL caused the initial PPA to be submitted to the DOE, in order to receive financial aid subsidies from the federal Government.

116.   As a result of a false record, Infilaw and CSOL caused the United States Department of the Treasury to pay money to Infilaw and CSOL that it was not obligated to pay.

117.   Infilaw and CSOL made the false record with knowledge that the initial PPA was made with deliberate ignorance or reckless disregard and that such PPA would be tied to an increase in funds to Infilaw and CSOL under Title IV of the HEA.

118.   All fraudulent records submitted to the federal Government by Infilaw and CSOL are subject to a civil fine under 31 U.S.C. § 3729(a).

119.   The federal Government is entitled to the full value of the fraudulent and false records submitted Infilaw and CSOL for payment.

**WHEREFORE,** Relator, BARBARA BERNIER, on behalf of the UNITED STATES OF AMERICA, demands judgment against Defendants, INFILAW CORPORATION and CHARLOTTE SCHOOL OF LAW, and respectfully requests that the court enter judgment in favor of the United States in an amount equal to three times the amount of damages the federal government has sustained because of Infilaw and CSOL's actions, pursuant to 31 U.S.C. § 3729(a); statutory civil penalties for each violation, pursuant to 31 U.S.C. § 3729(a); that Bernier be awarded reasonable attorneys' fees and costs, pursuant to 31 U.S.C. § 3730(d); that Bernier be awarded with the applicable percentage of award, pursuant to 31 U.S.C. § 3730(d); that Bernier and the United States be awarded with pre-judgment and post-judgment interest; and any such further relief as the court deems just and proper.

### COUNT III
#### Negligence
#### (Council and Accreditation Committee)

120.   Bernier and Love re-allege and incorporate the allegations contained in paragraphs 3 through 67 and paragraphs 75 through 96, as though fully set forth herein.

121.   The ABA, through the Council and Accreditation Committee, voluntarily undertook and assumed a legal duty on behalf of prospective law students, including Love, to certify the competency, authority, and credibility of CSOL to provide legal education commensurate with the obligations set forth in Title IV of the HEA.  More specifically, the ABA

was not and is not required to undertake a legal duty for prospective law students to vouch for the credibility and competency of a law school, but it has voluntarily done so since 1952.

122. The ABA, through the Council and Accreditation Committee, voluntarily undertook and assumed a legal duty on behalf of prospective faculty members of accredited law schools, including Bernier, to certify the competency, authority, and credibility of CSOL to provide legal education commensurate with the obligations set forth in Title IV of the HEA and as the competency of CSOL as an institution of higher learning. More specifically, the ABA was not and is not required to undertake a legal duty for prospective faculty members to vouch for the credibility and competency of a law school, but it has voluntarily done so since 1952.

123. The ABA, through the Council and Accreditation Committee, breached the duties owed to Love and Bernier by failing to ensure that CSOL was in full compliance with the Standards to achieve full accreditation.

124. The ABA, in failing to enforce and ensure that CSOL was in compliance with the Standards failed to act as a reasonable accreditor, recognized by the DOE for purposes of ensuring compliance with Title IV of the HEA.

125. The ABA was the direct cause of Love's damages because Love opted to enroll at CSOL based upon the ABA's certification to prospective law students that CSOL had achieved and was in full compliance with the Standards when, in fact, CSOL was not in full compliance or substantial compliance with the Standards when Love enrolled at CSOL.

126. The ABA was the proximate cause of Love's damages because it was foreseeable that Love would be damaged if the ABA failed to ensure that CSOL was in full or substantial compliance with the Standards because Love would not have enrolled in CSOL had she known that CSOL was not in full or substantial compliance with the Standards.

127. The ABA was the direct cause of Bernier's damages because Bernier voluntarily resigned from a tenured professorship at another law school to join CSOL based on the ABA's representation to the public, including Bernier, that CSOL had achieved and was in full compliance with the Standards when, in fact, CSOL was not in full compliance or substantial compliance with the Standards when Bernier joined CSOL as a faculty member.

