UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA, *ex rel.*,
BARBARA BERNIER; and ESE LOVE,

      Plaintiffs,

v.                            Case No. 6:16-cv-970-Orl-37TBS

INFILAW CORPORATION;
CHARLOTTE SCHOOL OF LAW, LLC.;
AMERICAN BAR ASSOCIATION; and
AMERICAN BAR ASSOCIATION,

      Defendants.

_____

## ORDER

Before the Court is the latest complaint in this False Claims Act ("**FCA**") action initially brought against Defendants InfiLaw Corporation ("**InfiLaw**") and Charlotte School of Law, LLC ("**CSL**") by former CSL professor Barbara Bernier ("**Bernier**"). (Doc. 73, *see also* Docs. 1, 48.) On InfiLaw and CSL's motion (Doc. 53), the Court dismissed Bernier's previous, three-count complaint upon identifying varied errors and pleading deficiencies. (Doc. 71 ("**First Round Order**").) At the same time, the Court afforded Bernier the chance to fix what could be fixed, armed with the benefit of an extensive prior ruling. (*Id.*)

Not one to miss an opportunity, Bernier fired back with both barrels. Sans leave, she tacked on a new plaintiff, two new defendants, and three new state-law claims. (Doc. 73 ("**SAC**").) Fresh motions to dismiss followed, one from InfiLaw and CSL (Doc. 88

-1-

("**InfiLaw MTD**")), the other from now-Defendants American Bar Association Counsel and Accreditation Committee of the Section of Legal Education and Admissions to the Bar (collectively, "**ABA**") (Doc. 86 ("**ABA MTD**")). With briefing complete (Docs. 97, 98, 104, 105), the motions are ripe. Bernier's second bite at the apple, however, still sours, as explained below.

## I.   BACKGROUND[1]

As a refresher, the Court recites the course of events preceding the SAC. Formed in 2006, InfiLaw is a corporation that owns three for-profit law schools: Florida Coastal, Arizona Summit, and CSL (collectively, "**Schools**"). (Doc. 73, ¶¶ 28, 39.) Looking to break the mold from traditional law school curriculum, InfiLaw conceived a "disruptive" operating model that it implemented at the Schools. (*Id.* ¶ 35.) Suffice it to say, the model didn't pan out—CSL shuttered in 2017 after North Carolina revoked its license to operate. (*Id.* ¶ 45.)

While operational, CSL tapped into the well of federal funding by participating in loan programs under **Title IV** of the Higher Education Act ("**HEA**"), 20 U.S.C. § 1070, *et seq*. (*Id.* ¶ 53.)  Getting there required ABA accreditation, a feat CSL fully accomplished in 2011; and the execution of a Program Participation Agreement ("**PPA**") with the Department of Education ("**DOE**"), where CSL agreed to certain terms in exchange for the funds. (*Id.* ¶¶ 17–26.) But the wait was worth it—now CSL's students could finance their entire education with federal funds. (*Id.* ¶ 53.)

---

[1] The Court assumes familiarity with the First Round Order (Doc. 71).

On striking the mother lode, CSL changed almost everything: admissions practices, faculty, administration officials. (*Id.* ¶¶ 53–55.) The whole operation became about increasing enrollment to keep those federal funds flowing in. (*See id.*) And it worked—on the front end, at least. CSL began admitting hordes of academically unqualified students and increased their tuition from $30,000 more than $41,000. (*Id.* ¶¶ 46–48, 55–59.) But these dodgy practices caught up with CSL when it came time for students to pass the bar exam and find legal employment. (*Id.* ¶¶ 60–64.) Between 2010 and 2016, passage rates for InfiLaw students taking the North Carolina bar exam dropped from 75% to below 35%. (*Id.* ¶ 63.) CSL's rates were abysmal. Its July 2015 pass rate for first-time test takers was 47%, compared to 67.1% statewide. (*Id.*) This sunk to 34.7% in February 2016, 21.08% in February 2017, and 34.04% in July 2017. (*Id.*) CSL was failing its students.

The bar passage rates at InfiLaw Schools mirrored CSL's downward trajectory. (*See id.*) Before long, amidst extensive public coverage (*see* Doc. 71, pp. 7–13), the ABA and DOE caught wind of these goings-on and pulled CSL's plug. (Doc. 73, ¶ 45.) The ABA placed CSL on probation in November 2016 and DOE denied CSL federal funds for the spring 2017 semester. (*See* Doc. 88-2; Doc. 11, p. 3.) With the river of federal funds diverted, CSL dried up. (Doc. 73, ¶ 45.) It closed up shop in August 2017 after the State of North Carolina revoked its license to operate. (*Id.*)

Enter Bernier. Hired as a professor in 2013, Bernier instituted this FCA action on June 6, 2016 (Doc. 1) against InfiLaw and CSL after serving a written disclosure statement on the Government about InfiLaw and CSL's fraudulent scheme (Doc. 73, ¶¶ 3, 66). The

United States commenced investigation into her claims, moving several times for extension requests (as is its wont) over the next year. (*E.g.*, Docs. 9, 11, 12.) In one such request, the United States notified the Court that Bernier "does not have specific knowledge of [CSL] practices that may be pertinent to the investigation," but there were "two additional related *qui tam* cases pending before the U.S. District Court for the Middle District of Florida" and an already initiated "criminal investigation" of CSL and InfiLaw in the Western District of North Carolina to help the United States determine next steps. (Doc. 9, pp. 3–4.) Following over a year of investigation, the United Stated notified the Court it would not be intervening at that point, with investigation to remain ongoing. (Doc. 14 ("**Notice**").) Bernier's Complaint and the Notice were unsealed, and InfiLaw and CSL were served. (*See* Doc. 16.)