128.    The ABA was the proximate cause of Bernier's damages because it was foreseeable that Bernier would be damaged if the ABA failed to ensure that CSOL was in full or substantial compliance with the Standards because Bernier would not have resigned from a tenured professorship at another law school to join CSOL had she known that CSOL was not in full or substantial compliance with the Standards.  No tenured professor would reasonably give up tenure at any law school in order to join a law that was not actually in full or substantial compliance with the Standards.

129.    Love was damaged by virtue of the conduct alleged herein because she has amassed more than $350,000.00 in non-dischargeable law school debt from CSOL, who the ABA, through the Council and Accreditation Committee, knew or should have known was not fully compliant with the standards to achieve full law school accreditation.  Nonetheless, the ABA awarded such accreditation anyway, and repeatedly ignored non-compliance issues with Title IV of the HEA by CSOL.

130.    Bernier was damaged by virtue of the conduct alleged herein because she resigned from a tenured professorship from another law school to join CSOL and did so because of the ABA's decision to represent to prospective faculty, like Bernier, that CSOL had achieved and was in compliance with the standards of Title IV of the HEA to achieve full accreditation by the ABA.  The ABA repeatedly ignored non-compliance issues with Title IV of the HEA by CSOL and caused faculty members damaged who voluntarily left other professorships to join CSOL, based on the full accreditation awarded by the ABA.

**WHEREFORE,** Relator/Plaintiff, BARBARA BERNIER, and Plaintiff, ESE LOVE, demand judgment against Defendants, AMERICAN BAR ASSOCIATION, d/b/a COUNCIL OF THE SECTION OF LEGAL EDUCATION AND ADMISSIONS TO THE BAR and ACCREDITATION COMMITTEE OF THE SECTION OF LEGAL EDUCATION AND ADMISSIONS TO THE BAR, and respectfully request that the court award general, compensatory, and/or actual damages, and any such further relief as the court deems just and proper.

1

2

### COUNT IV
### Gross Negligence
### (Infilaw and CSOL)

3    131.    Bernier re-alleges and incorporates the allegations contained in paragraphs 3

4    through 67, paragraphs 75 through 96, and paragraphs 122, 123, 124, 127, 128, and 130, as

5    though fully set forth herein.

6    132.    The foregoing allegations consists of circumstances that together constitute an

7    imminent or clear and present danger amounting more than the normal peril.  In short, Infilaw

8    and CSOL were motivated by profits, not students, and created an atmosphere where the value

9    and quality of legal education was replaced by a rote quantitative analysis to increase the student

10    population to collect federal funds from the DOE.

11    133.    In addition, Infilaw and CSOL recruited Bernier and other faculty members solely

12    for their credentials, in order to "sell" those credentials to convince prospective students to

13    attend CSOL and apply for and receive federal funds for Infilaw and CSOL.

14    134.    Infilaw and CSOL knew that CSOL was not in compliance with the initial PPA

15    and was not in compliance with any of the certifications of the PPA.

16    135.    Infilaw and CSOl also knew that CSOL was not in full or substantial compliance

17    with the Standards when it actively recruited Bernier and tricked her into relinquishing her prior

18    tenured position as a law professor, in favor of joining CSOL.

19    136.    Infilaw and CSOL had a chargeable knowledge or awareness of the imminent

20    danger because CSOL, as directed by Infilaw, repeatedly reduced the minimum GPA

21    **WHEREFORE,** Plaintiff, BARBARA BERNIER, demands judgment against

22    Defendants, INFILAW CORPORATION and CHARLOTTE SCHOOL OF LAW, and

23    respectfully requests that the court award general, compensatory, and/or actual damages, as well

24    as punitive damages, and any such further relief as the court deems just and proper.

25

26

27

28

1
2

## COUNT V
### Fraudulent Inducement
### (Infilaw and CSOL)

3    137.    Bernier and Love re-allege and incorporate the allegations contained in

4    paragraphs 3 through 67 and paragraphs 75 through 96, as though fully set forth herein.