On receipt, InfiLaw and CSL moved to dismiss Bernier's original complaint for failure to state a claim. (Doc. 45.) Specifically, they argued that Bernier's three FCA claims were barred because: (1) her underlying allegations were publicly disclosed; (2) she lacked a plausible basis for her allegations; and (3) she failed to plead with requisite particularity under Federal Rule of Civil Procedure 9(b). (*Id.*) She responded by submitting an amended complaint with the same three counts. (Doc. 48.) InfiLaw and CSL moved to dismiss again, raising the same arguments. (Doc. 53.) After briefing on that motion closed, one of the related *qui tam* actions filed in this district was unsealed when the relators dismissed the action without prejudice, *United States ex. rel. O'Connor v. InfiLaw Corp., et al.*, 3:15-cv-1351-BJD-JBT ("***O'Connor* Action**"). (*See* Doc. 69). As the *O'Connor* Action was filed before Bernier's, the unsealing of that complaint added a new

wrinkle: the potential application of the FCA's first-to-file bar. (*See id.*) Alas, that argument was late to the party, so the Court ruled on Bernier's amended complaint as originally briefed.[2] (*See* Doc. 71.)

In its First Round Order, the Court found most of Bernier's allegations subject to dismissal based on the FCA's public disclosure bar and because Bernier wasn't an original source. (*Id.* at 6–18.) For the remaining allegations, the Court analyzed whether they satisfied Rule 9(b)'s particularity requirement. (*Id.* at 18–20.) None did (*see id.*), and because Bernier's three claims all relied on the faulty allegations, the Amended Complaint was dismissed. (*See id.* at 18–19, 19 n.6.) Nevertheless, the Court provided Bernier the opportunity to re-plead—specifically "to remedy the deficiencies identified . . . or otherwise state a plausible claim." (*Id.* at 20, ¶ 3.)

Plaintiffs then filed the SAC, where Bernier brought Ese Love ("**Love**"), a former CSL employee and student, into the mix. (Doc. 73.) The SAC has five counts: Bernier brings two renewed FCA claims against InfiLaw and CSL based on three alleged circumstances of fraud; Plaintiffs allege negligence against the ABA for accrediting CSL without ensuring its compliance with ABA standards; and Bernier alleges gross negligence and fraudulent inducement against InfiLaw and CSL for its recruitment of her.[3] (*Id.* ¶¶ 68–146.) Motions to dismiss ensued (Docs. 86, 88), now fully briefed (Docs.

---

[2] The day after the First Round Order, the second related *qui tam* action was unsealed, *United States ex rel. Paula C. Lorona v. InfiLaw Corp., Arizona Summit Law School, LLC, Florida Coastal School of Law, Charlotte School of Law*, 3:15-cv-959-MMH-PDB (M.D. Fla. Aug. 5, 2015) ("**Lorona Action**").

[3] The first paragraph of the fraudulent inducement count names both Plaintiffs, but the following allegations refer only to Bernier, not Love. (Doc. 73, ¶¶ 137–46.) The

97, 98, 104, 105.) Time to tuck in.

## II.   INFILAW MTD

First up, the Court tackles the InfiLaw MTD, which launches Rule 12(b)(1) and 12(b)(6) attacks. (Doc. 88.) For the two FCA Claims, InfiLaw and CSL present the first-to-file bar argument as 12(b)(1) challenge, then argue under 12(b)(6) that Bernier still fails to state a claim. (*Id.* at 8–32.) For the state law claims, InfiLaw and CSL bring up the procedural fly in the ointment that Bernier added these claims after the Court's deadlines without leave or notice; and seek dismissal based on lack of supplemental jurisdiction, the applicable statute of limitations, and failure to state a claim. (*Id.* at 33–44.) The Court takes each set of claims in turn.

### A.   FCA Claims

Briefly, the Court sketches the nature of Bernier's FCA claims. The SAC re-alleges two FCA Claims against InfiLaw and CSL based on an implied false certification theory: (1) presentment of a false claim in violation of 31 U.S.C. § 3729(a)(1)(A) ("**Presentment Claim**"); and (2) false record or statement in violation of 31 U.S.C. § 3729(a)(1)(B) ("**Record Claim**"). (Doc. 73, ¶¶ 68–119.) Through them, Bernier spins a yarn that CSL defrauded the federal government of millions of dollars in student loan funds by accepting federal funds without disclosing three violations of the PPA. (*See id.*) According to Bernier, the three PPA provisions allegedly violated were "material regulatory

---

Court therefore construes the first paragraph's inclusion of Love as a scrivener's error and finds this count brought only by Bernier. Accordingly, this Order refers to the FCA and state-law claims against InfiLaw and CSL as "Bernier's" and the negligence claim against the ABA as "Plaintiffs'."

requirements under ABA accreditation standards" that "DOE expressly designated as a condition of payment" to receive Title IV funds. (*Id.* ¶ 73) And because these three terms were violated, Bernier alleges that CSL's entry into the PPA and annual re-certification of compliance amounts to presenting a false claim and submitting a false record to the Government in exchange for federal funds. (*Id.* ¶¶ 77, 97–119.)