5    138.    Infilaw and CSOL actively recruited Bernier for a professorship at CSOL in late

6    2011/early 2012.  Specifically, Dean Camille Davidson, Dean Spriggs, and Dennis Stone

7    actively recruited Bernier because of her significant professorship credentials and several ABA

8    accredited law schools.

9    139.    Through Bernier, Infilaw and CSOL told Bernier that CSOL wanted to "deepen"

10   its bench and that Bernier's credentials would further that purpose.

11   140.    During negotiations to convince Bernier to join CSOL as a faculty member,

12   Infilaw and CSOL misrepresented a material fact to Bernier by representing that CSOL was in

13   full or substantial compliance with the Standards and was, by extension, a fully accredited law

14   school.

15   141.    Infilaw and CSOL knew or should have known of the falsity of the representation

16   of material fact because it knew that it was not actually in compliance with the Standards, more

17   specifically Standard 205(b), Standard 301(a), and Standard 501(b).

18   142.    Infilaw and CSOL intended that the representation of full ABA accreditation

19   induce Bernier to voluntarily resign and relinquish her prior position as a full-time tenured

20   professor at a different law school.

21   143.    Ultimately, CSOL presented Bernier with an employment contract on March 20,

22   2012, which Bernier accepted and entered into based on the representations made by Infilaw and

23   CSOL with respect to her ability to gain tenure at CSOL in exchange for relinquishing tenure at

24   the previously law school where she was employed.

25   144.    As stated in the employment contract, CSOL represented to Bernier that it viewed

26   her as a "primary contributor" to CSOL and the Infilaw Consortium of Schools' growth,

27   development, and success.  Bernier later learned that she was one of very few faculty members

28   recruited by Infilaw and CSOL with any significant teaching experience at a law school.

145.    Bernier justifiably relied on Infilaw and CSOL's representations of full ABA accreditation or that CSOL was in full or substantial compliance with the Standards as of late 2011/early 2012 because as a tenured professor, Bernier was only interested in accepting employment at an accredited ABA law school.

146.    And by giving up her tenure to join CSOL, Bernier was damaged in her loss of tenure, which is a property right.

**WHEREFORE,** Plaintiff, BARBARA BERNIER, demands judgment against Defendants, INFILAW CORPORATION and CHARLOTTE SCHOOL OF LAW, and respectfully requests that the court award general, compensatory, and/or actual damages, as well as punitive damages, and any such further relief as the court deems just and proper.

**DATED** on May 7, 2018

Respectfully submitted,

WATSON LLP

*/s/ Coleman Watson*
**Coleman W. Watson, Esq.**
Florida Bar. No. 0087288
California Bar No. 266015
Georgia Bar No. 317133
New York Bar Reg. No. 4850004
Email: coleman@watsonllp.com
             docketing@watsonllp.com
**Leia V. Leitner, Esq.**
Florida Bar No. 0105621
Email**:** leia@watsonllp.com
**Ronika J. Carter, Esq.**
Florida Bar No. 0122358
Email: ronika@watsonllp.com

**WATSON LLP**
189 S. Orange Avenue
Suite 810
Orlando, FL 32801
Telephone: 407.377.6634
Facsimile: 407.377.6688

*Attorneys for*

*Relator/Plaintiff Barbara Bernier
and Plaintiff Ese Love*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 7, 2018, pursuant to Fed. R. Civ. P. 5(d)(3), I filed the foregoing document electronically with this court's CM/ECF system, which will serve an electronic copy of the foregoing document on the following counsel of record in this proceeding:

**LAW OFFICES OF MARK L. HORWITZ, P.A.**
**Vincent A. Citro, Esq.**
17 East Pine Street
Orlando, FL 32801
Email: vince@mlhorwitzlaw.com

**COOLEY, LLP**
**David Mills, Esq.**
1299 Pennsylvania Avenue
Washington, D.C. 20004
Email: dmills@cooley.com

**COOLEY, LLP**
**Mazda K. Anita, Esq.**
4401 Eastgate Mall
San Diego, CA 92121
Email: mantia@cooley.com

*/s/ Coleman Watson*
**Coleman W. Watson, Esq.**