The three provisions of the PPA Bernier alleges CSL violated are: (1) the obligation to serve as a fiduciary of federal funds; (2) the obligation to develop, publish, administer, and enforce a code of conduct with respect to loans made, insured or guaranteed under Title IV and inform those responsible accordingly; and (3) the obligation to implement a written plan to combat the unauthorized distribution of copyrighted material by users of the law school's network. (*Id.* ¶¶ 78–94.) As factual support for the first alleged violation, Bernier says that CSL improperly handled the disbursement of federal funds by transferring them on receipt to an InfiLaw bank account and holding them there for a certain time instead of immediately distributing them to students. (*Id.* ¶ 88) For the second, Bernier contends CSL neither created nor enforced a code of conduct "to prohibit conflicts of interest with the responsibilities of its officers, employees, or agents with respect to Title IV financial aid." (*Id.* ¶ 89.) And for the third, Bernier alleges that InfiLaw and CSL announced that faculty members, program assistants, and staff should photocopy and post needed chapters of textbooks at the beginning of the semester for students who hadn't received their ordered textbooks yet. (*Id.* ¶¶ 91–94)

Together, such facts form the basis of this entire cause of action and, simply put, they do not suffice. For one thing, the FCA's first-to-file bar applies here. Second of all,

they fail to state a claim. As this is Bernier's third re-pleader, these claims will be dismissed with prejudice.

### 1. First-to-file bar

Although the FCA generally allows actions by private persons, certain restrictions apply. *See* 31 U.S.C. § 3730(b). One such restriction is the "first-to-file" bar, which states that "[w]hen a person brings an action [alleging a violation of section 3729], no person other than the Government may intervene or bring a related action based on the facts underlying the pending action." *Id.* § 3730(b)(5). This means that "once one suit has been filed by a relator or by the government, all other suits against the same defendant based on the same kind of conduct would be barred." *Cooper v. Blue Cross & Blue Shield of Fla., Inc.*, 19 F.3d 562, 567 (11th Cir. 1994). It abates only "pending" related actions "while the earlier suit remains undecided but ceases to bar that suit once it is dismissed." *Kellogg Brown & Root Servs., Inc. v. United States ex rel. Carter*, 135 S. Ct. 1970, 1978 (2015). Accordingly, a dismissal based solely on the first-to-file bar should be without prejudice. *See id.* at 1979; *United States ex rel. Wood v. Allergan, Inc.*, 899 F.3d 163, 174 (2d Cir. 2018).

Back in the day, courts first analyzing the first-to-file bar considered it jurisdictional. This understanding seems to stem from previous versions of the FCA that classified other bars as jurisdictional, like the public disclosure bar. *See, e.g., United States ex rel. Lujan v. Hughes Aircraft Co.*, 243 F.3d 1181, 1186–87 (9th Cir. 2001). Thus, the first-to-file bar was grouped with the those—even though those bars expressly contained jurisdictional language and the first-to-file bar did not. *See, e.g., Walburn v. Lockheed Martin Corp.*, 431 F.3d 966, 970 (6th Cir. 2005) ("Congress has placed a number of jurisdictional

limitations on *qui tam* actions, two of which are relevant here: the first-to-file bar of 31 U.S.C. § 3730(b)(5) and the public disclosure bar of 31 U.S.C. § 3730(e)(4)(A).") Nowadays, the public disclosure bar has been amended to no longer contain jurisdictional language, instead starting with, "The court shall dismiss an action or claim." 31 U.S.C. § 3730(e)(4); *see also United States ex rel. Osheroff v. Humana, Inc.*, 776 F.3d 805, 810 (11th Cir. 2015) ("We conclude that the amended § 3730(e)(4) creates grounds for dismissal for failure to state a claim rather than for lack of jurisdiction."). Old habits die hard though, and some circuits still consider the first-to-file bar jurisdictional. *See, e.g., United States ex rel. Ven-A-Care of the Fla. Keys, Inc. v. Baxter Healthcare Corp.*, 772 F.3d 932, 936 (1st Cir. 2014); *United States ex rel. Carter v. Halliburton Co.*, 710 F.3d 171, 181 (4th Cir. 2013), *aff'd in part, rev'd in part on other grounds sub nom Kellogg Brown*, 135 S. Ct. at 1979 (2015); *United States ex rel. Branch Consultants v. Allstate Ins. Co.*, 560 F.3d 371, 377–78 (5th Cir. 2009). Yet others, in light of recent Supreme Court case law tightening the belt on jurisdiction-stripping provisions, read the first-to-file bar as "bear[ing] only on whether a *qui tam* plaintiff has properly stated a claim." *United States ex. rel. Hayes v. Allstate Ins. Co.*, 853 F.3d 80, 86 (2d Cir. 2017) (quoting *United States ex rel. Heath v. AT&T, Inc.*, 791 F.3d 112, 121 (D.C. Cir. 2015)); *see also Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 153 (2013); *Gonzalez v. Thaler*, 565 U.S. 134, 141-42 (2012) ("The Court has endeavored in recent years to 'bring some discipline' to the use of the term 'jurisdictional.'") (quoting *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434 (2011)).[4] Without a clear path from the U.S. Court of Appeals

---

[4] The U.S. Court of Appeals for the Tenth Circuit also appears to have changed its tune based on the recent Supreme Court tide, no longer steadfastly considering the first-

for the Eleventh Circuit,[5] the Court tags along with the Second and D.C. Circuits, who

have the better reading of the first-to-file bar as part of the 12(b)(6) inquiry, not 12(b)(1).

Having set those ground rules, the Court turns to the substance of this issue:

whether the first-to-file bar applies here. As it stands, this case faces the first-to-file bar

---

to-file bar jurisdictional as it once did. *Compare Grynberg v. Koch Gateway Pipeline Co.*, 390 F.3d 1276, 1278 (10th Cir. 2004), *with United States ex rel. Little v. Triumph Gear Sys., Inc.*, 870 F.3d 1242, 1246 (10th Cir. 2017), *cert denied*, 138 S. Ct. 1298 (2018).

[5] Yes, there is a dearth of Eleventh Circuit authority precisely analyzing whether the first-to-file bar is jurisdictional. In a tertiary manner, a 2008 case proceeded on the assertion that the first-to-file bar was jurisdictional, but the context was hazy. *See Makro Cap. of Am., Inc. v. UBS AG*, 543 F.3d 1254 (11th Cir. 2008). The issue on appeal was how the relation-back doctrine applied to a FCA claim, where the district court granted a motion to dismiss for lack of jurisdiction based on the now-repealed government knowledge bar and then denied a motion for reconsideration asserting jurisdiction by relating back an amended complaint to an original complaint with no FCA claim to get around the first-to-file bar. *Id.* at 1256–57. The Eleventh Circuit found that the relation-back doctrine could not apply to an original complaint devoid of a *qui tam* claim, so the first-to-file bar would bar the amended complaint, but the amended complaint also didn't meet the government knowledge requirement. *Id.* at 1258–60. Either way, the Eleventh Circuit found that the district court was right, so there was no exegetical examination of the jurisdictional nature of the first-to-file bar.

*Makro* hasn't been cited much by the Eleventh Circuit since issued, and when it has, it appears mostly in other contexts. Outside of *Makro*, the Eleventh Circuit hasn't touched this issue either. Two recent cases bear mention. In *Urquilla-Diaz v. Kaplan University*, at the motion to dismiss stage the district court classified a first-to-file bar challenge as jurisdictional but proceeded to analyze the sufficiency of the claims before the first-to-file bar. No. 09-20756-CIV, 2011 WL 3627285, at *3–9 (S.D. Fla. Aug. 17, 2011). Long story short, some claims proceeded to summary judgment and following final judgment, two relators appealed. *See* 780 F.3d 1039, 1043 (11th Cir. 2015). On appeal, the Eleventh Circuit followed suit by analyzing the sufficiency of the pleadings and the summary judgment, mentioning the first-to-file bar only to say that the district court declined to decide that issue. *Id.* at 1046.

Next, a 2018 case analyzing § 3731(b)(2)'s limitations period mentions the first-to-file bar in the context of other impediments to bringing a FCA claim, specifically the public disclosure bar, which, of course, is no longer jurisdictional. *See United States ex rel. Hunt v. Cochise Consultancy, Inc.*, 887 F.3d 1081, 1093 (11th Cir 2018). No jurisdictional language was mentioned there either. All of this is to say that the Eleventh Circuit hasn't spoken definitively on the topic, so the Court looks elsewhere.

from two others—the *O'Connor* Action and the *Lorona* Action. The *Lorona* Action is the first-filed: it was brought on August 5, 2015 while *O'Connor* was brought November 10, 2015. (*Lorona* Doc. 1; *O'Connor* Doc. 4.) Thus, if the first-to-file bar applies from *Lorona*, any related action would be subject to dismissal.[6] *See Wood*, 899 F.3d at 174; *Kellogg Brown*, 135 S. Ct. at 1978–79. So is the *Lorona* Action related?

Assessing relatedness is not rocket science; doing so requires "comparing the complaints side-by-side" to see whether "the claims [in the second action] incorporate 'the same material elements of fraud' as the earlier action, even if the allegations incorporate additional or somewhat different facts or information." *Heath*, 791 F.3d at 121 (quoting *United States ex. rel Hampton v. Columbia/HCA Healthcare Corp.*, 318 F.3d 214, 217 (D.C. Cir. 2003) (quoting *Lujan*, 243 F.3d at 1189)). This is not an incredibly searching inquiry, as Plaintiffs would have it. (*See* Doc. 88, pp. 7–12.) The Court need not sweepingly analyze the original complaint to determine whether a plausible claim is stated under Rules 12(b)(6) or (9)(b), or if any allegations are subject to the public disclosure bar. *See Wood*, 899 F.3d at 169–70 (finding no support in 3730(b)(5)'s text or purpose for that approach, which creates a "precarious dynamic"). *But see Walburn*, 431 F.3d at 972 (applying heightened pleading requirements in first-to-file bar analysis). Rather, the whole point of the first-to-file bar is to see "whether the later [filed] complaint 'alleges a fraudulent scheme the government already would be equipped to investigate

---

[6] Likely, had the *O'Connor* Action not been voluntarily dismissed, it would also have been subject to the first-to-file bar by *Lorona*. Thus, the Court does not consider the relatedness of Bernier's claims to *O'Connor*, despite InfiLaw and CSL's invitation. (Doc. 88, pp. 14–15.)

based on [the first] [c]omplaint.'" *Heath*, 791 F.3d at 121 (quoting *United States ex rel. Batiste v. SLM Corp.*, 659 F.3d 1204, 1209 (D.C. Cir. 2011) (first alteration added, second in original)). That is why the relevant complaints to consider are the *originals*—time is of the essence with FCA actions and only the true "whistleblower" should be rewarded, not copycats. *See Wood*, 899 F.3d at 137 ("The first-to-file bar ensures that only one relator shares in the Government's recovery and encourages potential relators to file their claims promptly."); *see also United States ex rel. Chovanec v. Apria Healthcare Grp. Inc.*, 606 F.3d 361, 365 (7th Cir. 2010) (reading § 3730(b)(5) "to specify only the materially similar situations that objectively reasonable readings of the original complaint, or investigations launched in direct consequence of that complaint, would have revealed").

That said, the Court finds the *Lorona* Action "related" to trigger the first-to-file bar here. The *Lorona* Action was brought on August 5, 2015 by a former employee and student at Arizona Summit who alleged four FCA claims against InfiLaw, CSL, Arizona Summit, and Florida Coastal. (*Lorona* Action, Doc. 1.) Uncannily, its complaint sketches the *exact same* fraudulent scheme by InfiLaw: that based on its practices and polices, the schools were ineligible for Title IV/HEA funding but submitted claims for payment anyway; the Government would not have doled out the funds had it known of the unlawful practices; ABA accreditation guidelines and standard were violated; and, the kicker, the schools violated their PPAs and falsely certified compliance with applicable regulations, statutes and accreditation guidelines. (*Id.* ¶¶ 226–67.) As factual support, the *Lorona* complaint generally identifies: (1) circumvention of DOE's 90/10 Rule; (2) deception involving ABA accreditation requirements; (3) fraudulently inducing students to enroll; and (4) a gaggle

of issues related to bar passage. (*Id.* ¶¶ 70–224.) These allegations are regurgitated in Bernier's original complaint, albeit directed to CSL instead of Arizona Summit. (*See* Doc. 1, ¶¶ 44–83.) Some details vary, of course, and Bernier includes some other allegations. But when it comes down to it, these complaints are incredibly similar and clearly related. *Cf. Wood*, 899 F.3d at 169. Thus, the first-to-file bar applies here, and supports dismissal of Bernier's FCA claims *without* prejudice. *See Wood*, 899 F.3d at 174; *Kellogg Brown*, 135 S. Ct. at 1978–79.

Were that the only dismissal argument before the Court, the inquiry could end there and Bernier would simply have to wait her turn to see if she could bring this action again following the completion of Lorona's. *Cf. Wood*, 899 F.3d at 174. But because this is Bernier's third attempt at stating plausible FCA claims—and she's tacked on other claims—the Court next considers whether her allegations suffice at all to continue this action.

## 2.    Rules 12(b)(6) and 9(b) Arguments

To state a claim for relief under the Federal Rules of Civil Procedure, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Allegations need not be set out in a "technical form," but they "must be simple, concise, and direct." Fed. R. Civ. P. 8(e)(1). Rule 8's pleading standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal,* 556 U.S. 662, 672, 679 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

When allegations are simply "labels or conclusions" or "a formulaic recitation of

the elements of a cause of action," the complaint will not survive a Rule 12(b)(6) motion to dismiss. *Twombly*, 550 U.S. at 555. To withstand such a motion, a plaintiff's allegations "must contain factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). Plausible claims must be founded on sufficient "factual content" to allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Factual allegations "'merely consistent with' a defendant's liability" are not facially plausible. *Id.* (quoting *Twombly*, 550 U.S. at 557).

When a claim arises under the FCA, "Rule 8's pleading standard is supplemented but not supplanted by Federal Rule of Civil Procedure 9(b)." *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1051 (11th Cir. 2015) (citing *United States ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1309–10 (11th Cir. 2002)). Rule 9(b) imposes a heightened pleading standard for allegations of fraud, requiring a party to "state with particularity the circumstances constituting fraud or mistake," while allowing scienter to "be alleged generally." Fed. R. Civ. P. 9(b). In the FCA context, "the relator has to allege 'facts as to time, place, and substance of the defendant's alleged fraud,' particularly, 'the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them.'" *Urquilla-Diaz*, 780 F.3d at 1051 (quoting *Clausen*, 290 F.3d at 1310 (quoting *Cooper*, 19 F.3d at 567–68)).

"Liability under the [FCA] arises from the submission of a fraudulent claim to the government, not the disregard of government regulations or failure to maintain proper internal procedures." *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1012 (11th Cir. 2005) (citing

*Clausen*, 290 F.3d at 1311). Where, as here, the FCA claim advances a "false certification theory," the relator must prove: "(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due." *Urquilla-Diaz*, 780 F.3d at 1045 (quoting *United States ex rel. Hendow v. Univ. of Phx.*, 461 F.3d 1166, 1174 (9th Cir. 2006)). Broken down, to satisfy Rule 9(b) for a claim of presentment under § 3729(a)(1)(A), "the relator must allege the 'actual presentment of a claim . . . with particularity,' meaning particular facts about 'the who, what, where, when, and how of fraudulent submissions to the government.'"[7] *Id.* at 1052 (quoting *Hopper v. Solvay Pharms.*, 588 F.3d 1318, 1326 (11th Cir. 2009); *Corsello*, 428 F.3d at 1014). To do the same for § 3729(a)(1)(B), "the relator has to allege with particularity that the defendant's false statements ultimately led the government to pay amounts it did not owe." *Id.* (quoting *Hooper*, 588 F.3d at 1329).

As outlined above, Bernier alleges three instances where CSL violated the PPA to factually support her two FCA claims. (Doc. 73, ¶¶ 78–94.) She claims that: (1) transferring and holding student loan funds at the beginning of the semester; (2) failing to have or follow a code of conduct prohibiting conflicts of interest with respect to Title IV financial aid; and (3) allowing students to review scanned pages of textbooks at the beginning of the semester constituted "material" violations of the PPA and Title IV

---

[7] The Eleventh Circuit in *Urquilla-Diaz* examined the 2006 version of the FCA that numbered sub-sections of § 3729 claims differently than the current version. *See* 780 F.3d at 1045 (quoting 2006 version). What was then § 3729(a)(1) is the equivalent to now § 3729(a)(1)(A), and what was § 3729(a)(2) is now § 3729(a)(1)(B). *Compare Urquilla-Diaz*, 780 F.3d at 1045, *with* §§ 3729(a)(1)(A)–(B).

eligibility requirements such that the government would not have provided CSL federal funds had it known about this conduct. (*Id.*) On review, these allegations blink in the face of Rule 9(b)'s stare down—taken as true, none establish that CSL's entry into and re-certifications of the PPA were false. *See Urquilla-Diaz*, 780 F.3d at 1055–57.

For starters, the SAC alleges facts surrounding the receipt and disbursement of student loan funding at the beginning of each semester. (Doc. 73, ¶¶ 78–87.) CSL's obligation was "to administer the loans, and once student enrollment statuses were confirmed, [CSL], as fiduciary, was then obligated under the PPA to deduct tuition and administrative fees owed and disburse the remaining balance." (*Id.* ¶ 81.) InfiLaw apparently abrogated this obligation by instructing CSL financial aid to transfer the funding to its own bank accounts until ready for disbursement at CSL—the course drop-add deadline. (*Id.* ¶ 82.) As a result, CSL's bank accounts were often low. (*Id.* ¶ 84.)

These allegations fail to establish that CSL's certification in its PPAs to serve as a fiduciary of federal funds and take responsibility for administering them was false. *See Urquilla-Diaz*, 780 F.3d at 1055. Bernier generally claims that InfiLaw did this for nefarious reasons, "effectively for use as a slush fund for [InfiLaw's] own purposes in the interim and while collecting interest," but provides no factual support for this. (Doc. 73, ¶ 82.) And based on the PPA Plaintiffs provide, simply gathering interest on federal funds is not problematic. (*See* Doc. 73-1, p. 3(b)(1) ("[A]n institution agrees that—[i]t will comply with . . . the requirement that the institution will use funds it receives under any Title IV, HEA program and any interest or other earnings thereon, solely for the purposes specified in and in accordance with that program."). Thus, all Bernier really says here is

that federal funds were transferred to CSL's corporate parent before CSL had to disburse them as required by the PPA. Absent more details, Bernier hasn't plausibly demonstrated this conduct violated the PPA and, even if it did, these facts do not establish that CSL's entry into and re-certifications of the PPA were false. *See Urquilla-Diaz*, 780 F.3d at 1055.

Next, Bernier points to a PPA provision requiring CSL to come up with a code of conduct regarding Title IV loans and inform those responsible accordingly. (Doc. 73, ¶ 88.) She then flatly alleges CSL violated this requirement by failing to have a code of conduct to prohibit conflicts of interest for those responsible for Title IV funds. (*Id.* ¶ 89.) That's all she says. She doesn't point to a specific conflict or offer any particulars concerning this allegation. Apparently from those two sentences—one that matter-of-factly states "[CSL] was not in compliance with Title IV"—the Court is supposed to surmise that fraud occurred? (*Id.*) This the Court cannot do. But the Court did search elsewhere in the SAC to find something to back up this claim, coming across an allegation that InfiLaw employees staff CSL's financial aid, which "creates a conflict of interest . . . as to improper trust accounting," without saying anything else on this topic. (*Id.* ¶ 41.) That doesn't help either. Vague, generalized assertions like so fail to support either FCA claim, as they provide no indication that the failure to include language concerning conflicts of interest violated the PPA requirement to establish a code of conduct, and that doing so means the initial PPA and re-certifications were false. *See Urquilla-Diaz*, 780 F.3d at 1055–56. So these allegations too fail to carry the day.

Last, and perhaps least, Bernier alleges CSL and InfiLaw violated copyright law by instructing faculty and staff to photocopy needed materials for students at the

beginning of the semester while they waited for their own textbooks to arrive. (Doc. 73, ¶¶ 90–94.) She claims this violated CSL's certification in the PPA to "implement a written plan to combat the unauthorized distribution of copyrighted material by users of the law school's network." (*Id.* ¶ 90.) How one goes with the other is beyond the Court's comprehension—there is no allegation that CSL lacked such a plan, or that a plan couldn't include the temporary provision of materials at the start of a semester. It would be one thing if CSL copied entire textbooks for their students, posted them online, printed them in course-packs, and charged for them. But this is a horse of a different color. Clearly, these allegations are not the least bit consistent with a violation of the PPA's requirement to enact a written plan combating misuse of copyrighted works, and do not come close to alleging that CSL's actions reach the submission of a false claim. These allegations fall short.

What's more, the SAC as a whole fails to plead with particularity facts to provide a plausible connection between these three alleged PPA violations and DOE's decision to award CSL federal funding—again. (*See* Doc. 71, pp. 18–19); *see also Urquilla-Diaz*, 780 F.3d at 1056. Rather, each set of factual allegations here fits the "disregard of government regulations or failure to maintain proper internal procedures" category—which does not suffice for FCA claims. *Corsello*, 428 F.3d at 1012. And as "[t]hree attempts at proper pleading are enough," *Urquilla-Diaz*, 780 F.3d at 1057, these FCA claims will be dismissed with prejudice as to Bernier.[8]

---

[8] Based on the Government's Notice (Doc. 14), this dismissal will be without prejudice with respect to the Government.

With the FCA claims taken care of, the Court shifts its attention to Bernier's two state-law claims.

## B.   Other State Law Claims

Invoking the Court's supplemental jurisdiction under 28 U.S.C. § 1367(a), the SAC asserts two never-before-seen state-law claims against InfiLaw and CSL: gross negligence and fraudulent inducement. (Doc. 73, ¶¶ 11, 131–46.) InfiLaw and CSL challenge their inclusion as: (1) not being part of the same "case or controversy" of the FCA claims; (2) abrogating the Court's deadline for amending pleadings and adding additional parties, as well as the scope of re-pleader allowed from the First Round Order; and (3) time barred and not pleaded properly. (Doc. 88, pp. 33–45.) The Court starts and ends with the 12(b)(1) jurisdictional attack.[9]

As it stands, the federal claims these state-law claims are supposedly tethered to have been dismissed, and no other jurisdictional basis is alleged. (*Cf.* Doc. 71, ¶¶ 3, 5, 6, 7 (no diversity jurisdiction would exist here because Plaintiffs and InfiLaw and CSL are citizens of the same states).) Even so, the Court has the power to hear state-law claims if the federal and state claims "derive from a common nucleus of operative fact . . .  such

---

[9] "Rule 12(b)(1) motions to dismiss for lack of subject matter jurisdiction can be asserted on either facial or factual grounds." *Carmichael v. Kellogg, Brown & Root Serv., Inc.*, 572 F.3d 1271, 1279 (11th Cir. 2009). On factual attack, the trial court is free to consider matters outside the pleadings—such as testimony and affidavits—in order to determine whether it has the power to hear the case. *See Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990). Here, because InfiLaw and CSL's exhibits are not aimed at jurisdiction, the Court assumes their attack is facial. (*See* Docs. 88-1–88-7.) "On a facial attack, a plaintiff is afforded safeguards similar to those provided in opposing a Rule 12(b)(6) motion—the court must consider the allegations of the complaint to be true." *Lawrence*, 919 F.2d at 1529.

that [the plaintiff] would ordinarily be expected to try them all in one judicial proceeding." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966).

If such power exists, the Court can then decide whether to exercise it based on "considerations of judicial economy, convenience and fairness to litigants," and "as a matter of comity" to avoid "[n]eedless decisions of state law." *Id.* at 726. "When the balance of these factors indicates that a case properly belongs in state court, as when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988) (citing *Gibbs*, 383 U.S. at 726–27).

Now, the two state-law claims here are for gross negligence and fraudulent inducement. (Doc. 73, ¶¶ 131–46.) For gross negligence, Bernier alleges that the circumstances undergirding her FCA claims equate to "an imminent or clear and present danger" exceeding "normal peril." (*Id.* ¶ 132.) She contends that she was duped into teaching at CSL as part of this fraudulent scheme to drum up more federal funds. (*Id.* ¶¶ 133, 135.) In turn, that deceit forms the basis for her fraudulent inducement claim. (*Id.* ¶¶ 137–46.)

As pleaded, the Court finds that these two claims do form part of the same case or controversy as the FCA claims, namely whether InfiLaw and CSL committed fraud by any means necessary, including recruiting Bernier. So these claims arise from the same event, and the Court has power to hear them. *See* 28 U.S.C. § 1367(a); *cf. Palmer v. Hosp. Auth. of Randolph Cty.*, 22 F.3d 1559, 1563–64, 1566–68 (11th Cir. 1994).

That doesn't mean the Court will hear them. "Section 1367(c) gives a court *discretion* to dismiss a supplemental claim or party when 'the district court has dismissed all claims over which it has original jurisdiction.'" *Id.* at 1568 (quoting § 1367(c)(3)). Discretionary dismissal is especially apposite "if the federal claims are dismissed before trial." *Gibbs*, 383 U.S. at 726; *Mergens v. Dreyfoos*, 166 F.3d 1114, 1119 (11th Cir. 1999). Such is the case here, and the Court finds no compelling reason to keep these claims. Indeed, they are the freshest, just added in the SAC,[10] so no momentum is lost in jettisoning them at this point. Thus, Counts IV and V will be dismissed without prejudice.

Four claims disposed of, the Court turns its attention to the fifth, the sole claim to include Love that is against the ABA. (Doc. 73, ¶¶ 120–30.)

### III.   ABA MTD

Count III of the SAC alleges a negligence claim against the ABA for accrediting CSL. (*Id.*) The ABA MTD raises three dismissal grounds: 12(b)(1), 12(b)(2), and 12(b)(6). (Doc. 86.) Like before, the Court need not go further than the 12(b)(1) motion.

For subject matter jurisdiction over the negligence claim, Plaintiffs again look to supplemental jurisdiction under 1367(a), with no allegations of original jurisdiction over this claim contained in the SAC. (Doc. 73, ¶ 11.) The ABA contests this, arguing the claim

---

[10] As an aside, the Court absolutely and undoubtedly finds these claims were improperly affixed to the SAC. Nothing in the First Round Order remotely intimated that Bernier's next round of pleading was a free-for-all to bring all claims under the sun. For Plaintiffs to state otherwise—telling this Court that it "modified its scheduling order" giving "leave" to add parties and pleadings (Doc. 98, p. 20), when the entire Order focused on Bernier's pleading errors and culminated in dismissal of all claims for specific, articulated reasons—is beyond the pale.

arises from different facts and its resolution will turn on separate evidence. (Doc. 88, pp. 13–14.) Whether this is so presents a trickier question than before—at this stage, the ABA is a pendent party, swept into this litigation last-minute for one claim of negligence. *Cf. Moor v. Alameda Cty.*, 411 U.S. 693, 713 (1973) (discussing pendent party problems). As such, the Court declines to reach the issue of its power to hear this claim, and will instead exercise its discretion to decline supplemental jurisdiction here. *See id.* at 715; *see also Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 585 (1999) ("[D]istrict courts do not overstep Article III limits when they decline jurisdiction of state-law claims on discretionary grounds without determining whether those claims fall within their pendent jurisdiction.") (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 100 n.3 (1998) (citing *Moor*, 411 U.S. at 715–16)). This is because no federal claim will continue here and Plaintiffs' claim against the ABA, like the other state-law claims, just arrived. That means it's early enough to remove this claim without unduly burdening the parties. Plus, the claim presents a pretty run-of-the-mill negligence question; it's not wrapped up in a federal issue that would lean in favor of resolution by a federal court. *See Gibbs*, 383 U.S. at 727 (the argument for exercising pendent jurisdiction is "particularly strong" in "situations in which the state claim is so closely tied to questions of federal policy"). The factors thus support separate resolution of this claim elsewhere, so it will be dismissed without prejudice.

## IV.   Conclusion

Pleading gauntlet run, it is **ORDERED AND ADJUDGED** as follows:

1.   ABA Defendants' Motion to Dismiss the Second Amended Complaint and

Supporting Memorandum of Law (Doc. 86) is **GRANTED IN PART AND DENIED IN PART**:

    a.      Count III is **DISMISSED WITHOUT PREJUDICE** as the Court discretionarily declines to exercise supplemental jurisdiction over this claim.

    b.      In all other aspects, this Motion is **DENIED**.

2.      Defendants InfiLaw Corporation and Charlotte School of Law, LLC's Motion to Dismiss Second Amended Complaint and Supporting Memorandum of Law (Doc. 88) is **GRANTED IN PART AND DENIED IN PART**:

    a.      Counts I and II are **DISMISSED WITH PREJUDICE** as to Bernier; **WITHOUT PREJUDICE** as to the Government.

    b.      Counts IV and V are **DISMISSED WITHOUT PREJUDICE** as the Court discretionarily declines to exercise supplemental jurisdiction over them.

    c.      In all other aspects, this Motion is denied.

3.      This case is **CLOSED.** The Clerk is **DIRECTED TO TERMINATE** any pending deadlines and motions and **CLOSE** the file.

**DONE AND ORDERED** in Chambers in Orlando, Florida, on November 8, 2018.



ROY B. DALTON JR.
United States District Judge

Copies to:
Counsel of Record